**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EMERGENCY COALITION TO DEFEND, EDUCATIONAL TRAVEL ("ECDET"); WAYNE S. SMITH; JOHN W. COTMAN; JESSICA KAMEN; ADNAN AHMAD,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY; HENRY M. PAULSON, JR., Secretary of the United States Department of the Treasury; THE OFFICE OF FOREIGN ASSETS CONTROL; ADAM J. SZUBIN, Director of the Office of Foreign Assets Control,<br><br>        Defendants.[1] | )<br>)<br>)<br>)<br>)<br>)  Case No. 1:06-CV-01215<br>)  Judge Ellen S. Huvelle<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

<u>**DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**</u>

Pursuant to Rules 12 and 56 of the Federal Rules of Civil Procedure, Defendants hereby respectfully move this Court to dismiss this case, or in the alternative, to grant summary judgment in favor of Defendants.  The reasons for this motion are set forth in the accompanying Memorandum of Law in Support of Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

_____

[1]  Pursuant to Federal Rule of Civil Procedure 25(d), Henry M. Paulson, Jr., in his official capacity as the Secretary of the United States Department of the Treasury, substitutes for John W. Snow, and Adam J. Szubin, in his official capacity as Director of the Office of Foreign Assets Control, substitutes for Barbara Hammerle.

JEFFREY A. TAYLOR
United States Attorney

By:   /s/ Hannah Y.S. Chanoine
      SANDRA M. SCHRAIBMAN
      Assistant Branch Director, Civil Division
      HANNAH Y.S. CHANOINE
      Trial Attorney
      U.S. Department of Justice
      Civil Division
      Mailing Address
      P.O. Box 883
      Washington, DC  20044
      Delivery Address
      20 Massachusetts Avenue, NW, Rm 7340
      Washington, DC  20001
      Telephone:  (202) 305-2318
      Facsimile:  (202) 616-8202
      E-mail: hannah.chanoine@usdoj.gov
      *Counsel for Defendants*

Dated:  February 2, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| EMERGENCY COALITION TO DEFEND, | ) | |
| EDUCATIONAL TRAVEL ("ECDET"); WAYNE | ) | |
| S. SMITH; JOHN W. COTMAN; JESSICA | ) | |
| KAMEN; ADNAN AHMAD, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:06-CV-01215 |
| | ) | Judge Ellen S. Huvelle |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF THE | ) | |
| TREASURY; HENRY M. PAULSON, JR., | ) | |
| Secretary of the United States Department of the | ) | |
| Treasury; THE OFFICE OF FOREIGN | ) | |
| ASSETS CONTROL; ADAM J. SZUBIN, | ) | |
| Director of the Office of Foreign Assets Control, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 7.1(h), Defendants submit this statement of material facts as to

which there is no genuine issue:

**Background of the Parties**

1.     The Office of Foreign Assets Control ("OFAC") is the office within the Department of

the Treasury ("Treasury") that is principally responsible for administering United States

economic sanctions programs to implement U.S. foreign policy and national security

goals.  Declaration of Adam J. Szubin, Director of OFAC ("Szubin Decl.") ¶¶ 4, 5.

2.     OFAC has been delegated authority under the Trading With the Enemy Act ("TWEA"),

50 U.S.C. App. §§ 1-44, to regulate transactions in which Cuba or a Cuban national has

1

an interest.  *See* Szubin Decl. ¶¶ 4, 6-9, 11.

3.      Plaintiff ECDET characterizes itself as "a coalition of higher academic professionals who

are affiliated, in academic capacities, with accredited colleges and universities across the

United States.  Compl. ¶ 4.  ECDET's membership does not include academic

institutions, but only individual academics.  *See id.*

http://www.ecdet.org/members.htm#4, last visited Feb. 2, 2007.

4.      Plaintiff Wayne Smith is a part-time employee of Johns Hopkins University.  *See* Compl.

¶¶ 5, 24(iii).

5.      Plaintiff John Cotman is employed by Howard University.  *See* Compl. ¶ 6.

6.      Plaintiff Jessica Kamen alleges that she is an undergraduate student at Johns Hopkins

University, scheduled to graduate in 2007.  *See* Compl. ¶ 7.

7.      Plaintiff Adnan Ahmad is an undergraduate student at Johns Hopkins University, who

alleges that he expects to graduate in 2007.  *See* Compl. ¶ 8.  Ahmad has already traveled

to Cuba through Johns Hopkins University's Cuba Exchange program, spending two

weeks in Cuba during the winter, and receiving three semester hours for the two week trip

towards his undergraduate degree.  *Id.*

## General Background of the Regulation of Educational Travel under the CACR

8.      A major purpose of the embargo has been to deny the Castro government hard currency

which could be used for purposes inimical to the interests of the United States.  *See*

Szubin Decl. ¶ 14.

9.      The Cuban Asset Control Regulations, ("CACR") have long restricted transactions

involving travel to Cuba, including educational travel to Cuba.  *See* Szubin Decl. ¶ 14.

2

10. The government's policy regarding permitted travel transactions has evolved over the course of the embargo to reflect changing international developments and different Administration policies.  *See* Szubin Decl. ¶ 14.

11. Significant changes to the Regulations with regard to educational travel regarding Cuba have occurred over the past three decades.  *See* Szubin Decl. ¶ 14.

### The 2004 Amendments to 31 C.F.R. § 515.565

12. On October 10, 2003, President Bush established an inter-agency Commission for Assistance to a Free Cuba ("CAFC I" or "the Commission").  *See* Szubin Decl. ¶ 15; President George W. Bush, Rose Garden Speech (Oct. 10, 2003), available at http://www.whitehouse.gov/news/releases/2003/10/20031010-2.html, *last visited* Jan. 4, 2007.

13. Among the purposes of the Commission was to identify ways to hasten the arrival of Cuba's peaceful transition from a dictatorship to a free and open society.  *See* Szubin Decl. ¶ 15; President George W. Bush, Rose Garden Speech (Oct. 10, 2003), available at http://www.whitehouse.gov/news/releases/2003/10/20031010-2.html, *last visited* Jan. 4, 2007; *see also* http://www.state.gov/p/wha/rt/cuba/c12238.htm, *last visited* Jan. 4, 2007

14. The Commission's report ("the CAFC I Report" or "the Report"), was released to the public on May 6, 2004.  *See* Szubin Decl. ¶ 15;  Comm'n for Assistance to a Free Cuba, Report to the President (2004), available at http://www.state.gov/p/wha/rt/cuba/commission/2004/, *last visited* Jan. 4, 2007.

15. In a section of Chapter 1 of the Report discussing the denial of revenues to the Castro regime, the Report identified tourism as one of the regime's economic lifelines and Cuba's

single largest revenue source.[1]  Administrative Record ("AR") (dkt. no. 7) at 41, 61-62;

*see* Szubin Decl. ¶ 16.

16.     In discussing the educational travel program in place at that time under the CACR, which

included short-term licenses for structured educational activities, the Report also stated

that "[i]n practice, while there are well-meaning participants who use this license category

as intended, other travelers and academic institutions regularly abuse this license category

and engage in a form of disguised tourism."  AR at 63; *see* Szubin Decl. ¶ 16.  The Report

went on to state that

> Many institutions use Cuba "study-tour programs" to generate revenues for other
> programs and most accept students not enrolled in their institution.  A large
> number of programs are for a short duration, allow for limited interaction with the
> Cuban people, and include lengthy unscheduled time periods to permit largely
> tourist activities to be accomplished.  Such travel does not promote a genuinely
> free exchange of ideas between Cubans and American students.  Evidence
> indicates that the majority of visits by U.S. students are organized by or
> coordinated through Cuban state travel and tour entities, are highly controlled by
> Cuban state security officials, and allow for only limited interaction with the
> average Cuban citizen.  Moreover, the regime has often used the visits by U.S.
> education groups to cultivate the appearance of international legitimacy and
> openness to the exchange of ideas.

AR at 63; *see* Szubin Decl. ¶ 16.

17.     The CAFC Report made the following recommendation to the President:

> Eliminate abuses of educational travel by limiting educational travel to only
> undergraduate or graduate degree granting institutions and only for full-semester
> study programs, or for shorter duration only when the program directly supports
> U.S. policy goals; requiring that the travelers be enrolled in a full-time course of
> study at the licensed institution; and requiring that educational institutional licenses
> be renewed annually, rather than bi-annually, to allow for improved enforcement of
> OFAC regulations.

---

[1]  Chapter 1 of the Report, AR 39-85, is excerpted in an appendix to Defendants' Motion
to Dismiss, or in the Alternative, Motion for Summary Judgment.

AR at 65; *see* Szubin Decl. ¶ 16.

18.    In response to the President's directive, OFAC modified several portions of the
Regulations to incorporate the recommendations of the CAFC Report, including those
pertaining to educational travel.  See 69 Fed. Reg. 33768 (June 16, 2004).  Section
515.565 was modified to remove the authorization for certain educational activities
involving Cuba by secondary schools.  *Id.* at 33769.  The duration of a license issued to an
accredited college or university under this section was shortened from two years to one.
*Id.* at 33769-70.  The June 16, 2004 amendments also modified section 515.565 to require
that any student utilizing an institution's license to study in Cuba be enrolled in an
undergraduate or graduate degree program at that institution, and clarified that employees
traveling under an institution's license must be full-time permanent employees of the
licensed institution.  *Id.* at 33770.  Additionally, section 515.565 was amended to require
that the following three types of educational activity in Cuba be no shorter than 10 weeks
in duration:  (1) structured educational programs in Cuba offered as part of a course at the
licensed institution; (2) formal courses of study at Cuban academic institutions; and, (3)
teaching at a Cuban academic institution.  *Id.*; *see also* Szubin Decl. ¶ 17.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

By:    /s/ Hannah Y.S. Chanoine
SANDRA M. SCHRAIBMAN
Assistant Branch Director, Civil Division

5

HANNAH Y.S. CHANOINE
Trial Attorney
U.S. Department of Justice
Civil Division
Mailing Address
P.O. Box 883
Washington, DC  20044
Delivery Address
20 Massachusetts Avenue, NW, Rm 7340
Washington, DC  20001
Telephone:  (202) 305-2318
Facsimile:  (202) 616-8202
E-mail: hannah.chanoine@usdoj.gov
*Counsel for Defendants*

Dated: February 2, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EMERGENCY COALITION TO DEFEND,  )
EDUCATIONAL TRAVEL ("ECDET"); WAYNE  )
S. SMITH; JOHN W. COTMAN; JESSICA  )
KAMEN; ADNAN AHMAD,  )
                                      )
        Plaintiffs,  )  Case No. 1:06-CV-01215
                                        )  Judge Ellen S. Huvelle
        v.  )
                                        )
UNITED STATES DEPARTMENT OF THE  )
TREASURY; HENRY M. PAULSON, JR.,  )
Secretary of the United States Department of the  )
Treasury; THE OFFICE OF FOREIGN  )
ASSETS CONTROL; ADAM J. SZUBIN,  )
Director of the Office of Foreign Assets Control,  )
                                      )
        Defendants.  )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS,**
**OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      Trading With the Enemy Act (TWEA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     The Cuban Assets Control Regulations (CACR) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      *CACR Travel Restrictions, Generally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.      *Educational Travel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        C.      *The 2004 Rulemaking Responding to Changed U.S. Foreign Policy* . . . . . . . . . . 8

                1.      The Commission for Assistance to a Free Cuba (CAFC I) . . . . . . . . . . . . . . 8

                2.      THE 2004 AMENDMENTS TO 31 C.F.R. § 515.565 . . . . . . . . . . . . . . . . . . . . . 10

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                1.      Nature of Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                2.      Nature of Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.      Standard for Motion to Dismiss for Lack of Subject Matter Jurisdiction . . . . . . . . . . . 15

II.     Standard for Motion to Dismiss for Failure to State a Claim . . . . . . . . . . . . . . . . . . . 15

III.    Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.    This Action Should Be Dismissed for Lack of Subject Matter Jurisdiction . . . . . . . . . 16

        A.      *Standing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                1.      CONSTITUTIONAL LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                2.      PRUDENTIAL LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B.    *Plaintiffs Have Not Established Injury-in-Fact* . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C.    *Plaintiffs Have Not Established Redressability* . . . . . . . . . . . . . . . . . . . . . . . . . 22

D.    *Plaintiffs Seek To Assert the Rights and Interests of Third Parties* . . . . . . . . . . 24

IV.    Plaintiffs' APA Claims are Meritless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A.    *A Deferential Standard of Review Applies to Defendants' Action* . . . . . . . . . . 26

B.    *OFAC Validly Exercised TWEA's Economic Sanctions Powers* . . . . . . . . . . . . 29

C.    *OFAC Reasonably Interpreted TWEA as Authorizing Regulation of Educational Travel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

V.    Plaintiffs Have Not Been Deprived of First Amendment Rights . . . . . . . . . . . . . . . . . 34

A.    *Travel Restrictions Under the Cuban Embargo Have Long Withstood First Amendment Challenges* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

B.    *The First Amendment and the Scope of its Protection of "Academic Freedom"* 36

C.    *31 C.F.R. § 515.565 is Content and Viewpoint Neutral* . . . . . . . . . . . . . . . . . . 39

D.    *Even if The Regulation Incidentally Burdens Plaintiffs' First Amendment Rights, Depriving The Castro Dictatorship of Tourism Revenues is an "Important or Substantial Government Interest"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1.    Any Intrusion Into First Amendment Rights is Only Incidental to the Purpose of 31 C.F.R. § 515.565 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

2.    31 C.F.R. § 515.565 Survives Intermediate Scrutiny . . . . . . . . . . . . . . 41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**TABLE OF AUTHORITIES**

**CASES**                                                                 **PAGE(S)**

Allen v. Wright, 468 U.S. 737 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Asociacin de Educacin Privada de Puerto Rico,
    Inc. v. Echavarra-Vargas, 385 F.3d 81 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 38

Barrows v. Jackson, 346 U.S. 249 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Broadrick v. Oklahoma, 413 U.S. 601 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 25

Camp v. Pitts, 411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Capital Cities/ABC, Inc. v. Brady,
    740 F. Supp. 1007 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 39, 41, 43

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Cf. State Highway Comm'n v. Volpe,
    479 F.2d 1099 (8th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Clifford v. Pena, 77 F.3d 1414 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Consarc Corp. v. U.S. Treasury Dept., Office of Foreign
    Assets Control, 71 F.3d 909 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30

Crooker v. Bureau of Alcohol, Tobacco & Firearms,
    670 F.2d 1051 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Dames & Moore v. Regan, 453 U.S. 654 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Dep't of the Treasury v. FLRA, 494 U.S. 922 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

EEOC v. St. Francis Xavier Parochial Sch.,
    117 F.3d 621, 624 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Epperson v. Arkansas, 393 U.S. 97 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

Farrakhan v. Reagan, 669 F. Supp 506 (D.D.C. 1987),
    *aff'd*, (table) 851 F.2d 1500 (C.A.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 43

Fed. Express Corp. v. Airline Pilots Ass'n,
    67 F.3d 961 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. for Am. Immigration Reform, Inc. v. Reno,
    897 F. Supp. 595 (D.D.C. 1995),
    *aff'd*, 93 F.3d 897 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fla. Power & Light Co. v. Lorion, 470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Fla. Public Telecomm. Ass'n v. F.C.C.,
    54 F.3d 857 (D.C.Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Freedom to Travel Campaign v. Newcomb,
    82 F.3d 1431 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fund For Animals v. Norton, 374 F. Supp. 2d 91 (D.D.C. 2005),
    *aff'd on other grounds*, --- F.3d ----, 2006 WL 3687107
    (D.C. Cir. Dec. 15, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

George Washington Univ. v. Dist. of Columbia,
    318 F.3d 203 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Haig v. Agee, 453 U.S. 280, 306 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Harrisiades v. Shaughnessy, 342 U.S. 580 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Helms v. Sec'y of the Treasury, 721 F. Supp. 1354 (D.D.C. 1989) . . . . . . . . . . . . . . . . . . . . 11

Herbert v. Nat'l Acad. of Scis., 974 F.2d 192 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 15

Holly Farms Corp. v. NLRB, 517 U.S. 392 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Holly Land Found. For Relief and Dev. v. Ashcroft,
    333 F.3d 156 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 40

Islamic Am. Relief Agency v. Unidentified FBI Agents,
    394 F. Supp. 2d 34 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

Johnson-Kurek v. Abu-Absi, 423 F.3d 590 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 21, 38

Kaempe v. Myers, 367 F.3d 958 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Kent v. Dulles, 357 U.S. 116, 125 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Keyishian v. Bd. of Regents of Univ. of N.Y.,
    385 U.S. 589 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

Kowalski v. Tesmer, 543 U.S. 125 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 25

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Miranda v. Secretary of Treasury, 766 F.2d 1 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 3

Monahan v. Dorchester Counseling Ctr.,
    961 F.2d 987 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,
    125 S. Ct. 2688 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Nat'l Treasury Employees Union v. Horner,
    854 F.2d 490 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Nat'l Treasury Employees Union v. United States,
    101 F.3d 1423 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Nat'l Wrestling Coaches Assoc. v. Dep't of Educ.,
    366 F.3d 930 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24

Natural Res. Def. Council v. EPA, 464 F.3d 1 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . 18, 19

Nielsen v. Sec'y of Treasury, 424 F.2d 833 (D.C. Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . 29

Nova Univ. v. Educ. Inst. Licensure Comm'n,
    483 A.2d 1172 (D.C. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40

Palestine Info. Office v. Shultz, 853 F.2d 932 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 27

Parradissiotis v. United States, 304 F.3d 1271 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 29

Pauley v. BethEnergy Mines, Inc., 501 U.S. 680 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Powers v. Ohio, 499 U.S. 400 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Propper v. Clark, 337 U.S. 472 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 43

Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Regan v. Wald, 468 U.S. 222 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Regions Hosp. v. Shalala, 522 U.S. 448 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Renne v. Geary, 501 U.S. 312 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Rust v. Sullivan, 500 U.S. 173 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Schrier v. Univ. of Colo., 427 F.3d 1253 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . .  37

Sec'y of State of Md. v. Joseph H. Munson Co., Inc.,
    467 U.S. 947 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

See also Haig v. Agee, 453 U.S. 280 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

See EEOC v. St. Francis Xavier Parochial Sch.,
    117 F.3d 621 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Shelton v. Tucker, 364 U.S. 479 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36, 37

Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26 (1976) . . . . . . . . . . . . . . . . . . . . . . .  17, 22

Singleton v. Wulff, 428 U.S. 106 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

Sweezy v. New Hampshire, 354 U.S. 234 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Teague v. Reg'l Comm'r of Customs,
    404 F.2d 441 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Trojan Tech., Inc. v. Pennsylvania,
    916 F.2d 903 (3rd Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

United States v. Haggar Apparel Co.,
    526 U.S. 380 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

United States v. O'Brien, 391 U.S. 367, 376 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Univ. of Pa. v. EEOC, 493 U.S. 182 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36, 37, 38

Urofsky v. Gilmore, 216 F.3d 401 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 36, 38
Valley Forge Christian College v. Am. United for Separation
    of Church and State, Inc., 454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Walsh v. Brady, 927 F.2d 1229 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ward v. Rock Against Racism, 491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Warth v. Seldin, 422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Whitehill v. Elkins, 389 U.S. 54 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

Yang v. Cal. Dept. of Soc. Serv.,
        183 F.3d 953 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Zemel v. Rusk, 381 U.S. 1 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

## STATUTES

31 C.F.R. § 515.201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

31 C.F.R. § 515.560(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

31 C.F.R. § 515.563 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

31 C.F.R. § 515.565 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

31 C.F.R. § 515.802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

50 U.S.C. App. §5(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 U.S.C. App. § 5(b)(4) (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

50 U.S.C. § 1701 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

69 Fed. Reg. 33768-74 (June 16, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## LEGISLATIVE MATERIALS

Administrative Procedure Act (APA), 5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Act of Oct. 6, 1917, ch. 106, 40 Stat. 411 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Act of March 9, 1933, ch. 1, 48 Stat. 411 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Cuban Democracy Act of 1992, 22 U.S.C. § 6001 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        Cuban Liberty Democratic Solidarity (Libertad)

Act of 1996, 22 U.S.C. § 6021 *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Determination No. 2006-23, 71 Fed. Reg. 54399
    (Sept. 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Exec. Order. No. 9193, 7 Fed. Reg. 5205, 3 C.F.R. §§ 1174,
    1175 (July 6, 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Exec. Order No. 12854, 58 Fed. Reg. 36587 (July 4, 1993) . . . . . . . . . . . . . . . . . . . . . . 4

Export Administration Act of 1979, 50 U.S.C. App. §§ 2404, 2405 . . . . . . . . . . . . . . . . . 5

Fed. R. Civ. P. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

H.R. Conf. Rep. 103-482, at 239-240 (1994), *reprinted in* 1994
    U.S.C.C.A.N. 398, 483 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Proclamation 3447 of February 3, 1962, 27 Fed. Reg. 1085 (1962) . . . . . . . . . . . . . . . . . 3

Pub. L. No. 95-223, § 101(b), 91 Stat. at 1625 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pub. L. No. 95-223, § 101(a), 91 Stat. 1625, 1625 (1977) . . . . . . . . . . . . . . . . . . . . . . . . 3

Pub. L. No. 103-236, § 525(b), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

Pub. L. No. 100-418, § 2502(a), 102 Stat. 1107, 1371 (1988) . . . . . . . . . . . . . . . . . . . . 4

Pub. L. No. 103-236, § 525(b), 108 Stat. 382 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Title II, Pub. L. No. 95-223, 91 Stat. 1626 *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

TWEA, 50 U.S.C. App § 5(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

INTRODUCTION

For more than forty years, the United States has levied a comprehensive trade embargo against Cuba pursuant to the Trading with the Enemy Act ("TWEA").  Over the decades, Congress and nine Presidents have tailored the Cuba embargo – including limitations on educational travel – to fit the complexities of evolving United States foreign policy.  The Office of Foreign Assets Control ("OFAC"), an agency within the Department of the Treasury, is responsible for implementing the Cuban Assets Control Regulations ("CACR"), which embody the embargo's current terms and restrictions.  In 2004, in response to changed foreign policy, OFAC amended 31 C.F.R. § 515.565, the regulation governing educational activities in Cuba.

Specifically, OFAC implemented certain recommendations by a Presidential Commission responsible for examining United States foreign policy with respect to Cuba.  The Commission analyzed tourism as Cuba's single largest source of revenues, of which a substantial percentage flows directly into the regime.  The Commission also described the wide-spread effects of short-term academic travel licenses issued to academic institutions as tantamount to disguised tourism.  While acknowledging that well meaning participants did use the educational licenses as intended, overall, these travel licenses subverted the Cuban embargo's central objective of depriving the Castro regime of hard currency and even contributed to the regime's bid for international legitimacy.  When the President directed OFAC to implement certain recommendations in the Commission's report, therefore, OFAC needed to balance two important policy objectives: (1) to eliminate a practice that was undermining the embargo's purpose of isolating the dictatorship economically, and (2) to promote civil society by continuing to foster a free exchange of ideas between American students and professors and members of Cuban society.  OFAC responded by amending its regulation to

1

curtail short-term educational travel, and by restricting licenses to those academic institutions electing to hold full-term educational programs in Cuba, taught to the institutions' own enrolled students, and taught by their own full-time faculty.

Plaintiffs, comprised of academics, professors, and undergraduate students – but notably, no educational institutions – challenge the 2004 rulemaking under the Administrative Procedure Act, the First Amendment, and the Fifth Amendment. Because their claims are meritless, this Court should dismiss them for failure to state a claim or, in the alternative, grant Defendants summary judgment. This Court lacks subject matter jurisdiction, because Plaintiffs lack both constitutional and prudential standing to press their claims. Further, OFAC acted fully within the broad Congressional grant of the President's TWEA authority and the President's inherent authority. The regulation rationally relates to that statute's purpose, and in light of the foreign affairs context, OFAC is entitled to great deference. The rulemaking did not deprive Plaintiffs of rights secured by the First Amendment, because it is a content and viewpoint neutral regulation. Even if the regulation incidentally burdens Plaintiffs' First Amendment rights, diminishing the flow of tourism revenues into the Cuban regime is an important and substantial government interest justifying the regulation. Finally, the Supreme Court has repeatedly upheld embargo-related travel restrictions against claims that they violate liberty interests secured by the Due Process clause of the Fifth Amendment.

<u>STATUTORY AND REGULATORY BACKGROUND</u>

## I.    Trading With the Enemy Act (TWEA)

Section 5(b) of TWEA, 50 U.S.C. App § 5(b)(1), broadly authorizes the President, through a designated agency, to "investigate, regulate, . . . prevent or prohibit, any . . . use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or . . . transactions involving,

2

any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. App. § 5(b)(1)(B). As originally enacted in 1917, TWEA authorized the use of specified economic powers only during times of war. Act of Oct. 6, 1917, ch. 106, 40 Stat. 411; *see also Miranda v. Secretary of Treasury*, 766 F.2d 1, 3 (1st Cir. 1985). In 1933, Congress extended the President's TWEA powers to apply to peacetime national emergencies. Act of March 9, 1933, ch. 1, 48 Stat. 411. In 1977, Congress amended section 5(b) to eliminate the authority of the President to act pursuant to TWEA during "period[s] of national emergency." Pub. L. No. 95-223, § 101(a), 91 Stat. 1625, 1625 (1977).[1] Mitigating this amendment, however, was a "grandfather clause," which empowered the President to continue to exercise his authority under section 5(b) with respect to any country that was subject to sanctions on July 1, 1977, including Cuba. Pub. L. No. 95-223, § 101(b), 91 Stat. at 1625. *See generally, Regan v. Wald*, 468 U.S. 222, 244 (1984) (upholding Cuban embargo under grandfather clause). To do so, the President must annually determine that extending the relevant sanctions "is in the national interest of the United States." Pub. L. No. 95-223, § 101(b), 91 Stat. at 1625; *Regan*, 468 U.S. at 229.

In 1962, in response to the expropriation of U.S. property in Cuba and other acts by the Castro regime deemed antagonistic to the interests of this country, President Kennedy exercised his TWEA authority and imposed an embargo on all trade with Cuba. See Proclamation 3447 of February 7, 1962, 27 Fed. Reg. 1085 (1962). Pursuant to the grandfather clause, Presidents have

---

[1] In the same 1977 bill, Congress enacted the International Emergency Economic Powers Act ("IEEPA"), which governs the President's peacetime exercise of emergency economic powers. *See* Title II, Pub. L. No. 95-223, 91 Stat. 1625 *et seq.*, codified at 50 U.S.C. § 1701 *et seq.* The authorities granted to the President by section 203 of IEEPA are substantially similar to those in section 5(b) of TWEA. *Regan v. Wald*, 468 U.S. 222, 227-28, 228 n.8 (1984).

annually, since 1978, determined that it is in the national interest to continue the exercise of

emergency powers with respect to Cuba. *See, e.g.,* Determination No. 2006-23, 71 Fed. Reg. 54399

(Sept. 13, 2006) (most recent renewal of the President's TWEA authority to continue economic

sanctions against Cuba); *see also Regan*, 468 U.S. at 229; *Walsh v. Brady*, 927 F.2d 1229, 1230

(D.C. Cir. 1991).[2]  The President has delegated his authority under TWEA to the Secretary of

Treasury.  In delegating his TWEA powers, the President has authorized the Secretary of the

Treasury to take such actions, including the issuing of rules and regulations, as may be necessary to

carry out TWEA's purposes. *See, e.g.*, Exec. Order No. 12854, 58 Fed. Reg. 36587 (July 4, 1993).

The Secretary, in turn, has delegated his authority to OFAC to administer the Cuban Assets Control

Regulations ("CACR"), 31 C.F.R. Part 515, which were promulgated under TWEA § 5(b) and

embody the embargo's current terms and restrictions. *See, e.g.*, Exec. Order. No. 9193, 7 Fed. Reg.

5205, 3 C.F.R. §§ 1174, 1175 (July 6, 1942); 31 C.F.R. § 515.802.

    In 1988, in what is commonly styled the "Berman Amendment," Congress amended TWEA

to exempt the import and export of certain informational materials from regulation, such as films,

posters, and photographs.  Pub. L. No. 100-418, § 2502(a), 102 Stat. 1107, 1371 (1988) (codified

at 50 U.S.C. App. § 5(b)(4) (1988)); *see Walsh*, 927 F.2d at 1230.  In a 1994 amendment entitled

"Free Trade in Ideas," Congress expanded the category of informational materials so exempted from

TWEA to (i) include any medium or format of transmission used, (ii) add additional types of

informational materials, such as artworks and news wire feeds, and (iii) exclude materials already

regulated under provisions of the Export Administration Act of 1979, 50 U.S.C. App. §§ 2404, 2405.

---

[2] *See also* the Cuban Democracy Act of 1992, 22 U.S.C. § 6001 *et seq.*, and the Cuban
Liberty Democratic Solidarity (Libertad) Act of 1996, 22 U.S.C. § 6021 *et seq.*

*See* Pub. L. No. 103-236, § 525(b), 108 Stat. 382 (1994).

## II.    The Cuban Assets Control Regulations (CACR)

Originally promulgated in 1963, the CACR seek to isolate the Cuban government economically and deprive it of hard currency.[3]  *Regan*, 468 U.S. at 225-26; *see Teague v. Reg'l Comm'r of Customs*, 404 F.2d 441, 445 (2d Cir. 1968) ("Hard currency is a weapon in the struggle between the free and the communist worlds." (Internal citation and quotation marks omitted)).  The CACR "have been retained, though alternately loosened and tightened in response to specific circumstances, ever since."  *Regan*, 468 U.S. at 243.[4]

### A.    *CACR Travel Restrictions, Generally*

In particular, the CACR severely restrict travel-related transactions involving Cuba. *Regan*, 468 U.S. at 229-30; *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1434 (9th Cir. 1996); *see also Walsh*, 927 F.2d at 133-34.  Persons subject to the jurisdiction of the United States are prohibited from engaging in travel-related transactions involving Cuba absent either a general or specific license issued by OFAC.  31 C.F.R. §§ 515.201(b)(1), 515.560(a); *Freedom to Travel Campaign*, 82 F.3d at 1434.  Under a general license, certain categories of travelers do not have to obtain prior approval from OFAC before engaging in travel-related transactions.[5]  31 C.F.R.

---

[3]  *See also* http://www.treas.gov/offices/enforcement/ofac/programs/cuba/cuba.shtml, last visited Jan. 4, 2007 (OFAC's website providing guidance on the CACR).

[4]  The CACR affect all U.S. citizens and permanent residents wherever they are located, all people and organizations physically located in the United States, and all branches and owned or controlled subsidiaries of U.S. organizations throughout the world.  31 C.F.R. §§ 515.201, 515.313, 515.329-330.

[5]  Examples of those who may engage in travel-related transactions in Cuba under a general license include those engaged in professional research and journalistic activities.  *See* 31 C.F.R. §§ 515.563, 515.564.  However, not every individual asserting professional researcher or

§§ 501.801(a), 515.560(a), 515.801.  A person seeking to engage in travel-related transactions

involving Cuba, but does not qualify for a general license category, must obtain a specific license.

31 C.F.R. § 515.560(a).  Absent proper authorization from OFAC, a person subject to United States

jurisdiction who engages in any travel-related transactions involving Cuba violates the CACR.  31

C.F.R. § 515.201(b)(1).

      B.    *Educational Travel*

    While the CACR generally restrict travel-related transactions, throughout the embargo's

existence they have often permitted specific types of Cuba-related travel transactions – such as

educational travel transactions – that were deemed beneficial to overall U.S. policy towards Cuba.

Declaration of Adam J. Szubin, (attached as Defs. Ex. 1) at ¶ 14.[6]  The embargo's treatment of

educational travel has not remained static over the years.  *Id.*  Rather, the regulation of educational

travel has evolved to reflect changing priorities and policies of the President with respect to Cuba.[7]

*Id.*; *see Regan*, 468 U.S. at 243 (explaining that the CACR have been "alternately loosened and

---

journalist status may access this general license.  For example, limitations on the general license
for journalistic activities include restricting the license to "persons regularly employed as
journalists by a news reporting organization or by persons regularly employed as supporting
broadcast or technical personnel," *id.* § 515.563(a), and limitations on professional researchers
include the requirements that the research must be of a "noncommercial, academic nature" that
"has a substantial likelihood of public dissemination," *id.* § 515.564(a)(1).

   [6] OFAC offers OFAC Director Szubin's declaration "to provide the court with
background information" about the Cuba sanctions program and information underlying OFAC's
decision to amend the regulation.  *See Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 2006); *see
also Camp v. Pitts*, 411 U.S. 138, 141-43 (1973).  OFAC routinely submits such background
declarations in lawsuits challenging OFAC actions.  *E.g. Holy Land Found. For Relief and Dev.
v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003); *Islamic Am. Relief Agency v. Unidentified FBI
Agents*, 394 F. Supp. 2d 34  (D.D.C. 2005) ("IARA").

   [7]  *See* Szubin Decl. ¶ 14 (outlining comprehensive timeline from 1977 to 2002 of CACR
changes pertaining to educational travel).

tightened in response to specific circumstances").

For example, from 1977-1982, all travel to Cuba, including educational travel, was generally permitted pursuant to a general license. Szubin Decl. ¶ 14. That policy changed in 1982, and in an effort to reduce the flow of hard currency into Cuba, all travel to Cuba in connection with undergraduate course work (a type of travel challenged in this lawsuit) was specifically excluded from the scope of the then-available general travel license. *Id.* In 1995, President Clinton announced changes to the U.S. policy toward Cuba to encourage Cuba's peaceful transition to a free and open society. *Id.* He modified the Cuban embargo in order to increase the number of people allowed to travel to and from Cuba for educational purposes. *Id.* The CACR were amended accordingly to provide for, *inter alia*: specific licensing of educational activities related to study towards an undergraduate or graduate degree by sponsoring U.S. academic institutions; educational exchanges between Cuban and U.S. scholars; and study in Cuban academic institutions. *Id.*

In 1999, President Clinton announced further changes to the Cuban embargo aimed at encouraging humanitarian efforts and fostering civil society, which again triggered changes in the portions of the CACR addressing educational travel. Szubin Decl. ¶ 14. Among other changes, the 1999 amendments included the creation of a new section 515.565, providing for two-year specific licenses for accredited U.S. academic institutions to permit their students and employees to engage in several categories of educational activities. *Id.* These activities included (1) participation in "structured educational programs" offered by an accredited U.S. college or university, (2) noncommercial academic research, (3) participation in formal courses of study at Cuban academic institutions by undergraduate or graduate students enrolled at degree programs at accredited U.S. colleges or universities, provided that the student's U.S. college or university would accept the

course of study for credit, (4) teaching at a Cuban academic institution by an individual regularly employed in a teaching capacity at an accredited U.S. college or university, (5) sponsorship of Cuban scholars to teach at U.S. colleges or universities, (6) educational exchanges involving secondary school students, and (7) full time employees; organization and preparations for these activities.  *Id.*

     C.    *The 2004 Rulemaking Responding to Changed U.S. Foreign Policy*

    1.  The Commission for Assistance to a Free Cuba (CAFC I).  On October 10, 2003, President Bush established an inter-agency Commission for Assistance to a Free Cuba ("CAFC I" or "the Commission"), naming then Secretary of State Colin Powell as Chairman.[8]  The President tasked the Commission with (i) exploring how the United States can help the Cuban people expedite the Castro dictatorship's end and (ii) considering United States assistance to a post-dictatorship Cuba.[9]  The Commission divided into five working groups, consisting of agencies with relevant authority and expertise, to develop recommendations for the President.[10]  The Commission's report

---

    [8]  *See* President George W. Bush, Rose Garden Speech (Oct. 10, 2003), available at http://www.whitehouse.gov/news/releases/2003/10/20031010-2.html, *last visited* Jan. 4, 2007.

    [9]  *See also* http://www.state.gov/p/wha/rt/cuba/c12238.htm, *last visited* Jan. 4, 2007 (describing CAFC I's mission and members).  Specifically, the Commission was directed to report to the President by May 1, 2004, with recommendations on developing a comprehensive program to: (i) bring about a peaceful, near-term end to the dictatorship; (ii) establish democratic institutions, respect for human rights, and the rule of law; (iii) create the core institutions of a free economy; (iv) modernize infrastructure; and (v) meet basic needs in the areas of health, education, housing, and human services.  *Id.*

    [10]  Participating agencies included:  The Departments of State, Treasury, Defense, Justice, Interior, Agriculture, Commerce, Labor, Health and Human Services, Housing and Urban Development, Transportation, Energy, Education, Veterans Affairs, and Homeland Security, the United States Agency for International Development, National Security Council, Environmental Protection Agency, Office of Management and Budget, United States Trade Representative, and the Office of National Drug Control Policy.  *See* http://www.state.gov/p/wha/rls/fs/26976.htm, *last visited* Jan. 4, 2007.

("the CAFC I Report" or "the Report"), approximately 500 pages long, was released to the public on May 6, 2004.[11]  *See also* Administrative Record ("AR") (Dkt No. 7).

Chapter 1 of the Report, entitled "Hastening Cuba's Transition," focused on "additional means by which the United States can help the Cuban people bring about an expeditious end to the Castro dictatorship."[12] AR at 40.  This Chapter sought to identify a more "proactive, integrated, and disciplined approach" than previous policy initiatives had achieved, composed of six inter-related tasks: (i) empower Cuban civil society, (ii) break the information blockade, (iii) deny resources to the Cuban dictatorship, (iv) illuminate the reality of Castro's Cuba, (v) encourage international diplomatic efforts to support Cuban civil society and challenge the Castro regime, and (vi) undermine the regime's "succession strategy."  *Id.* at 40-44.

With respect to the third of these tasks – denial of revenues – the Report emphasized the extreme importance of tourism revenues to the Castro regime.  AR at 61-62.  For example, the Report identified tourism as "Cuba's largest single source of revenue, generating some $1.8-$2.2 billion in annual gross revenues" and that "[o]f this amount, it is estimated that the regime nets 20 percent."  *Id.* at 62.  According to the Report, four categories of activity nourish the Castro dictatorship with tourism revenues – including educational travel.  AR at 62-64 ("Tourism & Travel-related Exports"; "Educational Travel"; "Fully-Hosted Travel"; and "Travel by Private Plane").  Acknowledging that "there are well-meaning participants" who use the license category as intended (*i.e.*, for academic research and teaching), in practice "other travelers and academic institutions

---

[11] Comm'n for Assistance to a Free Cuba, Report to the President (2004), available at http://www.state.gov/p/wha/rt/cuba/commission/2004/, *last visited* Jan. 4, 2007.

[12] For the Court's convenience, Chapter 1 is excerpted in the attached Appendix.

regularly abuse this license category and engage in a form of disguised tourism." *Id.* at 63.

> Many institutions use Cuba "study-tour programs" to generate revenues for other programs and most accept students not enrolled in their institution. A large number of programs are for a short duration, allow for limited interaction with the Cuban people, and include lengthy unscheduled time periods to permit largely tourist activities to be accomplished. Such travel does not promote a genuinely free exchange of ideas between Cubans and American students. Evidence indicates that the majority of visits by U.S. students are organized by or coordinated through Cuban state travel and tour entities, are highly controlled by Cuban state security officials, and allow for only limited interaction with the average Cuban citizen. Moreover, the regime has often used the visits by U.S. education groups to cultivate the appearance of international legitimacy and openness to the exchange of ideas.

*Id.* The Report concluded that granting educational licenses only to programs "engaged in full-semester study in Cuba would support U.S. goals of promoting the exchange of U.S. values and norms in Cuba, would foster genuine academic study in Cuba, and would be less prone to abuse than the current regulations." AR at 63. The Report formally recommended that the President eliminate abuse of educational travel licenses by (1) "limiting educational travel to only undergraduate or graduate degree granting institutions and only for full-semester study programs, or for shorter duration only when the program directly supports U.S. policy goals;" (2) "requiring that the travelers be enrolled in a full-time course of study at the licensed institution;" and (3) "requiring that educational institutional licenses be renewed annually, rather than bi-annually, to allow for improved enforcement of OFAC regulations." *Id.* at 32.

2. The 2004 Amendments to 31 C.F.R. § 515.565. On May 6, 2004, the President directed that certain recommendations in the CAFC I report be implemented. 69 Fed. Reg. 33768-74 (June 16, 2004). In an interim final rule issued on June 16, 2006, OFAC implemented these recommendations, and further altered the CACR consistent with the President's policy with respect to Cuba. *Id.*; Szubin Decl. ¶ 17. Challenged in this lawsuit are the amendments to paragraphs (a)

("Specific institutional licenses") and (b) (Other specific licenses") of 31 C.F.R. § 515.565, the regulation governing "Educational Activities."[13]

The implementing amendments restricted the availability of specific licenses to undergraduate and graduate institutions, thereby eliminating certain activities by secondary schools. 69 Fed Reg. at 33769. The amendments shortened the duration of institutional licenses from two years to one year. *Id.* at 33769-70. The amendments required any students using an institution's license for Cuba travel-related transactions to be enrolled in an undergraduate or graduate degree program at that licensed institution, thereby eliminating the ability of students to engage in Cuba travel-related transactions under another educational institution's license. 69 Fed Reg. at 33770. The amendments further clarified a requirement that had already existed prior to the 2004 amendments: that employees traveling to Cuba under an institution's license be full-time permanent employees of the licensed institution, and that temporary employees and contractors do not qualify as full time permanent employees.[14] *Id.*; Szubin Decl. ¶ 19.

The CACR permit certain types of travel to Cuba in order to foster a free exchange of ideas between American students and professors, and members of Cuban society, as well as to promote civil society. Szubin Decl. ¶ 18. As the CAFC Report noted, while there are well-meaning

---

[13] Because OFAC's amendments to the CACR involve a "foreign affairs function," the notice and comment provisions of the APA are inapplicable. *See* 5 U.S.C. § 553(a)(1); 69 Fed Reg. at 33770; *Helms v. Sec'y of the Treasury*, 721 F. Supp. 1354, 1360-61 (D.D.C. 1989). Though under no obligation to do so, OFAC invited comments regarding the 2004 amendments at the time it published the interim final rule challenged here. Szubin Decl. ¶ 20. Due to space limitations on the OFAC website, these comments were placed in the Treasury Department's Reading Room located at 1500 Pennsylvania Avenue N.W., Washington, D.C. *Id.*

[14] The full-time permanent employee requirement for professors teaching structured educational programs in Cuba had been somewhat obscured by the paragraph structuring in the previous version of the regulation. Szubin Decl. ¶ 19.

participants who use this license category as intended, academic programs of shorter duration typically allowed for only very limited interaction with Cuban society while providing the regime with, among other benefits, access to hard currency. *Id.* ¶¶ 17, 19. OFAC's regulatory experience indicated that the typical academic semester for U.S. colleges and universities lasted approximately ten weeks. *Id.* ¶ 19. Therefore, in order to implement the CAFC Report's recommendations pertaining to full-semester study programs, OFAC amended section 515.565 to require that three types of educational activities in Cuba be no shorter than ten weeks, including (i) structured educational programs in Cuba offered as a part of a course at the licensed institution, (ii) formal courses of study at a Cuban academic institution, and (iii) teaching at a Cuban academic institution. *Id.*; 69 Fed Reg. at 33770. Three other categories of educational activity continue to be permitted for shorter than 10 weeks, including (i) graduate research in Cuba, (ii) sponsorship of Cuban nationals to teach or engage in other scholarly activities in the United States, and (iii) organization of and preparation for licensed educational activities. 69 Fed. Reg. at 33770.[15]

---

[15] The amendments altered the requirements of the certifying letter from the licensed institution that must be carried by each authorized traveler. 69 Fed. Reg. at 33770. The amendments to 31 C.F.R. § 515.565(b) also clarified that the availability of specific licenses for individuals – rather than institutions – to engage in certain educational activities in Cuba is generally limited to the situation where the individual's educational institution lacks an institutional license under paragraph (a) of the regulation. *Id.* This individual licensing policy permits specific licenses to be issued to individuals on a case-by-case basis to authorize travel to Cuba for (1) academic research specifically related to Cuba for the purpose of obtaining a graduate degree, and (2) participation in a full semester of study Cuban academic institution. 31 C.F.R. § 515.565(b). Finally, the amendments rendered the licensing policy inapplicable to "individuals or entities that purport to arrange, facilitate, or coordinate educational programs in Cuba for U.S. academic institutions." 69 Fed. Reg. at 33770. The 2004 rulemaking did not affect paragraph (c) of 31 C.F.R. § 515.565 ("Transactions related to activities that are primarily tourist-oriented, including self-directed educational activities that are intended only for personal enrichment, are not authorized by this section.").

PROCEDURAL BACKGROUND

1. NATURE OF COMPLAINT.  On July 3, 2006, Plaintiffs filed this action challenging the 2004 amendments to 31 C.F.R. § 515.565.  First, Plaintiffs allege that Defendants violated the Administrative Procedure Act (APA), 5 U.S.C. § 702, because (1) "non-economic restrictions on the activities of United States academic institutions were adopted under a statute that has a purely economic purpose, those restrictions are not rationally related to the purpose of [TWEA]," and are therefore "arbitrary, capricious and otherwise not in accordance with law," and (2) the 1994 "Free Trade in Ideas" amendment to TWEA stripped the President of his authority to regulate educational travel.  Compl. ¶¶ 30-31.  Second, Plaintiffs allege that Defendants violated Plaintiffs' First Amendment rights of "academic freedom and association" in that the regulation "dictate[s], directly and indirectly, to the faculties, and students of United States colleges and universities who may teach, who may attend, what may be taught and how it should be taught."  *Id.* ¶ 33.  Finally, Plaintiffs allege that the rulemaking "restrict[s] and burden[s] plaintiffs' Fifth Amendment liberty interest in organizing, teaching and participating in educational programs conducted abroad by United States institutions of higher learning."  *Id.* ¶ 35.  Plaintiffs seek declaratory and injunctive relief, and attorneys fees.  *Id.* at 14-15.

2. NATURE OF PLAINTIFFS.  Plaintiffs fall into three categories: (i) an entity comprised of academic professionals, (ii) individually named university professors, and (iii) individually named undergraduate students.  The entity ECDET characterizes itself as "a coalition of higher education professionals who are affiliated, in academic capacities, with accredited colleges and universities across the United states."  Compl. ¶ 4.  ECDET does not allege that its members include academic institutions.  ECDET alleges that its members are harmed by Defendants' restrictions on "(i) who

13

may teach the academic courses of United States academic institutions, (ii) the structure of such courses and (iii) who may attend those courses as students." *Id.*

Plaintiff Wayne Smith is an adjunct professor at Johns Hopkins University and Chairman of ECDET. Compl. ¶ 5. Smith alleges that from 1997-2004 he taught "intersession courses in Cuban [*sic*] attended by United States students enrolled in the Johns Hopkins Cuban Exchange program." *Id.* Smith alleges that he is harmed because "[a]s a direct consequence of the [2004 rulemaking], Dr. Smith is prohibited from teaching Johns Hopkins' courses in Cuba." *Id.* Plaintiff John Cotman is an Associate Professor at Howard University." *Id.* ¶ 6. Cotman alleges that he is harmed because "[a]s a direct consequence of the [2004 rulemaking], Professor Cotman is prohibited from teaching another academic institution's courses in Cuba." *Id.*

Plaintiffs Jessica Kamen and Adnan Ahmad are undergraduate students at Johns Hopkins University scheduled to graduate in 2007. Compl. ¶¶ 7, 8. Kamen alleges that she is harmed because she "wishes to develop further her knowledge of U.S.-Cuba relations through participation in a for-credit course in Cuba," but in order to graduate on schedule she would have to take an "inter-sessional" course. *Id.* ¶ 7. She also alleges that she "was told that the university has cancelled all of its programs in Cuba as a result of the [2004 rulemaking]" and that "she therefore has no opportunity to study in that country." *Id.* ¶ 7. Ahmad alleges that he has already participated in Johns Hopkins University's Cuba Exchange Program. *Id.* ¶ 8. He spent two weeks in Cuba during "a winter intersession," and garnered "three semester hours" for his trip. *Id.* He alleges that he is harmed, however, because "[a]s a result of the [2004 rulemaking], Mr. Ahmad cannot develop further his academic interests in Cuba through study there because Johns Hopkins no longer offers courses in that country." *Id.*

14

<u>STANDARDS OF REVIEW</u>

**I.     Standard for Motion to Dismiss for Lack of Subject Matter Jurisdiction**

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a claim on the ground that the court lacks jurisdiction over the subject matter. Where necessary, "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). Accordingly, a motion to dismiss for lack of jurisdiction that relies on matters outside the pleadings, such as a declaration or other documents, should not be converted to a motion for summary judgment. *See Fed. for Am. Immigration Reform, Inc. v. Reno*, 897 F. Supp. 595, 600 n.6 (D.D.C. 1995), *aff'd*, 93 F.3d 897 (D.C. Cir. 1996); 5A Charles A. Wright & Arthur R. Miller, *Fed. Practice & Proc.* § 1366 at 484-85 (2d ed. 1990).

**II.    Standard for Motion to Dismiss for Failure to State a Claim**

A motion to dismiss for failure to state a claim should be granted where the complaint fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court may grant a Rule 12(b)(6) motion when it appears that there is no set of facts under which the plaintiff would be entitled to relief. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). In determining whether a complaint fails to state a claim, a court may consider the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *Id.*; *see Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (holding that documents "referred to in the complaint" and "integral" to the claim may also be considered as part of a motion to dismiss). Because the CAFC I Report is central to Plaintiffs' allegations and is referenced in the Complaint, Compl. ¶¶ 20-24, it

15

is incorporated therein. In addition, both the Report and published information about the Commission are matters of public record, and thus may be considered on a Rule 12(b)(6) motion.

## III.    Standard for Summary Judgment

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary Judgment procedure is properly regarded not as a disfavored procedural shortcut but rather, as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. *See id.* at 323; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (explaining that "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment" because standard requires absence of "genuine issue of material fact"). Once the movant's initial burden is satisfied, the burden shifts to the responding party to demonstrate through the production of probative evidence that there remains a triable issue of fact. *See* 477 U.S. at 250. In weighing a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, the non-moving party cannot rely on "mere allegations or denials" but must set forth specific facts showing genuine issues for trial exist. *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d 1051, 1054 n. 7 (D.C. Cir. 1981).

<u>ARGUMENT</u>

## III.    This Action Should Be Dismissed for Lack of Subject Matter Jurisdiction

16

Article III of the U.S. Constitution "confines the federal courts to adjudicating actual 'cases' and 'controversies.' *Allen v. Wright*, 468 U.S. 737, 750 (1984). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976); *Fed. Express Corp. v. Airline Pilots Ass'n*, 67 F.3d 961, 963 (D.C. Cir. 1995) ("The federal courts are powerless to decide any matter unless it involves a case or controversy."). Plaintiffs cannot satisfy this "bedrock requirement" for federal judicial review, *Valley Forge Christian College v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982), because they have failed to establish their standing to bring this lawsuit.

A.    *Standing*

1.    CONSTITUTIONAL LIMITATIONS.    It is axiomatic that "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," and is fundamental to the Court's jurisdiction to hear the case. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum of standing," requires plaintiffs to show: (1) that they have suffered an injury which is (i) concrete and particularized and (ii) actual or imminent, not conjectural or hypothetical; (2) the existence of a causal connection between the alleged injury and conduct that is fairly traceable to the defendants; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* The plaintiff bears the burden of proving these elements. *Lujan*, 505 U.S. at 560. Courts should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (citation and internal quotation marks omitted). It "is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and

17

the exercise of the court's remedial powers." *Id.* (citation and internal quotation marks omitted).

Furthermore, these standing requirements apply whenever an organization asserts standing to sue, whether on its own behalf or on behalf of its members. *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)). Plaintiff ECDET, as an association, must show either (1) that ECDET itself has suffered a "'concrete and demonstrable injury to [its] activities'" *Nat'l Treasury Employees Union*, 101 F.3d at 1427 (quoting *Havens Realty Corp.*, 455 U.S. at 379), in order to assert standing in its own name, or (2) it must "establish that at least one of its members has standing to sue in his own right, the interests the association seeks to protect are germane to its purpose, and individual members need not participate in the lawsuit themselves," in order to assert standing in a representative capacity. *Natural Res. Def. Council v. EPA*, 464 F.3d 1, 5-6 (D.C. Cir. 2006) (citation omitted). ECDET appears to be asserting standing in a representative capacity, alleging that "its members are harmed by defendants' restrictions." Compl. ¶ 4. Thus, ECDET's standing is derivative of its ability to show that at least one of its members has standing to sue in his own right. *Natural Res. Def. Council*, 464 F.3d at 5-6. The Complaint only alleges Plaintiff Smith to be a member of ECDET, and thus ECDET's standing is, in part, derivative of Smith's standing.

2. PRUDENTIAL LIMITATIONS. In addition to constitutional limitations on federal court jurisdiction, the standing inquiry also involves prudential limitations on its exercise. *Kowalski v. Tesmer,* 543 U.S. 125, 128-29 (2004). These prudential concerns include the "general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen*, 468 U.S.

at 751.  The prudential principles of third-party standing provide that, generally, a litigant "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citing *Barrows v. Jackson*, 346 U.S. 249 (1953)); *see Broadrick v. Oklahoma*, 413 U.S. 601, 610-11 (1973) ("[C]onstitutional rights are personal and may not be asserted vicariously.  These principles rest on more than the fussiness of judges.  They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." (citation omitted)).

B.    *Plaintiffs Have Not Established Injury-in-Fact*

Plaintiffs have failed to establish an "injury-in-fact" that is "actual or imminent."  *See Lujan*, 504 U.S. at 564 ("Such 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the someday will be – do not support a finding of the 'actual or imminent' injury that our cases require.").  Plaintiff Smith alleges that he taught an inter-session course from 1997-2004, but does not allege that the course would have taken place in subsequent years.  Compl. ¶ 5.  Plaintiff Cotman alleges he is harmed because, as a consequence of the 2004 rulemaking, he "is prohibited from teaching another academic institution's courses in Cuba."  *Id.* ¶ 6.  However, Cotman does not allege any specific opportunity to teach at another institution's course that was foreclosed.  *Id.*

The undergraduate Plaintiffs' allegations also fail to establish injury-in-fact.  Plaintiff Kamen alleges that she "wishes to develop further her knowledge of U.S.-Cuba relations through participation in a for-credit course in Cuba."  Compl. ¶ 7.  Her alleged injury has two components.  First, she claims that to graduate "on schedule" she would have to take an "inter-sessional" course.  *Id.*  Second, she alleges that as a result of OFAC's regulation and Johns Hopkins' cancellation of its

19

exchange program, "she therefore has no opportunity to study in [Cuba]." *Id.* However, neither allegation of harm qualifies as an injury-in-fact. Section 515.565 plainly contradicts Kamen's allegation that she "has no opportunity to study in [Cuba]." That provision permits undergraduate students – like Kamen – to study for a semester at a *Cuban* academic institution.[16] 31 C.F.R. §§ 515.565(a)(3), 515.565(b).[17] Her allegation that to graduate on schedule "such a course would have to be inter-sessional," fails for several reasons. First, Kamen waited two full years after the rulemaking to bring this challenge. She could have sought full-semester opportunities to study at a Cuban institution during that time.[18] Kamen cannot assert an injury-in-fact of delayed graduation that she herself created by failing to seek full-semester opportunities years earlier. Second, upon enrolling at Johns Hopkins, Kamen had no guarantee that she could participate in any particular course, and she cannot now assert the deprivation of an entitlement that she never possessed. Finally, she has not alleged that participation in an inter-session course in Cuba is a requirement for graduation, rather than simply another academic option.

---

[16] Nor has Kamen alleged that Johns Hopkins has refused to "accept[] for credit toward [her] undergraduate . . . degree" her proposed "[p]articipation in a formal course of study" at a particular "Cuban academic institution," *see* 31 C.F.R. §§ 515.565(a)(2), 515.565(b). While such an allegation would not confer standing, its absence underscores the redressability flaws to the undergraduate Plaintiffs' assertions of standing, discussed *infra*.

[17] Kamen can seek specific opportunities to "develop further her knowledge of U.S.-Cuba relations" in Cuba itself in yet another way: if she later chooses to pursue a relevant graduate degree. The regulation provides for specific licenses – including for short-term travel to conduct research towards a graduate degree – both to institutions and to individual graduate students on a case-by-case basis. *See* 31 C.F.R. §§ 515.565(a)(2), 515.565(b).

[18] Again, the redressability problems inherent to the undergraduate Plaintiffs' assertion of standing are manifest. *See infra.* Once OFAC amended the regulation in 2004, Johns Hopkins could have elected to allocate resources to a full-semester program in Cuba and Kamen could have applied for such a program – likely obviating any supposed need for her delayed graduation.

Plaintiff Ahmad's allegation of harm – that he "cannot develop further his academic interests in Cuba through study there because Johns Hopkins no longer offers courses in that country" – fails for the same reasons as Kamen's. Compl. ¶ 8. Ahmad has not established an injury-in-fact for an additional reason: he alleges that he *already* participated in the Johns Hopkins exchange program *Id.* He spent two weeks of winter break in Cuba, and received "three semester hours" towards his undergraduate degree. *Id.* Thus, he already enjoyed the privilege of academic travel to Cuba, and has not been deprived of that opportunity. Moreover, he has not explained why he would have been permitted to participate a second time in the Johns Hopkins exchange program.

Finally, Plaintiffs have failed to allege an injury-in-fact with respect to their First Amendment claims to "academic freedom." *See* Compl. ¶ 33. The phrasing of Plaintiffs' First Amendment claim – "who may teach, who may attend, what may be taught and how it should be taught," *id.* – apparently derives from Justice Frankfurter's concurrence in *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), in which he referred to "'the four essential freedoms' of a university – to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." 354 U.S, at 263 (Frankfurter, J., concurring) (quotation marks, citation, and footnote omitted) (emphasis added). To the extent that these rights are uniquely protected, if at all,[19] those rights inhere in the *university*, not its professors or students. *See Urofsky v. Gilmore*, 216 F.3d 401, 412 (4th Cir. 2000) (en banc) ("Appellees ask us to recognize a First Amendment right of academic freedom that belongs to the professor as an individual. The Supreme Court, to the extent it has constitutionalized a right of academic freedom at all, appears to have recognized only an institutional right of self governance in academic affairs."); *accord Johnson-Kurek v. Abu-Absi*, 423

_____

[19] *See infra*, Sec. V.B-D.

21

F.3d 590, 593-95 (6th Cir. 2005).  Because academic institutions are not parties to this case, Plaintiffs lack standing to press their First Amendment claims.

C.    *Plaintiffs Have Not Established Redressability*

Even assuming, *arguendo*, that Plaintiffs have adequately alleged an injury-in-fact, they nonetheless lack standing because that injury is necessarily indirect.  The decision to conduct academic programs in Cuba – whether over a full semester or over winter break – belongs to academic institutions, not to professors or students.  Yet not a single academic institution is party to this case.  Compl. ¶¶ 4-8.  Plaintiffs have therefore "failed to demonstrate how a favorable judicial decision on the merits of their claims will redress this injury."  *Nat'l Wrestling Coaches Assoc. v. Dep't of Educ.*, 366 F.3d 930, 933 (D.C. Cir. 2004).  Such "indirectness of injury, while not necessarily fatal to standing, 'may make it substantially more difficult to meet the minimum requirement of Art. III: [*I.e.*,] [t]o establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.'"  *Simon*, 426 U.S. at 44-45 (*quoting Warth*, 422 U.S. at 505).  As the Supreme Court has elsewhere explained:

> When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed.  In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction – and perhaps on the response of others as well.  The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume to control or to predict  . . . .

*Lujan*, 504 U.S. at 562 (emphasis in original).  It is just such "unfettered choices made by independent actors" that are at issue here and that undermine any claim of redressability.

The D.C. Circuit opinion in *National Wrestling Coaches Association v. Department of*

*Education*, 366 F.3d 930 (D.C. Cir. 2004), is instructive on this point.  In that case, the Department of Education issued interpretive rules implementing Title IX, requiring universities to provide intercollegiate athletic opportunities to both males and females in numbers proportionate to their respective enrollments.  366 F.3d at 935.  In response, various universities eliminated or reduced the size of men's wrestling programs, rather than increasing opportunities for female athletes.  *Id.* Membership organizations representing the interests of collegiate men's wrestling coaches, athletes, and alumni challenged the interpretive rules.  *Id.*  Because none of the universities that had altered their wrestling programs was party to the case, the D.C. Circuit upheld the district court's dismissal of the complaint for lack of standing.  *Id*. at 938-45.

The *Nat'l Wrestling Coaches* Court noted that the appellants had not substantiated their "assertion that a decision from the court vacating [the challenged interpretive rules] will redress their injuries by altering schools' independent decisions whether to eliminate or retain their men's wrestling programs."  366 F.3d at 939.  Nothing in the challenged rules *required* the schools to eliminate their men's wrestling programs.  *Id.*  In addition, the appellants had not suggested that "any particular school necessarily would forego elimination of a wrestling team or reinstate a previously disbanded program in the absence of these interpretive rules."  *Id.*  Overall, therefore, the appellants had fallen "far short of establishing the requisite likelihood that the educational institutions whose choices lie at the root of appellants' alleged injuries will behave any differently with respect to men's wrestling if appellants prevailed on the merits and secured their requested relief."  *Id.*

Here, Plaintiffs have similarly fallen short in demonstrating redressability.  It remains within the independent purview of individual academic institutions – none of whom are present in this case – as to whether to eliminate or retain academic programs in Cuba.  While OFAC's rulemaking

23

effectively requires the elimination of short-term academic programs in Cuba, nothing in the challenged rulemaking requires the schools to eliminate their academic programs in Cuba *entirely*, as the Complaint implies. *See* Compl. ¶ 26 ("According to several surveys, almost every United States institution of higher education with an academic program in Cuba reported canceling that program after the OFAC rulemaking of June 16, 2004."). In addition, Plaintiffs have not suggested that "any particular school necessarily would forego elimination" of an academic program in Cuba "or reinstate a previously disbanded program in the absence of" OFAC's rulemaking. *Nat'l Wrestling Coaches*, 366 F.3d at 939. Johns Hopkins could elect to allocate its resources towards a full-semester program in Cuba – as that University has chosen to do in Italy, Spain, and France.[20] Similarly, it is Johns Hopkins' choice whether to hire Smith as a full-time permanent employee, and not merely as a part-time employee. If Johns Hopkins took those steps – both fully permissible under the regulation – Smith could not then claim that he "is prohibited from teaching Johns Hopkins' courses in Cuba." Compl. ¶ 5. Because Plaintiffs' prayer for relief "depends on the unfettered choices made by independent actors not before the courts," namely academic institutions, "and whose exercise of broad and legitimate discretion the courts cannot presume to control or to predict," Plaintiffs lack standing to press their claims. *Lujan*, 504 U.S. at 562.

D.    *Plaintiffs Seek To Assert the Rights and Interests of Third Parties*

Finally, even if Plaintiffs have established the requirements of constitutional standing, prudential concerns weigh heavily against a finding of standing here. As noted, Plaintiffs seek to assert the rights and interests of academic institutions. Indeed, the challenged amendments govern specific *institutional* licenses to pursue educational activities in Cuba. 31 C.F.R. § 515.565(a)

---

[20]    *See* http://www.jhu.edu/~advising/Programs.htm, last visited Jan. 17, 2007.

24

("Specific Institutional Licenses").  As discussed *supra*, it is committed to discretion of the institution – and not of professors and students – whether or not to provide an academic exchange program to Cuba at all.  Furthermore, academic freedom rights as described by the Plaintiffs inhere in the university, not in the individual professors or students.

The Supreme Court has outlined three prudential considerations to be weighed when assessing whether an individual may assert the rights of others: (1) "[t]he litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute," (2) "the litigant must have a close relation to the third party," and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (quoting *Singleton v. Wulff*, 428 U.S. 106, 112-16 (1976)).[21]  Quite simply, there exists no hindrance to the ability of individual academic institutions, such as those employing Plaintiffs Smith and Cotman, to protect their interests in holding short-term academic travel programs in Cuba.  *See Kowalski*, 543 U.S. at 130 (rejecting third party standing asserted by

---

[21]  In the context of overbreadth challenges, the Supreme Court has occasionally "'enunciated other concerns that justify a lessening of prudential limitations on standing.'" *Kowalski*, 543 U.S. at 130 (quoting *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 957 (1984).  In particular, the Court has expressed concern with the danger of a particular statute chilling a third party's free speech, because that party might be fearful of risking "punishment for his conduct in challenging the statute" and will "refrain from engaging further in the protected activity." *Sec'y of State of Md.*, 467 U.S. at 956.  "Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." *Id.; see Broadrick*, 413 U.S. at 612 ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.").  These concerns are inapplicable here. *Kowalski*, 543 U.S. at 130.  Plaintiffs have not challenged the regulation on overbreadth grounds, but on "academic freedom" grounds.  Compl. ¶ 33.  Academic institutions are fully capable of asserting their own challenge to the regulation without fear of punishment for doing so, merely by invoking the APA as Plaintiffs have done. *See Kowalski*, 543 U.S. at 130.

attorneys on behalf of future indigent clients, where indigent clients' lack of sophistication about the

legal system did not constitute a "hindrance" to asserting their own rights, and remarking that the

Supreme Court has "not looked favorably upon third-party standing"); *Singleton*, 428 U.S. at 113-14

(explaining policies justifying limitation include that (i) "it may be that in fact the holders of those

rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-

court litigant is successful or not" and (ii) "third parties themselves will usually be the best

proponents of their own rights").[22]  In the absence of such a hindrance, prudential concerns militate

against a finding of standing in these circumstances.

## IV.    Plaintiffs' APA Claims are Meritless

### A.    *A Deferential Standard of Review Applies to Defendants' Action*

The Administrative Procedure Act (APA) authorizes federal courts to determine whether an

agency's action is "arbitrary, capricious . . . or otherwise not in accordance with law," "contrary to

constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority,

or limitations."   *See* 5. U.S.C. § 706(2)(A)-(C).   Because OFAC is the agency authorized to

administer the CACR, a challenge to OFAC's interpretation of TWEA – its 2004 rulemaking

amending the regulation governing educational activities – must either demonstrate that the statute

clearly forbids the interpretation or that the interpretation is unreasonable.  *See Chevron U.S.A. Inc.

v. NRDC*, 467 U.S. 837, 843-44 (1984); *Consarc Corp. v. U.S. Treasury Dept., Office of Foreign

Assets Control*, 71 F.3d 909, 914 (D.C. Cir. 1995) ("Consarc II"); *Walsh*, 927 F.2d at 1232.

Under the familiar *Chevron* analysis, to find that an agency's interpretation "reflects a

---

[22]  *Cf. Am. Library Ass'n v. Odom*, 818 F.2d 81, 86-87 (D.C. Cir. 1987) (Ginsburg, R.B.) (rejecting library reader standing to object to NSA restrictions where library itself did not object).

reasonable interpretation of the law," *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 409 (1996), a reviewing court "need not conclude that the agency construction was the only one it permissibly could have adopted," *Rust v. Sullivan*, 500 U.S. 173, 184 (1991) (quoting *Chevron*, 467 U.S. at 843 n. 11), or that it is "the best interpretation of the statute," *United States v. Haggar Apparel Co.*, 526 U.S. 380, 394 (1999), or that is "the most natural one." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991). The agency's view is deemed reasonable so long as it is not "flatly contradicted" by plain language. *Dep't of the Treasury v. FLRA*, 494 U.S. 922, 928 (1990). Plaintiffs, on the other hand, must show that their view of TWEA must be "the only possible interpretation." *Regions Hosp. v. Shalala*, 522 U.S. 448, 460 (1988). *See also Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 125 S. Ct. 2688, 2699 (2005) ("[i]f the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory construction.").

Beyond *Chevron* deference, yet another profound measure of deference is due to OFAC's interpretation of TWEA. The challenged amendments to the CACR relate to the President's twin exercise, through the Secretary of Treasury and, in turn, through OFAC, of (1) a broad grant of Congressional authority, and (2) the President's immense inherent authority in the realm of foreign affairs. *See, e.g., Regan*, 468 U.S. at 243-44 ("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" (quoting *Harrisiades v. Shaughnessy*, 342 U.S. 580 (1952))); *Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981) ("When the President acts pursuant to an express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress. In such a case the executive action would be supported by the strongest of

presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." (internal quotation marks and citation omitted)); *Holy Land Found. For Relief and Dev. v. Ashcroft*, 333 F.3d 156, 159 (D.C. Cir. 2003) (observing that a Presidential declaration of national emergency under IEEPA, a statute modeled on TWEA, "clothes the President with extensive authority"); *Freedom to Travel Campaign*, 82 F.3d at 1439 (declining to examine policy reasons underlying Cuban travel ban, citing "history of judicial deference" to executive decision-making in the foreign policy area).[23]

Finally, review of challenges to final agency action under the APA, even those combined with constitutional challenges, is limited to the administrative record compiled and submitted by the agency. 5 U.S.C. § 706 ("the court shall review the whole record or those parts of it cited by a party"); *id.* § 706(2)(B) (record review where agency action is challenged as "contrary to constitutional right, power, privilege, or immunity"); *see Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"); *Holy Land Found.*, 333 F.3d at 166 (indicating that perhaps in the "general case," extra-record evidence of constitutional claims might be appropriate to oppose summary judgment, but challenges to OFAC blocking actions are not the "general case," rather cases "involving sensitive issues of national security and foreign policy").[24]

---

[23] *See also Palestine Info. Office v. Shultz*, 853 F.2d 932, 937 (D.C. Cir. 1988) (analogizing to President's TWEA and IEEPA authority to hold that "[i]f the authority accorded the executive branch when acting pursuant to a congressional grant of power is great, it is greater still in the case at bar because the Secretary was acting in the field of foreign affairs").

[24] The Supreme Court has explained that
If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the

B.    *OFAC Validly Exercised TWEA's Economic Sanctions Powers*

Plaintiffs allege that OFAC exceeded TWEA's statutory authority "[b]ecause non-economic restrictions on the activities of United States academic institutions were adopted under a statute that has a purely economic purpose, those restrictions were not rationally related to the purpose of [TWEA]" and are therefore "arbitrary, capricious and otherwise not in accordance with law." Compl. ¶ 30.  It is not wholly clear why Plaintiffs deem the 2004 rulemaking to impose "non-economic restrictions" – the regulation of travel-related transactions *are* economic restrictions, regardless of Plaintiffs' belief that the restrictions feature non-economic characteristics as well. Further, there can be little doubt that the amended regulation rationally relates to TWEA's purpose, as well as to the CACR's overall regulatory scheme of depleting the Castro dictatorship's access to hard currency.  Plaintiffs' theory therefore fails as a matter of law and should be dismissed.

In implementing sanctions programs under TWEA and IEEPA, OFAC's authority is not constrained by Plaintiffs' interpretation that TWEA has a "purely economic purpose.  *See*, *e.g.*, *Parradissiotis v. United States*, 304 F.3d 1271 1275 (Fed. Cir. 2002) (holding TWEA and IEEPA's history demonstrate that OFAC's actions serve multiple interests, including "'depriv[ing] enemies, actual or potential of the opportunity to secure advantages to themselves or to perpetuate wrongs against the United States or its citizens'" (quoting *Propper v. Clark*, 337 U.S. 472, 481 (1949))); *Nielsen v. Sec'y of Treasury*, 424 F.2d 833, 840 (D.C. Cir. 1970) (explaining how freezing a foreign

proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.
*Nat'l Treasury Employees Union v. Horner*, 854 F.2d 490, 500 (D.C. Cir. 1988) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

country's assets "may not only promote economic isolation in the present, but also constitute meaningful planning for the future, by preserving the assets involved for possible use in some satisfaction of American claims against the country involved"); *cf. Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002) (discussing broad scope of IEEPA authority to regulate interests beneficial to Designated Global Terrorists).

Travel restrictions under the Cuban embargo have long been upheld as a potent sanctions tool, serving the "'important,' 'substantial,' and even 'vital'" purpose of denying hard currency to the Cuban dictatorship. *Freedom to Travel Campaign*, 82 F.3d at 1439; *see Regan*, 468 U.S. at 232-33; *Walsh*, 927 F.2d at 1233. As described *supra*, the CAFC I Report delineated the importance of tourism revenues to the regime; indeed, the Report identified tourism as Cuba's single largest source of funds, funneling millions of dollars annually into Castro's coffers. AR at 61-62. The Commission also examined licensed educational travel as an area widely abused in the United States as a form of disguised tourism – even though there are well-meaning participants who use the category as intended – thereby weakening the CACR's ability to stifle the regime's access to hard currency. *Id.* at 63. The Report noted that academic programs of short duration usually allow for only very limited interaction with Cuban society while providing the regime with increased access to hard currency, and even serving to reinforce the regime's bid for international legitimacy. *Id.*

Overall, therefore, the Report suggests that the benefit to Cuba far exceeds the limited benefit to academics and U.S. policy provided by short-term academic travel. The Commission made several recommendations geared towards reducing that abuse, while allowing for meaningful academic pursuits by recommending, *inter alia*, that institutions be licensed for full-semester courses in Cuba. *Id.* at 32. In amending the educational travel regulations, OFAC responded to the

Commission's analysis, implemented the Commission's recommendations, and ensured that those changes remained consistent with United States foreign policy. Szubin Decl. ¶¶ 17-19. Because the rulemaking rationally relates to TWEA's purpose, and because OFAC's action is reasonable, this claim must be dismissed. *Consarc II*, 71 F.3d at 914. Furthermore, OFAC's action is based not only upon TWEA's authority but also the President's inherent foreign affairs powers. As noted *supra,* the exercise of both sources of authority merits unique deference. *Dames & Moore*, 453 U.S. at 672.

C. *OFAC Reasonably Interpreted TWEA as Authorizing Regulation of Educational Travel*

Plaintiffs also allege that OFAC exceeded TWEA's authority because, according to Plaintiffs, when Congress passed the "Free Trade in Ideas" amendment to TWEA in 1994, Congress divested the President of his authority to regulate educational travel under the Cuban embargo. Compl. ¶ 31. Because basic tenets of statutory interpretation and legislative history flatly contradict Plaintiffs' assertion, this second theory also fails as a matter of law.

As noted *supra*, in the 1994 "Free Trade in Ideas" amendment, Congress broadened TWEA's provision that purported to expressly restrict the President's authority to regulate the import and export of certain informational materials. *See* Pub. L. No. 103-236, § 525(b).[25] Congress prefaced

---

[25] "(4) The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly, the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 5 of the Export Administration Act of 1979, or under section 6 of that Act to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of title 18, United States Code." 50 U.S.C. App. § 5(b)(4) (1994).

31

the amendment, stating that "It is the sense of the Congress that the President should not restrict travel or exchanges for informational, educational, religious, cultural, or humanitarian purposes or for public performances or exhibitions, between the United States and any other country." *Id.* at § 525(a).  Notwithstanding this prefacing language, however, the Free Trade in Ideas amendment did *not* affect the President's authority to impose  travel restrictions under the Cuban embargo.

First, Congress was perfectly capable of seeking to expressly affect the President's authority to regulate travel, but chose not to do so in the context of TWEA and the Cuban embargo.  The "Free Trade in Ideas" legislation itself underscores this fundamental principle of statutory construction. *See Fla. Public Telecomm. Ass'n, Inc. v. F.C.C.,* 54 F.3d 857, 860 (D.C.Cir. 1995) (noting "the usual canon that when Congress uses different language in different sections of a statute, it does so intentionally").  The 1994 amendment altered both TWEA and TWEA's successor statute, the International Emergency Economic Powers Act ("IEEPA").  *See* Pub. L. No. 103-236, § 525(c), *amending* 50 U.S.C. § 1702(b).  The amendment inserted nearly identical language into both TWEA and IEEPA regarding various categories of informational materials.  *See id.* §§ 525(b)(1) (amending TWEA), 525(c)(1) (amending IEEPA).   With respect to IEEPA, Congress elected to legislate even further, adding the following provision to affect the President's authority, under IEEPA, to regulate:

> any transactions <u>ordinarily incident to travel</u> to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

Pub. L. No. 103-236, § 525(c)(1) (emphasis added).  This language – and its conspicuous absence from the provision amending TWEA in the self-same legislation – illustrates that Congress chose to affect the President's authority to regulate travel under IEEPA, but *not* under TWEA.  The

32

accompanying House Conference Report expressly confirms this interpretation:

> The second part of paragraph (1) of subsection (c) amends [IEEPA] to add a new subsection (4) that would prohibit restrictions of any kind, including currency restrictions, on travel and transactions ordinarily incident to travel by Americans under embargoes implemented pursuant to the IEEPA. This section does not apply to restrictions that are currently in place under existing IEEPA embargoes against Libya and Iraq. <u>Because the embargoes on Cuba and North Korea are imposed not under IEEPA but under TWEA, this change would also not apply to either of those embargoes</u>. [Emphases added]

 H.R. Conf. Rep. 103-482, at 239-240 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483.

Second, Plaintiffs cannot rely on the language prefacing the "Free Trade in Ideas" amendment – that the "sense of Congress" is that the President "should not" restrict various sorts of travel – as restricting the President's authority. *See* Compl. at 31. This "sense of Congress" provision cannot substantively mandate that OFAC and the Court read the TWEA in any particular way. "Sense of Congress" provisions generally do not create substantive or mandatory law and courts instead rely on them primarily to confirm what other substantive sections of the statute mean. *See, e.g.*, *Yang v. Cal. Dept. of Soc. Serv.*, 183 F.3d 953, 958 (9th Cir. 1999) (holding "sense of Congress" provision was precatory and did not bestow legal rights); *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 994-95 (1st Cir. 1992) (holding that "use of the term 'should' and 'the sense of Congress' language indicate[s] that the statute is merely precatory"); *Trojan Tech., Inc. v. Commonwealth of Pennsylvania*, 916 F.2d 903, 909 (3rd Cir. 1990) (characterizing a "sense of Congress" provision as persuasive rather than mandatory). *Cf. State Highway Comm'n v. Volpe*, 479 F.2d 1099, 1116 (8th Cir. 1973) (finding "sense of Congress" provisions useful in resolving ambiguities). *See also Fund For Animals v. Norton*, 374 F. Supp. 2d 91, 103 (D.D.C. 2005) (rejecting argument that "sense of Congress" language, *inter alia,* created ambiguity in plain

language of the statute), *aff'd on other grounds*, 472 F.3d 872 (D.C. Cir. Dec. 15, 2006).

      For the reasons noted, Plaintiffs' APA challenges are meritless and should be dismissed.

**V.    Plaintiffs Have Not Been Deprived of First Amendment Rights**

      Plaintiffs allege that the 2004 rulemaking violates their First Amendment "rights of academic

freedom and association" because the regulation "dictate[s] directly and indirectly, to the faculties,

and students of United States colleges and universities who may teach, who may attend, what may

be taught and how it should be taught."  Compl. ¶ 33.  To the extent that the First Amendment

actually protects "academic freedom," however, any burdens placed upon the substantive scope of

that protection by 31 C.F.R. § 515.565 are (i) merely incidental and (ii) justified by sufficiently

important government interests.  In addition, the regulation is both viewpoint and content neutral.

Plaintiffs' First Amendment claims are therefore devoid of merit.

      A.    *Travel Restrictions Under the Cuban Embargo Have Long Withstood First*
           *Amendment Challenges*

      For decades, litigants have sought – and failed – to invalidate travel restrictions, as well as

other sanctions restrictions, by invoking the First Amendment.  *E.g.*, *Freedom to Travel*, 82 F.3d at

1439-42 (rejecting First Amendment challenges to CACR regulation of educational travel, both on

vagueness and on claim that regulation interfered with plaintiff's "right to gather firsthand

information about Cuba"); *Walsh*, 927 F.2d at 1234-35 (rejecting First Amendment challenge to

application of travel ban, where plaintiff alleged that travel to Cuba for the statutorily permissible

purpose of importing informational materials was the "constitutional equivalent" of newsgathering);

*Teague*, 404 F.2d at 445-47 (rejecting First Amendment challenge to prohibition on unlicensed

importation of informational materials, as restriction was "only incidental to the proper general

purpose of the regulations:  restricting the dollar flow to hostile nations”); *Capital Cities/ABC, Inc.*

*v. Brady*, 740 F. Supp. 1007, 1012-15 (S.D.N.Y. 1990) (rejecting First Amendment challenge to

OFAC’s refusal to license broadcasting deal where royalties would have been paid to Cuban regime);

*Farrakhan v. Reagan*, 669 F. Supp 506, 510-512 (D.D.C. 1987) (rejecting Free Exercise clause

challenge to Libyan sanctions because “[a]n accommodation toward all religious groups exempting

them from the limitations of economic sanctions would intolerably limit the President’s power to

deal with international emergencies”), *aff’d*, (table) 851 F.2d 1500 (C.A.D.C. 1988). *See also Zemel*

*v. Rusk*, 381 U.S. 1, 16-17 (1965) (rejecting First Amendment challenge to Secretary of State’s

refusal to validate passports for travel to Cuba because restriction inhibited action, not speech).

In the seminal case of *Zemel v. Rusk*, 381 U.S. 1 (1965), the Supreme Court held that the

Secretary of State’s refusal to validate passports for travel to Cuba did not implicate First

Amendment rights *at all*.  381 U.S. at 16.  While the Court recognized that the travel restriction

would diminish the “free flow of information,” the Court nonetheless concluded:

> [We] cannot accept the contention of appellant that it is a First Amendment Right
> that is involved.  For to the extent that the Secretary’s refusal to validate passports
> for Cuba acts as an inhibition (and it would be unrealistic to assume that it does not),
> it is an inhibition of action.  There are few restrictions on action which could not be
> clothed by ingenious argument in the garb of decreased data flow. . . . The right to
> speak and publish does not carry with it the unrestrained right to gather information.

*Id.* at 16-17.  *See also Walsh*, 927 F.2d at 1235 (noting that it was undisputed that the CACR “are

aimed at denying hard currency to Cuba, rather than at suppressing the receipt of information from

or about Cuba”).

Two decades later, the Supreme Court relied upon *Zemel*’s holding in *Regan v. Wald*, 468

U.S. 222 (1984), to reject the argument that the CACR violated liberty interests secured by the Due

Process clause of the Fifth Amendment.  The *Regan* Court observed that the passport restriction challenged in *Zemel* had effectively prevented travel to Cuba and "thus diminished the right to gather information about foreign countries," and reiterated that the *Zemel*'s "across-the-board restriction" did not implicate First Amendment rights.  468 U.S. at 241.  In *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431 (9th Cir. 1996), the Ninth Circuit applied *Zemel* to a CACR provision regulating educational travel, rejecting the argument that the restrictions implicated an educational organization's First Amendment rights, as (1) there was no constitutional right to travel abroad to gather information, and (2) the relevant regulation was not void for vagueness.  82 F.3d at 1441.

In sum, travel restrictions under the Cuban embargo have long withstood First Amendment challenges.  Plaintiffs' claim here that 31 C.F.R. § 515.565 hems their "academic freedom" rights under the First Amendment similarly fails.

B.    *The First Amendment and the Scope of its Protection of "Academic Freedom"*

"'Academic freedom' is a term that is often used, but little explained by federal courts." *Urofsky v. Gilmore*, 216 F.3d 401, 410 (4th Cir. 2000) (en banc).  One Circuit court has observed that "decisions invoking academic freedom are lacking in consistency, and courts invoke the doctrine in circumstances where it arguably has no application."  *Id.* (internal citations omitted).  The Supreme Court has never invalidated a regulation on the grounds that it violated a First Amendment right to academic freedom.  *Id.* at 412.[26]

---

[26]  *See, e.g.*, *Epperson v. State of Arkansas*, 393 U.S. 97, 106-09 (1968) (holding state law prohibiting teaching of evolution violated Establishment Clause); *Whitehill v. Elkins*, 389 U.S. 54, 59-62 (1967) (invalidating for overbreadth loyalty oath requirement for publicly employed teachers); *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603-604 (1967) (invalidating as vague statute prohibiting employment of subversives at state universities); *Shelton v. Tucker*, 364 U.S. 479, 490 (1960) (invalidating for overbreadth employment requirement that teachers certify organizational membership); *Sweezy v. State of New Hampshire*,

The Supreme Court has clarified, however, that in "the so-called academic freedom cases," the Court invalidated government efforts "to control or direct the *content* of the speech engaged in by the university or those affiliated with it." *Univ. of Pa. v. EEOC*, 493 U.S. 182, 197 (1990) (unanimous opinion) (emphasis in original). In *Sweezy v. State of New Hampshire*, 354 U.S. 234 (1957), for example, a plurality of the Court "invalidated the conviction of a person found in contempt for refusing to answer questions about the content of a lecture he had delivered at a state university." *Univ. of Pa.*, 493 U.S. at 197; *see Sweezy*, 354 U.S. at 238-44 (describing Attorney General's use of compulsory process powers to ascertain whether lecturer advocated Marxism). "Similarly, in *Keyishian*, the Court invalidated a network of state laws that required public employees, including teachers at state universities, to make certifications with respect to their membership in the Communist Party." *Univ. of Pa.*, 493 U.S. at 197; *see Keyishian*, 385 U.S. at 591 (describing how professors who failed to sign the certificates would be dismissed). The Supreme Court has unequivocally stated that when it "spoke of 'academic freedom' and the right to determine on 'academic grounds who may teach,' the Court was speaking in reaction to content-based regulation." *Univ. of Pa.*, 493 U.S. at 197; *see Keyishian*, 385 U.S. at 603 (warning of danger when "pall of orthodoxy" is cast "over the classroom").

As noted *supra*, the phrasing of Plaintiffs' First Amendment claim – "who may teach, who may attend, what may be taught and how it should be taught," Compl. ¶ 33 – apparently derives from Justice Frankfurter's concurrence in *Sweezy*, in which that Justice referred to "'the four essential freedoms' of a university – to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." 354 U.S., at 263 (Frankfurter,

_____

354 U.S. 234, 254-55 (1957) (vacating lecturer's conviction under due process).

J., concurring) (quotation marks, citation, and footnote omitted). Plaintiffs' reliance upon the *Sweezy*

concurrence to invalidate the amended travel regulation takes them nowhere. To the extent that

Frankfurter's "freedoms" are uniquely protected, if at all,[27] *Sweezy* is inapplicable to a content and

viewpoint neutral regulation. *Univ. of Pa.*, 493 U.S. at 197 (explaining how *Sweezy* concerned

content-based regulation); *see George Washington Univ. v. Dist. of Columbia*, 318 F.3d 203, 212

(D.C. Cir. 2003) (rejecting university's First Amendment challenge to a neutral zoning law, where

university relied upon Frankfurter's *Sweezy* concurrence to argue that its academic freedom had been

constrained); *Nova Univ. v. Educ. Inst. Licensure Comm'n*, 483 A.2d 1172, 1182-84 (D.C. 1984)

(rejecting university's First Amendment challenge to statute requiring licensing criteria for

---

[27] The Supreme Court has never relied upon the purported "four essential freedoms of a university" outlined in the *Sweezy* concurrence to invalidate a government restriction, instead relying upon traditional First Amendment doctrines. *E.g.*, *Epperson*, 393 U.S. at 106-09 (Establishment Clause); *Whitehill*, 389 U.S. at 59-62 (overbreadth); *Keyishian*, 385 U.S. at 603-604 (vagueness); *Shelton*, 364 U.S. at 490 (overbreadth). *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1266 (10th Cir. 2005) ("[A]n independent right to academic freedom does not arise under the First Amendment without reference to the attendant right of free expression. Thus, the right to academic freedom is not cognizable without a protected free speech or associational right.").

Courts of Appeal occasionally refer to the "four essential freedoms" to assess restrictions, but rarely, if ever, actually rely upon those "freedoms" to invalidate a restriction under the First Amendment. *See Urofsky*, 216 F.3d at 411-16 (rejecting argument that *Sweezy* adopted academic freedom rights, and "to the extent it has constitutionalized a right of academic freedom at all, appears to have recognized only an institutional right of self-governance in academic affairs"); *Nova Univ. v. Educ. Inst. Licensure Comm'n*, 483 A.2d 1172, 1182-84 (D.C. 1984) (rejecting First Amendment attack on content and viewpoint neutral statute requiring licensing criteria degree conferral, referring to University's "four essential freedoms"; Katheryn D. Katz, *The First Amendment's Protection of Expressive Activity in the University Classroom: A Constitutional Myth*, 16 U.C. Davis L. Rev. 857, 900-31 (1982) (exploring how "academic freedom" is not uniquely protected under the First Amendment, despite much contrary dicta). *But see Asociación de Educación Privada de Puerto Rico, Inc. v. Echevarría-Vargas*, 385 F.3d 81, 86-87 (1st Cir. 2004) (reversing dismissal of complaint challenging regulation of textbook purchases, as "by analogy to the academic freedom interests articulated" in the *Sweezy* concurrence, further factual development was required). Other cases raise the "four freedoms" in a context inapplicable here: in exploring the tension between a teacher's asserted academic freedom and that asserted by the teacher's employer. *See Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 593-95 (6th Cir. 2005).

institutions conferring degrees, because statute was content and viewpoint neutral, and rejecting argument that university's "four essential freedoms" were violated).

C.    *31 C.F.R. § 515.565 is Content and Viewpoint Neutral*

"The principal inquiry in determining content neutrality, in speech cases generally . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Capital Cities/ABC*, 740 F. Supp. at 1013-14.  OFAC amended 31 C.F.R. § 515.565 to promote the embargo's objectives, and not because of any disagreement with Cuba-related speech.  The regulation does not prohibit the professor Plaintiffs (neither individually nor ECDET's constituent members) from teaching any Cuba-related topic, anywhere within the United States, and indeed, in most of the world.  For example, the regulation does not prevent an adjunct professor employed by Johns Hopkins University from teaching an inter-session course on Cuban history located at universities in Miami or Jamaica.  What that professor may *not* do, however, is teach that same short-term course in Cuba itself.  31 C.F.R. § 515.565(a).  It is up to the individual universities to allocate resources towards full-semester courses in Cuba – just as they could chose to hold such courses in Poland or Kenya.

Similarly, under the regulatory scheme, the student Plaintiffs are not prohibited from studying any topic relating to Cuba – ranging from the intricacies of the Santeria religion to producing thesis papers positing their disagreement with the Cuban embargo.  The students may enroll in short and long term classes both in their own institution, or at other academic institutions in the U.S. or elsewhere.  As undergraduates, however, they are restricted from taking short-term courses in Cuba *itself*, and are limited to attending full-semester courses offered by their own institution and taught by their institution's full-time employees.  31 C.F.R. § 515.565(a).  Accordingly, the regulation does

not restrict the *content* of Plaintiffs' academic activity, merely the *location*. *See Capital Cities/ABC*, 740 F. Supp. at 1013-14 (holding CACR were not content-based discriminatory restrictions).

In addition to being a content-neutral regulation, 31 C.F.R. § 515.565 is viewpoint neutral. It does not condition, for example, the granting of a license upon an applicant's agreement with United States foreign policy, the surrender of an applicant's membership in a particular organization, or hostility to a particular political philosophy. *See Nova Univ.*, 483 A.2d at 1183 ("In enacting § 29-815, Congress was not motivated by hostility to particular ideas, opinions, or educational philosophies, nor was Congress concerned with harms that might occur from public exposure to particular information." (footnote omitted)).[28]    Thus, while the regulation governs "educational activities," the regulation itself is both content and viewpoint neutral. *Sweezy* is inapplicable.

> D.    *Even if The Regulation Incidentally Burdens Plaintiffs' First Amendment Rights, Depriving The Castro Dictatorship of Tourism Revenues is an "Important or Substantial Government Interest"*

The standards for evaluating a content-neutral regulation under the First Amendment challenge are well settled.    "[C]ontent-neutral regulations that have an incidental effect on First Amendment rights will be upheld if they further 'an important or substantial governmental interest.'" *Walsh*, 927 F.2d at 1235 (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).

1. A̲N̲Y̲ ̲I̲N̲T̲R̲U̲S̲I̲O̲N̲ ̲I̲N̲T̲O̲ ̲F̲I̲R̲S̲T̲ ̲A̲M̲E̲N̲D̲M̲E̲N̲T̲ ̲R̲I̲G̲H̲T̲S̲ ̲I̲S̲ ̲O̲N̲L̲Y̲ ̲I̲N̲C̲I̲D̲E̲N̲T̲A̲L̲ ̲T̲O̲ ̲T̲H̲E̲ ̲P̲U̲R̲P̲O̲S̲E̲ O̲F̲ ̲3̲1̲ ̲C̲.̲F̲.̲R̲.̲ ̲§̲ ̲5̲1̲5̲.̲5̲6̲5̲.̲    Even assuming, *arguendo*, that 31 C.F.R. § 515.565 burdens Plaintiffs' First Amendment rights, that burden is wholly incidental to the regulation's purpose.    As discussed

---

[28]    *See also IARA*, 394 F. Supp. 2d at 53-54 (rejecting charity's freedom of association challenge to OFAC's blocking action under IEEPA where action was not based upon organization's guilt by association or upon the organization's views, but based upon the prohibition on terrorism funding (citing *Holy Land Found. For Relief and Dev. v. Ashcroft*, 219 F. Supp 57, 80-81 (D.D.C. 2002), *aff'd on other grounds,* 333 F.3d at 164-65)).

40

*supra*, the CACR's purpose is to deprive the Castro regime of hard currency. *Regan*, 468 U.S. at

225-26. The CAFC I Report recommended altering the Cuban embargo to reduce abuses of short-

term educational travel licenses that were effectively forms of disguised tourism, thereby benefitting

Cuba more than U.S. academics. At the same time, the Report allowed for meaningful academic

activity by recommending that full-semester courses of study in Cuba continue to be permitted. In

response to a Presidential directive to implement some the CAFC I Report recommendations, 69

Fed. Reg. at 33768, OFAC amended 31 C.F.R. § 515.565 to reflect new policy with respect to

specific licensing of certain educational activities in Cuba. 69 Fed. Reg. at 33769; Szubin Decl. ¶¶

17-19. The purpose of the regulations is not to suppress academic activity, but to diminish the flow

of tourism revenues into the Castro dictatorship. *See* Szubin Decl. ¶ 17; *Walsh*, 927 F.2d at 1235;

*Teague*, 404 F.2d at 445-47 ("[R]estricting the flow of information or ideas is not the purpose of the

regulations. The restriction of first amendment freedoms is only incidental to the proper general

purpose of the regulations: restricting the dollar flow to hostile nations."); *Capital Cities/ABC*, 740

F. Supp. at 1013 n. 13 (explaining that "[t]he interests advanced by the Regulations" include

"limit[ing] funds which Cuba may use to promote activities inimical to the United States' interests").

    2. 31 C.F.R. § 515.565 SURVIVES INTERMEDIATE SCRUTINY. Where a government restriction

is "unrelated to the suppression of expression but . . . burden[s] First Amendment freedoms

incidentally," *Walsh*, 927 F.2d at 1235, *O'Brien*'s intermediate scrutiny standard applies. A content-

neutral governmental restriction survives intermediate scrutiny if (1) it is within the government's

constitutional power; (2) it furthers an important or substantial governmental interest; (3) the

governmental interest is unrelated to the suppression of free expression; and (4) the incidental

restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of

that interest.  *See O'Brien*, 391 U.S. at 376-77; *Walsh*, 927 F.2d at 1235; IARA, 394 F. Supp. 2d 34 at 53; *Holy Land Found.*, 219 F. Supp 2d at 82, *aff'd on other grounds,* 333 F.3d at 164-65.  Section 515.565 easily survives this standard.

First, it is indisputably within the President's constitutional power to restrict travel to Cuba under TWEA.  *See, e.g., Regan*, 468 U.S. at 232-44; *Freedom to Travel Campaign*, 82 F.3d at 1438-41; *see also IARA*, 394 F. Supp. 2d at 53 (holding that IEEPA and an Executive Order "clearly survive constitutional scrutiny under this standard").  Second, depriving the Castro regime of hard currency is an important or substantial governmental interest.  *Walsh*, 927 F.2d at 1235; *Freedom to Travel Campaign*, 82 F.3d at 1439; *see* Szubin Decl. ¶ 14.  Third, as discussed *supra*, the governmental interest in stifling the dictatorship's access to tourism revenues is unrelated to the suppression of free expression.  *See Walsh*, 927 F.2d at 1235; *Teague*, 404 F.2d at 445; Szubin Decl. ¶¶ 14, 18.  Finally, the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.  *IARA*, 394 F. Supp. 2d at 53.

In addition, Plaintiffs appear to predicate their First Amendment claims upon a notion that as academics, they ought to be exempted from the scope of the President's TWEA authority to regulate travel-related transactions.  As the Supreme Court recognized over a half century ago, "[t]he power in peace and in war must be given generous scope to accomplish its purpose," and that the exercise of authority under TWEA to deprive our enemies of assets "has necessitated some inconvenience to our citizens and others."  *Propper v. Clark*, 337 U.S. 472, 481 (1949). "That fact, however, cannot lead us to narrow the broad coverage of the Executive Order [promulgated under TWEA]."  *Id.* at 481-82.  *See Farrakhan*, 669 F. Supp at 510-12 ("An accommodation [under the Free Exercise clause of the First Amendment] toward all religious groups exempting them from the

42

limitations of economic sanctions would intolerably limit the President's power to deal with international emergencies."), *aff'd*, (table) 851 F.2d at 1500; *cf. Walsh*, 927 F.2d at 1234-35 (refusing to construe Berman amendment as affecting President's authority to regulate travel transactions, even for importing materials under amendment, in face of First Amendment challenge); *Capital Cities/ABC*, 740 F. Supp. at 1012-13 (deferring to OFAC's construction of Berman amendment in face of First Amendment challenge). *Compare also Kleindienst v. Mandel*, 408 U.S. 753, 765-70 (1972) (rejecting U.S. professors' First Amendment challenge to Executive's denial of a foreign scholar's entry lest it render delegated discretionary authority a "nullity").[29]

## VI.    Plaintiffs Have Not Been Deprived of Fifth Amendment Rights

Plaintiffs allege that 31 C.F.R. § 515.565 "restrict[s] and burden[s] plaintiffs' Fifth Amendment liberty interest in organizing, teaching and participating in educational programs conducted abroad by United States institutions of higher learning." Compl. ¶ 35. The Supreme Court's opinion in *Regan v. Wald* forecloses this argument. *See* 468 U.S. at 240-43. As discussed *supra*, *Regan* upheld travel restrictions under the CACR against a Fifth Amendment challenge premised on the argument that "the right to travel 'is a part of the "liberty" of which the citizen cannot be deprived without due process of law.'" *Id.* at 240 (quoting *Kent v. Dulles*, 357 U.S. 116, 125 (1958)). The *Regan* Court relied upon *Zemel*, the case upholding passport restrictions against First and Fifth Amendment challenges, to uphold the travel restrictions. *Id.* at 241-42. *Regan* interpreted *Zemel* as holding that "the Fifth Amendment right to travel, standing alone" was

___

[29]   Similarly, Plaintiffs apparently assume "that the congressional or executive power to regulate speech when dealing with foreign affairs is subject to the same scrutiny and limitations that the First Amendment would impose in the domestic context." *Capital Cities/ABC*, 740 F. Supp. at 1012-13 (citing *Teague*, 404 F.2d at 441). But as cases such as *Zemel, Walsh, Freedom to Travel Campaign* and *Teague* "make[] clear, that is most assuredly not the case." *Id.*

43

"insufficient to overcome the foreign policy justifications supporting the restriction." *Id.* at 242. The *Regan* Court saw "no reason to differentiate between" the restrictions challenged in *Zemel* and the restrictions challenged in *Regan*, because "[b]oth have the practical effect of preventing travel to Cuba by most American citizens, and both are justified by weighty concerns of foreign policy." *Id.*

The Court further rejected the argument that "only a Cuban missile crisis in the offing will make area restrictions on international travel constitutional," because "matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branchs of government as to be largely immune from judicial inquiry or interference.'" *Id.* (quoting *Harisiades,* 342 U.S. at 589). "Given the traditional deference to executive judgment in this vast external realm," the *Regan* Court held that there was "an adequate basis under the Due Process Clause of the Fifth Amendment to curtail the flow of hard currency to Cuba – currency that could then be used in support of Cuban adventurism – by restricting travel." *Id.* at 243 (internal citation and quotation marks omitted); *Freedom to Travel Campaign*, 82 F.3d at 1438-39 (declining to evaluate validity of rationale justifying CACR because foreign affairs arena merited judicial deference). *See also Haig v. Agee*, 453 U.S. 280, 306 (1981) ("[T]he *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States." (emphases in original)).

Plaintiffs' Fifth Amendment claim fails as a matter of law. The Supreme Court has twice held, first in *Zemel* and later in *Regan*, that there is no protected liberty interest to travel abroad. Logically, therefore, there cannot exist a protected subsidiary "liberty interest in organizing, teaching and participating in educational programs conducted abroad by United States institutions of higher learning," Compl. ¶ 35. Plaintiffs' Fifth Amendment claim, therefore, must be dismissed.

44

<u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss Plaintiffs' claims or, in the alternative,

grant Defendants summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

By:    <u>/s/ Hannah Y.S. Chanoine</u>
SANDRA M. SCHRAIBMAN
Assistant Branch Director, Civil Division
HANNAH Y.S. CHANOINE
Trial Attorney,
U.S. Department of Justice, Civil Division
<u>Mailing Address</u>
P.O. Box 883, Washington, DC  20044
Telephone:  (202) 305-2318
Facsimile:  (202) 616-8202
E-mail: hannah.chanoine@usdoj.gov
*Counsel for Defendants*

Dated: February 2, 2007