# APPENDIX

## Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment

1.  Excerpt from Administrative Record ("AR") (Dkt. No. 7): Commission for Assistance to a Free Cuba, Report to the President (2004), Chapter 1 "Hastening Cuba's Transition," AR 39-89

2.  69 Fed. Reg. 33768-74 (June 16, 2004)

# CHAPTER 1

# Hastening Cuba's Transition

# I.    EXECUTIVE SUMMARY

As an essential part of America's commitment to stand with the Cuban people against the tyranny of Fidel Castro's regime, President George W. Bush mandated that the Commission for Assistance to a Free Cuba identify additional means by which the United States can help the Cuban people bring about an expeditious end to the Castro dictatorship.

In the past, the United States has tended to initiate policies towards Cuba that were implemented in isolation from each other.  For instance, economic sanctions were initially imposed with little, if any, support to Cuban civil society, and were not coupled with initiatives to break the regime's information blockade or proactively engage the international community.  In addition, well-meaning humanitarian policies were authorized without thorough consideration of the relationship they would have to the fundamental policy objective of assisting the Cuban people regain their freedom and their right to determine their way of life and their future.

The Commission for Assistance to a Free Cuba sought a more proactive, integrated, and disciplined approach to undermine the survival strategies of the Castro regime and contribute to conditions that will help the Cuban people hasten the dictatorship's end.  The recommendations focus on actions available to the United States Government, allowing us to establish a strong foundation on which to build supportive international efforts.  This comprehensive framework is composed of six inter-related tasks considered central to hastening change:

## EMPOWER CUBAN CIVIL SOCIETY

Recognizing the work that is already underway by U.S. agencies and NGOs, we propose additional ways to empower Cuban civil society and strengthen the democratic opposition through material assistance and training.  Our recommendations include facilitating the provision of support to the families of political prisoners by independent actors, including NGOs; increasing U.S. Government funds to support pro-democracy activities and bolster the work of independent civil society activists; and, streamlining licensing requirements to get more, and more useful, equipment and material

7

AR 40

support to the island.  We also recommend expanding international and other sources of support for civil society in Cuba through greater use of willing third-country organizations and greater outreach to religious and faith-based groups.

## BREAK THE INFORMATION BLOCKADE

The Castro regime controls all formal means of mass media and communication on the island.  The Cuban Communist Party (CCP) exerts strict editorial control over newspapers, television, and radio through the regime's pervasive apparatus of repression, preventing the Cuban people from obtaining accurate information on such issues as the regime's systematic violations of human rights and fundamental freedoms, and the state of the Cuban economy.  Consistent with its fear of uncontrolled information flow to the Cuban people, the regime has set up technological, administrative, and intelligence structures to impede the ability of pro-democracy groups and civil society, both on and off the island, to effectively communicate their message to the Cuban people.  In concert with efforts to strengthen Cuban civil society, and building on the excellent work already underway by U.S. Government broadcasting entities, the Commission recommends a near-term program to deploy COMMANDO SOLO as an airborne platform for radio and television transmissions on a regular basis; an increase in the use of third-country private radio stations for broadcasting programs into Cuba; and expanded distribution of videotapes and other media materials on the island.  Over the long-term, the Commission recommends making available funds to acquire and refit an aircraft for dedicated airborne radio and television transmissions into Cuba, in a manner consistent with the United States' international telecommunications obligations.

## DENY RESOURCES TO THE CUBAN DICTATORSHIP

The policies of the Castro regime have debilitated the Cuban economy and impoverished the Cuban people.  Rather than address the deprivation confronting Cubans, the regime cynically ignores its obligations and seeks to exploit external engagement with the island and humanitarian assistance to the Cuban people in order to maintain its grip on power.  The economic lifelines of the Castro regime are tourism; access to subsidized Venezuelan oil; commodities; and revenues and other support generated by those with

8

family on the island, with the vast majority of such support coming from the United States. Over the past decade, the regime has built an apparatus designed to exploit humanitarian aspects of U.S. policy, specifically to siphon off hundreds of millions of dollars for itself. Remittances, gift parcels and travel-related revenues from those in exile who have family on the island, especially those Cubans who have come to the United States since the early 1990s, are avenues through which the regime has franchised out the subsistence of a significant portion of the Cuban population. The dollars made available to the regime through these means permit it to divert resources to the maintenance and strengthening of its repressive apparatus and away from meeting the basic needs of the Cuban people. Dollars and donated goods, although provided with good intentions by U.S. persons, are effectively helping keep the regime afloat.

Our recommended strategy is to maintain avenues by which Americans can engage the Cuban people, and by which those with family on the island can reasonably assist immediate relatives, while minimizing the regime's manipulation of the plight of the Cuban people. In order to reduce the flow of U.S. dollars to the regime, the Commission's principal recommendations include: promulgation of new regulations denying the transfer of funds to certain Cuban government officials and members of the Cuban Communist Party; reasonable restrictions on the contents and shipment of gift parcels to minimize unintended benefits to the regime; and new limits on travel that ensure that it is for valid and necessary family or educational purposes, and that prevent importation of regime-subsidizing products. We also recommend supporting an international campaign to highlight the repressive and criminal nature of the Cuban regime to diminish the island's attraction as a tourist destination.

## ILLUMINATE THE REALITY OF CASTRO'S CUBA

The current survival of the regime is, in part, dependent upon its projection of a benign international image. Cuba presents itself internationally as a prime tourist destination, as a center for bio-technological innovation, and as a successful socialist state that has improved the standard of living of its people and that is a model for education, health care, and race relations for the world. This image belies the true state of Cuba's political, economic, and social conditions, its status as a state sponsor of terrorism, and the increasingly erratic behavior of its

9

leadership. We propose increased efforts to illuminate the reality of Castro's Cuba, with the objectives of encouraging international solidarity with the Cuban people and promoting democracy on the island, including through the funding of NGOs to facilitate the distribution of information on the condition of the Cuban people, the reality of the circumstances under which they struggle to survive, and the nature of the Castro regime, including its threat potential.

## ENCOURAGE INTERNATIONAL DIPLOMATIC EFFORTS TO SUPPORT CUBAN CIVIL SOCIETY AND CHALLENGE THE CASTRO REGIME

There is a growing international consensus on the nature of the Castro regime and the need for fundamental political and economic change on the island. This consensus coalesced, in large part, after the regime's brutal March-April 2003 crackdown on peaceful pro-democracy activists, an act properly characterized as the most severe repression of peaceful political activists in the history of Cuba, and certainly the most significant act of political repression in Latin America in a decade. Infuriated by, and fearful of, the valiant effort by these same activists to continue to reach out to the Cuban people and the international community, the regime reacted; Castro's political attacks against the European Union (EU) and other nations also reveal his regime's continuing trepidation in the face of peaceful Cubans calling for their fundamental rights. Many of those who once stood by Castro have now begun to speak out publicly against the regime's abuses. However, this same international consensus has limits.

Encouraging multilateral diplomatic efforts to challenge the regime in international organizations and to strengthen policies of proactive support for pro-democracy groups in Cuba forms a cornerstone of our policy to hasten an end to the Castro regime. Specifically, we recommend intensifying support for the monitoring of human rights by and engagement with the Inter-American Commission on Human Rights. We also propose expanding coordination with willing friends and allies to encourage both greater assistance to independent Cuban civil society groups and, building on the work done by this Commission, to also encourage more robust and more international initiatives to plan for Cuba's transition. Finally, in order to target the regime's gross violation of labor rights and norms, and to encourage the establishment of minimal standards for engagement by

10

existing foreign investors, we recommend supporting re-energized
International Labor Organization efforts and increased coordination and
cooperation with labor groups in other countries regarding Cuba.

## UNDERMINE THE REGIME'S "SUCCESSION STRATEGY"

The Castro dictatorship is pursuing every means at its disposal to
survive and perpetuate itself through a "succession strategy" from Fidel
Castro to Raul Castro and beyond; its goal is that the unelected and
undemocratic communist elite now in power remain so indefinitely. The
United States rejects the continuation of a communist dictatorship in Cuba,
and this Commission recommends measures to focus pressure and attention
on the ruling elite so that succession by this elite or any one of its
individuals is seen as what it would be: an impediment to a democratic and
free Cuba. The Commission recommends: targeting regime officials for
U.S. visa denials by establishing a database consisting of the names of those
Cubans involved in torture and other serious human rights abuses against the
Cuban people and others, including the torture by Castro regime officials of
American POWs in South East Asia; and creating a second database of those
Cuban regime officials who have provided assistance to fugitives from U.S.
justice. These visa denial watchlists will be provided to other nations,
particularly those in the EU and Latin America, to ensure that Cuban regime
human rights abusers cannot find refuge in these regions. The Commission
also recommends establishing a Transition Coordinator at the State
Department to facilitate expanded implementation of civil society building
and public diplomacy efforts and to continue regular transition planning and
coordination with other U.S. Government agencies.

11

## II.    INTRODUCTION

> [T]he Cuban people have a constant friend in the United States
> of America.  No tyrant can stand forever against the power of
> liberty, because the hope of freedom is found in every heart.  So
> today we are confident that no matter what the dictator intends
> or plans, *Cuba será pronto libre* [Cuba will soon be free].
>
>                    President George W. Bush
>                    October 10, 2003

Fidel Castro continues to maintain one of the world's most repressive regimes.  As a result of Castro's 45-year strategy of co-opting or crushing independent actors, Cuban civil society is weak and divided, its development impeded by the comprehensive and continuous repression of the Castro regime.  Yet despite decades of suppression, degradation, and deprivation, the aspiration for change is gathering momentum and growing in visibility on the island.  Brave Cubans continue to defy the regime and insist that it recognize their fundamental rights, as guaranteed by the Universal Declaration on Human Rights, which Cuba signed, but to which Cuba now outlaws any reference.  The March-April 2003 crackdown on peaceful opposition activists was only the most recent and brutal high-profile effort by the regime to eliminate democratic civil society.  While these actions set back the consolidation of that movement, they did not end the Cuban people's quest for freedom.

The Castro regime continues to be a threat not only to its own people, but also to regional stability, the consolidation of democracy and market economies in the Western Hemisphere, and the people of the United States. The Castro regime harbors dozens of fugitives from U.S. justice, including those convicted of killing law enforcement officials.  It aggressively conducts espionage against the United States, including having operated a spy network, one of whose members was convicted of conspiring to kill U.S. citizens.  The Castro regime also has engaged in other hostile acts against its neighbors and other democracies in the Hemisphere.  On several occasions, Castro has threatened and orchestrated mass sea-borne migrations to Florida of tens of thousands of Cubans in an effort to intimidate and harm the United States.

12

This dictatorship has every intention of continuing its stranglehold on power in Cuba and is pursuing every means at its disposal to survive and perpetuate itself, regardless of the cost to the Cuban people. In furtherance of this goal, the regime ruthlessly implements a strategy to maintain the core elements of the existing political and repressive structure to ensure that leadership passes from Fidel Castro to his selected successor, Raul Castro. Under this "succession strategy," the core governmental and Communist Party elite would survive the departure of Fidel Castro and would seek to effect a new relationship with the United States without undergoing fundamental political and economic reform. An element that is critical to the success of the regime's strategy is its repressive security apparatus, which instills fear in the Cuban people and uses their impoverishment as a means of control.

This strategy cannot succeed without the continued flow of resources to the regime from outside Cuba. To this end, the Castro regime has built an economic structure on the island designed specifically to exploit all outside engagement with Cuba. One of the regime's central goals is to obtain additional sources of income from the United States, especially through tourism receipts. Overall, these efforts annually subsidize the regime in the amount of more than $3 billion in gross revenues.

Specifically, the tourism sector has been developed to generate hard currency as well as to contribute to an image of "normalcy" on the island and to promote international acceptance of the regime. The Castro regime also cynically exploits U.S. humanitarian and immigration policies, primarily remittances and "family visits," to generate millions in hard currency flows from its victims: those seeking freedom and the Cuban diaspora. Further, Cuba maintains a beneficial arrangement with the sympathetic government of Hugo Chavez in Venezuela, whereby Castro receives up to 82,000 barrels of oil per day on preferential terms; this arrangement nets more than $800 million in annual savings to Cuba (mirrored by an identical amount of lost revenues to Venezuela). Cuba continues to exploit joint economic ventures with third-country investors, who enter these arrangements despite the absence of the rule of law or neutral dispute resolution mechanisms and despite Cuba's lack of respect for basic labor rights. Under these ventures, international employers pay hard

13

AR 46

currency to the Castro regime for each Cuban worker, who is in turn paid in worthless Cuban pesos.

Another facet of the regime's survival strategy is to control information entering, circulating within, and coming from the island. The regime seeks to minimize the information available to the Cuban people, as well as to manipulate what the outside world knows about the Castro dictatorship and the plight of the average Cuban citizen. Cuba presents itself internationally as a prime tourist destination, as a center for bio-technological innovation, as a successful socialist state that has improved the standard of living of its people, and as a model for the world in terms of health, education, and race relations. This image belies the true state of Cuba's political, economic and social conditions and the increasingly erratic behavior of its leadership.

Despite the aggressive internal and international propaganda effort by the regime, there is a growing international consensus on the need for change in Cuba. This consensus has been strengthened by the regime's March-April 2003 suppression of peaceful pro-democracy activists, the summary executions of three Afro-Cubans attempting to flee the island, and the courageous effort by many peaceful activists to continue to reach out to the Cuban people and the international community. This flagrant repression, along with the continued work of pro-democracy groups in Cuba, has caused the international community to again take stock of the Castro regime and condemn its methods. This re-evaluation provides an opportune moment to strengthen an evolving international consensus for democratic change in Cuba.

America's commitment to support the Cuban people against Castro's tyranny is part of our larger commitment to the expansion of freedom. In furtherance of this commitment, President George W. Bush mandated that the Commission for Assistance to a Free Cuba identify additional means by which the United States can help the Cuban people bring about an expeditious end to the Castro dictatorship.

In the past, the United States has tended to adopt policies toward Cuba that were implemented in isolation from each other. For instance, economic sanctions were imposed with little, if any, support to Cuban civil society, and were not coupled with initiatives to break the regime's information

14

AR 47

blockade or proactively engage the international community. In addition, well-meaning humanitarian policies were authorized without thorough consideration of the relationship they would have with the fundamental policy objective of assisting the Cuban people regain their freedom and their right to determine their way of life and their future.

The Commission for Assistance to a Free Cuba sought a more proactive, integrated, and disciplined approach to undermine the survival strategies of the Castro regime and contribute to conditions that will help the Cuban people hasten the dictatorship's end. The recommendations also focus on actions available to the United States Government, allowing us to establish a strong foundation on which to build supportive international efforts. This comprehensive framework is composed of six inter-related tasks considered central to hastening change:

- To empower Cuban civil society;
- To break the Cuban dictatorship's information blockade;
- To deny resources to the Cuban dictatorship;
- To illuminate the reality of Castro's Cuba;
- To encourage international efforts to support Cuban civil society and challenge the Castro regime; and
- To undermine the regime's "succession strategy."

## III.    EMPOWER CUBAN CIVIL SOCIETY

The Castro dictatorship has been able to maintain its repressive grip on the Cuban people by intimidating civil society and preventing the emergence of a credible alternative to its failed policies. As a result of Castro's 45-year strategy of co-opting or crushing independent actors, Cuban civil society is weak and divided, its development impeded by pervasive and continuous repression. Through absolute control of the Cuban economy and the manipulation of U.S. migration policy, the Castro regime has made it all but impossible for human rights activists and reformers to operate and has forced many into exile. Until recently, the dictatorship has been able to keep civil society infiltrated and stunted. Through the use of these totalitarian measures, the regime has been able to mobilize large segments of the Cuban public to "support" it in times of difficulty and to assist it in silencing voices of dissent. As a result, Cubans have had little

15

opportunity to glimpse an alternative to the Castro regime and its failed policies.

Now, the tide of public opinion has turned and Castro's loyalists must constantly work to restrain the Cuban people from organizing and expressing demands for change and freedom. Cubans are increasingly losing their fear and vocalizing their desire to be architects of their own destinies. Examples of this include the efforts of such brave dissidents as Raul Rivero, Dr. Oscar Elias Biscet, Martha Beatriz Roque, and Oswaldo Paya. These people demonstrate the same determination to challenge the system that was evident in the Polish "Solidarity" movement two decades ago. The same resilience and determination of Czech leader Vaclav Havel's Charter 77 and of the "Solidarity" movement is also embodied today in the activists of the Cuban independent library movement, and the scores of independent journalists who risk everything so that the world no longer can claim ignorance about the repressive practices of a ruthless dictatorship.

Charter 77, the Polish student and union movements, and the forthright role of the Polish Catholic Church created authentically independent civil societies, building islands of independent thought, movement, interaction, and self-reliance among the repressed peoples of Eastern Europe. The development of a self-contained civil society within the gates of repression helped create a parallel culture that offered the people of the former Soviet Bloc alternatives to the corruption, exploitation, fear, and powerlessness that characterize life under communism. It offered them hope.

In Cuba, we are now witnessing a similar phenomenon. By continuing to isolate the Castro regime while supporting the democratic opposition, and empowering an emerging civil society, the U.S. can help the Cuban people in their efforts to effect positive political and social change in their country. Cuban civil society is not lacking spirit, desire, or determination; it is hampered by a lack of materials and support needed to bring about these changes.

## A.  Current U.S. Assistance Program

Section 109 of the Cuban Liberty and Democratic Solidarity Act (LIBERTAD) of 1996 (P.L. 104-114) authorizes the President to furnish

16

assistance and provide other support for individuals and independent NGOs "to support democracy-building efforts for Cuba." This provision authorizes assistance for, among other things, published and informational matter such as books, videos, and cassettes on democracy, human rights, and market economies; humanitarian assistance to victims of political repression, as well as their families; support for democratic and human rights groups; and, support for visits and permanent deployment of independent international human rights monitors in Cuba.

This assistance program, currently administered by the U.S. Agency for International Development (USAID), concentrates on information dissemination efforts that will foster democratic change through the development of civil society. The USAID Cuba Program aims at increasing the flow of accurate information on democracy, human rights, and free enterprise to, from, and within Cuba. The program provides support to U.S. NGOs and individuals engaged in this effort. U.S. partners encourage the development of independent civil society and provide humanitarian assistance to political prisoners, their families, and other victims of repression.

U.S. programs are also intended to help build solidarity with Cuba's human rights activists, give voice to Cuba's independent journalists, help develop independent Cuban NGOs, defend the rights of Cuban workers, provide direct outreach to the Cuban people, and support planning for assistance to a future transition government in Cuba. Partnership with U.S. NGOs and their Cuban counterparts is central to program design and implementation.

The United States Interests Section (USINT) in Havana is also a vital asset in the effort to aid the Cuban people in their struggle for freedom and democracy. USINT stands as a symbol of freedom and opportunity in the center of Havana and is a focal point for Cubans seeking more information about events both in Cuba and around the world.

## B.  Improve U.S. Outreach to Cuban Civil Society

**Youth, women, and Afro-Cubans:**  Youth, women, and Afro-Cubans constitute key segments necessary for the continued growth of the Cuban civil society movement.  These groups acutely lack access to

17

independent and non-regime sources of information that address their specific needs and aspirations for freedom and democracy. At the same time, the regime portrays these segments of Cuban society as pillars of social support and stability for Castro's regime.

Outreach to Cuban youth represents one of the most significant opportunities to hasten the end of the regime. More than half of Cuba's population is under age 35. This generation has the weakest attachment to the Castro revolution; even by Cuban government admission, apathy and disaffection are endemic in this segment of the population. However, U.S. and international pro-democracy programs aimed at Cuban youth, motivating them and mobilizing them are nearly non-existent. Yet, youth have been critical catalysts for regime change in other countries, helping to unify opposition forces, particularly in the former Yugoslavia, Slovakia, and recently in Georgia.

Women have also fared poorly in Castro's Cuba. Over the past decade, many have been treated as commodities to be exploited for the regime's benefit. With Fidel Castro's active encouragement, Cuban women have been advertised as inducements to foreign male tourists. Castro denies the fact that his policies have forced women into prostitution, claiming that Cuban women choose prostitution "because they like sex" and boasts that Cuban prostitutes are "highly educated hookers" who are "quite healthy." It is then not surprising that women, such as imprisoned Martha Beatriz Roque of the Assembly to Promote Civil Society, are at the forefront of the independent civil society movement. The mothers and wives of the 75 activists imprisoned after the March-April 2003 crackdown are a powerful and visible domestic and international symbol of the current struggle for freedom and democracy in Cuba. At the same time, the broader development of women's civil society groups that directly address the concerns of women in Cuba today remains limited. Few international or third-country women's NGOs have developed links with Cuban women's groups or implemented programs to encourage their development. In other societies struggling to rid themselves of dictatorships, these women's groups helped form the backbone of powerful civic movements.

Afro-Cubans and mixed-ethnicity Cubans comprise 62 percent of the population. Yet despite the regime's incessant rhetoric of social inclusion, Afro-Cubans are underrepresented in leadership positions and continue to be

18

socially marginalized. The regime gives lip service to inclusion of Afro-Cubans and mixed-ethnicity Cubans in government. For example, persons of color currently occupy only 33 percent of the seats (203 out of 609) in the rubber-stamp National Assembly of People's Power, only nine out 31 positions on the all-powerful Council of State, and just 4 of the 14 provincial Communist Party leadership positions. Afro-Cubans tend to have the least access to external or non-regime sources of information. They have little or no access to outside sources of humanitarian support, and they are the least likely to migrate from Cuba, largely as a result of their poor economic and social condition.

As with youth, more programs need to be oriented towards the Afro-Cuban population. NGOs have proposed promoting the development of civil society within the Afro-Cuban community through targeted broadcasting and by encouraging more African ex-government and NGO leaders to travel to the island for training and outreach and to form national working groups on Cuba in their own countries. Former government leaders from Africa have offered to take the lead in these efforts. Small grants of U.S. funds could provide the critical spark to activate more of the Afro-Cuban community and generate greater involvement by African-Americans and African nations in promoting change in Cuba. The African-American experience in peaceful civil society formation to achieve political change could be instructive in the Cuban environment.

**Political Prisoners and Their Families:** In March and April 2003, 75 human rights and opposition activists were arrested and sentenced to prison sentences as long as 28 years for acts such as possessing and publicly displaying human rights literature, receiving money and medicine from abroad for families of political prisoners, communicating with international media organizations, and organizing meetings and demonstrations to call for political reforms. Members of the security forces and prison officials routinely beat and abuse detainees and prisoners, including human rights activists. According to human rights monitoring groups inside the country, there are between 300 and 400 political prisoners in Cuba.

The detainees and their families face enormous challenges, including meeting their basic economic and social needs. The regime has used the pretext of the arrests to confiscate property, evict families from their homes,

19

and dismiss members from employment. These courageous people need additional support.

**Independent Civil Society Groups:** Despite years of repression, there is a growing independent civil society movement on the island. Cubans have organized, or attempted to organize, and identify themselves as "independent journalists," "independent librarians," "independent writers," "independent economists," etc. The key is their willingness to depart from the existing Stalinist structure. These groups are hampered, however, by a lack of basic materials and access to the equipment necessary to conduct their work. Independent libraries operate out of people's homes and the majority lack even the most rudimentary equipment. The tools of independent journalists often only consist of a simple notepad and pencil as the Castro regime denies them access to basic equipment such as cameras, copiers, and computers. Even possession of a typewriter, regardless of vintage, can be used by the regime as a pretext for detention and worse.

One example is that of Raul Rivero, an accomplished poet and journalist who founded the unofficial press agency Cuba Press. Using a manual typewriter to produce his reports, he often wrote on political and economic conditions in Cuba. For this, he was accused under Article 91 of the Penal Code of carrying out unspecified "subversive activities, aimed at affecting the territorial independence and integrity of Cuba." The regime also accused him of disseminating "false news to satisfy the interests of his sponsors of the North American government" and of associating with Reporters Without Borders and Agence France Presse. The regime cited his typewriter as evidence of his guilt. He was sentenced to 20 years in prison. Despite this type of intimidation and the scarcity of basic materials, civil society activists continually seek the means by which they can exercise their skills and their rights. Hence, increasing the amount of basic equipment available to them is vital.

A number of regulations govern the export from the United States of equipment, including computers, to Cuba, a state sponsor of terrorism. These export rules are intended to restrict the Cuban government's access to sensitive technology and to prevent the Cuban government from transferring this technology to other hostile states.

20

At the same time, it is essential that Cuban civil society gain greater access to computers and other basic modern equipment, such as faxes and copiers, in order to help expand distribution of information and facilitate pro-democracy activities. Greater access to these types of equipment will assist Cuba's civil society in its efforts to disseminate information to the Cuban people and counter regime efforts to harass, intimidate, and stifle opposition and dissent through exclusive control over all forms of communication.

**Religious Organizations and Faith-Based Initiatives:** Religious organizations, including both Catholic and certain authentically independent Protestant denominations, represent the fastest growing and potentially strongest alternatives to the Cuban state in providing basic services and information to the Cuban people.

About four to five million Cubans identify themselves as Roman Catholic, and Cuban Catholic priests estimate that as many as 10 percent of Catholics attend mass weekly. Cuba has close to 1,000 priests and nuns, less than half the total prior to 1960, when Cuba had half of today's population. The regime has failed to live up to its commitment to loosen restrictions on the Church in the wake of the 1998 visit by Pope John Paul II; overall numbers of Catholic Church officials are only slightly higher than before the Papal visit. Many Catholic Church leaders are engaged in a daily struggle with the regime to provide help, both spiritual and material, to the Cuban people. The regime continues to deny the Catholic Church access to the Internet, does not allow the Church to purchase vehicles or to run educational institutions, and engages in other measures to impede its work and growth. Nonetheless, many Catholic churches and Catholic charities regularly distribute medicine and other material help to both Church members and non-members, even though state health officials threaten them with "severe sanctions" for doing so.

Estimates of the number of Protestants in Cuba range from 600,000 to two million. These estimates may be low, however, given the recent explosive growth in evangelical Christian worship in "house churches" not registered by the "Office of Religious Affairs" of the Ministry of Interior (MININT), which is responsible for a number of organs of political control. Less than 30 percent of Cuban Protestants are members of those establishment denominations that make up the Cuban Council of Churches, a

21

AR 54

body tightly controlled by government authorities. Several heads of denominations within the Council were, or are now, "deputies" in the National Assembly, Cuba's powerless legislature. The Council, which works closely with MININT's Office of Religious Affairs, gives authorization to publish and distribute religious literature and to broadcast religious radio programs. It also approves overseas travel by pastors, and accepts large-scale humanitarian donations, but only after the political overseers in MININT have signaled their acceptance. The largest religious denominations generally reject cooperation with the Council, and have been able to grow and develop limited humanitarian and social services. In addition, several U.S. NGOs are working to develop conferences of ministries, churches, and lay persons with a common interest in providing humanitarian aid in Cuba as a vehicle to strengthen civil society.

## RECOMMENDATIONS:

### A Robust U.S. Assistance Program to Empower Cuban Civil Society:

- *Recognizing the U.S. assistance program already in place, the Commission recommends that the U.S. Government make available an additional $29 million (to augment the current Cuba program budget of $7 million) to the State Department, USAID, and other appropriate U.S. Government agencies for the following measures to aid the training, development, and empowerment of a Cuban democratic opposition and civil society:*

  - *Provide additional grants to willing NGOs for activities supporting democratic and human rights groups on the island to fund an increased flow of information on transitions to a political system based on democracy, human rights, and a market economy to the island, including radio and TV broadcasts, in support of and to augment Radio/TV Martí's efforts;*

  - *Support NGOs involved in medical assistance in buying and distributing medicines on the island, which can be distributed to unemployed physicians and medical personnel. Over-the-counter medicines, vitamins, and similar products can also be distributed to dissidents and human rights organizations to assist in outreach efforts within their communities;*

22

- *Work with willing third-country allies to support creation of an international fund for the protection and development of civil society in Cuba. This fund should engage, train, and provide resources for volunteers of different nationalities to travel to Cuba for several weeks to provide logistical and technical assistance to independent libraries, professional organizations, charity organizations, journalists, educators, nurses, and medical doctors working independently of the regime;*

- *Fund programs to provide educational opportunities to family members of political opponents and, working with the OAS, to establish a university scholarship program for the children of Cuban dissidents to study at Latin American universities;*

- *Fund programs to support democracy-building efforts by women, such as programs to train, develop, and organize women's groups in Cuba, and bring third-country NGOs with expertise on this issue into Cuba. Core areas for activity could include areas of concern to women in Cuba — including education, security of the family, health, and sex tourism — that are neglected by the Castro regime;*

- *Fund programs to develop democracy-building and civil-society groups within the Afro-Cuban community. Programs could involve NGO leaders from the African-American community and African countries traveling to Cuba for training and outreach and forming national working groups on Cuba in their own countries. Also fund targeted broadcast programs targeted to the needs of the Afro-Cuban community;*

- *Fund programs to reach out to disaffected Cuban youth to enable them to take greater political/civil society action in support of democracy and human rights in Cuba. The program could draw on youth organizations in Central and Eastern Europe, especially in Poland, the Czech Republic, Albania, Serbia, and others, to travel to Cuba to organize and conduct training, develop informational materials, and conduct other outreach. Many of these groups have been successfully involved in similar efforts in other countries and have expressed a commitment to doing the same in Cuba; and*

AR 56

- *Fund NGO training programs that promote peaceful methods to build democracy and civil society and advocate greater respect for human rights and fundamental freedoms. While some limited training is already underway, increased funding would enable greater use of techniques and experiences of other countries through expanded training and travel, targeted especially at Cuban youth, and through the greater use of broadcasting.*

**Additional Measures to Support Cuban Civil Society:**

- *Streamline current licensing requirements for providing computers and other basic equipment to Cuban civil society groups with the following goals:*

  - *Increase the capacity of computers and similar equipment that can be donated to Cuban civil society groups to the maximum level allowed by U.S. law;*

  - *Expedite the approval process for licenses sought by NGOs receiving U.S. Government funding to send computers and similar basic equipment to Cuban civil society groups; and*

  - *Increase coordination with willing third-country donor countries and NGOs to maximize the provision of basic equipment to independent Cuban civil society groups.*

- *Encourage a wider array of religious organizations to provide humanitarian assistance and training to Cuban churches through streamlining licensing procedures and expanding outreach to those organizations.*

24

## RECOMMENDED FUNDING

### A. Building Democracy by Empowering Cuban Civil Society:

| | |
|---|---|
| $7 million | Ongoing USAID Section 109 Cuba program |
| $5 million | <u>Human Rights and Democracy</u>:  Grants for activities supporting democratic and human rights groups on the island and to fund an increased flow of information to the island on transitions to a political system based on democracy, human rights, and a market economy. |
| $5 million | <u>Women</u>: Programs to support democracy-building efforts by women, such as programs to train, develop, and organize women's groups in Cuba. |
| $4 million | <u>Afro-Cubans</u>: Programs to develop democracy-building and civil-society groups within the Afro-Cuban community. |
| $4 million | <u>Youth</u>: Programs to reach out to disaffected Cuban youth to enable them to take greater political/civil society action in support of democracy and human rights in Cuba. |
| $3 million | <u>Civil Society Development:</u> NGO training programs to promote peaceful methods to build democracy and civil society and advocate greater respect for human rights and fundamental freedoms. |
| $3 million | <u>Material Assistance</u>: Provision of computers, short-wave radios, satellite dishes, decoders, faxes and copying machines by U.S. and third-country NGOs to Cuban civil society groups and journalists. |
| $2    illion | <u>Independent Libraries:</u> Programs to re-stock, strengthen and expand the Cuban independent library network and to promote their solidarity with national library associations in Europe and Latin America. |
| $3 million | <u>Independent Labor:</u> Programs to promote membership and organizational development in Cuba and to facilitate international contacts by the independent labor movement in Cuba. |
| **$36 million** | **Subtotal** |

### B. Illuminating the Reality of Castro's Cuba:

| | |
|---|---|
| $5 million | <u>Public Diplomacy:</u> Illuminate the reality of Castro's Cuba, through public diplomacy initiatives worldwide, including conferences, small grants, media and public outreach. |
| **$41 million** | **Total Recommended Funding** |

## IV.   BREAK THE INFORMATION BLOCKADE

The Castro regime controls all formal means of mass media and communication on the island.  Strict editorial control over newspapers, television, and radio by the regime's repressive apparatus prevents the Cuban people from obtaining accurate information on such issues as the Cuban economy and wide-scale and systematic violations of human rights and abridgement of fundamental freedoms.  It also limits the ability of pro-democracy groups and civil society to effectively communicate their message to the Cuban people.

According to a December 2003 poll of Cuban public opinion, more than 75 percent of the Cuban public watch state-run television or listen to state radio on a weekly basis.[1]  The regime uses these media programs to advance its propaganda war against Cuban civil society and other forces for change.  The Cuban public, however, is increasingly seeking external and non-state sources of information.  According to the same poll, increasing numbers of Cubans are turning to international television and radio broadcasting for news and information.  Foreign TV broadcasters such as CNN, TV Espanola, and TV Martí, as well as radio programs such as Radio Martí, BBC, and Voice of America (VOA) enjoyed high levels of recognition.

Access to the equipment necessary to receive foreign media, however, remains a critical obstacle to empowering civil society.  The Castro regime blocks many external radio signals and limits the ability of Cubans to obtain the necessary equipment to receive international broadcasts.  According to the poll, only 15 percent of Cubans had access to satellite channels.  Forty percent claimed to have a VCR at home.  While Cubans recognized and had highly favorable views of foreign radio stations, a far lower percentage had regular access to such stations.

Radio and Television Martí have consistently sought imaginative and effective solutions to increase the audience on the island.  The primary, almost exclusive, means of transmitting radio and television signals to Cuba has been by the use of an aerostat.  An important step in expanding the

---

[1] "Office of Cuba Broadcasting (OCB) Review: Media Audience Telephone Survey, Nov.-Dec. 2003," presented by Casals & Associates, to the Office of Cuba Broadcasting, by Sergio Diaz-Briquets, February 24, 2004.

26

transmission of accurate and timely information to the Cuban people is through the maintenance and continued deployment of the existing aerostat capability and adding a second transmission capability.

Immediately and for the short-term, existing C-130 COMMANDO SOLO aircraft have the ability to augment regular Radio and TV Martí broadcasts, as demonstrated in May 2003. These aircraft and their experienced crews fly in weather conditions that could ground the aerostat transmission platform now regularly used for broadcasts into Cuba.

Lofting both the C-130 COMMANDO SOLO airborne platform and the existing aerostat platform simultaneously, while operating on two separate frequencies, would advance the objective of reaching a larger Cuban audience. Over the longer-term, an airborne platform dedicated to full-time broadcast transmissions into Cuba, in combination with the aerostat platform, would expand the listening and viewing audience.

Similar patterns of obstruction, control, and lack of equipment apply to the Internet and computers. While 95.7 percent of Cubans polled had heard of the Internet, only 4.5 percent had used the Internet in the past year. The Cuban regime controls all access to the Internet, and all electronic mail messages are subject to strict government review and censorship. There are estimated to be only 270,000 computers in Cuba, with a paltry 58,000 connected to the national Internet network, which blocks access to most sites on the worldwide web. Thus, access to computers and peripheral equipment remains limited, and the Internet can be accessed only through government-approved institutions. Dial-up access to government-approved servers is prohibitively expensive for most citizens, and hence very few have access.

The regime also blocks instant messaging programs and has increased efforts to identify unauthorized Internet and e-mail users. In 2002, the government opened a national intranet gateway to some journalists, artists, and municipal-level youth community centers, but continued to restrict the types and numbers of international sites that could be accessed. Catholic Church representatives have been denied access to the Internet, or even the establishment of an intranet among dioceses.

This blockade on information must be broken in order to increase the availability to the Cuban people of reliable information on events in Cuba

27

and around the world and to assist in the effort to present a democratic alternative to the failed policies of the Castro regime.

**RECOMMENDATIONS:**

- *Direct the immediate deployment of the C-130 COMMANDO SOLO airborne platform, coordinated with the Office of Cuba Broadcasting (OCB), for weekly airborne radio and television transmissions into Cuba, consistent with the United States international telecommunication obligations.*

- *Make available funds to acquire and refit a dedicated airborne platform for full-time transmission of Radio and TV Martí into Cuba, consistent with the United States international telecommunications obligations.*

- *Direct OCB to provide audiotapes, videotapes, CDs and DVDs of its programs to NGOs for distribution in Cuba.*

- *Provide funds to NGOs to purchase broadcast time on TV and radio stations in the Caribbean basin that can be received in Cuba for programs on democracy, human rights, and market economies.*

- *Increase the provision of short-wave radios, satellite dishes, decoders, and other similar types of equipment to the Cuban people.*

## V.   DENY REVENUES TO THE CUBAN DICTATORSHIP

### A.  Undermine Regime-sustaining Tourism

"Flooding the island with tourists" is part of the Castro regime's strategy for survival. Since 1992, it has been aggressively developing and marketing a tourism infrastructure, including a cynically-orchestrated campaign to make Cuba attractive to U.S. travelers.

The estimated annual total number of international travelers is in the 1.8 to 2 million range. Of this global figure, some 160,000 to 200,000 legal and illegal travelers have come from the United States on an annual basis over the past decade. Since the October 10, 2003 implementation of increased U.S. enforcement efforts, there has been a decrease in the number of U.S. travelers, reducing the total to about 160,000. The regime has a

28

target of hosting 7.5 million international tourists by 2010 and 10 million by 2025. Currently, tourism is Cuba's largest single source of revenue, generating some $1.8-$2.2 billion in annual gross revenues. Of this amount, it is estimated that the regime nets 20 percent, although its take may be greater given the Cuban regime's routine failure to pay creditors or honor contracts with foreign investors. While Cuba based its initial calculations on luring U.S. tourists because of history and geography, the largest number visiting the island are from Western Europe (primarily Spain, Italy, and Germany) and Canada.

Today, Cuba has approximately 40,000 hotel rooms, and also permits the option for foreign nationals to rent private residences. The regime's eventual goal is to have upwards of 200,000 hotel rooms, and then limit, if not end, the ability of average Cubans to rent out rooms. The regime is moving now to implement this aspect of its strategy by increasing the tax on private room renters, as well as by sharply increasing harassment of those entrepreneurs. It seeks an eventual earning potential of $20,000-40,000 per hotel room per year.

**Tourism & Travel-related exports:** Central to the marketing of Cuba as a tourist destination, including to U.S. nationals traveling for licensed activities, is its "sand, sun, rum, and cigars" image. Closely related to tourism is the marketing and export of alcohol and tobacco products, a significant revenue-generating activity. Under current U.S. Department of Treasury regulations, licensed U.S. travelers to Cuba can import up to $100 worth of Cuban goods as accompanied baggage. In practice, these goods are almost exclusively Cuban rum and tobacco. In 2003, such imports by licensed travelers could have generated as much as $20 million in revenues to the regime through sales. (Actual revenues may have been even greater because of illegal imports by licensed and unlicensed travelers.)

Revenue gained from the sale of Cuban state-controlled commodities and products strengthens the regime. In addition, a number of state companies where these products are manufactured are subject to expropriation claims by U.S. nationals or have lawsuits pending in the United States to resolve ownership rights to product trademarks. Allowing the continued import of such goods increases the Castro government's hard currency reserves, undermines efforts to promote a transition to a market

29

economy, and legitimizes Cuban government use and marketing of confiscated trade names.

**Educational Travel:**  Under current regulations, accredited academic institutions receive specific licenses, usually valid for up to two years, to permit students to travel to Cuba for certain educational activities.  These include undergraduate or graduate students participating in a program as part of a course at a licensed institution; students conducting research towards a degree; students participating in a formal course of study at a Cuban academic institution; and other teaching-related activities.  In practice, while there are well-meaning participants who use this license category as intended, other travelers and academic institutions regularly abuse this license category and engage in a form of disguised tourism.

Many institutions use Cuba "study-tour programs" to generate revenues for other programs and most accept students not enrolled in their institution.  A large number of programs are for a short duration, allow for limited interaction with the Cuban people, and include lengthy unscheduled time periods to permit largely tourist activities to be accomplished.  Such travel does not promote a genuinely free exchange of ideas between Cubans and American students.  Evidence indicates that the majority of visits by U.S. students are organized by or coordinated through Cuban state travel and tour entities, are highly controlled by Cuban state security officials, and allow for only limited interaction with the average Cuban citizen.  Moreover, the regime has often used the visits by U.S. education groups to cultivate the appearance of international legitimacy and openness to the exchange of ideas.  Requiring that educational licenses be granted only to programs engaged in full-semester study in Cuba would support U.S. goals of promoting the exchange of U.S. values and norms in Cuba, would foster genuine academic study in Cuba, and would be less prone to abuse than the current regulations.  Academic programs of a shorter duration would be permitted only when the program directly promotes U.S. foreign policy goals.

**"Fully-Hosted Travel":**  "Fully-hosted travelers" — those whose travel-related expenses are paid for by the regime or other non-U.S. entity — currently may travel to Cuba without violating the Cuban Assets Control Regulations.  Although the regulations currently state that any person subject to U.S. jurisdiction who travels to Cuba without an Treasury Department

30

Office of Foreign Assets Control (OFAC) general or specific license is presumed to have engaged in prohibited travel-related transactions, the regulations allow a traveler to overcome this presumption by providing a signed explanatory statement, accompanied by relevant supporting documentation, showing that — however unlikely this might be, and however contrary this would be to the regime's intent of squeezing available dollars from U.S. and other foreign visitors — the traveler undertook no financial transactions.

A number of U.S. travelers, with the assistance of the Cuban regime, have abused the concept of fully-hosted travel to hide tourism to the island. This abuse is especially relevant in the case of Cuban marinas, which are owned and operated by the regime, and used by U.S. pleasure boaters. These marinas and related Cuban government agencies routinely issue letters attesting that the traveler was fully-hosted, when in fact the traveler paid for his/her own travel expenses and paid an additional fee to the Cuban regime to obtain the letter. Thus, the regime facilitates tourism by assisting U.S. travelers to evade U.S. travel restrictions which enhances the regime's currency reserves and undermines our overall policy goals of minimizing direct subsidies to the regime. Pleasure boaters on "fully-hosted" travel continue to need to seek a license from the U.S. Department of Commerce for the vessel.

**Travel By Private Plane:** Currently, U.S. regulations allow for licensed travelers to obtain a license, known as a temporary sojourn permit, from the U.S. Department of Commerce to travel by private plane to Cuba. While some private plane travel to Cuba is necessary, such as for the delivery of licensed humanitarian goods, this travel increases the regime's revenues through landing rights, airport/entry-exit fees, and services, and it limits the U.S. Government's ability to strictly enforce travel and trade prohibitions. Moreover, such travel by private plane, while ostensibly for humanitarian or religious purposes, often includes a tourism element and creates the appearance of business-as-normal relations with the Cuban government.

**RECOMMENDATIONS:**

31

- *Continue to strengthen enforcement of travel restrictions to ensure that permitted travel is not abused and used as cover for tourism, illegal business travel, or to evade restrictions on carrying cash into Cuba. This can be accomplished by increasing inspections of travelers and shipments to and from Cuba and continuing training of inspectors at all points of entry and pre-clearance facilities on the identification of unlicensed travelers.*

- *Support efforts by NGOs in selected third countries to highlight human rights abuses in Cuba, as part of a broader effort to discourage tourist travel. This could be modeled after past initiatives, especially those by European NGOs, to boycott tourism to countries where there were broad human rights concerns. Such a campaign, focused on international audiences, would reinforce international attention on the plight of the Cuban people, including political prisoners and civil society.*

- *Eliminate the regulatory provision allowing for the import of $100 worth of Cuban goods produced by Cuban state entities, including cigars and rum, as accompanied baggage. In order to enforce this measure, Treasury would need to continue to provide training to law enforcement authorities at U.S. ports and pre-clearance facilities to identify and fine violators of the import ban.*

- *Eliminate abuses of educational travel by limiting educational travel to only undergraduate or graduate degree granting institutions and only for full-semester study programs, or for shorter duration only when the program directly supports U.S. policy goals; requiring that the travelers be enrolled in a full-time course of study at the licensed institution; and requiring that educational institutional licenses be renewed annually, rather than bi-annually, to allow for improved enforcement of OFAC regulations.*

- *Eliminate the general license provision for amateur or semi-professional athletic teams to travel to Cuba to engage in competitions and require that all such travel be specifically licensed.*

- *Eliminate the specific license provision for travel related to clinics and workshops in Cuba, leaving general and specific license categories for professional research and attendance at professional meetings unchanged.*

32

- *Eliminate the concept of fully-hosted travel and require that all Cuba travel-related transactions be licensed under general or specific license, regardless of whether or not the U.S. traveler or another person subject to U.S. jurisdiction is directly involved in and/or pays for the transactions.*

- *Effective March 1, 2004, the President expanded the Cuba national emergency to provide the Coast Guard authority to require pleasure boaters to demonstrate that they have the appropriate Treasury and Commerce licenses before granting them a permit to leave U.S. territorial waters for Cuba. In order to improve unity of effort, responsiveness, and overall effectiveness, federal, state, and local law enforcement agencies should increase active participation in intelligence sharing and establish agreed-upon protocols for locating and prosecuting pleasure boaters who travel to Cuba illegally. We recommend an increase in both maritime surface patrols and air sorties in the region by law enforcement agencies.*

- *Revise the U.S. Government licensing policy to limit the issuance of temporary sojourn permits for private travel, except for the explicit delivery of humanitarian goods or services or when it is in the U.S. foreign policy interest. To mitigate against undue burdens on legitimate religious and humanitarian groups, we recommend increased efforts to reduce the costs charged by licensed scheduled charter flights.*

## B. Limit the Regime's Manipulation of Humanitarian U.S. Policies

To alleviate the hardships of a portion of the Cuban population, the United States has implemented various measures by which those with family members in Cuba can send cash remittances to them; travel to Cuba carrying gifts; and ship "gift parcels."

Castro has exploited these policies by effectively shifting burdens that ought to be assumed by the Cuban state and by profiting enormously from these transactions. Not only has he benefited from the pacifying effects of these humanitarian outreaches within the population — relying on the exile community to provide the Cuban people what he refuses to — but he attaches high fees to the various transactions involved. Whether sending remittances or care packages or traveling to the island, the costs to the exile

33

community far exceed market rates and translate into a significant cash windfall to the regime.

The Commission found that more than $1 billion annually in funds and goods are sent to Cuba from those living outside the island. This revenue stream has been institutionalized over the last 10 years, including by the manipulation of migration flows through the U.S.-Cuba Migration accords. Between 1994 and the first quarter of 2004, the United States issued more than 260,000 immigration travel documents to Cuban nationals, a total roughly equal to 2.7 percent of the island's entire population. It is estimated that of all Cuban nationals who have emigrated to or entered the United States since 1994, more than 50 percent were from the Havana area. In effect, U.S. compliance with the Migration Accords has had the effect of facilitating the relocation of a significant Cuban population to the United States; it is this population that is the most active in traveling and sending remittances and gift parcels to the island. And it is this source of resources, on a net basis, which is by far the largest hard currency source for the Castro regime after tourism. The following data further illuminate this situation:

**Remittances:** Under current U.S. regulations, U.S. persons aged 18 or older may send to the household of any individual in Cuba cash remittances of up to $300 per household in any three-month period, provided that no member of the household is a senior-level Cuban government or senior-level Cuban Communist Party official. Remittance transactions alone account for an estimated $400 to $800 million in annual hard currency flows to the island, with some estimates placing the total as high as $1 billion. The regime quickly captures a portion of the total value of remittances through transfer fees negotiated with legal U.S. remittance companies and through their "cut" from the unlicensed remittance carriers ("mules") bringing currency onto the island. There is no way to know how much is extorted from "mules," but information collected by legal U.S. remittance companies indicates that courier fees paid to "mules" by U.S. remitters exceed service fees charged by legal U.S. remittance companies, which are approximately 19 percent of the value of the remittance.

The regime recoups more of the remitted foreign exchange when the recipients make purchases at state-controlled *Tiendas para la Recuperación de Divisas (TRDs)* -- literally, Stores to Recover Hard Currency. Also known as "dollar stores," a large number of which also host offices of legal

34

U.S. remittance companies, these enterprises are a central part of the regime's apparatus to capture hard currency sent to the island. As of 2003, 1,000 dollar stores had been established, of which 300 were in Havana alone. Given the regime's near-monopoly on legal sales of products in dollars, the prices in dollar stores average 240 percent of the value of the product.[2] Between these mark-ups and the limited black market opportunities for Cubans to trade in dollars among themselves, the regime eventually captures a large percentage of the remaining amount of remitted dollars, estimated at 75-80 percent.

**Gift Parcels:** Gift parcels ("*paquetes*") with a dollar limit of $200 per parcel per month (excluding food, which is exempt from the value calculation) may be legally exported to Cuba and do not require a license. Eligible parcels may only contain items from 14 categories: food, clothing, vitamins, seeds, medicines, medical supplies and devices, hospital supplies and equipments, equipment for the handicapped, clothing, personal hygiene items, veterinary medicines and supplies, fishing equipment and supplies, soap-making equipment, and receive-only radio equipment and batteries for such equipment.

While the gift parcels provide a critical humanitarian benefit to the Cuban people, the Cuban regime directly benefits in two ways. First, such parcels decrease the pressure on the government to provide the basic needs of its people, enabling it to dedicate more resources to strengthening its repressive apparatus, while taking the political credit for the resultant improvement at the margin in the well-being of the Cuban people. Second, through delivery charges, the regime is able to generate additional hard foreign currency.

During the 2002-2003 period, the number of individual gift parcels authorized for shipment was 1.215 million, or about 50,650 per month. In 2003, the total value of licenses approved for Cuban gift parcels was $243 million. In 2002, the total value of approved gift parcel licenses was $257 million; in 2001, it was $302.9 million. There is no reliable figure for value or amount of goods shipped to Cuba outside these means. These are goods

---

[2] "Realities of Food Security in Cuba," Presentation prepared by Dr. James E. Ross, Courtesy Professor, University of Florida, for seminar on Humanitarian Aid for a Democratic Transition in Cuba, sponsored by the University of Miami's Cuba Transition Project, Institute for Cuban and Cuban-American Studies, Washington, D.C., January 16, 2004.

AR 68

that the regime does not have to purchase to meet the needs of the Cuban population.

Because the Cuban government does not permit direct mail or private shipping service to individuals, those wanting to mail packages to Cuba must use the services of consolidators, who ultimately rely on and pay fees to the Cuban state agency CubaPacks for delivery within Cuba. (The United States has repeatedly offered to resume normal postal service to Cuba, but the Castro regime has refused.) On average, U.S.-based consolidators charge $10 per pound for delivery of food and medicine parcels and $15 per pound for other eligible items (mainly clothing items), exclusive of the value of the commodities being shipped. CubaPacks, which receives the gift parcels when they arrive in Cuba and delivers them to the recipients, charges processing and delivery fees of $5 per pound for food and medicine parcels and $12 per pound for clothes. These Cuban government fees are built into the consolidators' fees. Based on an average weight of 3.5 pounds per parcel, this amounts to $53.2 million in gross value over the 24-month that the export license is valid. Of this amount, the Castro regime receives $36.2 million in revenues over the same 24-month period, or $1.5 million per month, in delivery charges.

**Family Visits:** Under existing U.S. regulations, U.S. nationals and permanent resident aliens are authorized to travel to Cuba once a year to visit relatives in Cuba, without a specific license. Any number of additional trips within the one-year period may be specifically licensed by the Treasury Department and such licenses are routinely issued. This category of travel was intended to support families, provide humanitarian relief to the Cuban people, and promote the sharing of U.S. democratic values.

Again, the regime has managed to exploit a well-intentioned program to generate hard currency for itself. A good portion of this travel involves carrying extra cash into the country, including under the rubric of allowable per diem amounts, which are $164 per day for any visiting U.S. national or permanent resident alien. As with other travel, Cuba makes money from the charter flights, which it controls; from its dollar stores, where the incoming dollars are generally spent; as well as in a variety of other ways, as outlined in the next section. In 2003, while the total number of U.S. travelers to the island dropped to an estimated 160,000, travelers claiming to visit family comprise as many as 125,000 of this number, which represents no decrease

36

in this category of travel. And of these 125,000 individuals, at least 31,097 traveled more than once (based on the number of specific licenses for additional family visits issued by the Treasury Department). It is estimated that the regime was able to generate $96.3 million in hard currency through these family visits from the United States to the island in 2003.

This amount does not include regime earnings through customs duties and a percentage of excess baggage fees levied on the extra baggage that most travelers on family visits bring to Cuba. Cuba allows travelers to the island to bring in goods valued at no more than $250 free of customs duties. In practice, most travelers on family visits bring in merchandise of much greater value and are therefore required to pay the Cuban regime $200 per traveler in additional customs duties, on top of the excess baggage fees of $2 per pound above the 44 pound maximum charged by the charter flight companies, fees of which the regime earns a percentage. It is estimated that the regime earns up to $20 million per year through fees and duties charged on excess baggage.

When considering possible changes to the "family visits" program, which was implemented in its present form in 1995 and revised in 1999 and 2003, it is important to note that those Cubans who have arrived in the United States within the last ten years under the Migration Accords are the most likely to travel back to Cuba on a regular basis, including through multiple annual trips.[3]

While the present regulations were presented as an effort to facilitate brief and intermittent family visits, the policy, in effect, has facilitated the ability of some Cubans in the United States to "commute" between the United States and Cuba. Should a migrant from Cuba wish to reunite his or her family, there are existing safe and legal methods to bring immediate relatives to the United States for reunification. It is then up to the Castro regime to allow those with immigrant visas to leave Cuba.

---

[3] Under current U.S. law, persons who are natives or citizens of Cuba may apply for Lawful Permanent Resident (LPR) or "green card," status one year after being admitted to or paroled into the United States. As LPRs, they may travel to Cuba, but, as is true for all LPRs and U.S. citizens, they are subject to the Department of Treasury's Cuban Asset Control Regulations and must comply with these requirements before a Treasury license will be issued. All Cuban LPRs who meet the regulatory requirements may travel to Cuba, regardless of how they initially entered the United States, including if they were originally admitted as refugees.

**Migration as a Revenue Generator:**  Remittances, gift parcels, and family visits are generated as a result of the migration of Cubans principally to the United States, facilitated by the fact that the United States is effectively obligated under the Migration Accords to issue at least 20,000 migration documents annually.  It was the Castro regime that insisted on the 20,000 visas threshold, not Cuban dissidents or the exile community.  While the humanitarian interest of discouraging potential rafters from taking to the seas remains paramount, the regime has effectively been provided an institutionalized safety valve for Cuban discontent with an accompanying revenue generator — it is the Cubans who recently migrated who have become one of the largest sources of funds and goods to the island.

The present system for Cuban emigration provides the Castro regime an additional mechanism to earn hard currency.  U.S. law requires a medical examination before permanent entry into the United States; however, U.S. law does not require a foreign government or entity to conduct these examinations.  In the case of Cuba, such examinations are conducted by a Cuban government doctor and have failed to identify serious pre-existing medical conditions of some Cubans seeking entry into the United States.  However, these examinations have proven to be a reliable source of hard currency for the regime and represent another part of the regime's manipulation of the migration process to approve those individuals it wants to send to the United States, regardless of their true medical condition. Medical examinations in Cuba for migration purposes cost between $350-400 per person; for the same purpose, the same examination is routinely performed in other Latin American countries for generally less than $70. The regime earns approximately $8 million per year from these medical examinations.

Another migration-related source of revenue for the regime is the fees for Cuban passports, which the regime requires for all Cubans seeking to emigrate.  The regime mandates a Cuban passport in order for a Cuban to obtain a regime-issued exit permit.  Fees for passports are $55.  Fees for exit permits are $150.

All activities related to the regime's regulation of the exit process can only be paid for in U.S. dollars by the Cuban wishing to exit Cuba in a safe, orderly, and legal manner.  In total, these costs amount to over $12,664,000

38

per year in additional hard currency for the regime through Cubans migrating to the United States.

Under the current system, visas may be processed at the U.S. Interests Section in Havana, but the determination of who actually gets to leave the country is ultimately determined by the Castro regime, through the issuing of the exit visa, known as the "white card." There are literally hundreds of cases of individuals who cannot leave the country even though they possess valid U.S. migration documents. There also are cases in which the regime simply extorts payments for exit visas, especially from professionals and those with family members living in the United States. Fees between $15,000 and $30,000 are sometimes required to gain the release of professionals. There is no effective means to tabulate the amount earned by the regime through this means of extortion. The regime garners further revenue through the cost of airfare charged to regime-approved charter services. These charters are the primary means of travel for migrants (and other travelers to Cuba). Each traveler must pay a $25 departure tax and approximately $300 for airfare.

**RECOMMENDATIONS:**

Recognizing the humanitarian need in Cuba as a basis for U.S. policies on remittances, gift parcels, and family travel, the Commission recommends a tightening of current policies to decrease the flow of resources to the regime.

**Remittances:**

- *Prohibit remittances to certain Cuban officials and members of the Cuban Communist Party and its affiliated institutions.*

- *Permit individuals to send remittances only to immediate family (grandparents, grandchildren, parents, siblings, spouses, and children) in Cuba.*

- *Revoke the existing general license provision in the Cuban Assets Control Regulations for banks to send individual remittances to Cuba. Such transactions would require each bank to be specifically licensed as*

39

*a remittance-forwarding service provider. This will facilitate the oversight and effective enforcement of remittance regulations.*

- *Offer rewards to those who report on illegal remittances that lead to enforcement actions. An undetermined amount of remittances are sent illegally to Cuba, via third country companies and through "mules" who carry the money to Cuba either directly or through third-countries. Rewards will encourage efforts to identify and eliminate illegal remittance networks.*

- *Direct U.S. law enforcement authorities to conduct "sting" operations against "mule" networks and others who illegally carry money to Cuba as a means to disrupt and discourage the sending of illegal remittances.*

## Gift Parcels:

- *Recognizing that gift parcels meet a fundamental humanitarian need in Cuba and that the shipment of these benefit the regime less directly than cash remittances, the Commission recommends:*

  - *Prohibit gift parcels to certain Cuban officials and members of the Cuban Communist Party and its affiliated institutions.*

  - *Limit gift parcels to medicines, medical supplies and devices, receive-only radios, and batteries, not to exceed $200 total value, and food (unlimited in dollar amount); and*

  - *Limit gift parcels to one per month per household, except for gift parcels exclusively containing food, rather than the current policy of allowing one gift parcel per month per individual recipient. This change will have no impact on NGOs that provide humanitarian support or assistance to pro-democracy or civil society groups.*

## Family Visits:

- *To reduce the regime's manipulation of family visits to generate hard currency — while preserving efforts to promote legitimate family ties and humanitarian relief for the Cuban people — the Commission recommends:*

40

- *Limit family visits to Cuba to one (1) trip every three years under a specific license; individuals would be eligible to apply for a specific license three years after their last visit to Cuba; new arrivals from Cuba would be eligible to apply for a specific license three years after leaving Cuba;*

- *Limit the definition of "family" for the purposes of family visits to immediate family (including grandparents, grandchildren, parents, siblings, spouses, and children);*

- *Limit the length of stay in Cuba for family visitation to 14 days. (This limit would be consistent with limits currently being implemented for humanitarian and other groups visiting the island);*

- *Reduce the current authorized per diem amount (the authorized amount allowed for food and lodging expenses for travel in Cuba) from $164 per day to $50 per day (i.e. approximately eight times what a Cuban national would expect to earn during a 14-day visit) for all family visits to Cuba, based on the presumption that travelers will stay with family in Cuba. This new limit will reduce the amount of hard currency that travelers can carry on their person and therefore undermine the efforts of those who seek to carry illegal remittances; and*

- *Limit the volume of baggage carried by those traveling to Cuba to no more than 44 pounds per traveler, without the possibility of purchasing excess baggage capacity. Travelers and groups holding specific licenses to deliver humanitarian goods or to deliver assistance to civil society groups and official U.S. Government travelers would continue to be exempt from this requirement.*

### Denying Migration Revenues to the Regime:

- *Recognizing our humanitarian interest in continuing to discourage potential rafters from risking their lives at sea, while seeking to minimize the Castro regime's ability to earn hard currency by exploiting our visa determination process, the Commission recommends:*

41

AR 74

- *Reduce Castro's profiteering from legal migration to the United States, including through charging exorbitant fees for passports, exit permits, medical examinations, and charter flights, by requesting an international monitoring and coordination entity to conduct a thorough review of regime practices with a view to reasonableness and consistency with other nation's practices, and to suggest changes as appropriate.*

## C.  Deny Other Sources of Revenue to the Regime

**Foreign Investment in Cuba:**  Starting in the early 1990s as part of its effort to replace lost Soviet subsidies, the Castro regime has pursued an aggressive effort to attract third-country investors for joint ventures.  A number of these ventures involve properties expropriated by the regime without adequate and effective compensation.  The Castro regime continues to promote foreign investment opportunities in Cuba, including in confiscated properties, claims to which are owned by U.S. nationals.  An unfavorable investment climate, a hostile Cuban bureaucracy, and unwieldy and frequently changing laws have limited the levels and types of foreign investment in recent years.  In 2003, for example, the number of foreign joint ventures in Cuba dropped by 15 percent, the most notable decline in recent years and a sign of the Castro regime's failed economic and investment policies.  However, it continues to actively seek foreign investment, especially from Europe, Canada, and Latin America, in its drive to reap more hard currency.  The Cuban Liberty and Democratic Solidarity (LIBERTAD) Act provides measures to discourage foreign investments in Cuba that involve confiscated property, claims to which are owned by U.S. nationals.

Implementation of these laws must address the legitimate desire of U.S. citizens to seek redress for the confiscation of their property, an objective consistent with efforts to implement a comprehensive strategy to deny hard currency to the Castro regime.  For those U.S. nationals who hold an ownership claim to property wrongfully confiscated by the Castro government, Title III of the LIBERTAD Act provides that U.S. national the right to bring an action in U.S. federal court against foreign nationals benefiting from that property.  Furthermore, Title IV of the LIBERTAD Act provides authority to impose visa sanctions against foreign nationals who benefit from properties wrongfully confiscated when a claim to the property

42

is owned by a U.S. national. The U.S. Government should seek to deter investment in Cuba by devoting additional personnel and resources to Title IV implementation and enforcement.

**Cuban Government Front Companies**: The Cuban government is believed to operate a number of front companies in the United States, Latin America, and Europe that are used to circumvent travel and trade restrictions and to generate additional hard currency. These front companies are believed to be involved in efforts to encourage illegal tourism and the sending of illegal remittances and gift parcels to Cuba, as well as helping the regime acquire high-end computer equipment and other sensitive technologies. These front companies provide another source of currency and technological information for the regime and function as a base for economic espionage.

**Venezuelan Oil:** Cuba maintains an extremely favorable oil arrangement with Venezuelan President Hugo Chavez, whereby up to 82,000 barrels of oil per day is received on preferential terms, a portion of which is then sold on the spot market. This arrangement nets more than $800 million in annual savings to Cuba, mirrored by an identical amount of lost revenues to Venezuela. In exchange, according to his own accounts, Castro has provided Chavez with an army of up to 12,000 Cubans, including doctors, medical personnel, and other technicians to bolster Chavez's popularity with the poorer segments of Venezuelan society, as well as more senior political and military advisors to help Chavez strengthen his authoritarian grip on the nation. Reports from Venezuela also indicate that Cuban doctors are engaging in overt political activities to boost Chavez's popularity. Cheap Venezuelan oil is vital to keeping the Cuban economy functioning, generates additional hard currency, and enables Cuba to postpone much needed economic reforms.

## RECOMMENDATIONS:

- *The process for implementation of Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act should ensure that the full range of policy options are made available to the President, and that a detailed, rigorous and complete country-by-country analysis of policies and actions with respect to Cuba is provided to the President for use in assessing whether the statutory requirements for a suspension of this*

43

*authority are satisfied, i.e., whether suspension is necessary to the national interests of the United States and whether suspension will expedite a transition to democracy in Cuba.*

- *To deter foreign investment in Cuba in confiscated properties, claims to which are owned by U.S. nationals, aggressively pursue Title IV visa sanctions against those foreign nationals trafficking in (e.g., using or benefiting from) such property, including devoting additional personnel and resources to application and enforcement.*

- *Neutralize Cuban government front companies by establishing a Cuban Asset Targeting Group, comprised of appropriate law enforcement authorities, to investigate and identify new ways in which hard currency is moved in and out of Cuba, including Internet banking, pre-paid cards, hawala-type systems, Internet gambling companies, and other such mechanisms. The group would also work to identify and close Cuban government front companies.*

## VI.    ILLUMINATE THE REALITY OF CASTRO'S CUBA

The current survival of the regime is in part dependent upon its carefully crafted international image. Cuba presents itself internationally as a prime tourist destination, as a center for bio-technological innovation, and as a successful socialist state that has improved the standard of living of its people. This image belies the true state of Cuba's economic and social conditions and the increasingly erratic behavior of its leadership.

**U.S. Embassy Public Diplomacy Efforts:** Public Diplomacy sections at U.S. embassies around the world, especially in Latin America and Europe, maintain extensive contacts with national NGOs and other civil society groups. Through small-grants programs, International Visitor Programs (IVPs), media resource centers, and other public diplomacy initiatives, Public Diplomacy sections have significant capabilities to communicate U.S. policies abroad and to generate host-country national interest on a given issue. With additional funding and other resources, these Public Diplomacy sections could be used to raise awareness of the human rights situation in Cuba, promote the discussion of transition planning for Cuba, and assist in the development of national working groups on the Cuba issue.

44

**RECOMMENDATIONS:**

- *Recognizing the importance of an enhanced public diplomacy effort, the Commission recommends that the U.S. Government make available an additional $5 million for the following purposes:*

  - *Fund U.S. Embassy public diplomacy sections worldwide to disseminate information abroad about U.S. foreign policy, specifically regarding human rights and other developments in Cuba, including Castro's record of harboring terrorists, committing espionage against the other countries, fomenting subversion of democratically-elected governments in Latin America, and the U.S. Government's belief that Cuba has at least a limited, developmental offensive biological weapons research and development effort;*

  - *Provide small grants and other assistance to local national groups interested in promoting greater information about U.S. policies toward Cuba and greater national involvement in support of democracy and the development of civil society in Cuba; and*

  - *Fund and promote international or third-country national conferences to disseminate information abroad about U.S. policies on transition planning efforts related to Cuba.*

## VII.  ENCOURAGE INTERNATIONAL DIPLOMATIC EFFORTS TO SUPPORT CUBAN CIVIL SOCIETY AND TO CHALLENGE THE CASTRO REGIME

There is a growing international consensus on the nature of the Castro regime and the need for change.  This consensus was brought about, in part, by the March-April 2003 crackdown on peaceful pro-democracy activists, the valiant effort by these same activists to continue to reach out to the Cuban people and the international community, and Castro's political attacks against the European Union and other nations.  Many of those who once stood by Castro have now begun to speak out publicly against the regime's abuses.  This same international consensus has limits.  All too frequently, moral outrage and international condemnation have not translated into real actions that directly assist the Cuban people in their quest for freedom and basic human rights.  On the positive side, the European

45

Union and its member states have denounced the Cuban regime, curtailed assistance and, in some cases, stepped up contacts with Cuban dissidents. However, much more needs to be done.

Encouraging international solidarity, challenging the regime in international organizations where appropriate, and strengthening international proactive support for pro-democracy groups in Cuba form a cornerstone of our policy to hasten an end to the Cuban regime and the transition to a free Cuba.

**International Solidarity**: Since the March-April 2003 crackdown, some third-country governments and NGOs have been searching for viable options to support civil society groups and political prisoners in Cuba. International outrage has opened the doors to new and creative strategies to support the opposition in Cuba, as the possibilities resulting from the downgraded public image of the regime increasingly mount. High-profile public initiatives, such as solidarity campaigns involving prominent public figures, solidarity concerts and artistic expositions, TV public interest commercials, etc., are valid options, as sectors of the international community are now much more willing to participate in public criticism of the regime and accept the necessity of halting rights violations in Cuba and supporting independent pro-democracy efforts.

This strategy is designed to generate greater active support for Cuban civil society from new sources and ultimately to develop a larger network of like-minded organizations sharing a body of knowledge and experience about democracy efforts in Cuba. This strategy will not only serve to globalize assistance efforts, but will also bring new perspectives, ideas, and methodologies to the table.

Examples of the types of projects that willing third-countries and NGOs could engage in include: technical training and material assistance to the Independent Libraries Project; outreach initiatives on labor rights in Cuba; technical training for independent unions provided by willing third-country trade unionists; publicly available Internet access facilities in diplomatic missions in Cuba, which also could be used to distribute other informational materials related to democracy, the rule of law, and human rights; direct relationships between willing third-country governments and

46

independent civil society and opposition groups; and solidarity visits to the families of political prisoners by prominent foreign figures.

**International Working Group on Democracy in Cuba**: A working group on democracy in Cuba composed of willing third-country leaders (ex-presidents and prime/cabinet ministers) could extend formal recognition to the civic movement on the island and contribute to the international isolation of the Castro regime. The working group could also be instrumental in forming national working groups on Cuba that would raise the profile of human rights abuses and mobilize third-country governments to do more to promote change on the island.

**Labor Rights and International Labor Organizations**: Currently, Cuban workers do not have the right to organize freely into independent unions. Cuban citizens who attempt to organize independent unions have been persecuted, and in some cases, imprisoned. In other cases, their families have also been subject to employment discrimination by the government, which maintains "employee files" that contain information on political activities. Because workers have no access to independent unions and the official union confederation merely reflects government views, collective bargaining rights are also denied to employees. Furthermore, Cuban workers do not have a legal right to strike.

The International Labor Organization (ILO) has been especially critical of the lack of freedom of association in Cuba, in particular with regard to the institutionalized trade union monopoly enjoyed by the official union confederation under Cuba's Labor Code. In 2003, the ILO's supervisory bodies also examined cases related to threats, detentions, and pressure against workers who attempted to form unions outside the established structure. In June 2003, the ILO Conference Committee on the Application of Standards called on the Cuban government to accept an ILO "direct contacts mission" with a view to ensuring the application of freedom of association in law and practice. The Cuban government rejected this suggestion, and instead argued that Cuban labor movement "unity" was the will of the workers themselves and that alleged attempts to establish new unions were in fact subversive activities funded by the United States. The ILO should be supported in its efforts to improve the labor situation on the island.

47

**The Inter-American Commission on Human Rights:**  The Inter-American Commission on Human Rights (IACHR) monitors human rights abuses in the Western Hemisphere.  Any person, group, or NGO may present a petition to the IACHR alleging violations of the rights protected in the American Convention on Human Rights.  The IACHR may process petitions alleging human rights violations by state agents and petitions alleging that a state failed to act to prevent a violation of human rights or failed to carry out proper follow-up after a violation, including the investigation and sanction of those responsible as well as the payment of compensation to the victim.

The IACHR continues to exercise jurisdiction regarding Cuba, processes complaints, and has twice requested on-site visits to Cuba.  The Commission also continues to prepare reports on the situation of human rights in that country, which have been transmitted to the Cuban government and submitted to the member states of the OAS.  However, more can be done to support efforts by Cubans to more effectively utilize the IACHR to highlight the regime's continued human rights violations and focus the activity of the international community, especially in Latin America, on these violations.

48

AR 81

**RECOMMENDATIONS:**

**International Solidarity Campaign:**

- *Recognizing the need to solidify international consensus and promote greater direct involvement by third-countries in Cuba, we recommend the implementation of the following diplomatic campaign:*

  - *Increase direct efforts with willing third-country governments to develop a robust, proactive policy to (1) support Cuban civil society, including the opposition, and (2) develop policy frameworks for assistance to a post-dictatorship Cuba;*

  - *Encourage greater involvement in Cuba by willing third-country NGOs to promote the development of Cuban civil society;*

  - *Encourage willing third-country governments to establish direct relationships with legitimate independent civil society groups;*

  - *Encourage willing third-country governments to create public access Internet facilities in their missions in Cuba;*

  - *Assist the development of an International Working Group on Democracy in Cuba through diplomatic support and making U.S. government financial assistance available to willing third-country NGOs as appropriate;*

  - *Encourage like-minded governments and third-country NGOs to develop coordinated international political and legislative actions to condemn the Castro regime and to pressure for change through the creation of Cuba working groups and interest groups and through actions by national legislatures to take up the issue of Cuba, call for hearings, and issue statements; and*

  - *Participate in and support efforts by willing third-country NGOs to host roundtables of experts to discuss transition planning and compare transition experiences.*

49

**Labor Rights and the ILO:**

- *To increase international attention to labor rights violations and to bolster support for the advancement of labor rights in Cuba, the following steps to re-energize labor rights efforts should be taken. In addition, increased attention to labor rights and corporate social responsibility in Cuba will have the added impact of raising the risks associated with investment on the island under the current regime and could facilitate efforts to discourage further investments.*

  - *Provide informational material on Cuba's labor rights violations at regional labor meetings and at the ILO conference as appropriate. Distribute the Department of State pamphlet "The Dream Deferred: Fear and Freedom in Fidel's Cuba" at similar meetings.*

  - *Assist NGOs and other interested parties in organizing conferences abroad on corporate social responsibility, to include NGOs, businesses, and unions. Participants would be encouraged to protect worker rights in existing foreign investment ventures and to speak out strongly against Cuban government labor rights violations at ILO conferences and other international meetings on labor issues.*

  - *Work with NGOs and other interested parties to assure that a Cuban independent labor representative or labor representative in exile is able to speak at ILO conferences.*

  - *Reach out to willing third-country labor unions and urge them to raise Cuban labor rights violations at regional labor meetings.*

  - *Encourage efforts by NGOs to draw attention to exploitative labor conditions in Cuba and assist Cuban workers in obtaining redress for that wrong.*

**Inter-American Commission on Human Rights:**

- *Fund NGO projects designed to help Cuban citizens obtain effective access to the IACHR and provide in-country training, through appropriate NGOs, to Cuban human rights activists in collecting and preparing information in order to file claims with the IACHR.*

**VIII. UNDERMINE THE REGIME'S SUCCESSION STRATEGY**

50

AR 83

Approaching his 78th birthday, Fidel Castro has conspicuously deteriorated physically and probably mentally as well. His decline over the last few years has been apparent on several occasions at public events in Cuba and abroad. The quality of Castro's decision-making has declined along with his physical condition. He has savagely denounced foreign leaders who have been the targets of bizarre and belligerent outbursts. Foreign visitors have been shocked by his decline, although little of this has attracted international media attention.

On the island, however, Cuban officials are aware of his impairments. Senior leaders have been called upon to cover for him and explain away his misstatements. Nothing remotely like this public checking of his absolute power has ever happened before.

The senior Cuban leadership is now faced with the reality that Fidel Castro's physical end is at hand and is making preparations to manage a "succession" of the regime that will keep the senior leadership in power. The regime's survival strategy is to maintain the core elements of the existing political structure in passing eventual leadership of the country from Fidel to Raul Castro and others currently in the senior leadership.

U.S. policy must be targeted at undermining this succession strategy by stripping away layers of support within the regime, creating uncertainty regarding the political and legal future of those in leadership positions, and encouraging more of those within the ruling elite to shift their allegiance to those pro-democracy forces working for a transition to a free and democratic Cuba. To these ends, attention and pressure must be focused on the ruling elite so that succession by this elite or any individual is seen as what it would be: an impediment to a democratic and free Cuba. Targeting current regime officials for U.S. visa denials is one instrument available to the United States to hold them accountable for human rights abuses against the Cuban people and others, including the torture by Castro regime officials of American POWs in South East Asia, or for providing assistance to fugitives in Cuba from U.S. justice. Current U.S. law prohibits assistance to a transition government that includes Raul Castro.[4]

---

[4] See Sec. 205(a)(7) of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act.

51

AR 84

**Transition Coordination:** Another signal of the unwillingness of the United States to accept the Castro regime's "succession strategy" would be the establishment of a focal point within the U.S. Government to coordinate U.S. programs to assist a democratic transition. Presently, there are offices to address the current bilateral relationship, migration, and other elements of U.S. policy towards Cuba, but no entity or official with a specific mandate to help prepare the U.S. Government for a transition.

The work of this Commission is the first comprehensive effort to address how the U.S. Government can support a democratic transition. Appointing a Transition Coordinator would signal to the regime and to the international community the interest of the United States in proactively preparing for a post-Castro Cuba. It would also provide a means through which the strategies and programs set forth by this Commission can be reviewed, updated, and revised as events on the island unfold. By establishing a dedicated Transition Coordinator, the U.S. Government can be prepared to respond strategically and effectively to a transition in Cuba.

## RECOMMENDATIONS:

- *Target regime officials for visa denial if they (1) are or were involved in torture or other serious human rights abuses or (2) provided assistance to fugitives from U.S. justice. Implementation measures would include:*

  - *A database of Cubans credibly alleged to have participated in torture or other serious human rights abuses; and*

  - *A second database of persons who provide assistance to fugitives from U.S. justice.*

- *Establish a Transition Coordinator at the State Department to facilitate expanded implementation of pro-democracy, civil-society building, and public diplomacy projects for Cuba and to continue regular planning for future transition assistance contingencies.[5]*

---

[5] The Transition Coordinator could serve as the Coordinating Official contemplated by Sec. 203 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act.

52



**Wednesday,**
**June 16, 2004**

**Part III**

# Department of the Treasury

**Office of Foreign Assets Control**

**31 CFR Part 515**
**Cuban Assets Control Regulations; Interim Final Rule**
**Revocation of OFAC Specific Licenses To Engage in Travel-Related Transactions Incident to Visiting Close Relatives in Cuba; Notice**

## DEPARTMENT OF THE TREASURY

**Office of Foreign Assets Control**

**31 CFR Part 515**

**Cuban Assets Control Regulations**

**AGENCY:** Office of Foreign Assets Control, Treasury.

**ACTION:** Interim final rule.

---

**SUMMARY:** The Office of Foreign Assets Control of the U.S. Department of the Treasury is amending the Cuban Assets Control Regulations, part 515 of chapter V of 31 CFR, to implement the President's May 6, 2004 direction with respect to certain recommendations in the May 2004 Report to the President from the Commission for Assistance to a Free Cuba. This rule also contains additional substantive amendments consistent with the President's policy as well as technical and clarifying amendments.

**DATES:** *Effective Date:* June 30, 2004.

*Comments:* Written comments must be received no later than August 16, 2004.

**ADDRESSES:** Comments may be submitted in the English language by any of the following methods:

• Federal eRulemaking Portal: *http:// www.regulations.gov.* Follow the instructions for submitting comments.

• Agency Web site: *http:// www.treas.gov/offices/enforcement/ ofac/comment.html.*

• Fax: Chief of Records, 202/622– 1657.

• Mail: Chief of Records, ATTN: Request for Comments, Office of Foreign Assets Control, Department of the Treasury, 1500 Pennsylvania Avenue, NW., Washington, DC 20220.

*Instructions:* All submissions received must include "Office of Foreign Assets Control, Treasury" and the FR Doc. number that appears at the end of this document. Comments received will be posted without change to *http:// www.treas.gov/ofac,* including any personal information provided. For detailed instructions on submitting comments and additional information on the rulemaking process, see the "Public Participation" subsection of the **SUPPLEMENTARY INFORMATION** section of this document. To read background documents or comments received, go to *http://www.treas.gov/ofac.*

**FOR FURTHER INFORMATION CONTACT:** Chief of Licensing, tel.: 202/622–2480 or Chief of Policy Planning and Program Management, tel.: 202/622–4855, Office of Foreign Assets Control, or Chief Counsel, tel.: 202/622–2410, Office of

Chief Counsel (Foreign Assets Control), Department of the Treasury, Washington, DC 20220 (not toll free numbers).

**SUPPLEMENTARY INFORMATION:**

### Electronic and Facsimile Availability

This file is available for download without charge in ASCII and Adobe Acrobat readable (\*.PDF) formats at *GPO Access. GPO Access* supports HTTP, FTP, and Telnet at *fedbbs.access.gpo.gov.* It may also be accessed by modem dialup at 202/512– 1387 followed by typing "/GO/FAC." Paper copies of this document can be obtained by calling the Government Printing Office at 202/512–1530. This document and additional information concerning the programs of the Office of Foreign Assets Control are available for downloading from the Office's Internet Home Page: *http://www.treas.gov/ofac,* or via FTP at *ofacftp.treas.gov.* Facsimiles of information are available through the Office's 24-hour fax-on-demand service: call 202/622–0077 using a fax machine, fax modem, or (within the United States) a touch-tone telephone.

### Background

On October 10, 2003, the President announced the establishment of a Commission for Assistance to a Free Cuba (the "Commission"), an interagency commission tasked with identifying ways to hasten Cuba's transition to a free and open society and identifying U.S. Government programs that could assist the Cuban people during such a transition. On May 1, 2004, the Commission delivered its Report to the President, recommending, among other things, a number of proposed changes to the U.S. sanctions with respect to Cuba. On May 6, 2004, the President directed the implementation of certain of the Report's recommendations. In this interim final rule, the Office of Foreign Assets Control ("OFAC") is amending the Cuban Assets Control Regulations, 31 CFR part 515 (the "CACR"), to implement these recommendations, to make additional changes consistent with the President's policy with respect to Cuba, and to make certain technical and clarifying changes.

*Fully-hosted travel.* Section 515.420, the note to paragraph (c) and paragraph (f) of § 515.560, and paragraph (c)(4)(i) of § 515.572 are amended to remove discussion of and references to fully-hosted travel and the presumption that travelers to Cuba pay expenses for Cuba travel-related transactions. The term "fully-hosted travel" refers to travel to,

from, or within Cuba for which all costs and fees either are paid for by a third-country national who is not subject to U.S. jurisdiction or are covered or waived by Cuba or a national of Cuba. The term was first introduced into the CACR on July 22, 1982, in § 515.560 of the "Licenses, Authorizations, and Statements of Licensing Policy" subpart. *See* 47 FR 32060. Paragraph (j) of § 515.560 provided that all transactions incident to fully-hosted travel were authorized. On May 13, 1999, OFAC removed this provision from § 515.560, amended it, and placed it in a new § 515.420, which is in the "Interpretations" subpart of the CACR. *See* 64 FR 24808.

In the years since the May 13, 1999 amendments, it has been found that persons who claimed their travel was fully-hosted in fact routinely engaged in prohibited money transactions (*e.g.,* payment of entry and exit and docking fees). It has also been determined that even a person who accepts goods or services in Cuba without paying for them is in fact engaging in a prohibited dealing in property in which Cuba or a Cuban national has an interest. Therefore, language regarding fully-hosted travel is removed from the CACR and any authorization of fully-hosted travel is thereby eliminated. Amended § 515.420 now explains that the prohibition in § 515.201(b)(1) on dealing in property includes a prohibition on the receipt of goods or services in Cuba when those goods or services are provided free-of-charge, whether received as a gift from the Government of Cuba, a national of Cuba, or a third-country national, unless otherwise authorized by an OFAC general or specific license. *See, e.g.,* § 515.560(a) of the CACR. Amended § 515.420 also explains that payment for air travel to Cuba on a third-country carrier, which involves property in which Cuba has an interest (for example, because the carrier will pass a portion of the payment on to Cuba), is now prohibited unless the travel is pursuant to an OFAC general or specific license.

Along with the references to fully-hosted travel, the companion language in § 515.420, which states that any person who travels to Cuba without OFAC authorization is presumed to have engaged in prohibited travel-related transactions there, is also removed. Notwithstanding the removal of this language, it is OFAC's position that the receipt of services or other dealings in property in which Cuba has an interest, such as a stay at a Cuban hotel or the purchase of food in Cuba, can be inferred from evidence of multi-day travel in Cuba.

*Importation of Cuban merchandise.* Paragraph (c)(3) of § 515.560 is amended to eliminate the general license authorizing licensed travelers to Cuba to purchase in Cuba and return to the United States with up to $100 worth of Cuban merchandise for personal consumption. The amended paragraph (c) now explains that, with the exception noted below, no merchandise may be purchased or otherwise acquired in Cuba and then brought back to the United States. OFAC has added a note to paragraph (c) explaining that this rule does not apply to the purchase in Cuba and importation into the United States of informational materials, which continue to be exempt from the prohibitions of the CACR, as described in § 515.206.

*Exportation of accompanied baggage.* Former paragraph (f) of § 515.560, which discussed the carrying of currency by fully-hosted travelers, is replaced with a new paragraph (f) limiting the amount of accompanied baggage carried by authorized travelers to Cuba to 44 pounds per traveler, unless a higher amount is authorized by the Bureau of Industry and Security of the Department of Commerce or, for exportations of non-U.S. origin accompanied baggage from third countries to Cuba, by a specific license from OFAC.

*Travel to visit relatives in Cuba.* Sections 515.560 and 515.561 are amended to make a number of changes to the rules regarding travel-related transactions incident to visiting relatives in Cuba.

Prior to these amendments, a person with a Cuban national close relative (defined to include second cousins) in Cuba could engage in travel-related transactions incident to visiting that relative once every 12 months under a general license and more often pursuant to specific licenses if requested. There was no stated limit to the duration of the first visit, and the traveler could spend up to the State Department per diem (currently $167) for living expenses in Cuba plus any additional funds needed for transactions that were directly incident to visiting that relative.

These amendments narrow the category of relatives who can be visited in Cuba. The definition of "close relative" set forth in former paragraph (d) of § 515.561, is replaced by the term "member of a person's immediate family," which is defined in new paragraph (c). Under the new rule, a member of a person's immediate family is defined as a spouse, child, grandchild, parent, grandparent, or sibling of that person or that person's spouse, as well as any spouse, widow,

or widower of any of the foregoing. Relevant portions of § 515.561 also are amended to eliminate the policy of authorizing those who share a common dwelling as a family with the traveler to accompany the traveler, unless they are themselves members of the immediate family of the person to be visited.

The once-per-twelve-months general license contained in former paragraph (a) of § 515.561 is eliminated. In its place, new paragraph (a) states that OFAC will issue specific licenses authorizing travel-related transactions incident to visits to members of a person's immediate family who are nationals of Cuba once per three-year period and for no more than 14 days. A person subject to U.S. jurisdiction who wishes to engage in travel-related transactions to visit a member of his or her immediate family who is a national of Cuba will need to request and receive specific permission from OFAC before engaging in those transactions. For those who emigrated to the United States from Cuba and have not since that time visited a family member in Cuba, the three-year period will be counted from the date they left Cuba. For all others, the three year period will be counted from the date they last left Cuba pursuant to the pre-existing family visit general license or, if they traveled under a family visit specific license, the date that license was issued. Former paragraph (b), under which OFAC issued specific licenses for additional visits, is eliminated. No additional visits will be authorized.

Former paragraph (c) of § 515.561 stated a different rule for travelers wishing to visit relatives who are not nationals of Cuba but who instead are in Cuba pursuant to an OFAC authorization (such as a student who is in Cuba under her university's educational activities license). This rule has been moved to paragraph (b) and modified to provide for the issuance of a specific license to visit a member of a person's immediate family in exigent circumstances provided the person to be visited is in Cuba pursuant to an OFAC authorization, the particular exigency has been reported to the U.S. Interests Section in Havana, and issuance of the license would support the mission of the U.S. Interests Section in Havana. Licenses would be issued under this paragraph, after consultation with the Department of State, in true emergent situations, such as serious illness accompanied by an inability to travel, and in order to support services normally provided in such circumstances by the U.S. Interests Section in Havana.

A number of individuals have outstanding specific licenses that were issued pursuant to former § 515.561(b) and (c). Those licenses will remain valid only until June 30, 2004, after which they are revoked. Accordingly, individuals who have such specific licenses may not use them to engage in any Cuba travel-related transaction occurring on or after June 30, 2004.

These amendments also reduce the amount of money travelers visiting members of their immediate family may spend for their living expenses in Cuba. The new limit, set forth in amended paragraph (c)(2) of § 515.560, is $50 per day plus up to an additional $50 per trip, if needed, to pay for transportation-related expenses in Cuba that exceed the $50 per day limit. For example, a traveler whose five-day trip to visit her father in Camaguey includes roundtrip ground transportation between Havana and Camaguey may expend $50 per day for her living expenses in Cuba plus up to an additional $50, if needed, to pay for the costs of transportation between Havana and Camaguey, for a total of $300 of in-Cuba costs (airfare to and from Cuba is not included in this limit). The per diem amount for all other categories of OFAC-authorized travel-related transactions in Cuba remains unchanged.

*Attendance at certain professional meetings in Cuba.* A note is added to paragraph (a)(1) of § 515.564 to clarify that the general license in paragraph (a) authorizing travel-related transactions incident to certain professional research in Cuba does not extend to transactions incident to attendance at professional meetings or conferences in Cuba. Attendance at certain professional meetings and conferences in Cuba already is addressed by a separate general license set forth in paragraph (a)(2). To the extent a professional researcher believes that attendance at a particular meeting or conference in Cuba is important to his or her research and the meeting or conference does not qualify under the general license set forth in paragraph (a)(2), the researcher may request a specific license from OFAC under paragraph (b).

*Educational activities in Cuba.* OFAC is amending § 515.565 to reflect new policy with respect to specific licensing of certain educational activities in Cuba. These amendments restrict the availability under paragraph (a) of specific licenses to institutions to undergraduate and graduate institutions. Accordingly, former paragraph (a)(2)(vi), which covered certain activities by secondary schools, has been eliminated. The duration of

these institutional licenses is shortened from two years to one year.

Paragraph (a) of § 515.565 is further amended by adding a requirement that any students who use an institution's license must be enrolled in an undergraduate or graduate degree program at that licensed institution. Students may no longer engage in Cuba travel-related transactions under the license of an educational institution other than their own even if their own institution will accept the licensed institution's program for credit toward the student's degree. Paragraph (a) also is amended to clarify that employees who travel under an institution's license must be full-time permanent employees of the licensed institution. Temporary employees and contractors do not qualify as full-time permanent employees of an institution.

Three of the six educational activities listed in paragraph (a) of § 515.565 that are available to licensed educational institutions and their students and staff are subject to a new requirement that those educational activities in Cuba be no shorter than 10 weeks. The three affected activities are: structured educational programs in Cuba offered as part of a course at the licensed institution; formal courses of study at a Cuban academic institution; and teaching at a Cuban academic institution. The remaining three educational activities may still be engaged in for a period of less than 10 weeks. These activities are: graduate research in Cuba; sponsorship of a Cuban national to teach or engage in other scholarly activities in the United States; and organization of and preparation for licensed educational activities. OFAC is also amending the requirements in paragraph (a) with respect to letters from the licensed institution that must be carried by each authorized traveler.

Some current holders of educational institution licenses may have already planned Cuba travel-related activities that would not be authorized under amended paragraph (a) of § 515.565. Those licensed institutions that, prior to the effective date of this Notice, have already planned Cuba trips that will not meet the new requirements may still engage in all transactions incident to such trips provided that the trips and all associated transactions are completed by August 15, 2004.

Paragraph (b) of § 515.565 is amended to clarify that its statement of specific licensing policy applies only to individuals seeking to engage in certain educational activities in Cuba if their educational institution does not have an institutional license under paragraph

(a). The licensing policies set forth in paragraphs (a) and (b) are not available to individuals or entities that purport to arrange, facilitate, or coordinate educational programs in Cuba for U.S. academic institutions.

*Participation in international sports federation competitions; clinics and workshops licensing policy.* OFAC is eliminating the general license set forth in paragraph (a) of § 515.567 for travel-related transactions incident to participation in amateur and semi-professional athletic competitions that take place in Cuba under the auspices of an international sports federation. In its place, revised paragraph (a) states a specific licensing policy under which OFAC will authorize those same activities on a case-by-case basis. OFAC also in amending paragraph (b) of the same section to eliminate the policy of specifically licensing travel-related transactions incident to participation in clinics and workshops, whether sports-related or otherwise, in Cuba.

*Quarterly remittances to nationals of Cuba.* OFAC is amending the general license in paragraph (a) of § 515.570 to eliminate the authorization of quarterly $300 remittances sent from any person subject to U.S. jurisdiction who is 18 years of age or older to any household of a national of Cuba. The amended general license authorizes such remittances only when they are sent to members of the remitter's immediate family. The term "member of the remitter's immediate family" is defined to include only a spouse, child, grandchild, parent, grandparent, or sibling of the remitter or that remitter's spouse, as well as any spouse, widow, or widower of any of the foregoing. Paragraph (a) is further amended to provide that the quarterly $300 remittance cannot be remitted to certain government officials and certain members of the Cuban Communist Party.

Paragraph (c)(4)(i) of § 515.560 is also amended to reduce the total amount of quarterly $300 remittances that an authorized traveler may carry to Cuba from $3,000 to $300.

*NGO remittances to Cuba.* Paragraph (d)(1) of § 515.570 is revised to clarify the specific licensing policy of authorizing remittances from nongovernmental organizations and individuals subject to U.S. jurisdiction to Cuban pro-democracy groups, independent civil society groups, and religious organizations as well as to individual members of such Cuban groups and organizations.

*Remittance-related transactions by banks and other depository institutions.* Paragraph (a)(3) of § 515.572 is amended

to eliminate the general license authorizing depository institutions to act as forwarders for the quarterly family household remittances or emigration-related remittances authorized in paragraphs (a), (b), and (c) of § 515.570. Depository institutions, as defined in § 515.333, are now required to apply to OFAC and receive specific authorization as remittance forwarders before providing such services. Depository institutions continue to be authorized by general license, however, to provide services related to other authorized financial transactions. For example, a banking institution does not need separate authorization from OFAC to transfer to Cuba funds covered by a specific license allowing overflight payments or remittances other than quarterly family or emigration-related remittances.

*Technical and conforming amendments.* OFAC is making a number of technical and conforming amendments to various sections of the CACR to amend wording, cross-references, and paragraph structure.

## Public Participation

Because the Regulations involve a foreign affairs function, the provisions of Executive Order 12866 and the Administrative Procedure Act (5 U.S.C. 553) (the "APA") requiring notice of proposed rulemaking, opportunity for public participation, and delay in effective date are inapplicable. However, because of the importance of the issues addressed in these regulations, this rule is being issued in interim form and comments will be considered in the development of final regulations. Accordingly, the Department encourages interested persons who wish to comment to do so at the earliest possible time to permit the fullest consideration of their views. Comments may address the impact of the amendments on the submitter's activities, whether of a commercial, non-commercial or humanitarian nature, as well as changes that would improve the clarity and organization of the CACR. All comments must be submitted in the English language.

The period for submission of comments will close August 16, 2004. The Department will consider all comments postmarked before the close of the comment period. Comments received after the end of the comment period will be considered if possible, but their consideration cannot be assured. The Department will not accept public comments accompanied by a request that a part or all of the submission be treated confidentially because of its business proprietary

nature or for any other reason. The Department will return such submission to the originator without considering them in the development of final regulations. In the interest of accuracy and completeness, the Department requires comments in written form.

All public comments on these Regulations will be a matter of public record. Copies of the public record concerning these Regulations will be made available not sooner than September 14, 2004, and will be obtainable from OFAC's Web site (*http://www.treas.gov/ofac*). If that service is unavailable, written requests for copies may be sent to: Office of Foreign Assets Control, U.S. Department of the Treasury, 1500 Pennsylvania Ave., NW., Washington, DC 20220, Attn: Chief, Records Division.

Because no notice of proposed rulemaking is required for this rule, the Regulatory Flexibility Act (5 U.S.C. 601–612) does not apply.

**Paperwork Reduction Act**

The collections of information related to the CACR are contained in 31 CFR part 501 (the "Reporting and Procedures Regulations"). Pursuant to the Paperwork Reduction Act of 1995 (44 U.S.C. 3507), those collections of information have been previously approved by the Office of Management and Budget under control number 1505–0164. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid control number.

**List of Subjects in 31 CFR Part 515**

Administrative practice and procedure, Banks, Banking, Blocking of assets, Cuba, Currency, Foreign trade, Imports, Reporting and recordkeeping requirements, Securities, Travel restrictions.

■ For the reasons set forth in the preamble, part 515 of 31 CFR chapter V is amended as follows:

■ 1. The authority citation for 31 CFR part 515 continues to read as follows:

**Authority:** 18 U.S.C. 2332d; 22 U.S.C. 2370(a), 6001–6010; 31 U.S.C. 321(b); 50 U.S.C. App 1–44; Pub. L. 101–410, 104 Stat. 890 (28 U.S.C. 2461 note); Pub. L. 106–387, 114 Stat. 1549; E.O. 9193, 7 FR 5205, 3 CFR, 1938–1943 Comp., p. 1147; E.O. 9989, 13 FR 4891, 3 CFR, 1943–1948 Comp., p. 748; Proc. 3447, 27 FR 1085, 3 CFR, 1959–1963 Comp., p. 157; E.O. 12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614.

**Subpart D—Interpretations**

■ 1. Revise § 515.420 to read as follows:

**§ 515.420    Travel to Cuba.**

The prohibition on dealing in property in which Cuba or a Cuban national has an interest set forth in § 515.201(b)(1) includes a prohibition on the receipt of goods or services in Cuba, even if provided free-of-charge by the Government of Cuba or a national of Cuba or paid for by a third-country national who is not subject to U.S. jurisdiction. The prohibition set forth in § 515.201(b)(1) also prohibits payment for air travel to Cuba on a third-country carrier unless the travel is pursuant to an OFAC general or specific license.

**Subpart E—Licenses, Authorizations, and Statements of Licensing Policy**

■ 2. Amend § 515.560 by removing the note to paragraph (c) and revising paragraphs (a) introductory text, (a)(1), (a)(7), (c) introductory text, (c)(2), (c)(3), (c)(4) introductory text, (c)(4)(i), and (f) to read as follows:

**§ 515.560    Travel-related transactions to, from, and within Cuba by persons subject to U.S. jurisdiction.**

(a) The travel-related transactions listed in paragraph (c) of this section may be authorized either by a general license or on a case-by-case basis by a specific license for travel related to the following activities (see the referenced sections for the applicable general and specific licensing criteria):

(1) Visits to members of a person's immediate family (specific licenses) (see § 515.561);

* * * * *

(7) Public performances, athletic and other competitions, and exhibitions (specific licenses) (see § 515.567);

* * * * *

(c) Persons generally or specifically licensed under this part to engage in transactions in connection with travel to, from, and within Cuba may engage in the following transactions:

* * * * *

(2) *Living expenses in Cuba.* All transactions ordinarily incident to travel anywhere within Cuba, including payment of living expenses and the acquisition in Cuba of goods for personal consumption there, are authorized, provided that, unless otherwise authorized, the total for such expenses does not exceed:

(i) For visits to members of a person's immediate family pursuant to § 515.561, $50 per day plus up to an additional $50 per trip, if needed, to cover within-Cuba transportation-related expenses.

(ii) For all other authorized activities, the "maximum per diem rate" for Havana, Cuba, in effect during the period that the travel takes place. The maximum per diem rate is published in the State Department's "Maximum Travel Per Diem Allowances for Foreign Areas," a supplement to section 925, Department of State Standardized Regulations (Government Civilians, Foreign Areas), which is available from the Government Printing Office, Superintendent of Documents, P.O. Box 371945, Pittsburgh, PA 15250–7954 and on the Internet at *http://www.state.gov/m/a/als/prdm*.

(3) *Importation of Cuban merchandise prohibited.* Nothing in this section authorizes the importation into the United States of any merchandise purchased or otherwise acquired in Cuba, including but not limited to any importation of such merchandise as accompanied baggage. The importation of Cuban-origin information and informational materials is exempt from the prohibitions of this part, as described in § 515.206.

(4) *Carrying remittances to Cuba.* The carrying to Cuba of any remittances that the licensed traveler is authorized to remit pursuant to § 515.570 is authorized, provided that:

(i) The total of all family household remittances authorized by § 515.570(a) does not exceed $300, and

* * * * *

(f) *Carrying accompanied baggage to Cuba.* The carrying to Cuba of accompanied baggage, as described in 15 CFR 740.14, provided that no more than 44 pounds of accompanied baggage per traveler may be carried unless otherwise authorized by the Bureau of Industry and Security of the Department of Commerce or, for exportations of non-U.S. origin accompanied baggage from third countries to Cuba, by a specific license from OFAC.

* * * * *

■ 3. Revise § 515.561 to read as follows:

**§ 515.561    Persons visiting members of their immediate family in Cuba.**

(a) *Visiting a family member who is a national of Cuba.* Specific licenses may be issued on a case-by-case basis to persons subject to U.S. jurisdiction to engage in the travel-related transactions set forth in § 515.560(c) for the purpose of visiting a member of the person's immediate family who is a national of Cuba, as that term is defined in § 515.302 of this part, in Cuba for a period not to exceed 14 days in duration, provided it has been at least three years since the most recent of the following three dates:

(1) If the applicant emigrated from Cuba, the date of emigration;

(2) The date the applicant left Cuba after the applicant's most recent trip to

visit family there pursuant to a general license from OFAC;

(3) The date of issuance of the applicant's most recent specific license to visit family in Cuba.

(b) *Visiting a family member who is not a national of Cuba.* Specific licenses may be issued on a case-by-case basis authorizing persons subject to U.S. jurisdiction to engage in the travel-related transactions set forth in § 515.560(c) and additional travel-related transactions that are directly incident to the purpose of visiting a member of the person's immediate family who is not a national of Cuba, as that term is defined in 515.302 of this part, in Cuba in exigent circumstances, provided the person to be visited is in Cuba pursuant to an OFAC authorization, the particular exigency has been reported to the U.S. Interests Section in Havana, and issuance of the license would support the mission of the U.S. Interests Section in Havana.

(c) For the purpose of this section, the term "member of a person's immediate family" means any spouse, child, grandchild, parent, grandparent, or sibling of that person or that person's spouse, as well as any spouse, widow, or widower of any of the foregoing.

■ 4. Amend § 515.564 by adding a note to paragraph (a)(1) to read as follows:

### § 515.564   Professional research and professional meetings in Cuba.

\*    \*    \*    \*    \*

**Note to paragraph (a)(1):** This general license does not authorize as professional research any travel-related transactions incident to attendance at professional meetings or conferences. Such transactions must either qualify under the general license set forth in paragraph (a)(2) of this section or be the subject of a request for a specific license under paragraph (b) of this section.

■ 5. Amend § 515.565 by revising paragraphs (a) and (b) to read as follows:

### § 515.565   Educational activities.

(a) *Specific institutional licenses.* Specific licenses for up to one year in duration may be issued to an accredited U.S. undergraduate or graduate degree-granting academic institution authorizing the institution, its students enrolled in an undergraduate or graduate degree program at the institution, and its full-time permanent employees to engage, under the auspices of the institution, in the travel-related transactions set forth in § 515.560(c) and such additional transactions that are directly incident to:

(1) Participation in a structured educational program in Cuba as part of a course offered at the licensed institution, provided the program

includes a full term, and in no instance includes fewer than 10 weeks, of study in Cuba. An individual planning to engage in such transactions must carry a letter from the licensed institution stating that the individual is a student currently enrolled in an undergraduate or graduate degree program at the institution or is a full-time permanent employee of the institution, stating that the Cuba-related travel is part of a structured educational program of the institution that will be no shorter than 10 weeks in duration, and citing the number of the institution's license;

(2) Noncommercial academic research in Cuba specifically related to Cuba and for the purpose of obtaining a graduate degree. A student planning to engage in such transactions must carry a letter from the licensed institution stating that the individual is a student currently enrolled in a graduate degree program at the institution, stating that the research in Cuba will be accepted for credit toward that degree, and citing the number of the institution's license;

(3) Participation in a formal course of study at a Cuban academic institution, provided the formal course of study in Cuba will be accepted for credit toward the student's undergraduate or graduate degree at the licensed U.S. institution and provided the course of study is no shorter than 10 weeks in duration. An individual planning to engage in such transactions must carry a letter from the licensed U.S. institution stating that the individual is a student currently enrolled in an undergraduate or graduate degree program at the U.S. institution, stating that the study in Cuba will be accepted for credit toward that degree and will be no shorter than 10 weeks in duration, and citing the number of the U.S. institution's license;

(4) Teaching at a Cuban academic institution by an individual regularly employed in a teaching capacity at the licensed institution, provided the teaching activities are related to an academic program at the Cuban institution and provided that the duration of the teaching will be no shorter than 10 weeks. An individual planning to engage in such transactions must carry a written letter from the licensed U.S. institution stating that the individual is a full-time permanent employee regularly employed in a teaching capacity at the U.S. institution and citing the number of the U.S. institution's license;

(5) Sponsorship, including the payment of a stipend or salary, of a Cuban scholar to teach or engage in other scholarly activity at the licensed institution (in addition to those transactions authorized by the general

license contained in § 515.571). Such earnings may be remitted to Cuba as provided in § 515.570 or carried on the person of the Cuban scholar returning to Cuba as provided in § 515.560(d)(3); or

(6) The organization of and preparation for activities described in paragraphs (a)(1) through (a)(5) of this section by a full-time permanent employee of the licensed institution. An individual engaging in such transactions must carry a written letter from the licensed institution stating that the individual is a full-time permanent employee of that institution and citing the number of that institution's license.

**Note to paragraph (a):** See §§ 501.601 and 501.602 of this chapter for applicable recordkeeping and reporting requirements. Exportation of equipment and other items, including the transfer of technology or software to foreign persons ("deemed exportation"), may require separate authorization from the Department of Commerce.

(b) *Other specific licenses.* Specific licenses may be issued to individuals on a case-by-case basis authorizing the travel-related transactions set forth in § 515.560(c) and other transactions directly incident to the educational activities described in paragraphs (a)(2) and (a)(3) of this section but not engaged in pursuant to a specific license issued to an institution pursuant to paragraph (a) of this section.

\*    \*    \*    \*    \*

■ 6. Revise § 515.567 to read as follows:

### § 515.567   Public performances, athletic and other competitions, and exhibitions.

(a) *Amateur and semi-professional international sports federation competitions.* Specific licenses, including for multiple trips to Cuba over an extended period of time, may be issued on a case-by-case basis authorizing the travel-related transactions set forth in § 515.560(c) and other transactions that are directly incident to athletic competition by amateur or semi-professional athletes or athletic teams wishing to travel to participate in athletic competition in Cuba, provided that:

(1) The athletic competition in Cuba is held under the auspices of the international sports federation for the relevant sport;

(2) The U.S. participants in the athletic competition are selected by the U.S. federation for the relevant sport; and

(3) The competition is open for attendance, and in relevant situations participation, by the Cuban public.

(b) *Public performances, other athletic or other non-athletic competitions, and exhibitions.* Specific licenses, including

for multiple trips to Cuba over an extended period of time, may be issued on a case-by-case basis authorizing the travel-related transactions set forth in § 515.560(c) and other transactions that are directly incident to participation in a public performance, athletic competition not covered by paragraph (a) of this section, non-athletic competition, or exhibition in Cuba by participants in such activities, provided that:

(1) The event is open for attendance, and in relevant situations participation, by the Cuban public; and

(2) All U.S. profits from the event after costs are donated to an independent nongovernmental organization in Cuba or a U.S.-based charity, with the objective, to the extent possible, of benefiting the Cuban people.

(c) Specific licenses will not be issued pursuant to this section authorizing any debit to a blocked account.

**Note to § 515.567:** See § 515.571 for the authorization of certain transactions related to the activities of nationals of Cuba traveling in the United States.

■ 7. Amend § 515.570 by revising paragraphs (a), (d) introductory text, and (d)(1) and the note to the section to read as follows:

### § 515.570   Remittances to nationals of Cuba.

(a) *Periodic $300 family household remittances authorized.* Persons subject to the jurisdiction of the United States who are 18 years of age or older are authorized to make remittances to nationals of Cuba who are members of the remitter's immediate family, provided that:

(1) The remitter's total remittances do not exceed $300 per recipient household in any consecutive 3-month period, regardless of the number of members of the remitter's immediate family comprising that household;

(2) The remittances are not made from a blocked source unless:

(i) The remittances are authorized pursuant to paragraph (c) of this section; or

(ii) The remittances are made to a recipient in a third country and are made from a blocked account in a banking institution in the United States held in the name of, or in which the beneficial interest is held by, the recipient; and

(3) The recipient is not a prohibited official of the Government of Cuba or a prohibited member of the Cuban Communist Party. For the purposes of this paragraph, the term "prohibited official of the Government of Cuba"

means: Ministers and Vice-ministers, members of the Council of State, and the Council of Ministers; members and employees of the National Assembly of People's Power; members of any provincial assembly; local sector chiefs of the Committees for the Defense of the Revolution; Director Generals and sub-Director Generals and higher of all Cuban ministries and state agencies; employees of the Ministry of the Interior (MININT); employees of the Ministry of Defense (MINFAR); secretaries and first secretaries of the Confederation of Labor of Cuba (CTC) and its component unions; chief editors, editors and deputy editors of Cuban state-run media organizations and programs, including newspapers, television, and radio; and members and employees of the Supreme Court (Tribuno Supremo Nacional). For purposes of this paragraph, the term "prohibited members of the Cuban Communist Party" means: members of the Politburo; the Central Committee; Department Heads of the Central Committee; employees of the Central Committee; and secretary and first secretary of the provincial Party central committees.

(4) For the purposes of this paragraph (a), the term "member of the remitter's immediate family" means a spouse, child, grandchild, parent, grandparent, or sibling of the remitter or the remitter's spouse, as well as any spouse, widow, or widower of any of the foregoing.

**Note to paragraph (a):** The maximum amount set forth in this paragraph does not apply to remittances to a Cuban individual who has been unblocked or whose current transactions are otherwise authorized pursuant to § 515.505, because remittances to such persons do not require separate authorization.

\*     \*     \*     \*     \*

(d) *Specific licenses.* Specific licenses may be issued on a case-by-case basis authorizing the following:

(1) Remittances by persons subject to U.S. jurisdiction, including but not limited to nongovernmental organizations and individuals, to independent non-governmental entities in Cuba, including but not limited to pro-democracy groups, civil society groups, and religious organizations, and to members of such groups or organizations.

\*     \*     \*     \*     \*

**Note to § 515.570:** For the rules relating to the carrying of remittances to Cuba, see paragraph (c)(4) of § 515.560. Persons subject to U.S. jurisdiction are prohibited from engaging in the collection or forwarding of remittances to Cuba unless authorized pursuant to § 515.572. For a list of authorized U.S. remittance service providers, see the

following Web site: *http://www.treas.gov/ offices/eotffc/ofac/sanctions/cuba_tsp.pdf.*

■ 8. Amend § 515.572 by revising paragraphs (a)(3) and (c)(4)(i) to read as follows:

### § 515.572   Authorization of transactions incident to the provision of travel services, carrier services, and remittance forwarding services.

(a) \* \* \*

(3) *Authorization of remittance forwarders.* Persons subject to U.S. jurisdiction, including persons who provide remittance forwarding services and noncommercial organizations acting on behalf of donors, who wish to provide services in connection with the collection or forwarding of remittances authorized pursuant to this part must obtain a license from the Office of Foreign Assets Control. Depository institutions, as defined in § 515.533, must obtain a license pursuant to this section only for the provision of services in connection with the collection and forwarding of remittances authorized pursuant to paragraphs (a), (b), and (c) of § 515.570. Depository institutions do not need a license pursuant to this section to provide such services with respect to any other remittances authorized pursuant to this part.

\*     \*     \*     \*     \*

(c) \* \* \*

(4)(i) In the case of applications for authorization to serve as travel or carrier service providers, a report on the forms and other procedures used to establish that each customer is in full compliance with U.S. law implementing the Cuban embargo and either qualifies for one of the general licenses contained in this part authorizing travel-related transactions in connection with travel to Cuba or has received a specific license from the Office of Foreign Assets Control issued pursuant to this part. In the case of a customer traveling pursuant to a general license, the applicant must demonstrate that it requires each customer to attest, in a signed statement, to his or her qualification for the particular general license claimed. The statement must provide facts supporting the customer's belief that he or she qualifies for the general license claimed. In the case of a customer traveling under a specific license, the applicant must demonstrate that it requires the customer to furnish it with a copy of the license. The copy of the signed statement or the specific license must be maintained on file with the applicant.

\*     \*     \*     \*     \*

■ 9. Remove the reference to "§ 515.565(a)(2)(v)" each place it

appears in part 515 and add in its place ''§ 515.565(a)(5)''.

Dated: June 10, 2004.

**R. Richard Newcomb,**

*Director, Office of Foreign Assets Control.*

Approved: June 10, 2004.

**Juan C. Zarate,**

*Deputy Assistant Secretary (Terrorist Financing and Financial Crimes), Department of the Treasury.*

[FR Doc. 04–13630 Filed 6–14–04; 9:51 am]

**BILLING CODE 4810–25–P**