# DEFENDANTS' EXHIBIT 1

In Support of
Defendants' Motion to Dismiss or, in the
Alternative, Motion for Summary Judgment

# DECLARATION OF ADAM J. SZUBIN

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EMERGENCY COALITION )
TO DEFEND EDUCATIONAL )
TRAVEL, et al., )
)
              Plaintiffs, )
)
v. )    Civil Action No. 1:06-CV-01215
)
UNITED STATES DEPARTMENT )
OF THE TREASURY, )
et al., )
)
              Defendants. )
_____)

## DECLARATION OF ADAM J. SZUBIN

I, Adam J. Szubin, pursuant to 28 U.S.C. § 1746, do declare:

1. I am the Director of the U.S. Department of the Treasury's ("Treasury") Office of Foreign Assets Control ("OFAC"), and I have been employed in this capacity since September 3, 2006. Prior to becoming the Director, I was Senior Advisor to Under Secretary Stuart Levey in Treasury's Office of Terrorism and Financial Intelligence, a position I assumed in August 2004. Before joining Treasury, I was an attorney at the Department of Justice, serving as Counsel to the Deputy Attorney General from August 2003 to August 2004, and working in the Civil Division from September 2000 to August 2003.

2. I am familiar with the mission and operations of OFAC, and I make this declaration based upon information within my personal knowledge or provided to me in my official capacity.

3. I have been made aware of the Complaint filed in this action by the Emergency Coalition to Defend Educational Travel, Wayne S. Smith, John W. Cotman, Jessica Kamen, and Adnan

Ahmad. This declaration is made in connection with Defendants' Memorandum in Support of their Motion to Dismiss, or, in the alternative, for Summary Judgment.

OFAC's Mission and Authority

4. OFAC is the office within Treasury that is principally responsible for administering U.S. economic sanctions programs. These programs are primarily directed against foreign states and nationals to implement U.S. foreign policy and national security goals. Pursuant to authority delegated by the President to the Secretary of the Treasury, OFAC acts under Presidential wartime and peacetime national emergency powers. In performing its function, OFAC relies primarily on its broad delegated powers under the Trading with the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 1-44, and the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706. As Director of OFAC, I am responsible for the implementation, administration, and enforcement of such economic sanctions programs.

5. OFAC currently administers approximately 30 economic sanctions programs against foreign governments, entities, and individuals whose activities conflict with U.S. national security and foreign policy interests. For instance, OFAC administers sanctions programs relating to Iran, Sudan, Burma, Cuba, Syria, North Korea, Zimbabwe, Liberia, Western Balkans, and Cote D'Ivoire. OFAC also implements sanctions programs related to drug trafficking, terrorism, and proliferation of weapons of mass destruction.

Cuba Sanctions Under TWEA

6. TWEA grants the President broad powers over property in which any foreign country or a national thereof has any interest, during times of war and otherwise as described below, including the authority to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest." 50 U.S.C. App. § 5(b)(1)(B).

7. Following the expropriation of U.S. property in Cuba and other hostile acts by the Castro regime, President Kennedy imposed an embargo on all trade with Cuba, effective in February 1962. *See* Proclamation No. 3447, 27 Fed. Reg. 1085 (1962). On July 8, 1963, the Cuban Assets Control Regulations, 31 C.F.R. Part 515 (the "Regulations"), were issued, freezing all Cuban assets located in the United States, prohibiting all transactions in which Cuba or a Cuban national has on or since the effective date of the Regulations had an interest, and further implementing the embargo on trade. *See* 28 Fed. Reg. 6974 (July 9, 1963). OFAC interprets the term "interest" when used with respect to property to mean an interest of any nature whatsoever, direct or indirect. *See, e.g.,* 31 C.F.R. § 515.312. OFAC considers all travel-related transactions to, from, and within Cuba to be transactions in which Cuba has an interest.

8. TWEA was amended on December 28, 1977, to restrict the use of its powers to times of war and to eliminate its use for peacetime emergencies. *See* Pub. L. No. 95-223, 91 Stat. 1625. However, the amending Act contained a "grandfather" clause. *See id.* at § 101(b). This clause authorized the President to continue to exercise those powers delegated under TWEA that were being exercised with respect to a country subject to sanctions as of July 1, 1977, as a result of a

3

presidential declaration of national emergency. *Id.* To do so, however, the President must determine on an annual basis that the extension of sanctions with respect to that country "is in the national interest of the United States." *Id.*

9. Since the enactment of Public Law 95-223, the President has consistently determined on an annual basis that the exercise of his authorities under TWEA with respect to Cuba is in the national interest of the United States. *See, e.g.,* Determination No. 2006-23, 71 Fed. Reg. 54399 (Sept. 13, 2006).

OFAC Licensing Authority

10. Under the Regulations, OFAC can issue licenses to authorize otherwise prohibited transactions. Licenses are either "specific" or "general." A specific license may be issued when a person individually requests authorization to conduct an otherwise prohibited transaction or service. *See* 31 C.F.R. § 501.801(b). A general license authorizes certain categories of transactions and is issued through publication on OFAC's website and/or in the Federal Register and the Code of Federal Regulations. A person who meets the criteria set forth in a general license may undertake activities in reliance on the general license without submitting any request to OFAC.

11. The Secretary of the Treasury has delegated broad authority under TWEA to OFAC to regulate transactions in which Cuba or a Cuban national has an interest, including to license specific transactions that otherwise are prohibited by the Regulations. *See* 50 U.S.C. App. § 5(b)(1)(B); 31 C.F.R. § 515.802.

12. The denial of a specific license request does not preclude the reopening of an application or the filing of a further application. *See* 31 C.F.R. § 501.801(b). The applicant may at any time

request further explanation of the reasons for a denial by correspondence or personal interview. *See id.*

13. Licenses (whether general or specific) may be amended, modified, or revoked at any time. *See* 31 C.F.R. § 501.803. Specific licenses typically note their revocability on the first page of the license.

History of Authorizing Limited Transactions Related to Educational Travel to Cuba

14. As mentioned above, the United States has maintained a comprehensive embargo on Cuba since 1963. A major purpose of the embargo has been to deny the Castro government hard currency which could be used for purposes inimical to the interests of the United States. The Regulations have long restricted transactions involving travel to Cuba, including educational travel to Cuba, just as most other transactions involving Cuba or Cuban nationals have been restricted. However, while the Regulations have generally restricted transactions involving travel to Cuba, they have permitted certain specific types of travel transactions that were deemed consistent with U.S. policy towards Cuba. The government's policy regarding permitted travel transactions has evolved over the course of the embargo to reflect changing international developments and different Administration policies. The following timeline reflects the dates of major changes in the Regulations with regard to educational travel involving Cuba from 1977 through 2002:

a) In 1977, a general license was issued permitting "[a]ll transactions ordinarily incident to travel to and from Cuba." 31 C.F.R. § 515.560 (1977). The broad scope of this general license permitted individuals to travel to Cuba for multiple purposes, including educational travel and tourism. *See id.*

b) In 1982, in an effort to reduce the amount of hard currency earned by Cuba from travel to Cuba by U.S. individuals, the portions of the general license permitting ordinary tourist and business travel were eliminated. *See* 47 Fed. Reg. 17030 (Apr. 20, 1982) (codified at

5

31 C.F.R. § 515.560 (1982)). The general license continued to permit individuals to travel to Cuba "for the purpose of…engaging in professional research[] or for similar activities…." *Id.* The "professional research" authorization applied only to full-time professionals, but the "similar activities" authorization included travel for research purposes specifically related to Cuba by persons who are working to qualify themselves academically as professionals (*e.g.*, certain graduate degree candidates). 47 Fed. Reg. 32060 (July 23, 1982) (codified at 31 C.F.R. § 515.560 (1982)). Travel to Cuba in connection with pre-college and undergraduate coursework was specifically excluded from the scope of the general license. *See id.* Similarly, specific license requests involving general study tours, general orientation visits, and student class field trips were made subject to a general policy of denial. *See id.*

c) In 1992, the types of graduate research activities permitted by the general license were limited to noncommercial academic research. *See* 57 Fed. Reg. 53996 (Nov. 16, 1992) (codified at 31 C.F.R. §§ 515.416, 515.560 (1992)). This modification was made "[t]o ensure heightened enforcement of the Cuba[n] embargo…." *Id.*

d) On August 20, 1994, in response to certain acts by the Castro regime to provoke a mass exodus from Cuba to the United States, the President announced modifications to the Cuban embargo to, *inter alia*, "limit the ability of the Cuban Government to accumulate foreign exchange…." President's Statement on Cuba, 30 WEEKLY COMP. PRES. DOC. 1696 (Aug. 20, 1994); 59 Fed. Reg. 44884 (Aug. 30, 1994). Pursuant to the President's directive, OFAC modified the general license described above to eliminate the portions authorizing travel to Cuba for the purpose of professional research and similar activities (including graduate research) as well as family visits. *See* 59 Fed. Reg. 44884, 44884-85 (codified at 31 C.F.R. § 515.560 (1994)). However, OFAC clarified that it would still consider issuing specific licenses for activities related to "professional research and similar activities" (including graduate research) as well as "clearly and narrowly defined educational activities." *See id.* (codified at 31 C.F.R. §§ 515.416, 515.560 (1994)). As before, pre-college and undergraduate coursework, general study tours, general orientation visits and student class field trips were explicitly excluded from qualifying as "professional research and similar activities." *See id.*

e) On October 6, 1995, the President announced modifications to the Cuban embargo aimed at "encourag[ing] [the] peaceful transition [of Cuba] to a free and open society." President's Remarks at a Freedom House Breakfast, 31 WEEKLY COMP. PRES. DOC. 1775 (Oct. 6, 1995). Among the measures announced by the President was an increase in the number of people allowed to travel to and from Cuba for educational purposes. *See id.* OFAC modified the Regulations to implement the President's policy. *See* 60 Fed. Reg. 54194 (Oct. 20, 1995). A new section was added to the Regulations describing the types of clearly defined educational activities for which OFAC would issue a specific license. *See id.* at 54196 (codified at 31 C.F.R. § 515.419 (1995)). Among the licensable activities were "[a]ctivities related to study for an undergraduate or graduate degree sponsored by a college or university located in the United States." *Id.* Similarly, a new section was added stating that OFAC would issue specific licenses authorizing "educational exchanges for Cuban and U.S. scholars, as well as study in a Cuban

academic institution by graduate and undergraduate students[.]" *Id.* at 54195, 54197 (codified at 31 C.F.R. § 515.573 (1995)).

f) On January 5, 1999, the President announced further changes to the Cuban embargo aimed at "reach[ing] out to the Cuban people through humanitarian efforts and help[ing] in developing civil society." President's Statement on United States Policy Toward Cuba, 35 WEEKLY COMP. PRES. DOC. 7 (Jan. 5, 1999). Among the changes announced by the President were an expansion of people-to-people contact between the United States and Cuba through two-way exchanges among academics and others, and a streamlining of the approval process for such exchanges. *Id.*

OFAC modified the Regulations to implement the President's announcement. *See* 64 Fed. Reg. 25808 (May 13, 1999). The discussion of academic educational activities was separated from the discussion of professional research activities and consolidated into a new section 515.565. *See id.* at 25816-17 (codified at 31 C.F.R. § 515.565 (1999)). Paragraph (a) of the section provided for two-year specific licenses for accredited U.S. academic institutions such that their students and employees could engage in the following categories of educational activities: (1) participation by undergraduate and graduate students, or groups thereof, in a structured educational program offered by an accredited U.S. college or university; (2) noncommercial academic research in Cuba specifically related to Cuba by a person working to qualify academically as a professional (for instance, research in connection with a graduate degree); (3) participation in a formal course of study at a Cuban academic institution by an undergraduate or graduate student enrolled in a degree program at an accredited U.S. college or university, provided the course of study in Cuba will be accepted for credit at the student's U.S. college or university; (4) teaching at a Cuban academic institution by an individual regularly employed in a teaching capacity at an accredited U.S. college or university, provided the teaching activities are related to an academic program at the Cuban institution; (5) sponsorship, including payment of a stipend or salary, of a Cuban scholar to teach or engage in scholarly activity at a U.S. college or university; (6) educational exchanges, including adult chaperones, sponsored by U.S. or Cuban secondary schools involving secondary school students' participation in a formal course of study or structured educational program offered by an educational institution and led by a teacher or other secondary school official; and (7) full-time employees' organization of and preparation for these educational activities in Cuba. *See id.* Paragraph (b) of the section provided for specific licenses authorizing educational activities in Cuba not covered by paragraph (a), including but not limited to non-academic educational exchanges that take place under the auspices of an organization that sponsors and organizes such programs in order to promote people-to-people contact. *See id.*

g) On May 20, 2002, the President announced an "Initiative for a New Cuba" to encourage freedom within Cuba, improve the Cuban people's quality of life, and give greater control to the Cuban people over their political and economic destiny. *See* President's Remarks Announcing the Initiative for a New Cuba (May 20, 2002).[1] Among the

---

[1] This speech is publicly available at http://www.whitehouse.gov/news/releases/2002/05/print/20020520-1.html, *last visited* Feb. 1, 2007.

7

changes that OFAC made to the Regulations in order to implement the President's Initiative, section 515.565 was modified to delete the authorization for people-to-people non-academic educational exchanges. *See* 68 Fed. Reg. 14141, 14142 (Mar. 24, 2003).

<u>The Commission for the Assistance to a Free Cuba Report to the President and the Resulting Changes to the Regulations</u>

15. On October 10, 2003, the President announced the establishment of the Commission for the Assistance to a Free Cuba (the "CAFC"). *See* President's Remarks on Cuba (Oct. 10, 2003).[2] The CAFC was charged with planning "for Cuba's transition from Stalinist rule to a free and open society [and] to identify ways to hasten the arrival of that day." *Id.* On May 6, 2004, the CAFC delivered its report (hereinafter, "CAFC Report")[3] to the President. *See* President's Remarks Following a Meeting with the Commission for Assistance to a Free Cuba (May 6, 2004).[4] In line with the goal of "hasten[ing] the day that Cuba will be a free country[,]" the President noted that the Administration's strategy "will prevent the [Castro] regime from exploiting [the] hard currency of tourists and of remittances to Cubans to prop up their repressive regime." *Id.*

16. The CAFC Report found that tourism was one of the economic lifelines of the Castro regime and the single largest source of revenue to the Cuban government. *See* Administrative Record ("AR") 41, 62. It found that "flooding the island with tourists" was part of the regime's strategy for survival. *Id.* at 61. In discussing the educational travel program in place at that time, the CAFC Report stated that "while there are well-meaning participants who use this license category as intended, other travelers and academic institutions regularly abuse this license category and engage in a form of disguised tourism." *Id.* at 63. The CAFC Report noted that:

---

[2] This speech is publicly available at http://www.whitehouse.gov/news/releases/2003/10/20031010-2.html, *last visited* Feb. 1, 2007.
[3] A complete copy of the CAFC Report is included in the Administrative Record.
[4] This speech is publicly available at http://www.whitehouse.gov/news/releases/2004/05/20040506-4.html, *last visited* Feb. 1, 2007.

8

> Many institutions use Cuba "study-tour programs" to generate revenues for other programs and most accept students not enrolled in their institution. A large number of programs are for a short duration, allow for limited interaction with the Cuban people, and include lengthy unscheduled time periods to permit largely tourist activities to be accomplished. Such travel does not promote a genuinely free exchange of ideas between Cubans and American students. Evidence indicates that the majority of visits by U.S. students are organized by or coordinated through Cuban state travel and tour entities, are highly controlled by Cuban state security officials, and allow for only limited interaction with the average Cuban citizen. Moreover, the regime has often used the visits by U.S. education groups to cultivate the appearance of international legitimacy and openness to the exchange of ideas. Requiring that educational licenses be granted only to programs engaged in full-semester study in Cuba would support U.S. goals of promoting the exchange of U.S. values and norms in Cuba, would foster genuine academic study in Cuba, and would be less prone to abuse than the current regulations. Academic programs of shorter duration would be permitted only when the program directly promotes U.S. foreign policy goals.

*Id.* Accordingly, the CAFC Report made the following recommendation:

> Eliminate abuses of educational travel by limiting educational travel to only undergraduate or graduate degree granting institutions and only for full-semester study programs, or for shorter duration only when the program directly supports U.S. policy goals; requiring that the travelers be enrolled in a full-time course of study at the licensed institution; and requiring that educational institutional licenses be renewed annually, rather than bi-annually, to allow for improved enforcement of OFAC regulations.

*Id.* at 65.

17. In response to the President's directive, OFAC modified several portions of the Regulations to incorporate the recommendations of the CAFC Report, including those pertaining to educational travel. *See* 69 Fed. Reg. 33768 (June 16, 2004). Section 515.565 was modified to remove the authorization for certain educational activities involving Cuba by secondary schools. *Id.* at 33769. The duration of a license issued to an accredited college or university under this section was shortened from two years to one. *Id.* at 33769-70. The June 16, 2004 amendments

9

also modified section 515.565 to require that any student utilizing an institution's license to study in Cuba be enrolled in an undergraduate or graduate degree program at that institution, and clarified that employees traveling under an institution's license must be full-time permanent employees of the licensed institution. *Id.* at 33770. Additionally, section 515.565 was amended to require that the following three types of educational activity in Cuba be no shorter than 10 weeks in duration: (1) structured educational programs in Cuba offered as part of a course at the licensed institution; (2) formal courses of study at Cuban academic institutions; and, (3) teaching at a Cuban academic institution. *Id.*

18. The Regulations permit certain types of academic travel to Cuba in order to foster a free exchange of ideas between members of Cuban society and American students and professors, as well as to promote civil society. As the CAFC Report noted, while there are well-meaning participants in academic programs of short duration in Cuba, such programs usually allow for only very limited interaction with Cuban society while providing the regime with, *inter alia*, access to hard currency. AR 61-63. OFAC's regulatory experience indicated that the typical academic semester for U.S. colleges and universities lasted approximately 10 weeks. Therefore, in order to implement the CAFC Report recommendations pertaining to full-semester study programs, OFAC designated 10 weeks as the minimum duration for Structured Educational Programs in Cuba.

19. In implementing the recommendations of the CAFC Report, OFAC also amended the Regulations to clarify that "employees who travel under an institution's license must be full-time permanent employees of the institution. Temporary employees and contractors do not qualify as full-time permanent employees." 69 Fed. Reg. at 33770 (codified at 31 C.F.R. § 515.565). Both before and after the 2004 amendment of section 515.565, a professor who taught a structured

educational program in Cuba was required to be a full-time permanent employee of the licensed U.S. educational institution. However, before the amendment, the requirement was somewhat obscured in section 515.565 because the paragraph that authorized a full-time permanent professors' transactions related to structured educational programs in Cuba -- paragraph (a)(2)(vii) -- was not near the paragraph that authorized the students' transactions related to such a program -- paragraph (a)(2)(i). In order to make this requirement clearer in the regulations, section 515.565 was modified to explicitly state in the first paragraph that only full-time permanent employees of a licensed educational institution were authorized to engage in any of the Cuba travel-related transactions listed in section 515.565.

20. Because the 2004 amendments to the Regulations involved a foreign affairs function, the notice and comment provisions of the Administrative Procedure Act were not applicable. Though under no obligation to do so, OFAC invited comments regarding the 2004 amendments. Due to space limitations on the OFAC website, these comments were placed in the Treasury Department's Reading Room located at 1500 Pennsylvania Avenue N.W., Washington, D.C.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 2, 2007.

                                            ADAM J. SZUBIN
                                            Director
                                            Office of Foreign Assets Control
                                            Department of the Treasury