**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EMERGENCY COALITION TO DEFEND, )
EDUCATIONAL TRAVEL ("ECDET"); WAYNE )
S. SMITH; JOHN W. COTMAN; JESSICA )
KAMEN; ADNAN AHMAD, )
                               )

        Plaintiffs, )     Case No. 1:06-CV-01215
                               )     Judge Ellen S. Huvelle
        v. )

UNITED STATES DEPARTMENT OF THE )
TREASURY; HENRY M. PAULSON, JR., )
Secretary of the United States Department of the )
Treasury; THE OFFICE OF FOREIGN )
ASSETS CONTROL; ADAM J. SZUBIN, )
Director of the Office of Foreign Assets Control, )
                               )
        Defendants. )
_____ )

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS, OR IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**PAGE**

I. Introduction…………………………………………………………..1

    (a) The Administrative Action Challenged in This Lawsuit……………………..1

    (b) The Impermissibility of Defendants' Actions……………………………………2

    (c) The Claim Justification for Defendants' Challenged Action…………………..2

    (d) The Plaintiffs……………………………………………………………...3

    (e) The Relief Sought…………………………………………………………….3

II. Background…………………………………………………………………….4

    1(a) Summary of Defendants' Rule Change with Respect to 31 C.F.R. § 515.565:
        The Regulation Concerning U.S. Academic Courses in Cuba………………4

    1(b) The Purge of U.S. Academic Programs in Cuba……………………………..5

    1(c) The Source of the OFAC Rule Changes………………………………………..6

    1(d) A Domestic Political Calculation Leads to a Commission Ostensibly
        Concerned with U.S. Foreign Policy Toward Cuba but Really Concerned
        with Florida's Electoral Votes………………………………………………8

III. Argument……………………………………………………………………….13

    1. Defendant's Motion to Dismiss Pursuance to Federal Rules of Civil Procedure
        12(b) and 56 Should be Denied…………………………………………….13

        (i) Summary of Plaintiffs' Opposition to Defendants' Motion to Dismiss,
            or in the Alternative, for Summary Judgment…………………...14

        (ii) Plaintiffs Have Standing…………………………………………..16

        (iii) Associational Standing……………………………………………16

        (iv) Plaintiffs' Standing as Individuals………………………………...19

            (A) A Brief Response to Defendants' Claim that Plaintiffs Have
                Not Established Injury-in-Fact…………………………...22

(B) Response to Defendants' Claim that Plaintiffs' Injuries Were Not Caused by OFAC's Actions, but Instead by U.S. Colleges and Universities Canceling their Programs in Cuba…………………………………………………..25

(C) Plaintiffs' Response to Defendants' Claim that they Have Failed to Allege an Injury-in-Fact With Respect to their First Amendment Claims to Academic Freedom………..26

(D) Plaintiffs' Response to Defendants' Claim That They Lack Standing Because Their Injuries Are "Indirect"…………29

(E) Response to Defendants' Claim That Plaintiffs "Seek to Assert the Rights and Interests of Third Parties"……………….32

2. PLAINTIFFS' CLAIMS UNDER THE ADMINISTRATIVE PROCEDURE ACT (APA) ARE MERITORIOUS……………………………………...33

(a) Judicial Review of Defendants' Actions……………………………..33

(b) Plaintiffs' Response to Defendants' Claim That a Deferential Standard of Review is Applicable…………………………………………34

(c) Plaintiffs' Response to Defendants' Claim that a "Profound Measure of Deference" is Due OFAC's Rulemaking Because it was made Pursuant to "A Broad Grant of Congressional Authority" and it Emanated from the President's 'Immense Inherent Authority in the Realm of Foreign Affairs" (Mem. 27)…………………………...35

(d) No Deference is Due Defendants' Rulemaking Because Congress has Pre-empted the Executive Branch's Foreign Relations Prerogatives with Respect to Cuba, Including Travel to that Country………...37

(e) Defendants' Acted in "Contravention of the Will of Congress"……..40

3. PLAINTIFFS' RESPONSE TO THE GOVERNMENT'S CLAIM THAT THEY HAVE NOT BEEN DEPRIVED OF FIFTH AMENDMENT RIGHTS

(a) Plaintiffs' Response to Defendants' Contention that "Travel Restrictions Under the Cuban Embargo Have Long Withstood First Amendment Challenges" Mem. 34………………………………43

III. Conclusion……………………………………………………………………...44

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*America's Community Bankers v. FDIC*,
        200 F.3d 822 (D.C. Cir. 2000)……………………………………………...17

*Animal Legal Defense Fund, Inc. v. Glickman*,
        154 F.3d 426 (D.C. Cir. 1998)…………………………………………….33

*Aptheker v. Secretary of State*,
        378 U.S. 500 (1964)………………………….………………………………42, 44

*Baker v. Carr*,
        369 U.S. 186 (1962)…………………………………………………………...36

*Block v. Meese*,
        793 F.2d, 303 (D.C. Cir. 1986)…………………………………………..26

*Briehl v. Dulles*,
        248 F. 2d 561 (D.C. Cir. 1957)…………………………………………..38

*Chevron U.S.A. Inc. v. NRDC*,
        467 U.S. 837 (1984)……………………………………………….……34, 35

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
        401 U.S. 402 (1971)…………………………………………………………...33

*City of Waukesha v. EPA*,
        320 F.3d 225 (D.C. Cir. 2003)……………………………………….…..18

*Clinton v. City of New York*,
        524 U.S. 417 (1998)…………………………………………………………...33

*Comty. for Creative Non-Violence v. Pierce*,
        814 F.2d 663 (D.C. Cir. 1987)…………………………………………...10

*Competitive Enterprise Institute v. NHTSA*,
        901 F.2d 107 (D.C. Cir. 1990)…………………………………………...19

*Conley v. Gibson*,
        388 U.S. 41 (1957)………………………………………………………15

*Consumer Federation of America v. FCC*,

348 F.3d 1009 (D.C. Cir. 2003)……………………………………………17, 18, 19

*Dames & Moore v. Regan,*
453 U.S. 654 (1981)……………………………………………………………...41

*E.E.O.C. v. St. Francis Parochial School,*
117 F.3d 621 (D.C. Cir. 1997)……………………………………………......15

*Flynn v. Schultz,*
748 F.2d 1186 (7th Cir. 1984)…………………………………………………...37

*Forum for Academic and Institutional Rights v. Rumsfeld,*
291 F. Supp. 2d 269 (S.D.N.J. 2003)……………………………………………19

*Fowler v. Board of Education,*
819 F.2d 657 (6th Cir. 1987)……………………………………………………28

*Freedom to Travel Campaign v. Newcomb,*
82 F.3d 1431 (9th Cir. 1996)……………………………………………………44

*Greene v. McElroy,*
360 U.S. 474 (1959)……………………………………………………………...35

*Haig v. Agee,*
453 U.S. 280 (1981)……………………………………………………………38, 44

*Hospital Council of Western Pa. v. City of Pittsburg,*
949 F.2d 83 (3rd Cir. 1991)……………………………………………………...19

*Humane Soc. of the U.S. v. Hodel,*
840 F.2d 45 (D.C. Cir. 1988)……………………………………………………19

*Hunt v. Washington State Apple Adver. Comm'n.,*
432 U.S. 333 (1977)……………………………………………………………18

*Kent v. Dulles,*
357 U.S. 116 (1958)……………………………………………………passim

*Keyishian v. Board of Regents,*
385 U.S. 589 (1967)…………………………………………………...27, 28, 42

*Lamont v. Postmaster Gen. of U.S.,*
381 U.S. 301 (1965)……………………………………………………………...29

*Leboeuf, Lamb, Greene & Macrae, LLP v. Abraham,*
215 F. Supp. 2d 73 (D.D.C. 2002)………………………………………………34

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)……………………………………………………………15, 22
*Marbury v. Madison,*
    1 Crach 137, 166 (1803)……………………………………………………………38

*Meyer v. Nebraska,*
    262 U.S. 390 (1925)………………………………………………………………...29

*Midwest ISO Transmission Owners v. FERC,*
    373 F.3d 1361 (D.C. Cir. 2004)………………………………………………………33

*Milena Ship Management Co. v. Newcomb,*
    804 F. Supp. 846 (E.D. LA. 1992) aff'd 995 F.2d 620 (5th Cir. 1993)…………..33

*Motor & Equip. Mfrs. Ass'n. v. EPA,*
    142 F.3d 449 (D.C. Cir. 1998)……………………………………………………...25

*NAACP v. Alabama ex. rel Patterson,*
    357 U.S. 449, 459 (1958)…………………………………………………………...17

*Nat'l Lime Assn., v. EPAI,*
    233 F.3d 625 (D.C. Circuit 2000)……………………………………………………18

*Nat'l Wildlife Fed'n v. Hodel,*
    839 F.2d 694 (D.C. Cir. 1988)……………………………………………………...26

*Nat'l Wrestling Coaches Assoc. v. Dept. of Educ.,*
    366 F.3d 930 (D.C. Cir. 2004)……………………………………………………...30

*Powers v. Ohio,*
    499 U.S. 400……………………………………………………………………..32

*Regan v. Wald,*
    468 U.S. 222 (1984)…………………………………………………………42, 43

*Roe v. Operation Rescue,*
    419 F.2d 857 (3rd Cir. 1990)…………………………………………...…17, 19

*Stachura v. Truszkowski,*
    763 F.2d 211 (6th Cir. 1985)……………………………………………………28

*Stanley v. Georgia,*
    394 U.S 564 (1969)………………………………………………………………29

*Sweezy v. New Hampshire,* 354 U.S. 234

(1957)…………………………………………………………...27

*Telephone & Data Sys. v. FCC*,
    19 F.3d 42 (D.C. Cir. 1993)……………………………………………19, 26

*Tozzi v. HHS*,
    271 F.3d 301 (D.C. Cir. 2001)……………………………………………...26

*UAW v. Brock*,
    477 U.S. 274 (1986)………………………………………………………..17

*United States v. Robel*,
    389 U.S. 258 (1967)………………………………………………………...37

*Urofsky v. Gilmore*,
    216 F.3d 401 (4th Cir. 2000)………………………………………………28

*Warth v. Seldin*,
    422 U.S. 490 (1975)………………………………………………………...30

*Wieman v. Updegraff*,
    344 U.S. 183 (1952)………………………………………………………...27

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)……………………………………………...39, 40, 41

*Zemel v. Rusk*,
    381 U.S. 1 (1965)…………………………………………………....passim

## STATUTES AND REGULATIONS

31 C.F.R. § 515.560……………………………………………...……………40

31 C.F.R § 515.565………………………………………………………passim

5 U.S.C. 706 (2) (A)……………………………………………………...15

5 U.S.C. 706 (2) (B)…………………………………………...……………35

22 U.S.C. § 6000 *et seq*……………………………………….………………39

22 U.S.C § 7201……………………………………………………………40

50 U.S.C App. § 5 (b) (4) (1994……………………………………………....41

50 U.S.C. § 1702 (b) (3)……………………………………………………41

Fed. Reg. 33768-74 (June 16, 2004)…………………………………………………...passim

H.R. Conf. Rep. 103-482, at 239-240 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483………………………………………………………………………………..41

## U.S. CONSTITUTION

First Amendment……………………………………………………………....passim

Fifth Amendment……………………………………………………………passim

## LEGISLATIVE MATERIALS

Administrative Procedure Act (APA), 5 U.S.C. § 702………………………………..15

Cuban Liberty Democratic Solidarity (Libertad) Act of 1996, 22 U.S.C. § 6201 *et seq*………………………………………………………………………………...passim

Fed. R. Civ. P. 12 (b)(1)…………………………………………………………14

Fed. R. Civ. P. 12 (b)(6)……...……………………………………………………14

Fed. R. Civ. P. 56……………………………………………………………...16

TWEA, 50 U.S.C. App § 5(b)(1)…………………………………………………...26

## MISCELLANEOUS

David M. Rabban, Functional Analysis of "Individual" and "Institutional" Academic Freedom Under the First Amendment, 53 Law & Contemp. Probs. 227 (1990)…….27, 29

Ignacio Sarmiento, *Traveling to Cuba? Sorry It's Closed*, 29 Nova L. Rev. 285 (2005)...3

# I. INTRODUCTION

## (a) The Administrative Action Challenged in this Lawsuit

On June 16, 2004 Defendants altered the terms upon which U.S. professors could design and teach courses in Cuba to American students enrolled in this nation's colleges and universities.  Defendants also curtailed the types of academic programs U.S. students of higher education could attend in Cuba.  This was accomplished by dictating a minimum duration of ten weeks for such programs, thereby eliminating inter-sessional courses, *i.e.* between semester courses.  This action by Defendants foreclosed study in Cuba to most American students who could not devote a full semester to study in Cuba, for any reason, including fulfilling the various credit hours in subjects required by their college or university in order to graduate on schedule.  Defendants also dictated to U.S. students from whom they could henceforth receive instruction in Cuba.  They did this by (i) prohibiting U.S. students from being taught by professors at U.S. colleges and universities, other than the one in which the student was actually enrolled in a degree program and by (ii) prohibiting all adjunct, emeritus and guest lecturers from teaching *any* courses in Cuba.  The latter was accomplished by prohibiting all but "full-time permanent employees" of U.S. institutions of higher education from teaching U.S. students in Cuba.[1]

The effect of Defendants' rule change was, for all practical purposes, to end U.S. academic programs in Cuba.  Therefore the harm to Plaintiffs is ongoing, as is the damage done across this country to U.S. professors and students who, but for the

---

[1] The rule change described above is set out at 69 Fed. Reg. 33, 768-33, 774 (June 16, 2004).  The rule itself is contained within the Cuban Asset Control Regulations (CACR) at 31 C.F.R. **§ 515.565**, the specific regulation governing academic travel to Cuba.  The CACR are promulgated and enforced by Defendant OFAC.

Defendants' action on June 16, 2004, would be able to participate in academic programs in Cuba.

### (b) The Impermissibility of Defendants' Actions

Defendants' actions violated Plaintiffs' First and Fifth Amendment rights to travel abroad in the exercise of academic freedom, and they did so egregiously. When Defendants' action is analyzed as it must be – in terms of the enumerated powers that define and delimit the sources of the federal government's authority to regulate U.S. citizens in this democracy – that action can be viewed in only one way, a unilateral assault by the Executive Branch on the constitutionally protected rights of U.S. citizens.

Defendants' action in restricting Plaintiffs' freedom to teach and study abroad in furtherance of the objectives of imparting and receiving knowledge occurred at what the U.S. Supreme Court has described as the "lowest ebb" of Executive Branch power – that is, where no grant of authority existed from Congress for Defendants' action. To the contrary, Congress had, long before the Executive Branch action complained of in this case, pre-empted Executive Branch authority to regulate U.S. citizens' travel to Cuba. As will be explained below, that process began in 1994 and concluded in 2000 with the codification (i.e. the freezing in place) by Congress of particularized categories of authorized travel to Cuba by U.S. citizens, including travel for academic purposes.

### (c) The Claimed Justification for Defendants' Challenged Action

Defendants claim they took the action they did because of "widespread abuses" in U.S. academic programs in Cuba. But, not only is there no administrative record to support that claim, there is, instead, a public record that reveals no enforcement action taken against a U.S. academic program in Cuba in the year preceding the OFAC rule

2

change challenged in this suit.[2]  Again, no known enforcement action was taken against

the multitude of U.S. academic programs operating in Cuba under several hundred

licenses issued by Defendants before its rule change of June 16, 2004.[3]

### (d) The Plaintiffs

The Emergency Coalition to Defend Educational Travel (ECDET) was formed in

response to Defendants' action.  Its purpose is to defend the freedom of U.S. professors

and students to design, teach and attend courses in Cuba free of U.S. government *diktat*.

The other Plaintiffs in this action are individual professors and students who were

deprived arbitrarily and capriciously by Defendants of their constitutionally protected

rights to teach and study in Cuba.

### (e) The Relief Sought

Plaintiffs' Complaint seeks a declaration from the Court that Defendants'

challenged actions violated the Administrative Procedure Act (APA) and the First and

Fifth Amendments to the U.S. Constitution.  Compl., Prayer for Relief ¶ 1.  Plaintiffs

further seek an injunction preventing Defendants from continuing to enforce the

regulations of June, 2004.  Compl., Prayer for Relief ¶ 2.  Finally, Plaintiffs seek a

mandatory injunction requiring Defendants to rescind the regulations challenged in this

action.  Compl., Prayer for Relief ¶ 3.

---

[2] The period immediately preceding the rule change at issue, was a time at which  OFAC posted "staggering numbers [of enforcements of the ban on travel to Cuba] proving how serious it is about enforcing travel restrictions."  Ignacio Sarmiento, *Traveling to Cuba? Sorry It's Closed*, 29 Nova L. Rev. 287, 305 (2005).  Since 2003 OFAC has made available a regular listing of civil penalties levied pursuant to its enforcement of sanctions programs under its jurisdiction, including violations of the Cuba travel regulations, at http://www.treas.gov/offices/enforcement/ofac/civpen/.

[3] Written statement of R. Richard Newcomb, Director, Office of Foreign Assets Control (OFAC), United States Department of the Treasury, before the Subcommittee on Human Rights and Wellness Committee on Government Reform, U.S. House of Representatives, October 16, 2003, at www.treas.gov/press/releases/js914.htm.  Mr. Newcomb testified that as of October 13, 2003 seven hundred and sixty OFAC licenses had been issued authorizing U.S. academic programs in Cuba.

## II. BACKGROUND

### 1(a) Summary of Defendants' Rule Change with Respect to 31 C.F.R. § 515.565: The Regulation Concerning U.S. Academic Courses in Cuba

OFAC's rule change of June 16, 2004 decreed:

**With respect to U.S. professors**: To teach U.S. academic programs in Cuba, professors must be "full-time permanent employees" of the college or university offering the course and that course must be no less than ten weeks in length. This meant that distinguished adjunct professors like Plaintiff Dr. Wayne Smith could no longer teach their college or university's courses in Cuba – even if such courses survived the OFAC rule changes – which, almost without exception, they did not. Smith Decl. ¶ 9. It also meant that Plaintiff Dr. John Cotman was prohibited from teaching a course in Cuba, in his areas of acknowledged expertise regarding that country, that might be offered, at his suggestion or otherwise, by any U.S. academic institution other than his employer, Howard University. (Howard, like Johns Hopkins, was forced to cancel all of its courses in Cuba as a result of OFAC's action, so he no longer has the opportunity to teach those courses as well). Finally, it meant in practical terms that Plaintiff Cotman cannot teach a course in Cuba at all – even if Howard University were to institute a course of ten weeks' duration, which it lacks the resources to do – because his professional and family obligations do not allow him to be abroad teaching for a period of no less than ten weeks at a time. Cotman Decl. ¶ 9.

**With respect to U.S. students**: To be eligible to participate in a U.S. college or university course in Cuba, a student must be enrolled in a degree program at the institution actually offering the course – even if his or her own institution would credit, toward the student's degree, hours awarded from another institution's program in Cuba.

4

This meant the end of academic consortia that allowed colleges and universities to send students to one another's Cuba programs, thereby greatly reducing the costs associated with those programs and making them accessible to more students, particularly at small and financially challenged colleges that do not have the resources to initiate, staff and maintain semester length courses in Cuba. By decreeing that anyone teaching in Cuba must be a "full-time permanent" employee of the college or university where the students they are to teach are enrolled in a degree program, Defendants denied U.S. students access to the knowledge of individuals with expertise in abstruse fields such as Afro-Cuban art and Santeria religion. It is a simple impossibility that every college or university in the U.S. will have "full-time permanent employees" with expertise in the rare specialties of such subjects as Cuban history and culture. Furthermore, the requirement that all courses in Cuba had to be of ten weeks or more in duration resulted in the effective end of undergraduate programs in Cuba for most American students. Those students could no more attend courses of such length and graduate on time than, for that reason, their universities could hope to attract them to courses of such length. Kamen Decl. ¶ 1. In consequence, the opportunity to study in Cuba was effectively terminated by Defendants' actions for thousands of U.S. students. Stellmaker Decl. ¶ 6; Merkx Decl. ¶ 3.

### 1(b) The Purge of U.S. Academic Programs in Cuba

The effect of OFAC's challenged action was cataclysmic. A reference point from which to survey the damage done by Defendants is the period immediately preceding their actions when a total of seven hundred and sixty federal licenses had been issued to U.S. colleges and universities authorizing their faculty and students to teach and study in

Cuba pursuant to degree programs at accredited U.S. academic institutions.[4]  Within six

months of the challenged OFAC action, only *one* U.S. university reported that its Cuba

program continued.[5]

### 1(c) The Source of the OFAC Rule Changes

Defendants ask the Court to believe, in what is an *ex post facto* rationale for the

OFAC rule change, that it was the product of a "balanc[ing] [of] two important policy

objections: (i) to eliminate a practice [i.e. "abuses" of academic licenses] that was

undermining the embargo's purpose of isolating the dictatorship [i.e. Cuba]

economically, and (ii) to promote civil society by continuing to foster a free exchange of

ideas between American students and professors and members of Cuban society."  Mem.

1.  There was no "balancing" of anything by OFAC.

The rule change at issue in this suit had one source, and that source was external

to OFAC and actually dictated the rule change to that agency.  A public record of

OFAC's enforcement of licensed activities of U.S. citizens in Cuba reveals no "abuses"

of any consequence in U.S. academic programs in that country, so there was no rational

basis for their elimination.  As to Defendants' second and remarkable contention,

Defendants' actions indisputably *destroyed* rather than "fostered" free exchanges of ideas

---

[4] Written statement of R. Richard Newcomb, Director, Office of Foreign Assets Control (OFAC), United States Department of the Treasury, before the Subcommittee on Human Rights and Wellness of the Committee on Government Reform, U.S. House of Representatives, October 16, 2003, at www.treas.gov/press/releases/js914.htm.

[5] Latin American Working Group Education Fund, *Retreat from Reason: U.S.-Cuban Academic Relations and the Bush Administration* 38 (2006), http://www.lawg.org/docs/retreatfromreason.pdf.  The survey of U.S. colleges and universities' programs in Cuba reported in *Retreat from Reason* was administered by the Association of International Educators (NAFSA) in December, 2004 and can be found at http://www.nafsa.org/public_policy.sec/study_abroad_2/cuba_travel_restrictions/institutions_reporting. It is not possible to learn with any specificity how many academic programs were operating in Cuba at the time of the rule change.  Only discovery will produce that information from OFAC.  Likewise there is no information (except of an anecdotal kind) as to how many academic programs may at present be operating in Cuba.  However, there is no dispute that those programs cannot amount to anymore than a tiny fraction of the programs in existence *before* the rule change.

between "American students and professors and members of Cuban society." The quantity of the exchanges of ideas between U.S. students and Cubans can only be proportionate to the number of students permitted by the U.S. government to study there under Defendants' amended rule – and that number is close to zero today.

The real source of the OFAC's rule change was a report published on May 6, 2006. That report was created by a hastily assembled and electorally animated body called the President's Commission for Assistance to a Free Cuba ("Report").[6] The Report of the Commission constitutes the sole item in the administrative record submitted to the Court in defense of OFAC's action. In this regard, it is of critical importance to note that nowhere do Defendants claim that OFAC exercised a grain of independent judgment in restricting the educational activities in Cuba – and hence the academic freedom – of U.S. professors and students. *See* Defendants' Statement of Undisputed Material Facts: "In response to the President's directive, OFAC modified several portions of the Regulations to incorporate the recommendations of the [Commission's] Report, including those pertaining to educational travel." The Report provides no record of the "abuses" that Defendants wish the Court to believe prompted the OFAC rule change. OFAC simply responded to the "'President's Directive' by modify[ing]…the regulations…pertaining educational travel." There was, as corroborated by the very record before the Court, no "balancing of policy objectives" by OFAC at all, and certainly no evidence to support its action.

As "Background" to its rule change, OFAC described the Commission as "tasked with identifying ways *to hasten Cuba's transition to a free and open society*…." 69 Fed.

---

[6] Commission for Assistance to a Free Cuba, Report to the President (2004), available at http://www.state.gov/p/wha/rt/cuba/commission/2004/, last visited Mar. 15, 2007.

Reg. 33768-33774 (June 16, 2004) (emphasis added).  OFAC goes on to say: "The president directed the implementation of certain of the Report's recommendations … and [OFAC] is amending [its regulations] to implement those recommendations."  *Id*.  So, to hasten the arrival of a "free and open" society in Cuba Defendants circumscribed the constitutional freedoms of U.S. professors and students.

Given that they are the exclusive source of OFAC's action in effectively eliminating U.S. academic programs in Cuba, the origins of the Commission, its Report and the Presidential Directive to implement the Report's recommendations obviously require careful examination.  That examination follows.

**1(d) A Domestic Political Calculation Leads to a Commission Ostensibly Concerned with U.S. Foreign Policy Toward Cuba, But Really Concerned with Florida's Electoral Votes**

On October 10, 2003 President George W. Bush announced the formation of his Commission for Assistance to a Free Cuba before an audience of anti-Castro Cuban Americans in the White House Rose Garden.  According to one knowledgeable commentator:

> "At first blush, the Commission for Assistance to a Free Cuba appears to have all the hallmarks of a political effort to shore up support for the Bush administration in South Florida's fractious Cuban-American community in the midst of the 2004 presidential election campaign.  President Bush announced the initiative in the fall of 2003, in part to stem growing discontent in Miami surrounding U.S.-Cuba policy."[7]

Actually the commentator understated the matter.  Two months before the announcement of the Commission a group of influential Cuban American state legislators

---

[7] Daniel P. Erikson, *The Commission for Assistance to a Free Cuba: Campaign Fantasy or Credible Blueprint?*, FOCAL [Canadian Foundation for the Americas] publication Focal Point: Spotlight on the Americas, June 2004.  Mr. Erikson is Senior Associate for U.S. Policy and Director of Caribbean Programs at the Inter-American Dialogue, where his work focuses on U.S. foreign policy.  (Biographical information is available at http://www.thedialogue.org/staff/default.asp, last visited Mar. 22, 2007).

in Florida had signed a letter to the President claiming "great disappointment and rage" over his lack of an aggressive Cuba policy.[8]  Those legislators expressed:

> "'fear that historic and intense support from Cuban American voters for Republican federal candidates, including yourself, will be jeopardized.' One of the signers … wonder[ed] how Bush will motivate his supporters in Miami next year.  'We may see much less voter turnout unless these problems are addressed.'"[9]

The *National Review* article concluded by saying:

> "Bush and the GOP should take this emerging threat seriously.  There are only about one and a half million Cuban Americans, but most of them live in Florida, where they play a crucial role in determining election outcomes.  Following the Elian Gonzalez controversy in 2000, when the Clinton administration forcibly returned a refugee boy to Cuba, Bush won about 80 percent of their votes.  'This community voted in numbers that make Crawford, Texas, look like enemy territory,' says Joe Garcia of the influential Cuban American National Foundation. Bush's 537-vote victory over Al Gore in Florida certainly would not have survived much in the way of lowered turnout."[10]

In early 2004 the White House reacted to the threat of defections by Cuban American voters to his Democratic opponent on Election Day 2006.  Suddenly there was an energetic commitment to regime change in Cuba.  For example, in January 2004, his Assistant Secretary for Western Hemisphere Affairs, Roger Noriega, said in Miami:

> "The President's commitment is not rhetorical or theoretical, it is in action. I am sure you all appreciate that in any important matter of national security, there is no substitute for presidential leadership. And this President's personal commitment to a free Cuba is making a difference. He has called for action and it is my responsibility – and my honor – to implement that policy."[11]

(As we shall see, Mr. Noriega was to play a critical role in the creation of the

---

[8]John J. Miller, *Trouble in Miami: If Bush Doesn't Watch Out, He Could Lose Those Cuban-Americans*, National Review, October 27, 2003.
[9] *Ibid.*
[10] *Ibid.*
[11] Statement of Roger F. Noriega, Remarks to the Cuban Liberty Council, Miami, Florida, January 30, 2004, at http://www.state.gov/p/wha/rls/rm/29151.htm.

Commission Report that is the sole administrative record proffered in this case by Defendants to justify their destruction of U.S. academic programs in Cuba).

The Bush Administration's newly discovered commitment to action on behalf of Miami's hard-line anti-Castro community (that is, its commitment to a key element of its electoral base) was soon to find expression in the Commission's specific recommendations to "hasten the transition to democracy" in Cuba. Those recommendations were intended, sufficiently in advance of the 2004 Presidential Election, to give new sustenance to an old dream in Miami – the dream of an abrupt regime change in Cuba.

Since the end of the Soviet Union's subsidies to Cuba in the early 1990's it had been the fervent hope of anti-Castro Cuban Americans that economic hardship in that country would produce a change of government. Something colloquially called the "pressure cooker effect" served, in Miami, as a metaphor for the social explosion that it was hoped would result from the intense pressures of U.S.-engineered poverty in Cuba.

Eight years before the Commission issued its Report the controversial Helms-Burton Act of 1996 (The Cuban Liberty Democratic Solidarity (Libertad) Act of 1996, 22 U.S.C. § 6021 *et seq.* was enacted. That law was predicated on the belief that cutting off hard currency to Cuba (principally in the form of foreign investment) would induce a violent change of government there. As President Clinton's special advisor on Cuba at that time the Helms-Burton legislation was being considered in Congress put it: "Under the Helms-Burton Act, the basic model of change in Cuba is societal collapse leading to a violent upheaval."[12] The Helms-Burton Act was acclaimed on its passage as a victory for

_____

[12] *U.S. Policy on Cuba Criticized*, Miami Herald, April 21, 1997, at 8A. "Worse is better," was the view from Miami of conditions in Cuba, post-Soviet Union. A Cuban American writer quoted his father as

conservative Cuban American political organizations like the Cuban American National Foundation (CANF).

Faced in 2004 with an incipient revolt of Cuban American voters in what was thought to be the "must-win" state Florida, the Bush Administration pandered to that part of the electorate by reprising the Helms-Burton mantra of "cut-off hard currency to Cuba and bring Castro down."  Applying the venerable formula that "personnel = policy," responsibility for drafting the Commission's Report was assigned to two political appointees at State Department – both of whom were former staff members of the Senate Foreign Relations Committee and had worked for Senator Jesse Helms, one of them at the time the Senator's namesake legislation (i.e. the Helms-Burton Act) was enacted. That individual was Daniel W. Fisk.  Mr. Fisk was Deputy Assistant Secretary of State at the time he authored Chapter 1 of the Report (titled Hastening Cuba's Transition), the section of the Report that recommended the restrictions on academic programs in Cuba that are at issue in this lawsuit.[13]  The other individual with direct responsibility for the Commission's Report was the aforementioned Roger Noriega.  Mr. Noriega was Assistant Secretary of State for Western Hemisphere Affairs when he added to his portfolio the role of "Commission Coordinator."[14]  A third individual, Jose R. Cardenas, served as Editor of the Report.  Before his political appointment as "Senior Advisor" to

---

saying: "Fidel is through…. It's only a matter of time…. The question is only when and how, that's all. *What's so good about the situation in Cuba is how bad it is getting.*"  Gustavo Pérez Firmat, Next Year in Cuba: A Cuban's Coming-of-Age in America 101 (1995) (emphasis added).

[13] Mr. Fisk was Chairman of the Commission's Working Group for Hastening Cuba's Transition.  He served as a senior staff member and associate counsel to the Senate Committee on Foreign Relations (1994-97) when Senator Jesse Helms chaired that committee.  (Biographical information is available at http://www.whitehouse.gov/government/dfisk-bio.html, last visited Mar. 15, 2007).  Mr. Fisk has described himself as having, "…played a principal staff role in the Cuban Liberty and Democratic Solidarity. (LIBERTAD) Act of 1996," (*see* Daniel W. Fisk, *Cuba and American Public Opinion*, July 22, 1999).

[14] Mr. Noriega worked for the House of Representatives International Relations Committee at the time Helms-Burton was enacted.From July 1997 to August 2001, he was a member of the Senate Foreign Relations Committee staff of Chairman Helms.  (Biographical information is available at http://www.tewlaw.com/professional.php?id=66, last visited Mar. 15, 2007).

the Department of State by the Bush Administration, Mr. Cardenas was the Washington

Director of the arch-conservative Cuban American National Foundation (CANF), where

his perspective on Cuba was on frequent display.[15]  CANF was the principal supporter of

the punitive Helms-Burton legislation when it was before Congress.

From the moment the Bush Administration was alerted in late 2003 to the

possibility of a mutiny of Cuban American voters, the academic freedom of U.S.

professors and students exercised in Cuba was at risk, for they were soon to become

targets and finally the victims of a Commission in search of ways to claim that it was

taking a hard line over Cuba.

However, the destruction of U.S. academic programs in Cuba required at least a

perfunctory rationale.  So the Commission's Report said in the most conclusory fashion

imaginable, "academic institutions *regularly abuse* this license category [i.e. of

educational travel to Cuba] and engage in a form of disguised tourism."  Administrative

Record ("AR") at 63; *see* Szubin Decl. ¶ 16 (emphasis added).  With that drive-by assault

on integrity of U.S. institutions of higher learning taken care of, the Report went on to its

pre-ordained "recommendation" to the President:

> "Eliminate abuses of educational travel by limiting educational travel to
> only undergraduate or graduate degree granting institutions and only for
> full-semester study programs, or for shorter duration only when the
> program directly supports U.S. policy goals; requiring that the travelers be
> enrolled in a full-time course of study at the licensed institution…."[16]

---

[15] For example, UPI reported in July 2001 that"…the White House [has]…nominated conservative Cuban-American cold warrior Otto Reich for Assistant Secretary for Western Hemisphere Affairs. Reich has compared Castro's regime to the Nazis and the Soviet Union, he once compared the popularity of baseball in Cuba to 'playing soccer in Auschwitz.'" Mr. Cardenas told UPI in the same article, "We are very excited about the nomination and we don't think the President could have found a better candidate to take over this important post." (White House to Unveil Tougher Cuba Policy, UPI, July 13, 2001, at http://www.newsmax.com/archives/articles/2001/7/13/60454.shtml).

[16] AR at 65; see Szubin Decl. ¶ 16.  Note the telling phrase, "or for shorter duration only when the program *directly supports U.S. policy goals*" (emphasis added).  That phrase from the Report does not appear in the June 16, 2004 OFAC rule change.  Nevertheless it is indicative of the Commission's indifference or

Not only was there no evidence of abuses of academic travel to point to in the Report, the evidence that did exist revealed only how scrupulously U.S. professors had conducted their academic programs in Cuba.  For example, the Director of OFAC when he testified before Congress on October 16, 2003 concerning his Office's enforcement of the embargo on Cuba, spoke only of curbing "the abuse of licenses issued for travel related to *non-accredited educational exchanges*, where travelers were engaging primarily in tourist activities."[17]  (emphasis added).

Mr. Newcomb went on to say:

"OFAC continues to authorize academic study in Cuba pursuant to a degree program at an accredited U.S. academic institution. To date, OFAC has issued 760 two-year specific licenses to accredited U.S. colleges and universities for this purpose, as well as numerous licenses to individual undergraduate and graduate students seeking to pursue academic study in Cuba where their academic institution has not applied for an institutional license. *OFAC will continue to license educational exchanges pursuant to accredited academic activities*."[18]  (emphasis added).

OFAC's Director made no reference to "abuses" of academic study programs in Cuba – only months before those programs were terminated for such alleged abuses – because they did not exist.  So of course there can be no administrative record of them before the Court.

### III. ARGUMENT

### 1. DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B) AND 56 SHOULD BE DENIED

---

hostility to, or even ignorance of, academic freedom as a constitutionally protected right.  For a time at least the Commission thought it perfectly proper that the government license solely academic endeavors that it deemed to "directly support U.S. policy goals."

[17] *See* Newcomb, *supra* at note 3.

[18] Ibid.

**(i) Summary of Plaintiffs' Opposition to Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment**

Defendants request dismissal of this action under Federal Rule of Civil Procedure 12(b); first, for lack of subject matter jurisdiction (Rule 12(b)(1)), and second, for failure to state a claim upon which relief can be granted (Rule 12(b)(6)). Both of Defendants' invocations of that Rule are devoid of merit.

Defendants' Rule 12(b)(1) Motion challenging subject matter jurisdiction rests on the claim that Plaintiffs do not have standing. In this Opposition, Plaintiffs will demonstrate that they more than satisfy the following elements of standing: (i) they have suffered actual injuries, (ii) those injuries are fairly traceable to Defendants' conduct, and, (iii) a favorable decision on the relief requested in their Complaint is likely to redress the injuries they have suffered. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

To survive Defendants' Rule (12)(b)(6) challenge, – i.e. that Plaintiffs have failed to state a claim upon which relief can be granted – Plaintiffs need only show that it is **not** "*beyond doubt* that [they] can prove *no set of facts* in support of [their] claim[s] which would entitle them to relief." *E.E.O.C. v. St. Francis Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997), quoting *Conley v. Gibson*, 388 U.S. 41, 45-46 (1957) (emphasis added). Plaintiffs will show that they meet and indeed exceed considerably the showing required by Rule 12(b)(6). Specifically, Plaintiffs will demonstrate that they can plausibly demonstrate a *likelihood* of proving at least the following set of facts in support of their claims: (1) There is no record to support the "abuses" in U.S. educational programs in Cuba that are the sole justification claimed by the Defendants for their challenged action. Hence they were "arbitrary, capricious, an abuse of discretion, or

14

otherwise not in accordance with law." 5 U.S.C. 706 (2)(A). (2) Defendants lacked the congressional authority to promulgate an amendment to an existing rule in order to divest U.S. professors and students of the opportunity to teach and study in Cuba. In fact, Defendants acted contrary to a declaration that it was the sense and hence the will of Congress that OFAC *not* regulate the foreign travel of Americans undertaken for educational purposes. (3) Defendants' actions were motivated by electoral concerns and could not have had, and have not had, any appreciable success in limiting hard currency to Cuba – the sole justification cited by Defendants for the rule change challenged in this suit. In fact, in the nearly four years since Defendants destroyed U.S. educational programs in Cuba, ostensibly in order to "hasten the transition to democracy in Cuba" by denying that country hard currency, the Cuban economy has grown annually at double digit rates. For example, last year that country's economy grew by 12.5%.[19] Hence, Defendants' restrictions on U.S. academic programs in Cuba are provably ineffectual and therefore irrational in Defendants' attempt to "hasten a transition to democracy in Cuba." 69 Fed. Reg. 33, 768 (June 16, 2004). (5) Contrary to Defendants' assertion that tourism is the single largest source of hard currency to Cuba, Mem. 1, the largest single source of hard currency to Cuba are the remittances sent by Cuban Americans to their relatives on the island. These remittances *are authorized by the Defendants* (pursuant to 31 C.F.R. § 515.570) and contribute nearly a net $1 billion annually in hard currency to Cuba.[20] By comparison it is difficult to believe that U.S. academic programs in Cuba could have produced much more than $2 million a year expended in that country by U.S. professors

---

[19] Reuters, March 22, 2007
[20] Mario A. Gonzalez - Corzo and Scott Carson, Cuba's Unique Remittance Landscape: A Comparative Perspective (2006). Available on the website of the Association for the Study of the Cuban Economy. [http://lanic.utexas.edu/project/asce/]

and students.  If so, those figures represent approximately 1% of the $2 billion, gross, spent in Cuba last year by foreign tourists.[21]  Moreover, that $2 million that may have been expended in Cuba by U.S. professors and students represents about 2% of the remittances to Cuba OFAC authorizes annually.  Given the *de minimis* contribution to the Cuban economy of U.S. academic programs in comparison to OFAC-facilitated dollar transfers to the island, OFAC's action in eliminating those programs had no rational basis.   (6) To the extent there were "abuses" in U.S. academic programs in Cuba, Defendants had adequate law enforcement means to address and prevent those abuses without impinging upon Plaintiffs' First and Fifth Amendment freedoms.  (7) Defendants' challenged action evinces no consideration given to narrowly tailoring its reaction to abuses (if any) of academic programs in Cuba.

Defendants also seek summary judgment under Rule 56.  In response, Plaintiffs will show in the attached Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts that a number of material issues exist in this case that will require factual resolution.

### (ii) Plaintiffs *Have* Standing

To have Article III standing, a plaintiff must demonstrate an "actual or immediate" "injury-in-fact" that is "fairly traceable" to the challenged conduct and that is "likely" to be redressed by a favorable decision by the court.  *Lujan*, 504 U.S. at 560. Each of those criterion is comfortably met by the Plaintiffs in this case.

### (iii) Associational Standing

**Emergency Coalition to Defend Educational Travel ("ECDET"):** The association

---

[21] The Commission's Report (at pg. 29) estimates Cuban tourism to gross $1.8-$2.2 billion gross. Of the figure Cuba is thought to net 20% of that figure. *Id*.  By comparison remittances net the Cuban economy their full dollar values as they are spent on the island.

Plaintiff in the case is a coalition whose members are described in the Complaint as "higher education professionals who are affiliated in academic capacities with universities across the country." Compl. ¶ 4. Most, until OFAC's rule change, were involved in designing, implementing and teaching academic courses in Cuba. Compl. ¶ 4. In *America's Community Bankers v. FDIC*, 200 F.3d 822, 827 (D.C. Cir. 2000) the Court of Appeals addressed what it described as "the concept of associational standing," and explained: "A membership organization may sue to redress its members' injuries, even if the organization cannot demonstrate an injury to itself," (citing *UAW v. Brock*, 477 U.S. 274). The Supreme Court made clear long ago that an association may sue to vindicate the constitutional rights of its members because the two are "in every practical sense identical" and because the association provides "the medium through which its individual members seek to make more effective the expression of their own views." *NAACP v. Alabama ex. rel Patterson*, 357 U.S. 449, 459 (1958); and see *Roe v. Operation Rescue*, 919 F.2d 857, 865 (3d Cir. 1990) ("'[T]he primary reason people join an organization is to create an effective vehicle to vindicating interests that they share with others.'") (quoting *International Union*, *UAW v. Brock*, 477 U.S. 274, 290 (1986)).

In this case ECDET possesses standing as an association if, (i) its members have standing to sue in their own right, (ii) the interests at stake are germane to the organization's purpose, and (iii) neither the claim asserted nor the relief requested requires members' participation in the lawsuit. *Consumer Federation of America v. FCC*, 348 F.3d 1009, 1011 (D.C. Cir. 2003), (citing *Hunt v. Washington State Apple Adver. Comm'n.*, 432 U.S. 333, 343 (1977)).

In *Consumer Federation of America*, 348 F.3d at 1012 the Court of Appeals

further held – with respect to the requirement that an association's members must have standing in their own right – that it is enough if just one member of the group has that standing (citing *City of Waukesha v. EPA*, 320 F.3d 225 (D.C. Cir. 2003) (*per curiam*) and *Nat'l Lime Assn., v. EPA* 233 F.3d 625 (D.C. Circuit 2000)).  Therefore Defendants say, correctly, that "ECDET's standing is derivative of its ability to show that at least one of its members has standing to sue in his own right."  Mem. 18.  Plaintiff Wayne Smith is a member of ECDET and he is also that organization's Chairman.  Compl. ¶ 5.  So, it is requested of the Court that it resolve the first question as to ECDET's standing (i.e. does one of its members have standing to sue), by referring to the demonstration of Plaintiff Smith's standing that is made below at page 20 in the section of this Memorandum titled Plaintiffs' Standing as Individuals.

The second requirement for ECDET to possess "associational standing" is a demonstration that the "interests at stake are germane to the organization's purpose." *Consumer Federation of America*, 348 F.3d at 1011.  The interests at stake in this litigation are the freedom of academic professionals affiliated with accredited U.S. colleges and universities to "design, implement, teach and recruit students for their academic programs in Cuba *as their professional judgment dictates*."  Compl. ¶ 4 (emphasis added).  ECDET was formed for the express and sole purpose of remedying the injury to its members' First and Fifth Amendment interests caused by Defendants when they effectively ended U.S. academic courses in Cuba by dictating, "(i) who may teach the academic courses of United States academic institutions, (ii) the structure of such courses and (iii) who may attend those courses as students."  Compl. ¶ 4.  ECDET's interest in recovering its members' lost freedoms is indisputably germane to that

18

association's purpose, as an organization.  *See Competitive Enterprise Institute v. NHTSA*, 901 F.2d 107, 111 (D.C. Cir. 1990) where the Court of Appeals held that "germaneness is satisfied by a 'mere pertinence' between litigation['s] subject and an organization's purpose" (citing *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)).  That standard is met in this case.  The subject of this litigation is not only pertinent to ECDET's purpose, it is the very reason for its existence.

The third and last requirement for "associational standing" is that neither the claim asserted nor the relief requested requires ECDET's members' participation in this lawsuit.  *See Consumer Federation of America*, 348 F.3d at 1011.  "There is no need for individual member participation, where as here, only injunctive and declaratory relief is sought."  *Forum for Academic and Institutional Rights v. Rumsfeld*, 291 F. Supp. 2d 269, 291 (S.D.N.J. 2003) citing *Roe v. Operation Rescue*, 419 F.2d 857, 865-66 (3rd Cir. 1990), and *Hospital Council of Western Pa. v. City of Pittsburg*, 949 F.2d 83, 89 (3rd Cir. 1991).  That is exactly the situation here.

### (iv) Plaintiffs' Standing as Individuals

*Consumer Federation of America*, 348 F.3d at 1012 is also authority for what is required for a member of a group, in this case (ECDET), to establish individual standing.  That member must show that he or she has suffered (1) an injury-in-fact, (2) that is fairly traceable to the administrative action complained of, and (3) that his or her injury can be redressed by vacating and remanding the adverse administrative action.  (citing *Tel. & Data Sys., Inc. v. FCC,* 19 F.3d 42 (D.C. Cir. 1994)).

2. **Dr. Wayne S. Smith**[22]: Professor Smith's injury-in-fact arises from OFAC's

---

[22] The demonstration of Dr. Smith's standing that follows serves also to meet the first requirement of "associational standing," i.e. that one of the association's members has standing to sue, (*see* page 18

prohibition on adjunct faculty teaching Johns Hopkins' courses in Cuba. Compl. ¶ 5. By its actions OFAC denied a preeminent expert on Cuba the academic freedom to disseminate his wide expertise pertaining to that country – in particular Cuba's bilateral relations with the U.S. – to students of Johns Hopkins University desirous of partaking of that expertise as an element of their overall undergraduate educations. (*See* Kamen Decl. ¶ 1). Plaintiff Smith's injury has no source but the Defendants' actions and the relief he seeks in the Complaint – i.e. the rescission of the regulation that eliminated his academic activities in Cuba – would immediately redress that injury. Smith Decl. ¶ 9.

The seriousness of Defendants' prohibition on Dr. Smith teaching U.S. students in Cuba is evidenced by the penalties to which he is subject. Should he teach in Cuba he would be subject to criminal prosecution, with statutorily prescribed fines and terms of imprisonment under the Trading with the Enemy Act (TWEA) (50 U.S.C. App.). Section 16(a) of that Act provides, in the case of "willful violations", for fines of $100,000 and imprisonment for up to ten years, or both. A civil penalty of up to $65,000 may also be imposed on Plaintiff Smith by Defendant OFAC under Section 16(b) of TWEA for the violation of any "rule or regulation" it issued under TWEA authority.[23] It cannot be argued seriously that the injury to Dr. Smith in the exercise of his academic freedom is anything other than traceable to Defendants' action on June 16, 2004.

Finally, a favorable decision by the Court (i) declaring the OFAC rulemaking at

---

above).

[23] See 31 C.F.R § 515.701. Note that, "the criminal penalties provided in the Trading with the Enemy Act are subject to increase pursuant to 18 U.S.C. 3571 which, when read in conjunction with Section 16 of the Trading with the Enemy Act, provides that persons convicted of violating the Trading with the Enemy Act may be fined up to the greater of either $250,000 for individuals and $1,000,000 for organizations, or twice the pecuniary gain or loss from the violation." 31 C.F.R. § 515.701(4)(c). Of course the fact of criminal and civil liabilities of up to $1,000,000 for "organizations" that would permit someone in Dr. Smith's position from teaching a course in Cuba is sufficient to deter any U.S. college or university from giving him that opportunity, even if he were willing to risk punishment to himself for the exercise of his academic freedom.

issue in this case invalid under the APA and violative of Plaintiffs' constitutional rights, and (ii) mandating the rescission of the amended regulation produced by that rulemaking, would redress immediately Dr. Smith's injury.  Smith Decl. ¶ 9.

3.  **Dr. John W. Cotman**: Dr. Cotman's injury arises from OFAC's prohibition on his teaching another institution's course in Cuba.  Compl. ¶ 8.  Dr. Cotman is further injured by OFAC's *diktat* that any course he teaches in Cuba must be of no less than ten weeks duration.  It is professionally impossible for Dr. Cotman to absent himself for at least two and a half months from his teaching, research and administrative duties at Howard University in order to teach a course in Cuba of the duration prescribed by OFAC.  In addition Dr. Cotman's parental and domestic duties preclude his absence from home for OFAC's minimum ten weeks.  Dr. Cotman is subject to the same civil and criminal penalties set out above with respect to Dr. Smith should he exercise his academic freedom to teach another institution's course in Cuba, or should he design and teach a course in that country of less than ten weeks duration.  As is true of Plaintiff Smith, Professor Cotman's injury is traceable to Defendants' actions on June 16, 2004 and rescission of the rule change produced by those actions will redress that injury.  Cotman Decl. ¶ 14.

4.  **Jessica Kamen**: Plaintiff Jessica Kamen is enrolled in an undergraduate degree program at Johns Hopkins University.  Compl. ¶ 7.  Ms. Kamen's injury is that she is foreclosed from the academic freedom to study in Cuba under the renowned Plaintiff Dr. Smith, because (i) Dr. Smith is debarred by Defendants from teaching a Johns Hopkins' course in Cuba, and, (ii) her university was forced to cancel all inter-sessional (i.e. between semester) programs in Cuba as a direct result of OFAC's requirement that all

such programs must be of ten weeks duration or longer.  As a direct result of OFAC's actions Johns Hopkins University no longer offers courses in Cuba.  But for OFAC's action, Plaintiff Kamen would have been able to exercise her academic freedom to attend a Johns Hopkins' course in Cuba.  Kamen Decl.¶ 2,3; Smith Decl. ¶ 9, and Gonzalez Decl. ¶ 6.

5.  **Adnan Ahmad**: Plaintiff Mr. Ahmad is enrolled in an undergraduate degree program at Johns Hopkins University.  If not for OFAC's actions in prohibiting U.S. institutions of higher learning from offering inter-sessional courses in Cuba, Plaintiff Ahmad would have attended a Johns Hopkins' course in that country, thereby building on the knowledge he had acquired through earlier academic study in Cuba.  Compl. ¶ 8.

Mr. Ahmad's injury, caused by Defendants' deprivation of his academic freedom, is traceable directly to Defendants' actions and would be redressed by the rescission of the rule promulgated on June 16, 2004. Ahmad Decl. ¶.

### (A) A Brief Response to Defendants' Claim that Plaintiffs Have Not Established Injury-in-Fact

The government claims that Plaintiffs have "failed to establish an 'injury-in-fact' that is 'actual or imminent.'"  Mem. 19 (citing *Lujan* 504 U.S. at 564).

With respect to Plaintiff Smith, Defendants assert that although he taught Johns Hopkins' courses in Cuba from 1997-2004, he "does not allege that the course would have taken place in subsequent years."  Mem. 19.  In fact the Complaint states: "In *every* year from 1997 to 2004 Dr. Smith taught intersession courses in Cuba attended by United States students enrolled in the Johns Hopkins Cuban Exchange program….As a direct consequence of the Treasury Department regulations challenged herein, Dr. Smith is prohibited from teaching Johns Hopkins' courses in Cuba.  This harm is ongoing and will

22

continue until defendants are enjoined." Compl. ¶ 5 (emphasis added). It may therefore be reasonably assumed from Dr. Smith's averment that he would still be teaching courses in Cuba, but for Defendants' action in terminating those courses. Why else would he have filed suit, founded ECDET and continued to serve as that organization's Chairman if he did not have personal knowledge of the fact that he would be teaching in Cuba if the OFAC curtailment of his freedom to do so were removed? In any event, Plaintiff Smith states in his attached Declaration what should be obvious; that is, Johns Hopkins' courses in Cuba would have continued – and he would have continued to teach them – if not for Defendants' actions. Smith Decl. ¶ 9.

With respect to Plaintiff John Cotman, the Defendants claim that he "does not allege any specific opportunity to teach at another institution's course that was foreclosed." Mem. 19. This is preposterous. Dr. Cotman has published books on Cuba's foreign policy and is an acknowledged authority on that subject. Cotman Decl. ¶ 5. The government destroyed his academic freedom to disseminate his specialized knowledge to students at institutions other than his place of full-time, permanent employment, (Howard University), and now says he does not allege "any specific opportunity to teach at another institution's course." How can he? For a start, it would be a crime punishable by fines and imprisonment for any institution other than Howard to provide him with "a specific opportunity to teach [its] course."[24]

With respect to Plaintiff Jessica Kamen, Defendants claim she has not suffered an "injury-in-fact" by virtue of their actions that resulted directly in her university, Johns Hopkins, canceling its courses in Cuba. She avers in the Complaint that in the Spring of

---

[24] As pointed out above, there are virtually no U.S. undergraduate courses left in Cuba as a direct result of Defendants' actions. So it is disingenuous of them to suggest that professors like Dr. Cotman continue to have the freedom to teach courses in Cuba offered by universities other than where they are employed.

2006 she inquired as to what courses Johns Hopkins was offering in Cuba and was told "that the university has cancelled all of its programs in Cuba as a result of the OFAC rulemaking of June 16, 2004." Compl. ¶ 7. But according to Defendants she has suffered no injury, because she can "study for a semester at a *Cuban* academic institution" (emphasis in original). Mem. 20. *See* Robins Decl. ¶ 3 and Smith Decl. ¶ 11 for a brief explanation of why the government's assertions that Ms. Kamen always had the option of simply enrolling as a student in a Cuban university can be fairly characterized as unrealistic.

Defendants next claim with respect to Plaintiff Jessica Kamen, that upon enrolling at Johns Hopkins she "had no guarantee that she could participate in any particular course" and therefore was not injured by Defendants' actions. Mem. 20. It is worth stopping and considering what Defendants, in making that argument, are really asking the Court to accept. It is this: If the government intercedes in academic life in this country in ways that lead to the cancellation of educational opportunities at our nation's colleges and universities, the students at those institutions have not been injured because they had no "guarantee" that those opportunities would continue to exist free of government interference. By that logic, the government could decree on pain of imprisonment that, for example, the teaching of evolution is prohibited and when students complain, it could reply: "There was no guarantee that you could take a course in evolution when you enrolled in your college or university, so you have no standing to sue the government for the curtailment of your constitutionally protected right to learn." Common sense says that cannot be right.

With respect to Plaintiff Adnan Ahmad the government contends that he has not

suffered an injury-in-fact and has "already enjoyed the privilege (*sic*) of academic travel to Cuba." Mem. 21. Mr. Ahmad in the Complaint states that he had studied in a Johns Hopkins' program in Cuba, but, "As a result of the OFAC rulemaking challenged in this action, [I] cannot develop further [my] academic interests in Cuba through study there because Johns Hopkins no longer offers courses in that country." Compl. ¶ 8. Plaintiff Ahmad but for the government's action would have exercised his right (not *privilege*) to study again in Cuba. Ahmad Decl. ¶ 3.

### (B) Response to Defendants' Claim that Plaintiffs' Injuries Were Not Caused by OFAC's Actions, but Instead by U.S. Colleges and Universities Canceling their Programs in Cuba

In *Motor & Equip. Mfrs. Ass'n. v. EPA*, 142 F.3d 449, 457 (D.C. Cir. 1998) it was held that suppliers of automobile emissions devices had standing to challenge  an EPA waiver of its federal preemption of certain emissions controls by allowing California to adopt a law that favored devices installed by automobile manufacturers, rather than those produced by the plaintiffs. The Court of Appeals dismissed EPA's contention that plaintiffs' injuries were not caused by it, but rather by the automobile manufacturers, which the Court described as "a third party not before the court." The Court held "petitioners' injury is fairly traceable to EPA's rulemaking, satisfying the second prong of the *Lujan* test. EPA itself has acknowledged that its … rule has resulted in an almost unanimous decision by major manufacturers to install [devices] that comply with California's regulations." In similar fashion, OFAC's rule has resulted in the almost unanimous decision of U.S. colleges and universities to end their academic programs in Cuba. Robins Decl. ¶ 4. *Tozzi v. HHS*, 271 F.3d 301 (D.C. Cir. 2001) held that, "Where, as here, the alleged injury flows not directly from the challenged agency action, but rather

25

from independent actions of third parties, we have required only a showing that 'the agency action is at least a substantial factor motivating the third parties' actions.'" (citing *Comty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 669 (D.C. Cir. 1987). *See also Telephone & Data Sys. v. FCC*, 19 F.3d 42 (D.C. Cir. 1993): "Recent decisions have clarified the application of the traceability and redressability requirements to suits that complain of administrative action that allows third parties to harm the complainant … "'mere indirectness of causation is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice.'" (*Quoting National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C. Cir. 1988)).

In *Block v. Meese*, 793 F.2d, 303, 1309 (D.C. Cir. 1986) Judge Scalia observed,

> "*It is impossible to maintain, of course, that there is no standing to sue regarding action of a Defendant which harms the Plaintiff only through the reaction of third persons.* If that principle were true…how state threats and intimidation directed at the distributors of certain books could confer standing upon the publisher whose sales are affected, constitutional injury-in-fact…requires no more than *de facto* casualty" (citations omitted) (emphasis added).

The colleges and universities of this country reacted to Defendants' actions as they had no choice but to do – they cancelled their academic programs in Cuba. See representative declarations of Merkx ¶ 2,3, Gonzalez ¶ 6, Stellmaker ¶ 3.  Had they done otherwise they would have been subject to criminal prosecution and ruinous civil penalties pursuant to the Trading with the Enemy Act.  Defendants, under any definition of causation imaginable, were the proximate cause of the injuries to Plaintiffs that are the subject of this litigation.

**(C) Plaintiffs' Response to Defendants' Claim that they Have Failed to Allege an Injury-in-Fact With Respect to their First Amendment Claims to Academic Freedom**

At Mem. 21 Defendants make the astonishing claim that *Sweezy v. New Hampshire*, 354 U.S. 234 (1957) is a case about institutional academic freedom, rather than the freedom of professors and students.  In fact, the Supreme Court in *Sweezy* referred to a lecturer's *personal* "liberties in the areas of academic freedom and political expression."  *Id*. at 250.

It is really beyond serious dispute, as the distinguished Professor Rabban has written, that the Supreme Court, "in *Sweezy* recognized both academic freedom and political expressions as *individual* First Amendment rights."  David M. Rabban, *Functional Analysis of "Individual" and "Institutional" Academic Freedom Under the First Amendment*, 53 Law & Contemp. Probs. 227, 280 (1990) (emphasis added).[25]

In *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) Justice Brennan writing for the majority of the Supreme Court said, "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and *not merely to the teachers concerned*.  That freedom is therefore a special concern of the First Amendment…" (emphasis added).  In *Wieman v. Updegraff*, 344 U.S. 183 (1952) the majority invalidated a statute that required state employees to take loyalty oaths.  Justice Frankfurter said that applying the statute *to teachers* "brings the safeguards of the [First and Fourteenth Amendments] vividly into operation," because such oaths would "chill that free play of the spirit which teachers especially ought to cultivate and practice."  *Id*. at 195.  And therefore academic freedom was protected by the Constitution as a "limitation upon State and National power."  *Id*. at 197.  One of many examples of cases in which Courts of Appeals have recognized the First Amendment academic freedom of

---

[25] Professor Rabban is Dahr Jamail, Randall Hage Jamail and Randall Lee Jamail Regents Chair in Law at the University of Texas and is generally considered a preeminent authority in this country on the subject of academic freedom as a First Amendment right.

individual teachers is *Fowler v. Board of Education*, 819 F.2d 657 (6th Cir. 1987) where

the Sixth Circuit held that, "Many courts have recognized that a *teacher's* First

Amendment rights encompass the notion of 'academic freedom' to exercise professional

judgment in selecting topics and materials for use in the course of the educational

process." (citing *Stachura v. Truszkowski*, 763 F.2d 211, 215 (6th Cir. 1985)) (emphasis

added).

Notwithstanding the plethora of authority to the contrary, Defendants invoke

*Urofsky v. Gilmore*, 216 F.3d 401, 412 (4th Cir. 2000) (*en banc*) for their extraordinary

proposition that: "To the extent these rights [i.e. academic freedom] are uniquely

protected, if at all, (*sic*)[26] those rights inhere in the university, not its professors or

students." Mem. 21. *Urofsky v. Gilmore* is not binding on the Court and it is bad law.

Professor Rabban has written of that case as follows:

"Despite the disappointing decision by the Fourth Circuit majority in the
*Urofsky* case, it seems unlikely, though not inconceivable, that other
courts will follow its bad example of denying First Amendment protection
to individual academic freedom. The Fourth Circuit, many believe, is the
most conservative in the United States. Even on this conservative circuit,
four judges dissented in *Urofsky*, and the chief judge, though concurring
with the majority's conclusion that the law was valid, wrote separately to
disagree with its rejection of the special First Amendment protection for
individual academic freedom…Five other federal circuit courts, consistent
with Supreme Court precedents such as *Sweezy* and *Keyishian*, have
recognized that the First Amendment safeguards the academic speech of
professors, and no other court has denied this otherwise universal
conclusion…[27]

Professor Rabban has written elsewhere that:

"While constitutionalizing academic freedom in Sweezy, Chief Justice

---

[26] Again, In *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) the Supreme Court said: "Our Nation
is deeply committed to safeguarding *academic freedom*, which is of transcendent value to all of us …. *That
freedom is therefore a special concern of the First Amendment*…." (emphasis added).

[27] *See* Professor Rabban, *Academic Freedom, Individual or Institutional?*, available at
http://www.aaup.org/publications/Academe/2001/01nd/01ndrab.htm, last visited Mar. 22, 2007.

Warren's plurality opinion and Justice Frankfurter's concurrence tied the
First Amendment values of critical inquiry and the search for knowledge
to the independence of both professors and universities from state
intrusion the Court in Sweezy recognized both academic freedom and
political expression as *individual First* Amendment rights."[28]   (emphasis
added).

With respect to the student Plaintiffs in this case, First Amendment protections for

listeners are particularly well-established when those listeners are students.  In *New*

*Jersey-Philadelphia Presbytery v. New Jersey State Board of Higher Education*, 654 F.2d

868 (3d Cir. 1981), the Court considered whether college students had standing, distinct

from that of their college, to bring a federal lawsuit challenging government interference

with the college's operation.  *Id*. at 877-78.  It held that "Supreme Court precedent clearly

indicates that the students have distinct rights which may be enforced."  *Id*. at 878.  The

Supreme Court has recognized the special First Amendment protections afforded to

recipients of a school's instruction.  *See*, *Kleindienst v. Mandel*, 408 U.S. 753, 763

(noting that right to receive information is "nowhere more vital than in our schools and

universities") and *Meyer v. Nebraska*, 262 U.S. 390, 401 (1925) (holding unconstitutional

a state law which "attempted materially to interfere with…the opportunities of pupils to

acquire knowledge").  *See also Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 308

(1965) (Brennan, J., concurring) ("The dissemination of ideas can accomplish nothing if

otherwise willing addresses are not free to receive and consider them").  And see *Stanley*

*v. Georgia*, 394 U.S 564 (1969), "The Constitution protects the right to receive

information and ideas."

### (D) Plaintiffs' Response to Defendants' Claim That They Lack Standing Because Their Injuries Are "Indirect"

---

[28] Functional Analysis of  "Individual" and "Institutional" Academic Freedom Under the First Amendment.
53 Law & Contemp. Probs. 227, 256 (1990).

29

Defendants tie their claim that Plaintiffs received "indirect" injuries to the issue of redressability:

> "The decision to conduct academic programs in Cuba – whether over a full semester or over winter break – belongs to academic institutions, not to professors or students. Yet not a single academic institution is party to this case. Compl. ¶¶ 4-8. Plaintiffs have therefore "failed to demonstrate show a favorable judicial decision on the merits of their claims will redress this injury." Mem. 22.

Defendants go on to say, incredibly, that it is "unfettered choices made by independent actors that are at issue here and that undermine any claim of redressability." Mem. 22, quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976) quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975).

Where would Defendants suggest that these "unfettered choices" regarding U.S. academic programs in Cuba might be found after their action on June 16, 2004? U.S. colleges and universities, such as Howard University and Johns Hopkins, are no longer free to endorse Dr. Smith's courses in Cuba *because he can no longer teach there*. Nor are they free to welcome a distinguished professor like Dr. Cotman to teach one of their courses in Cuba *because he cannot do so*. And of course Johns Hopkins and Howard may no longer accommodate their students' academic wishes – such as Plaintiff Kamen's to attend inter-sessional courses in Cuba *because those students, by government decree, must study in Cuba for a minimum of ten weeks, which is an impossibility for most of them*. Nor may those universities accept another institution's students to attend a course in Cuba *because those students are prohibited from attending another institution's courses in Cuba*.

To allow any of the academic activities listed immediately above would place a U.S. college or university at risk of enormous fines and civil penalties – and worse, the

imprisonment for up to ten years of any administrator who approved them. Yet the government speaks of their "unfettered choices"! To add insult to injury, the government goes on to say, "nothing in the challenged rulemaking requires the schools to eliminate their academic programs in Cuba *entirely*… Johns Hopkins could elect to allocate its resources toward a full-semester program in Cuba - as that university has done in Italy, Spain, and France." Mem. 24 (original emphasis). Next they say, "…it is Johns Hopkins' choice whether to hire Smith as a full- time permanent employee, and not merely as a part-time employee." Mem. 24. If according to Defendants, Johns Hopkins took those steps (i.e. established a semester-length program in Cuba and hired Dr. Smith as a permanent full-time employee), "Smith could not then claim that he is prohibited from teaching Johns Hopkins' courses in Cuba." Mem. 24. Having constructed an insuperable barrier to Plaintiff Smith's exercise of his First Amendment rights through the coercion of his employer Johns Hopkins, the government has the effrontery to say, in paraphrased form, that "it has really done nothing to injure Dr. Smith, but to the extent it has, any harm done can be cured by the targeted institution – at its expense and through a re-allocation of its personnel and other resources." Defendants' assertions are akin to saying that if a college is debarred by federal law from, for example, admitting students of Asian parentage unless each is provided with an individual swimming pool and given a job within the president of the university's office that pays at least $200,000 a year, a prospective Asian student has suffered no injury to his or her constitutional rights wrought by the government if he or she is denied entry to the college.

    *Res ipsa locquitor* – the facts here speak for themselves, and loudly. Only one U.S. undergraduate academic program in Cuba survived Defendants' actions on June 16,

2004.  For the perpetrators of a mass extinguishment of the freedoms of American professors and students to participate in academic programs in Cuba to now say that the individuals effected by their actions are merely the victims of the "unfettered choices" of their colleges and universities is breathtaking for what it reveals of Defendants' attitude to the academic freedom described as a "special concern of the First Amendment." *Keyishian*, 385 U.S. at 603.

### (E) Response to Defendants' Claim That Plaintiffs "Seek to Assert the Rights and Interests of Third Parties"

Defendants cite confusedly precedents such as *Powers v. Ohio*, 499 U.S. 400 (1991), that address cases where an individual attempts to assert the rights of others. Clearly, that is not what the Complaint in *this case* is about.  Here Plaintiffs have pleaded particularized harm *to themselves* and allege that harm to be the direct result of Defendants' rulemaking on June 16, 2004; that is, but for the actions of Defendants, the Plaintiffs would be exercising their rights to teach and to learn free of crude, electorally motivated government interference with the academic freedom that is guaranteed them under the First Amendment.

With respect to Defendants' assertion that, "Quite simply, there exists no hindrance to the ability of individual academic institutions, such as those employing Plaintiffs Smith and Cotman, to protect their interests in holding short-term academic travel programs in Cuba [i.e. by filing suit themselves]."  Mem. 25.  "[It is a] self-evident proposition that more than one party may have standing to challenge a particular action or inaction.  Once it is determined that a particular plaintiff is harmed by the defendant, and that the harm will likely be redressed by a favorable decision, that plaintiff has standing-- regardless of whether there are others who would also have standing to sue." *Animal*

*Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 432 (D.C. Cir. 1998) (citing *Clinton*

*v. City of New York*, 524 U.S. 417, 434-435 (1998)).

## 2. PLAINTIFFS' CLAIMS UNDER THE ADMINISTRATIVE PROCEDURE ACT (APA) ARE MERITORIOUS

### (a) Judicial Review of Defendants' Actions

"…the actions of [OFAC]…are governed by the judicial review provisions of the

APA, 5 U.S.C. 706 (2)(A)." *Holy Land Foundation v. Ashcroft*, 333 f.3d 156, 162 (D.C.

Cir. 2003). *Milena Ship Management Co. v. Newcomb*, 804 F. Supp. 846 (E.D. LA.

1992) aff'd, 995 F.2d 620 (5th Cir. 1993): "In reviewing an [OFAC] action, we inquire

whether the agency acted within its authority, adequately considered all the relevant

factors, and provided a reasoned basis for its decision."

"The Court should abide by the agency's factual findings if they are supported by

*substantial evidence*." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361,

1368 (D.C. Cir. 2004) (emphasis added) and *see Citizens to Preserve Overton Park, Inc.*

*v. Volpe*, 401 U.S. 402, 415. 416 (1971), the Court's "inquiry into [the] facts is to be

searching and careful…"

A court reviewing agency action must "… determine whether the agency's action

does not violate the law, has a reasonable basis, and is supported by facts *within the*

*record*." *Leboeuf, Lamb, Greene & Macrae, LLP v. Abraham*, 215 F. Supp. 2d 73, 83

(D.D.C. 2002). (emphasis added).

The OFAC action challenged in this lawsuit was (1) done with no consideration

of relevant factors; (2) done in violation of the Constitution; (3) had no reasonable basis

and (4) is bereft of any factual support, let alone substantial evidence, as revealed by the

barren administrative record before the Court.

**(b) Plaintiffs' Response to Defendants' Claim That a Deferential Standard of Review is Applicable**

Inevitably Defendants cite *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984). They do so for its statement of the deference to be accorded an agency's interpretation of an enabling statute - in this case the Trading with the Enemy Act. Mem. 26. They go on to say that, "a challenge to OFAC's interpretation of TWEA – its 2004 rulemaking amending the regulation governing educational activities – must either demonstrate that the statute clearly forbids the interpretation or that the interpretation is unreasonable." Mem. 26.

There was of course no interpretation of anything by OFAC in this case. By the government's own admission, a Commission recommended the curtailment of U.S. academic programs in Cuba, the President directed it and OFAC amended its rule *as ordered*. Szubin Decl. ¶ 17. The Supreme Court explained in *Greene v. McElroy*, 360 U.S. 474, 507 (1959) that before the "cherished rights" of individuals may be infringed, the Constitution "requires careful and purposeful consideration by those responsible for enacting and implementing our laws." The Plaintiffs in this case each possesses the "cherished right" of academic freedom. The record before the Court proves that OFAC gave *no* consideration to the constitutional rights of professor and students at U.S. academic institutions when it promulgated its rule change of June 16, 2004.

The *Chevron* standard does not exempt Defendants from providing a *reasoned* explanation for their action in denying U.S. professors and students their constitutional rights to teach and study in Cuba, and that explanation must include "a rational connection between the facts found and the choice made." *Lozowski v. Mineta*, 292 F.3d

840, 845 (D.C. Cir. 2002) citing Motor Vehicles MFRS. Ass. v. State Farm, 463 U.S. 43

(1983).  There was simply no factual basis for Defendants' claim of abuses in U.S.

academic programs in Cuba.  Hence there could be no "rational connection" between

non-existant facts and Defendants' rule change.  Therefore it was "arbitrary and

capricious" under the APA standard, (5 U.S.C. 706 (A)).

At this phase of this litigation the Court must consider only whether the

rulemaking at issue in this case *could* have violated Plaintiffs' First and Fifth Amendment

rights, as alleged clearly in their Complaint.  The *Chevron* standard does not and cannot

immunize agency actions from that constitutional scrutiny.  And of course the APA - as

well as holding invalid "arbitrary and capricious" Executive Branch actions – also

requires reviewing courts to "hold unlawful and set aside agency action [that is] contrary

to constitutional rights," 5 U.S.C. 706 (2)(B) –  as Plaintiffs' Complaint requests.

### (c) Plaintiffs' Response to Defendants' Claim that a "Profound Measure of Deference" is Due OFAC's Rulemaking Because it was made Pursuant to "A Broad Grant of Congressional Authority" and it Emanated from the President's 'Immense Inherent Authority in the Realm of Foreign Affairs" (Mem. 27)

Defendants' first contention is simply not true, as Plaintiffs will demonstrate later

in this Opposition when the comprehensive pre-emption by the U.S. Congress of

Executive Branch authority over Cuba policy is detailed.  (In summary, they will show

that instead of endorsing a "broad grant of congressional authority to the Executive

Branch to regulate the travel of U.S. citizens to Cuba," Congress has, since 1994,

narrowed Executive Branch authority with respect to Cuba to the point of extinction.  By

2000 Congress was micro-managing every aspect of the embargo on Cuba, including

travel to that country for academic purposes).

In support of their second contention, i.e. as to the immensity of Executive Branch

authority in the "realm of foreign affairs," Defendants ignore the oft-repeated judicial admonition that, "it is error to suppose that every case or controversy which touches on foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211 (1962). While the Supreme Court has recognized broad authority by the Executive Branch to make foreign policy judgments, *Dames & Moore v. Regan*, 453 U.S. 654 (1981), that authority must be exercised in conformity with the Constitution, and specifically within the limitations of the Bill of Rights.[29] In *Flynn v. Schultz*, 748 F.2d 1186, 1191 (7th Cir. 1984) it was held that; "an area concerning foreign affairs that has been uniformly found appropriate for judicial review is the protection of individual or constitutional rights from government action… This protection of the individual unquestionably extends to cases involving United States Government action taken against our citizens abroad." Citing *Reid v. Covert*, 354 U.S. 1, 5.

In *Ramirez de Arellano v. Weinberger*, 724 F.2d 143, (D.C. Cir. 1983), *rev'd*, 745 F.2d 1500 (D.C. Cir. 1984), *vacated*, 471 U.S. 1113 (1985), *on remand*, 788 F.2d 762 (D.C. Cir. 1986), the D.C. Circuit agreed to adjudicate the alleged unconstitutional taking of land in Honduras as a result of the decision of U.S. officials to establish a military training facility on Plaintiff's cattle ranch. In the rehearing by the D.C. Circuit, meeting *en banc*, the constitutional dimensions of the Plaintiff's claim were noted by the majority.

> "The Executive's power to conduct foreign relations free from the unwarranted supervision of the Judiciary cannot give the Executive *carte blanche* to trample the most fundamental liberty and property rights of this country's citizenry. The Executive's foreign relations prerogatives are subject to constitutional limitation." *Id*. 1514.

---

[29] Louis Henkin, *Foreign Affairs and the Constitution* 254 (1975). "The Bill of Rights limits foreign policy and the conduct of foreign relations as it does other federal activities."

As the Supreme Court explained in *United States v. Robel*, 389 U.S. 258, 263-64 (1967), "foreign policy", like "war power", "cannot be invoked as a talismanic incantation to support any exercise of….power which can be brought within its ambit."

It is clear, constitutional limitations safeguarding essential liberties cannot be nullified by Defendants' invocation of the President's "immense inherent authority in the realm of foreign affairs." While the President does have prerogative powers over foreign affairs in such sovereign-to-sovereign matters as the recognition of foreign governments and the negotiation of treaties, those powers are delegated expressly to the President by the Constitution.[30] What he does not have is what Defendants claim, namely plenary power over the liberties of American citizens abroad, and no cases in this Circuit or the Supreme Court have so held.

### (d) No Deference is Due Defendants' Rulemaking Because Congress has Pre-empted the Executive Branch's Foreign Relations Prerogatives with Respect to Cuba, Including Travel to that Country

Even when regulation of foreign travel is otherwise constitutional, decisions of the Supreme Court establish that the right to travel cannot be regulated without Congress' express authorization, or implied approval where Congress has granted broad rulemaking authority specifically related to foreign travel. *Haig v. Agee*, 453 U.S. 280 (1981); *Zemel v. Rusk*, 381 U.S. 1 (1965). As the Supreme Court said in *Kent v. Dulles*, 357 U.S. 116

---

[30] In *Marbury v. Madison*, 1 Crach 137, 166 (1803), Chief Justice Marshall, in discussing executive powers beyond judicial control, said, "[t]he subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive." The Bill of Rights does not allow "political" considerations - even if they related to foreign affairs - to trump enumerated constitutional rights. In *Briehl v. Dulles*, 248 F. 2d 561, 588 (D.C. Cir. 1957) *et seq.*, reversed *sub nom. Kent v. Dulles*, *supra*, Judge Bazelon in a dissenting opinion joined in by Chief Judge Edgerton analyzed the government's foreign relations claims and pointed out usefully that "those cases all relate in some direct fashion to the Executive's traditional power to do things which depend upon negotiations with foreign sovereignties or which bear directly upon our relations with foreign governments" (at 589). Each of the instances cited by Judge Bazelon is clearly distinguishable from restrictions upon a citizen's constitutional liberties of travel and academic freedom, as is the case here.

(1958): "Since we start with an exercise by an American citizen of an activity included in constitutional protection, we will not readily infer that Congress gave the Secretary of State [i.e. the Executive Branch] unbridled discretion to grant or withhold it…."

Because travel is a right protected by the Constitution, any grant of authority to the Executive Branch to curtail it must be narrowly construed. *Kent*, 357 U.S. at 129. As the Supreme Court in *Kent* said: "We are first concerned with the extent, if any, to which Congress has authorized its curtailment." *Id.* 127. The Court went on, citing *Korematsu v. United States*, 323 U.S. 214, 218, to say that the liberty of U.S. citizens to travel internationally was subject to restriction only where, upon a showing of " 'the gravest imminent danger to the public safety' * * * the Congress and the Chief Executive moved in coordinated action." *Id.* 128. Finally, the Court said: "If that 'liberty' [i.e. to travel] is to be regulated, it must be pursuant to the law-making functions of the Congress. Where activities or enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them." Id. 128.

Not only did the Congress and the Executive Branch not move "in coordinated action" to destroy U.S. academic programs in Cuba, nowhere is Executive Branch authority to conduct this nation's foreign affairs more circumscribed than it is with Cuba; and in fact OFAC acted in contravention of the will of Congress rather than in coordination with it when it destroyed those programs in Cuba. Beginning with the Cuba Democracy Act of 1992, (22 U.S.C. § 6001 *et seq.*) Congress has methodically stripped to the point of pre-emption the President's authority to conduct foreign relations with

Cuba.[31]  In 1996 the Helms-Burton Act, at Section 102(b), codified the embargo on Cuba

by providing:

> "Codification of Economic Embargo. – The economic embargo of Cuba,
> as in effect on March 1, 1996, including all restrictions under part 515 of
> title 31, Code of Federal Regulations, shall be in effect upon the enactment
> of this Act, and shall remain in effect subject to section 204 of the act."

The Helms-Burton Act went on to specify minutely the terms upon which a

presidential termination of the embargo could occur.  By congressional *fiat* the

termination of the embargo on Cuba is permitted under Section 204(c) [of the Act] only

when the President submits a determination to Congress that "a democratically elected

government" is in power in Cuba.[32]

In 2000 Congress once and for all preemptively authorized specific categories of

travel to Cuba by U.S. citizens.  Among them was the academic travel Defendants

destroyed on June 16, 2004.  Section 910 of the Trade Sanctions Reform Act (TSRA) 22

U.S.C. § 7201 states that the Treasury Department may not authorize travel-related

transactions in Cuba for "touristic activities."  The statute goes on to define the term

"touristic activities" to mean any activity *not* "expressly authorized in any of paragraphs

(1) through (12) of § 515.560 [of the CACR], or in any section referred to in any of such

paragraphs (1) through (12)…"  Paragraph (5) of § 515.560 expressly established the

Cuba travel category of "educational activities" and incorporates by specific reference §

---

[31] For example, Section 1706(a)(1) of that Act provides that no licenses involving trade with Cuba are to be
issued to foreign subsidiaries of U.S. firms.

[32] The micro-management of Cuba policy by Congress is exemplified by Section 206 of the Helms-Burton
Act, which defines a "democratically elected" government in Cuba as one that, in addition to meeting the
requirements of a transition government (see Section 205 of the Act), also: (1) results from free and fair
elections; (2) is showing respect for the basic civil liberties and human rights of the citizens of Cuba; (3) is
substantially moving toward a market-oriented economic system; (4) is committed to making constitutional
changes to ensure regular free and fair elections and the full enjoyment of basic civil liberties and human
rights; (5) has made demonstrable progress in returning to U.S. citizens' property confiscated by the Cuban
government or in providing equitable compensation.

515.565 and its component elements that cover U.S. academic programs in Cuba.

By enacting Section 910 of the TSRA, Congress expressed an endorsement of and a desire to preserve, free of Executive Branch interference, the twelve categories of approved travel to Cuba that it *deemed non-touristic*.  As explained by TSRA's chief sponsor then Representative George R. Nethercutt Jr. (R-WA), "Codification eliminated the flexibility of regulators to make further changes to travel regulations… [by] locking in the very limited categories of travel permitted at that point in time…" Again, academic travel to Cuba under § 515.565 was one such category of congressionally permitted travel.

### (e) Defendants' Acted in "Contravention of the Will of Congress"

"The executive branch [i.e. OFAC] must exercise its power under TWEA in accordance with congressional intent."  *Cernuda v. Heavey*, 720 F. Supp. 1544 (S.D. Fl. 1989) citing *United States v. Frade, supra.*

Justice Jackson's concurring opinion for the Supreme Court in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), provided an analytical framework for deciding the legitimacy of Executive Branch actions by describing the three general categories of presidential authority.  In a case where the President acts pursuant to the authorization of Congress, that action "would be supported by the strongest presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who would attack it." *Id.* at 637.  However, when the president acts in contravention of the will of Congress "his power is at its lowest ebb."  *Id.  Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981) later applied the *Youngstown* formula to analyze the President's authority in the realm of foreign affairs.

40

In this case, the challenged OFAC action was in *direct contravention of the will of Congress* and hence is not entitled to judicial endorsement or even deference. In the Free Trade in Ideas Act of 1994 (FTIA), codified at 50 U.S.C. App. Sec. 5(b)(4), Congress amended the Trading with the Enemy Act to provide expressly that "the President should not restrict travel" for educational or similar purposes "between the United States and any other country." The background to the enactment of the Free Trade in Ideas Act is revealing as to how low the "ebb" of presidential power regarding Cuba actually was when Defendants' effectively eliminated U.S. academic programs in that country on June 16, 2004. The Conference Report could not be clearer in expressing the will of Congress with respect to the type of travel at issue in this case. It said: "…the provisions of the conference substitute seek to protect the constitutional rights of Americans to educate themselves about the world by… engaging in educational… exchanges with persons from around the world." *H.R. Conf. Rep*. No. 482 at 239, 1994 U.S.C.C.A.N. at 482.

The position is clear. Congress through a series of statutes from 1992 to 2000 pre-empted Executive Branch authority to regulate U.S. citizens' travel to Cuba and twice, in 1994 and 2000, specifically endorsed academic travel to that country, thereby giving the Executive Branch an unmistakable instruction *not* to interfere with that travel.

### 3. PLAINTIFFS' RESPONSE TO THE GOVERNMENT'S CLAIM THAT THEY HAVE NOT BEEN DEPRIVED OF FIFTH AMENDMENT RIGHTS

Defendants' administrative action constitutes an ongoing interference with Plaintiffs' freedom to travel internationally, a freedom the Supreme Court has described as "an important aspect of the citizen's 'liberty.'" *Kent v. Dulles*, 357 U.S. 116, 127. However the actions of Defendants interfered with and continue to interfere with more than the physical movement of the Plaintiffs – they are also interfering with another

41

constitutional right, academic freedom, a freedom the Supreme Court has described as a "special concern" of the First Amendment. *Keyishian*, 385 U.S. at 603.

In *Aptheker v. Secretary of State*, 378 U.S. 500, 517 (1964), the Supreme Court elaborated on the constitutional importance of the right to travel by recognizing the connection between international travel and the First Amendment. The Court held that, "freedom of travel is a constitutional liberty closely related to rights of free speech and association." In this case, Plaintiffs' thwarted travel to Cuba for educational purposes is related to and allied with the First Amendment right of academic freedom.

The Supreme Court has repeatedly recognized that the right to travel is protected under the Fifth Amendment as a liberty interest that an individual cannot be deprived of without due process of law.[33] In each of its six international travel cases, the Supreme Court has upheld an individual's right to travel, or permitted restriction of that right, based upon its conclusion as to whether the agency restriction under review was "supported by the weightiest considerations of national security." *Zemel v. Rusk*, 381 U.S. 1, 16 (1965). *Zemel* followed closely on the Cuban Missile Crisis, which led the Court to conclude that the applicable standard had been met. In particular, the Court accepted the government's assertions in *Zemel* that allowing Americans to travel could endanger their lives and provoke an international incident if the Cuban government either attacked or took Americans hostage. *See Kent v. Dulles*, 357 U.S. at 128, (travel restrictions could be justified "only on a showing of the gravest imminent danger to the public safety"). The Court upheld the ban on travel to Cuba on that basis. In *Regan v. Wald*, 468 U.S. 222, 243 (1984), the Court required the same national security

---

[33] See *Regan v. Wald*, 468 U.S. 222 (1984); *Zemel v Rusk*, 381 U.S. 1 (1965); *Aptheker v. Secretary of State*, 378 U.S. 500 (1964); *Kent v. Dulles*, 357 U.S. 116 (1958). *See* e.g. *Aptheker* 378 U.S. at 516. The right to travel abroad is a "personal liberty protected by the Bill of Rights…."

justification as in *Zemel* and reached the same result in light of the government's assertion that Cuba continued to pose a threat given its alliance with the Soviet Union, its support for armed insurgency in the Western Hemisphere, and its use of troops in conflicts in Africa and elsewhere.

Defendants do not even address the requisite national security standard – and the degree of threat to that security – that was essential to the Supreme Court's decisions in both *Zemel v. Rusk*, 381 U.S. 1 (1965) and *Regan v. Wald*, 468 U.S. 222 that upheld prior restrictions on travel to Cuba. Again, those cases stand squarely for the requirement that (i) the government must assert convincingly a national security threat and (ii) the Court must find that that threat is a real one. The Supreme Court's analysis in *Zemel* and *Regan* is consistent with and supported by earlier decisions concerning the right to travel abroad. In each of those cases – whether the government prevailed or not – the Court determined the constitutionality of the restriction by determining whether the government had articulated a genuine threat to the United States. *See Agee*, 453 U.S. at 306 ("serious danger to the national security" justified passport revocation); *Aptheker*, 378 U.S. at 505 ("danger the world Communist movement presents for our national security" not present). Nothing in the Defendants' Memorandum filed in support of its motion challenges those decisions. Instead, by their reliance on a wrongly decided case like *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431 (9th Cir. 1996) they have decided to ignore the "national security" standard repeatedly employed by the Supreme Court when deciding constitutional claims relating to international travel.

**(a) Plaintiffs' Response to Defendants' Contention that "Travel Restrictions Under the Cuban Embargo Have Long Withstood First Amendment Challenges" Mem. 34**

Tellingly, Defendants cite no case involving travel abroad by U.S. citizens in

connection with activities covered by the First Amendment's protection of academic freedom. While the right to travel is principally conceived of as a Fifth Amendment "liberty," the First Amendment value of the travel activities at issue "is a factor to be considered in determining whether appellant [i.e. someone to whom U.S. laws restricting travel abroad] has been denied due process of law" under the Fifth Amendment. *Zemel*, 381 U.S. at 16. In *Kent v. Dulles*, 357 U.S. 116 (1958) and *Aptheker v. Secretary of State*, 378 U.S. 500 (1964), the Supreme Court recognized the close connection between travel and the First Amendment rights of free speech and association.

The First Amendment right of academic freedom simply cannot be curtailed for so-called foreign policy considerations, at least not without – and even this is arguable – a demonstration from Defendants that such curtailment was "supported by the weightiest considerations of national security." *Zemel*, 381 U.S. 16. The sole justification provided by Defendants for their action was "to hasten the transition to democracy in Cuba." Szubin Decl. ¶ 15. It is not enough.

### III. CONCLUSION

For the foregoing reasons the Court should deny Defendants' Motion to Dismiss or in the Alternative, for Summary Judgment.

Dated: March 29, 2007

Respectfully submitted,

By:    /s/ Robert L. Muse

ROBERT L. MUSE
(D.C. Bar No. 376369)
Muse & Associates
1320 19th St. NW, Suite M-2
Washington, DC 20036
Telephone: (202) 887-4990

44

Facsimile: (202) 861-6912
E-mail: MUSERL@YAHOO.COM

JOHN T. RIELY
(D.C. Bar No. 391840)
4405 East West Highway #603
Bethesda, Md. 20814
Telephone: (301) 656-3382
Facsimile: (301) 656-0729
E-mail: JTRIELY@MSN.COM
*Counsel for Plaintiffs*

45