**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EMERGENCY COALITION TO DEFEND,  )
EDUCATIONAL TRAVEL ("ECDET"); WAYNE )
S. SMITH; JOHN W. COTMAN; JESSICA )
KAMEN; ADNAN AHMAD,  )
                                       )
        Plaintiffs,  ) Case No. 1:06-CV-01215
                                         ) Judge Ellen S. Huvelle
        v.  )
                                         )
UNITED STATES DEPARTMENT OF THE )
TREASURY; HENRY M. PAULSON, JR.,  )
Secretary of the United States Department of the )
Treasury; THE OFFICE OF FOREIGN )
ASSETS CONTROL; ADAM J. SZUBIN,  )
Director of the Office of Foreign Assets Control, )
                                       )
        Defendants.[1]  )
_____)

**REPLY MEMORANDUM
IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

---

[1]  Pursuant to Federal Rule of Civil Procedure 25(d), Henry M. Paulson, Jr., in his official capacity as the Secretary of the United States Department of the Treasury, substitutes for John W. Snow, and Adam J. Szubin, in his official capacity as Director of the Office of Foreign Assets Control, substitutes for Barbara Hammerle.

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    Plaintiffs Have Failed to Refute Their Lack of Standing . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    *Plaintiffs Cannot Explain Their Injury-in-Fact* . . . . . . . . . . . . . . . . . . . . . . . . . 1

            (i) <u>Professor Plaintiffs</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

            (ii) <u>Student Plaintiffs</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            (iii) <u>Absence of First Amendment Injuries</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.    *Absent Party Participation by Relevant Universities, Plaintiffs'*
            *Putative Injuries Remain Unredressable* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      C.    *Because of the Regulatory Structure, Plaintiffs Cannot Escape the*
            *Fact That They Seek To Assert The Rights of Third Parties* . . . . . . . . . . . . . . . 12

II.   Plaintiffs Cannot Avoid The Deferential Standards Applicable to OFAC's Action . . . . 13

      A.    *Plaintiffs' Disagreement With the CAFC I Report*
            *Does Not Render OFAC's Action Irrational* . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.    *Plaintiffs Have Not Demonstrated That Congress*
            *"Pre-empted" the President's Broad Authority under*
            *TWEA to Regulate Academic Travel to Cuba* . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.  Plaintiffs Have Not Rescued Their First Amendment Claims . . . . . . . . . . . . . . . . . . . . 19

      A.    *Plaintiffs Concede That 31 C.F.R. § 515.565 is*
            *Content and Viewpoint Neutral* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      B.    *The Governing Standard is Intermediate Scrutiny* . . . . . . . . . . . . . . . . . . . . . . 21

IV.   Plaintiffs Misstate Supreme Court Precedent on Their Fifth Amendment Claims . . . . . 22

V.    This Action is Ready for Resolution Because No Material Facts Are In Dispute . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

Am. Library Ass'n v. Odom, 818 F.2d 81 (D.C. Cir. 1987). ................................. 11, 12

Aptheker v. Sec'y of State, 378 U.S. 500 (1964). ................................................ 23, 24

Block v. Meese, 793 F.2d 1303 (D.C. Cir. 1986). ...................................................... 8

Capital Cities/ABC, Inc. v. Brady, 740 F. Supp. 1007 (S.D.N.Y. 1990). ................... 22

Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837 (1984). ..................................... 13, 14, 19

Consarc Corp. v. U.S. Treasury Dept., Office of Foreign Assets Control,
    71 F.3d 909 (D.C. Cir. 1995). ....................................................................... 13

Dames & Moore v. Regan, 453 U.S. 654 (1981). ................................................ 13, 14

Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658 (D.C. Cir. 1996). ................... 3, 5, 10, 11

Fowler v. Bd. of Ed., 819 F.2d 657 (6th Cir. 1987) ..................................................... 6

Freedom to Travel Campaign v. Newcomb, 82 F.3d 1431 (9th Cir. 1996) .............. 17, 20, 22, 23

Haig v. Agee, 453 U.S. 280 (1981) ......................................................................... 24

Harisiades v. Shaughnessy, 342 U.S. 580 (1952). ............................................... 17, 23

Kent v. Dulles, 357 U.S. 116 (1958). ................................................................ 23, 24

Keyishian v. Bd. of Regents, 385 U.S. 589 (1967) ................................................ 6, 21

Kleindienst v. Mandel, 408 U.S. 753 (1972). ............................................................ 6

Kowalski v. Tesmer, 543 U.S. 125 (2004). .............................................................. 13

Lamont v. Postmaster Gen. of U. S., 381 U.S. 301 (1965) ......................................... 6

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992). ......................................... 3, 4, 7

Motor & Equip. Mfrs. Ass'n v. Nichols, 142 F.3d 449 (D.C. Cir. 1998). ................... 8

Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,
    125 S. Ct. 2688 (2005) ................................................................................. 19

Nat'l Wrestling Coaches Assoc. v. Dep't of Educ., 366 F.3d 930
        (D.C. Cir. 2004). ..................................................................................... 7, 8, 11

Regan v. Wald, 468 U.S. 222 (1984). ................................................... passim

Sweezy v. New Hampshire, 354 U.S. 234 (1957). ............................... 5, 6, 21

Tozzi v. HHS, 271 F.3d 301 (D.C. Cir. 2001). ........................................... 8

United States v. O'Brien, 391 U.S. 367 (1968). ................................... 21, 22

Univ. of Pa. v. EEOC, 493 U.S. 182 (1990). .................................. 6, 20, 21

Walsh v. Brady, 927 F.2d 1229 (D.C. Cir. 1991). ............................... 20, 21

Wieman v. Updegraff, 344 U.S. 183 (1952). ............................................. 6

Zemel v. Rusk, 381 U.S. 1 (1965). ................................................. 22, 23, 24

## **STATUTES**

22 U.S.C. § 7209(b). .......................................................................... 17, 18

Pub. L. 106-387, § 1(a), Title IX, § 910, 114 Stat. 1549, 1549A-71(Oct. 28, 2000). ................. 17

## **RULES AND REGULATIONS**

31 C.F.R. § 515.560(c)........................................................................ 18, 19

31 C.F.R. § 515.565. ........................................................................... passim

69 Fed. Reg. 33768, 33771-72 (June 16, 2004)........................................ 19

71 Fed. Reg. 54399 (Sept. 13, 2006). .................................................... 23

## INTRODUCTION

Replete with misstatements of Supreme Court precedent, Plaintiffs' Opposition is an exercise in rhetoric, not law. Plaintiffs' newly submitted declarations fail to repair their lack of standing. Their assertions that Congress "pre-empted" the President's authority to regulate academic travel under the Cuban embargo reflect a fundamental misunderstanding of the current embargo's statutory underpinnings. Because Plaintiffs do not dispute that the challenged regulation is content and viewpoint neutral, they effectively concede their First Amendment claims. Likewise, by relying on precedent expressly distinguished by the Supreme Court, Plaintiffs' Fifth Amendment claims cannot survive Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment. Finally, this action is ripe for resolution because no material facts are in dispute.

## I.   Plaintiffs Have Failed to Refute Their Lack of Standing

Defendants demonstrated that Plaintiffs lack standing to press their claims, Mem. 16-26, because (i) they did not allege an "actual or imminent" "injury-in-fact," *id.* at 19-22, (ii) any such injury was not redressable in light of the absence of academic institutions as parties to this case, *id.* at 22-24, and (iii) prudential concerns weighed strongly against a finding of standing, because no hindrance exists to prevent academic institutions – the subject of the challenged regulations – from challenging the rulemaking, *id.* at 24-26. With their Opposition, Plaintiffs submit new declarations in a futile effort to manufacture standing where none exists.

### A.   *Plaintiffs Cannot Explain Their Injury-in-Fact*

(i) <u>Professor Plaintiffs</u>. The professor Plaintiffs lack injury-in-fact. In his declaration, Plaintiff Smith now alleges that his course during the winter break would have continued absent the challenged rulemaking. Declaration of Wayne S. Smith, ¶ 9 (Dkt. #15). Nonetheless, Smith cannot

demonstrate the requisite injury-in-fact because, as a part-time employee, he was not entitled to teach short-term classes in Cuba prior to the rulemaking. Both before *and* after the 2004 amendment of section 515.565, a professor who taught at a structured educational program in Cuba was required to be a full-time permanent employee of the licensed U.S. educational institution.[2] Mem. 11; Declaration of Adam J. Szubin ¶ 19 (Dkt. #8). Thus, Smith's standing (and ECDET's) fails for want of injury-in-fact.

While Plaintiff Cotman now alleges the end of Howard University's programs, he does not allege that he was slated to teach in any of these programs at the time of the rulemaking. Declaration of John W. Cotman ¶¶ 9-13. To the contrary, Cotman admits that "parental responsibilities have limited fieldwork in Cuba since 1995," *id.* ¶ 8, and does not allege any "fieldwork in Cuba" since that time. Cotman's declaration underscores that he lacked concrete, particular, or imminent plans to teach in Cuba – whether at Howard or elsewhere – at the time of the rulemaking. Mem. 19.

Plaintiffs suggest that Cotman need not allege any particular teaching opportunity foreclosed by the rulemaking because "it would be a crime punishable by fines and imprisonment for any institution other than [Cotman's employer]" to hire him to teach an intersessional course in Cuba. Opp. 23. Plaintiffs' logic would dispense with the injury-in-fact requirement, because every single U.S. person would be able to allege injury-in-fact simply by invoking the *existence* of the CACR's penalty provisions.[3] All U.S. persons are subject to penalties if they violate the CACR, not just Cotman. Allegations of a generalized grievance, however, do not qualify as an injury-in-fact. *See*

---

[2] The full-time permanent employee requirement for professors teaching structured educational programs in Cuba had been somewhat obscured by the paragraph structuring in the previous version of the regulation. Mem. 11 n.14; Szubin Decl. ¶ 19.

[3] Plaintiffs apply the same flawed logic in their effort to explain why Smith's injury is traceable to Defendants' action, Opp. at 20, and why their injuries are not indirect, *id.* at 30-31.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658,667 n.4 (D.C. Cir. 1996) ("[T]he plaintiff must show that he is not simply injured as is everyone else, lest the injury be too general for court action, and suited instead for political redress.").

Cotman's supplemental declaration, furthermore, does not explain how the challenged rulemaking foreclosed a specific teaching opportunity at another academic institution. *Compare* Compl. ¶ 6 (alleging harm because he is "prohibited from teaching another academic institution's courses in Cuba), *with* Cotman Dec. ¶ 13 (at most, referring to summer-session courses he taught "previously at Cape Cod Community College," without any description of concrete plans to teach there again, even by way of implication). It is well settled that such a generalized allegation of harm is insufficient to establish injury-in-fact. *See Lujan*, 504 U.S. at 564 ("Such 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the someday will be – do not support a finding of the 'actual or imminent' injury that our cases require.").

(ii) <u>Student Plaintiffs</u>. Similarly, the newly submitted declarations cannot repair standing for the student Plaintiffs Kamen and Ahmad. Defendants explained how neither student established injury-in-fact because, contrary to their assertions, the regulations *do* provide undergraduate students with opportunities to study in Cuba, *see* 31 C.F.R. §§ 515.565(a)(3), (b).[4] Mem. 19-21. In addition, the student Plaintiffs (1) delayed two years after OFAC's rulemaking to bring a challenge, thus they cannot now allege an injury of being unable to graduate "on schedule" when their own inaction contributed to any purported delay, (2) they were never entitled to such opportunities in the first place, and (3) they are not required to take such intersession classes to graduate on time. *Id.* Ahmad,

_____

[4] The students can seek other opportunities to develop further their academic interests in Cuba by studying in that country. Mem. 20 n .17. If either student later pursues a relevant graduate degree, the regulations provide for specific licenses on a case-by-case basis for academic travel to Cuba, including short-term travel. *See* 31 C.F.R. §§ 515.565(a)(2), (b).

further, has not been deprived of the chance to study in Cuba, because he already enjoyed the privilege of academic travel to that country.  Mem. 21.

Plaintiffs' newly submitted declarations do not rescue the students' standing.  With respect to the availability of academic study in Cuba at *Cuban* institutions, Plaintiff Smith's declaration provides conclusory assertions that "this would be next to impossible" because (1) Cuba would be "unlikely" to issue visas to the undergraduate students, (2) "there is the problem of language fluency," and (3) "there is the problem of crediting a student's course at a Cuban university towards his or her degree."  Smith Decl. ¶ 11; *see* Declaration of Nicholas A. Robins, ¶ 3. (speculating on difficulties students would face in "transferring academic credit from Cuba to their home institution").  These concerns are, of course, purely speculative.  Plaintiffs have not alleged that the students attempted to seek out opportunities to study at a Cuban institution. Nor have they explained why increased language fluency for studies in a foreign country is a barrier relevant to the standing inquiry.  Nor have they alleged that Johns Hopkins has refused to "accept[] for credit toward [their] undergraduate . . . degree" the student Plaintiffs' proposed "[p]articipation in a formal course of study" at any particular "Cuban academic institution," *see* 31 C.F.R. §§ 515.565(a)(3), (b); Mem. 20 n.16.[5]  *See Lujan*, 504 U.S. 555 at 560 (noting that, in addition to an injury which is concrete and particularized, the injury be actual or imminent, not conjectural or hypothetical).

In addition, while each student states confidently that they would have taken the Johns Hopkins class in Cuba, Plaintiffs' declarations highlight how each students' mere desire to take the class would have been insufficient, by itself, to permit their participation.  Plaintiffs describe a

---

[5]  Even if Plaintiffs made such assertions, they would be unlikely to confer standing, but their absence further illustrates the substantial redressability problems to the student's allegations. Mem. 20, nn.16, 18.

4

practice of competitive admissions into the Johns Hopkins Cuba program, where each course consisted of a limited group "of between 20 to 30 students" that "was selected based on class rank as juniors or seniors, high GPA, and interview evaluation." Declaration of Eduardo González ¶ 3 (Dkt. #15). Kamen's declaration, however, provides only her participation in Smith's class as a basis for assuming that, absent the challenged rulemaking, she "certainly would have studied" in that program. Declaration of Jessica Kamen ¶¶ 1, 3 (Dkt. #15)). Ahmad describes his prior participation in the program, and likewise asserts that he "certainly would have studied there again" to continue research. Declaration of Adnan Ahmad ¶¶ 1-3 (Dkt. #15). But Plaintiffs have not provided any evidence to support the proposition that a student who already secured a slot in a program with a limited and competitive admissions practice would be granted that slot a second time.

(iii) <u>Absence of First Amendment Injuries</u>. Finally, Plaintiffs have not explained the nature of their injuries under the First Amendment. Defendants noted that the phrasing of Plaintiffs' First Amendment claim "who may teach, who may attend, what may be taught and how it should be taught," Compl. ¶ 33, appears to derive from Justice Frankfurter's concurrence in *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), articulating the "four essential freedoms of a university." Mem. 21-22. To the extent that these "four freedoms" are uniquely protected, if at all, *see* Mem. 21 n.7, 36-39, many courts attribute Frankfurter's concurrence to the rights of the universities, not those of professors and students. Mem. 21-22. Plaintiffs respond by misstating Defendants' argument – suggesting that Defendants' injury-in-fact argument was tantamount to arguing that professors and students somehow lack First Amendment protections entirely. Opp. 26-29. Defendants made no such argument. Rather, Defendants outlined how the First Amendment does not uniquely protect "academic freedom" separately from other speech, and to the extent it does exist in the form

articulated by Justice Frankfurter, it inheres in the institution, not students or professors.  Mem. 21-22, 36-39.

Furthermore, as discussed *infra*, *Sweezy* and its progeny are inapplicable to content-neutral regulations – and by failing to respond to Defendants' arguments, Plaintiffs have conceded as much.  Nor have Plaintiffs explained how 31 C.F.R. § 515.565 has actually injured them under the First Amendment, where they have not shown how that regulation attempts to direct or control the content or viewpoint of their speech.  Opp. 26-29; Mem. 36-40.  Indeed, the bulk of the cases relied upon by Plaintiffs to establish their injury-in-fact all pertain to restrictions on content or viewpoint.  Opp. 26-29; *see Univ. of Pa. v. EEOC*, 493 U.S. 182, 197 (1990) (distinguishing *Sweezy* and *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)); *Wieman v. Updegraff*, 344 U.S. 183, 191 (1952) (holding loyalty oath requirement for state employees "offends due process"); *compare also Fowler v. Bd. of Ed.*, 819 F.2d 657, 661-64 (6th Cir. 1987) (rejecting First Amendment claim by teacher fired for showing class sexually explicit movie, where conduct was, under the circumstances, conduct that was not "expressive or communicative in nature," and thus not protected).[6]

Similarly, Plaintiffs' unremarkable statements that recipients of information merit First Amendment protection do not illuminate how the student Plaintiffs (1) have been deprived of receiving any content about Cuba, (2) were inhibited from hearing any viewpoint about Cuba, or (3) have any legitimate reason to worry that receiving any content or viewpoint about Cuba will subject them to some sort of official retaliation.  *See* Opp. at 29; *Lamont v. Postmaster Gen. of U. S.*, 381 U.S. 301, 307, (1965) (noting that recipients of communist information under challenged statute

---

[6]  Curiously, Plaintiffs also rely upon *Kleindienst v. Mandel*, 408 U.S. 753 (1972), Opp. 29, where the Supreme Court *rejected* U.S. professors' First Amendment challenge to the Executive's denial of a foreign scholar's entry, lest it render Congressionally delegated authority to the Executive a "nullity."  408 U.S. at 765-70; Mem. 43.

"might think they would invite disaster if they read what the Federal Government says contains the seeds of treason."). In sum, Plaintiffs have failed to satisfy their burden to allege injury-in-fact, be it under the First Amendment or any other theory.

    B.    *Absent Party Participation By Relevant Universities, Plaintiffs' Putative Injuries Remain Unredressable*

Defendants explained how, even assuming *arguendo* that Plaintiffs adequately alleged an injury-in-fact, they nevertheless lack standing because it is only speculative that any such injury will be redressed by a favorable judicial decision. *See Lujan*, 504 U.S. at 560. The choice to offer academic programs in Cuba – or Timbuktu or Malaysia or Ukraine – as well as the decision to hire particular professors as full-time employees, is a resource decision belonging to academic institutions, not to professors or students. Because not a single academic institution is party to this case, Plaintiffs have "failed to demonstrate how a favorable judicial decision on the merits of their claims will redress this injury." *Nat'l Wrestling Coaches Assoc. v. Dep't of Educ.* 366 F.3d 930 (D.C. Cir. 2004). Mem. 22-24.

Plaintiffs respond by conflating two independent criteria for Article III standing: causation and redressability. *See* Opp. 25 ("Response to Defendants' Claim that Plaintiffs' Injuries Were Not Caused by OFAC's Actions . . ."); *see Lujan*, 504 U.S. at 560. This is a classic "strawman" argument, because Defendants did not argue the absence of a causal connection between the alleged injury and the rulemaking. *Compare* Mem. 22-24, *with* Opp. 25-26. Rather, in light of the glaring absence of affected academic institutions as parties to this case, Plaintiffs cannot show that it is likely that a favorable decision will redress their alleged injury. *Lujan*, 504 U.S. at 561; Mem. 22-24.

In particular, Defendants drew the Court's attention to the recent D.C. Circuit opinion in *National Wrestling Coaches Association v. Department of Education*, in which, as here, a regulatory

change caused numerous universities to cancel their men's wrestling programs, rather than allocating financial resources towards increasing the size of their women's wrestling programs. 366 F.3d at 935. While organizations representing affected students and coaches sued, because no university that had altered its wrestling program was party to the case, the D.C. Circuit upheld the district court's dismissal of the complaint for lack of standing. *Id.* at 938-45.

In the *National Wrestling Coaches* opinion, the D.C. Circuit distinguished each of the three cases relied upon by Plaintiffs, Opp. at 25-26, as examples of "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *See* 366 F.3d at 941-44. Those cases are distinguishable here, because they either involved (1) pejorative statements by the government, causing negative public reaction,[7] or (2) government action which provided no discretionary options to the affected third party actors.[8] While Plaintiffs have alleged the "almost unanimous decision of U.S. colleges and universities to end their academic programs in Cuba," Opp. 25; Robins Dec. ¶ 4, they have failed to explain why these circumstances are any different from the circumstances presented in *National Wrestling Coaches.* As in *National Wrestling Coaches,* a government restriction did not require complete elimination of a school's program, but retaining the program would require a university

---

[7] *See Tozzi v. HHS*, 271 F.3d 301 (D.C. Cir. 2001) (holding record left "little doubt" that Government's pejorative statement regarding carcinogenicity of dioxin motivated third party's conduct, where plaintiff introduced affidavits and other record evidence demonstrating decision by their actual customers to phase out use of product containing dioxin); *Block v. Meese*, 793 F.2d. 1303 (D.C. Cir. 1986) (finding redressability after government classified certain films as "political propaganda" in light of public reaction and customer statements).

[8] *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449 (D.C. Cir. 1998) (holding record sufficient to show redressability where evidence demonstrated that a remand to the agency for new rulemaking would provide plaintiffs with the opportunity to argue for the necessity of a bar against anti-tampering regulations, and record showed no discretionary choices available to affected manufacturers in response to government's action);

to allocate more resources to that program's expansion.  The persistent absence of participation by the particular universities associated with these plaintiffs, as discussed further below, raises serious questions about the redressability of *these* Plaintiffs' alleged injuries.

Plaintiffs seek to bolster redressability by submitting new declarations.  Three declarations are from employees at Duke University, St. Olaf College, and St. Thomas University, stating that their respective institutions' academic programs in Cuba would indeed be reinstated if OFAC's rulemaking were overturned.  Declarations of Gilbert W. Merx  ¶ 3 (Duke); Helen Stellmaker ¶ 3 (St. Olaf); Nancy Zingale (St. Thomas) ¶ 4 (Dkt. #15). However, none of these declarations suffice to bridge the gap between a favorable judicial decision and Plaintiffs' alleged injuries.

First, nothing about these declarations demonstrates that these individuals are authorized to make such predictive statements on behalf of their respective academic institutions.  Restatement (Second) of Agency, § 27.  None of these institutions have acted in a way which, reasonably interpreted, would signal that the institutions consent to have these statements made on their behalf. *Id.*  Rather, Plaintiffs have submitted declarations by individuals similarly situated to themselves – professors and employees – rather than declarations by or on behalf of the institutions.  Nancy Zingale, for example, is a political science professor who works in the office of St. Thomas University's President. Zingale Dec. ¶ 1.  The existence of actual or apparent authority to assert that if OFAC's rulemaking were overturned "St. Thomas would immediately recommence those programs in Cuba" is missing.  Zingale Dec. ¶¶ 1, 3-4 (Dkt. #15).  Similarly, Helen Stellmaker is a "program coordinator."  Stellmaker Dec. ¶ 1 (Dkt. #15).  While Gilbert Merkx may be a "vice provost," Merkx Dec. ¶ 1 (Dkt. #15), at best it is ambiguous as to whether he has been authorized to speak on behalf of Duke University on this particular subject.  There is no declaration from a

9

university's Board of Trustees or by a university President. Instead, these institutions have remained utterly silent.

Second, and more importantly, these statements are irrelevant to the question of the individual Plaintiffs' standing. Even if, *arguendo*, this Court were to accept the three new declarations as evidence that Duke, St. Olaf, and St. Thomas would reinstate their Cuba programs if the Court overturned OFAC's 2004 rulemaking, these three schools are wholly unconnected to the individual Plaintiffs and their putative injuries.[9] None of the individual Plaintiffs are professors or students at Duke, St. Thomas, or St. Olaf. None of the individual Plaintiffs allege that they were scheduled to teach or attend Cuba programs at Duke, St. Thomas, or St. Olaf. Instead, Plaintiff Smith teaches part-time at Johns Hopkins, and his alleged injury is that the Johns Hopkins program ended. Johns Hopkins is the same school where Plaintiffs Kamen and Ahmad are enrolled students, and their alleged injury, likewise, is that the Johns Hopkins program ended. Plaintiff Cotman is a full-time professor at Howard, who alleges that a program was being developed at that school. However, Plaintiffs have submitted redressability evidence for neither Johns Hopkins nor Howard.

While Plaintiffs have submitted a fourth declaration from another Johns Hopkins employee, Mr. Eduardo González, that declaration further exposes the gap between Plaintiffs' alleged injury and redressability, reflecting flaws similar to the other newly submitted declarations. González Dec. First, this declaration – in contrast to the declarations from individuals employed at Duke, St. Thomas and St. Olaf – does not actually assert that Johns Hopkins would reinstate its exchange program if the challenged rulemaking were overturned. *Id.*; *compare* Smith Dec. ¶ 9. It is Plaintiffs' burden to clearly allege the requisite elements of standing, *Fla. Audubon Soc'y*, 94 F.3d at 666, and

---

[9] The entity ECDET's standing is derivative of Plaintiff Smith's standing. Mem. 17-18.

this declaration fails to clearly allege that the program would be reinstated. Second, even if this Court were to infer a prediction of program reinstatement, this declaration is just as devoid of actual or apparent authority as the other three. Indeed, Mr. González appears to be a professor like Plaintiff Smith (albeit a full-time professor rather than a part-time adjunct). Mr. González's title is the "Head of the Spanish and Latin American Section Department of German and Romance Languages and Literatures" at Johns Hopkins University, and he describes himself as formerly "in charge" of Johns Hopkins' Academic Exchange Program. *Id.* ¶ 1. However, his declaration does not evidence apparent or actual authority to make statements on behalf of that institution. Thus, the González Declaration, like the other declarations, does not resolve the redressability problem.

The absence of direct redressability evidence is telling. No institutions are parties to this action challenging OFAC's rulemaking. *See* Mem. 22-26. Plaintiffs waited two years before challenging the 2004 rulemaking. During those two years, Plaintiffs could have importuned officials at both Johns Hopkins and Howard for institutional participation in this action as parties. Similarly, Plaintiffs could have renewed such a petition during the pendency of this motion. The fact that neither Johns Hopkins nor Howard has elected to participate in this action – in any fashion – suggests that these institutions' views may differ from Plaintiffs. Indeed, the redressability inquiry exists separate from the causation inquiry for just this sort of purpose: to identify potential fault lines between the interests of the third party actors and the interests of the parties before the court. *See Nat'l Wrestling Coaches*, 366 F.3d at 943-44. Even if their views do not differ, the institutions have not challenged the regulations and have not brought this action. *Cf. Am. Library Ass'n v. Odom*, 818 F.2d 81, 86-87 (D.C. Cir. 1987) (Ginsburg, R.B., J.) (rejecting library reader standing to object to NSA restrictions where library itself did not object). Plaintiffs' "attempts to show redressability,"

11

therefore, remain "based on nothing but 'unadorned speculation.'" *Id.*

C.     *Because of the Regulatory Structure, Plaintiffs Cannot Escape the Fact That They Seek To Assert The Rights of Third Parties*

Plaintiffs cannot avoid the prudential infirmities of their standing argument by making conclusory assertions about their own rights rather than the institutions' rights. *See* Opp. 32-33. Plaintiffs may have the subjective belief that it is their own rights that have been affected, but that belief is incorrect. Both before and after the challenged rulemaking, the decision to hold academic programs in Cuba – and to apply to OFAC for a license to do so – belonged to the institution, not to professors or students. Mem. 22-25. Neither Johns Hopkins nor Howard were ever required to allocate resources towards programs in Cuba. Had these two universities *declined* to seek institutional licenses to conduct academic programs in Cuba prior to the challenged rulemaking, then OFAC's action would have been irrelevant to these individual plaintiffs – there would have been no winter-session programs in Cuba to be eliminated. Similarly, other universities would not have been required to apply for institutional licenses, hire the professor Plaintiffs, or to accept the student Plaintiffs into their programs.

As individuals, these plaintiffs were never entitled to apply for institutional licenses under the affected regulation. In contrast, other CACR provisions do permit individuals to apply for specific licenses. One provision permits both individuals and institutions to apply for specific licenses for short-term academic travel in Cuba to conduct research towards a graduate degree on a case-by-case basis. *See* 31 C.F.R. §§ 515.565(a)(2), (b). The provisions challenged here, however, do not permit individuals to apply for licenses. The changed provisions apply strictly to institutions. In sum, the decision to seek a license under the affected regulations belonged to the universities, not the plaintiffs. Because they never had the right to seek institutional licenses, Plaintiffs seek to assert

the institutions' rights and interests. *Id.* at 24-25.

Absent a hindrance preventing individual academic institutions from asserting their own rights, prudential concerns weigh strongly against the ability of these Plaintiffs to do so on the institutions' behalf. Mem. 24-26; *see Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Plaintiffs have not responded to Defendants' argument that no such hindrance exists, Opp. 32-33, thereby conceding that nothing prevents individual academic institutions from challenging OFAC's rulemaking directly.

## II.    Plaintiffs Cannot Avoid The Deferential Standards Applicable to OFAC's Action

Defendants explained that a particularly deferential standard of review applies to OFAC's action under the APA. Mem. 26-28. First, OFAC's reasonable interpretation of TWEA merits deference under the familiar *Chevron* analysis. *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984); *Consarc Corp. v. U.S. Treasury Dept., Office of Foreign Assets Control*, 71 F.3d 909, 914 (D.C. Cir. 1995). Second, because the challenged action relates to the President's twin exercise, through the Secretary of the Treasury and, in turn, through OFAC, of (1) a broad grant of Congressional authority, and (2) the President's immense inherent authority in the realm of foreign affairs. *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981) ("When the President acts pursuant to an express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress. In such a case the executive action would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." (internal quotation marks and citation omitted)). Plaintiffs cannot escape this deferential level of review.

A.    *Plaintiffs' Disagreement With the CAFC I Report Does Not Render OFAC's Action Irrational*

Plaintiffs conflate review of their constitutional claims with review of their claims under the

APA. Opp. 34-35. With respect to their APA claims, Plaintiffs do not dispute that *Chevron* deference applies. *Id.* Rather, Plaintiffs protest that OFAC was irrational in relying upon the analysis and recommendations found within the 500 pages of the CAFC I Report. *Id.* Plaintiffs strenuously object to the Report's analysis and recommendations, dwell extensively on their disagreement with U.S. foreign policy, and charge that various election-related concerns improperly influenced the Report's content and genesis. *See* Opp. at 8-13, 34-35. Plaintiffs assert that "[t]here was simply no factual basis for Defendants' claim of abuses in U,S. [*sic*] academic programs in Cuba" and thus "there could be no 'rational connection' between non-existant [*sic*] facts and Defendants' rule change." *Id*. at 35.

As Defendants explained, a Presidential Commission generated the CAFC I report. Mem. 8-10. This Commission combined the institutional expertise of multiple federal agencies and was tasked with developing recommendations for the President on, *inter alia*, bringing about a peaceful end to the Cuban dictatorship. *Id.* Chapter 1 of the Report sought to identify a more "proactive, integrated, and disciplined approach" than previous policy initiatives had achieved, and thereby re-evaluated the efficacy of the embargo. *Id.* The Report detailed an analysis explaining (1) the centrality of tourism revenues to the Castro regime, (2) how the widespread effects of certain short-term academic travel licenses were tantamount to "a form of disguised tourism," and (3) how certain short-term academic travel licenses subverted central goals of the Cuban embargo, "did not promote a genuinely free exchange of ideas," and contributed to the Castro regime's bid for international legitimacy. *Id.*; AR at 61-64. Defendants further noted the Report's recommendations, including the recommendation to limit educational travel to full-semester study programs. Mem. 10; AR at 65. OFAC's implementation of the Report's recommendations, in light of the President's directive

and the Report's analysis of the consequences to the embargo of certain short-term travel licenses, was therefore rational.  Plaintiffs profoundly disagree with the Report's content and conclusions. But that disagreement does not render OFAC's reliance upon the Report irrational, arbitrary, or capricious.  Plaintiffs cannot explain how a 500 page, inter-agency Commission Report, providing analysis and recommendations directly pertinent to the challenged action, is insufficient as a rational basis for OFAC's rulemaking.  Nor do Plaintiffs point to any authority supporting such a proposition.

Plaintiffs cannot depend upon Congressional testimony by former OFAC Director Richard Newcomb to imply that OFAC acted irrationally by relying upon the CAFC I Report.  Opp.  12-13. Mr. Newcomb testified before Congress in October 2003 about, *inter alia*, why OFAC eliminated a particular category of educational travel that had been implemented in 1999 – the non-academic educational exchange category.  *See* Written Statement of R. Richard Newcomb Director, Office of Foreign Assets Control (Oct. 16, 2003) ("Newcomb Test.");[10] Szubin Dec. ¶ 14(g).  By way of background, Mr. Newcomb described the then-present licensing scheme for academic institutions, and stated that "OFAC will continue to license educational exchanges pursuant to accredited academic activities."  Newcomb Test.  Mr. Newcomb proceeded to explain in depth why *non*-accredited educational exchanges "too often devolved into tourism," how contacts between tour group members and Cuban nationals (other than government employees) was sporadic, and how this practice "diluted any meaningful educational exchange." *Id.*  Ultimately, despite efforts to correct the situation "the licenses continued to be used for tourism, plain and simple."  *Id.*

Plaintiffs suggest that because Mr. Newcomb testified in 2003 – prior to the issuance of the Commission Report and the President's directive – to OFAC's intention to continue to license

_____

[10]  *Available at* http://www.treas.gov/press/releases/js914.htm, *last visited* May 2, 2007.

academic travel as it then existed, that no "abuses" of short term educational travel licenses must have therefore existed. Plaintiffs' argument, however, misses the point entirely. Opp. 12-13. The purpose of Mr. Newcomb's testimony was to explain the rational basis underlying OFAC's rescission of the non-academic educational exchange license regulation. *See* Newcomb Test. As part of its re-evaluation of the Cuban embargo's efficacy, the CAFC Commission later reached analogous conclusions regarding the larger consequences of certain short-term educational travel activities undertaken by accredited academic institutions. Mem. 8-10; Szubin Dec. 15-17; AR at 62-63. OFAC rationally relied upon its own regulatory experience with non-academic educational exchanges to rescind that regulation in 2003. One year later, OFAC rationally relied upon the Commission's analysis – evaluating the broader impact of certain short-term educational travel licensing on the embargo's objectives – to amend 31 C.F.R. § 515.565. Plaintiffs are entitled to their disagreement with the CAFC I Report.[11] Their disagreement, however, does not change the fact that OFAC acted quite rationally in implementing the Report's recommendations.

Plaintiffs also imply that OFAC acted irrationally by responding to the President's directive to implement the Report's recommendations. *See* Opp. 34. This peculiar logic suggests that when the President of the United States alters the course of our nation's foreign policy – directing relevant agencies to implement regulatory changes reflecting that policy shift – that those agencies act irrationally by implementing those changes. *Cf. Regan v. Wald*, 468 U.S. 222, 243-44 (1984) at 243 (describing how the CACR "have been retained, though alternately loosened and tightened in response to specific circumstances" ever since the Kennedy administration). Plaintiffs have pointed

---

[11] *But compare* AR at 63 ("Evidence indicates that the majority of visits by U.S. students are organized by or coordinated though Cuban state travel and tour entities . . . ."), *with* González Dec. at ¶ 1 (describing how Johns Hopkins' Academic Exchange Program was hosted in affiliation "with the Ministry of Culture").

to no authority supporting such an odd proposition, and this Court should be chary of opining in this arena. *Compare id.* at 243-44 (1984) ("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952)); *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1439 (9th Cir. 1996) ("This immunity manifests itself in a history of judicial deference.").

B.    *Plaintiffs Have Not Demonstrated That Congress "Pre-empted" the President's Broad Authority under TWEA to Regulate Academic Travel to Cuba*

Plaintiffs fundamentally misunderstand the current statutory and regulatory architecture of the Cuban embargo. *E.g.* Opp. 38-39 (incorrectly stating that "Congress has methodically stripped to the point of pre-emption the President's authority to conduct foreign relations with Cuba").[12] Plaintiffs' confusion is evident in its invocation of the Trade Sanctions Reform and Export Enhancement Act of 2000 ("TSRA"), Pub. L. 106-387, § 1(a), Title IX, § 910, 114 Stat. 1549, 1549A-71(Oct. 28, 2000), *codified at* 22 U.S.C. § 7209. Plaintiffs believe that with the TSRA, Congress carved out twelve categories of "approved travel to Cuba" that would be "free of Executive Branch interference." Opp. 40.[13] In fact, Plaintiffs have the TSRA precisely backwards. The relevant portion of the TSRA provides:

---

[12]  Defendants' discussion of the Free Trade in Ideas amendment amply refutes Plaintiffs' argument that OFAC's action contravened the will of Congress, and requires no further response. *Compare* Mem. 31-34, *with* Opp. 40-41.

[13]  Plaintiffs quote, without citation, to a statement by former Representative George Nethercutt purporting to "explain[]" the TSRA. Opp. 40. Defendants' research suggests that this quotation derives from a July 15, 2003 statement issued at the Freedom to Travel to Cuba Forum. *See* http://www.ciponline.org/cubaforum/nethercutttestimony.htm, *last visited* May 3, 2007. However, a legislator's statement more than three years after a statute's passage has little bearing on legislative intent, particularly in light of the statute's unambiguous meaning and the deference owed to OFAC's interpretation.

17

(b) Prohibition on Travel Relating to Tourist Activities.—

(1) In General.—Notwithstanding any other provision of law or regulation, the Secretary of the Treasury, or any other Federal official, may not authorize the travel-related transactions listed in subsection (c) of section 515.560 of title 31, code of federal Regulations, either by a general license or on a case-by-case basis by a specific license for travel to, from, or within Cuba for tourist activities.

(2) Definition.—In this subsection, the term "tourist activities" means any activity with respect to travel to, from, or within Cuba that is not expressly authorized in subsection (a) of this section, in any of paragraphs (1) through (12) of section 515.560 of title 31, Code of Federal Regulations, or in any section referred to in any such paragraphs (1) through (12) (as such sections were in effect on June 1, 2000).

22 U.S.C. § 7209(b). The first paragraph of 22 U.S.C. § 7209 prohibits the Secretary of the Treasury from authorizing certain transactions for "tourist activities." *See* 31 C.F.R. § 515.560(c) (listing travel-related transactions, including *inter alia*, "Transportation to and from Cuba" and "Living expenses in Cuba"). The second paragraph defines "tourist activities" as any activity related to Cuban travel "that is not expressly authorized" in one of twelve categories of authorized activities in Cuba listed in 31 C.F.R. § 515.560 or one of twelve other sections of 31 C.F.R. part 515 incorporated therein by reference. 22 U.S.C. § 7209(b)(2).

This paragraph of the TSRA on its face states that OFAC "may not authorize" travel that is not related to one of the referenced twelve categories of authorized activities in Cuba. It does not, as Plaintiffs imply, *require* OFAC to authorize travel (or deprive OFAC of the authority to license travel) that is related to one of the twelve categories of activities. As the title of the paragraph – "Prohibition on Travel Relating to Tourist Activities" – suggests, the purpose of the paragraph is to prevent expansion of travel licensing beyond the twelve broad categories, not to require OFAC to license travel, nor to prevent OFAC from further restricting travel. Thus, Plaintiffs' belief that the

18

TSRA removes those twelve categories from "Executive Branch interference" is incorrect.[14]

Since the TSRA's enactment, OFAC has consistently interpreted this paragraph of the TSRA to prevent licensing for travel for activities that fall outside of the broad categories of activities set forth in paragraphs (1) through (12) of 31 C.F.R. § 515.560. OFAC has, however, periodically amended the travel licensing policies while staying within the limits of the twelve categories of allowable activities. Of particular relevance here, OFAC has periodically contracted the travel licensing policies under these existing twelve categories. *See, e.g.,* 69 Fed. Reg. 33768, 33771-72 (June 16, 2004) (contracting the list of relatives who could be visited under the family visit licensing policy); Newcomb Test. (testifying before Congress regarding OFAC's contraction of educational travel license category to eliminate abuses of non-academic licenses, as well as OFAC's determination that these licenses violated the TSRA). As with TWEA, OFAC's reasonable interpretation of the TSRA as permitting contractions of the educational travel category merits deference. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 125 S. Ct. 2688, 2699 (2005) ("[I]f the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory construction.").

## III. Plaintiffs Have Not Rescued Their First Amendment Claims

Defendants demonstrated that OFAC's action did not deprive Plaintiffs of their First Amendment rights. Mem. 34-43. First, even if the First Amendment uniquely protects the vaguely-defined concept of "academic freedom" separately from other First Amendment doctrines, *id.* at 36-

---

[14] The logic of Plaintiffs' TSRA interpretation suggests a perverse outcome: that a U.S. person who subjectively believed he or she fell within the scope of the twelve categories would not be required to apply to OFAC for a license at all.

19

38, the Supreme Court has expressly refused to apply the so-called "academic freedom" cases to content-neutral restrictions. *Univ. of Pa. v. EEOC*, 493 U.S. 182, 197 (1990) (unanimous opinion); Mem. 37. Second, Defendants demonstrated that the challenged regulation is content and viewpoint neutral. Mem. 39-40. Third, Defendants showed that even if the regulation incidentally burdened Plaintiffs' First Amendment rights, the regulation survives intermediate scrutiny because depriving the Castro dictatorship of tourism revenues is an important or substantial government interest. Mem. 40-43. In addition, Defendants traced the history of other failed First Amendment attacks on travel restrictions under international sanctions programs. Mem. 34-36.

Plaintiffs seem to hope that by ignoring Supreme Court and D.C. Circuit precedent, it will go away. Aside from arguing that they indeed possess standing to bring a First Amendment claim, Plaintiffs' *substantive* First Amendment argument is minimal. *Compare*, Opp. 26-29, *with* Opp. 43-44. Though somewhat opaque, Plaintiffs' argument appears to be twofold. First, Plaintiffs state that the First Amendment must be considered as a "factor" in their Fifth Amendment claim. Opp. 44. This assertion, which relates to misrepresentations of the Supreme Court's Fifth Amendment precedent in this area, will be addressed *infra*, part IV. Second, Plaintiffs imply that intermediate scrutiny is not the correct standard governing their First Amendment claim, but instead assert that any "curtail[ment]" must be "supported by the weightiest considerations of national security." *Id.*[15] As discussed in Defendants' memorandum and below, intermediate scrutiny remains the correct standard under Supreme Court and Circuit precedent.

---

[15] Curiously, Plaintiffs posit that a "national security standard" applies, but fail to respond to the long history of courts upholding travel restrictions under the Cuban embargo as a potent sanctions tool serving the "important,' 'substantial,' and even 'vital'" purpose of denying hard currency to the Cuban dictatorship. *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1439 (9th Cir. 1996); *see also Regan v. Wald*, 468 U.S. 222, 232-33 (1984); *Walsh v. Brady* 927 F.2d 1229, 1233 (D.C. Cir. 1991); Mem. 30, 34-36, 40-44.

A.    *Plaintiffs Concede That 31 C.F.R. § 515.565 is Content and Viewpoint Neutral*

As noted *supra*, Defendants directed the Court's attention to the unanimous Supreme Court opinion in *University of Pennsylvania v. EEOC*, the leading case discussing "the so-called academic freedom cases." 493 U.S. at 197.  The Court clarified that the cases invoked by Plaintiffs, such as *Sweezy v. State of New Hampshire*, 354 U.S. 234 (1957) and *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967), *e.g.,* Opp. at 27-28, invalidated efforts "to control or direct the *content* of the speech engaged in by the university or those affiliated with it." 493 U.S. at 197 (emphasis in original).  Plaintiffs do not bother to cite to this important precedent, much less levy any argument as to why it does not apply to their putative "academic freedom" injuries.

Furthermore, by failing to respond – at all – to Defendants' argument that 31 C.F.R § 515.565 is content and viewpoint neutral, Plaintiffs concede any argument that the regulation is otherwise. *Compare* Mem. 39-40, *with* Opp. 26-29, 43–44.  Plaintiffs have not shown how the regulation inhibits them from devoting entire semesters, for example, to professing their distaste for the CAFC I Report, or how a geographical restriction on teaching or studying for fewer than ten weeks in Cuba affects their ability to teach or study any Cuba-related topic elsewhere.  Mem. 39-40.

B.    *The Governing Standard is Intermediate Scrutiny*

By conceding that the regulation is content and viewpoint neutral, Plaintiffs cannot avoid the force of D.C. Circuit precedent on the governing standards of intermediate scrutiny.  Mem. 40-43; *see, e.g.*, *Walsh v. Brady* 927 F.2d 1229, 1235 (D.C. Cir. 1991) ("[C]ontent-neutral regulations that have an incidental effect on First Amendment rights will be upheld if they further 'an important or substantial governmental interest.'" (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968))). Plaintiffs would have this Court ignore the D.C. Circuit, which has expressly rejected the application

21

of strict scrutiny to First Amendment challenges to travel restrictions under sanctions programs. *See id.* at 1234-35. Plaintiffs' confused assertion – that a *higher* standard than intermediate scrutiny applies – fails at the threshold.[16] *See Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007 (S.D.N.Y. 1990) (rejecting "the assumption that the congressional or executive power to regulate speech when dealing with foreign affairs is subject to the same scrutiny and limitations that the First Amendment would impose in the domestic context").

## IV.    Plaintiffs Misstate Supreme Court Precedent on Their Fifth Amendment Claims

Defendants demonstrated that Plaintiffs' Fifth Amendment claims cannot survive two Supreme Court cases: *Zemel v. Rusk*, 381 U.S. 1 (1965) and *Regan v. Wald*, 468 U.S. 222 (1984). Mem. 35-36, 43-45. While Plaintiffs simply ignore governing precedent with respect to their First Amendment claims, their Fifth Amendment arguments misrepresent the Supreme Court's holdings. *See* Opp. 41-43. For example, Plaintiffs assert that *Zemel* and *Regan* "stand squarely for the requirement that (i) the government must assert convincingly a national security threat and (ii) the Court must find that that threat is a real one," invoking the Cuban missile crisis by way of illustration. Opp. 42-43. In fact, the *Regan* Court expressly held the opposite. 468 U.S. at 242. *Regan* (1) rejected the argument that "only a Cuban missile crisis in the offing will make area restrictions on international travel constitutional," (2) affirmatively stated that *Zemel*'s holding "was not tied to the Court's independent foreign policy analysis," (3) re-affirmed that "[m]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of

---

[16] *Compare also* Opp. 43-44 ("Tellingly, Defendants cite no case involving travel abroad by U.S. citizens in connection with activities covered by the First Amendment's protection of academic freedom"), *with* Mem. 34-36 (discussing, *inter alia*, Ninth Circuit's rejection of First Amendment challenge to travel restrictions by educational travel organization under CACR in *Freedom to Travel Campaign*, 82 F.3d at 1441).

government as to be largely immune from judicial inquiry or interference'" (quoting *Harisiades*, 342 U.S. at 589), and (4) explained that *Zemel*'s holding "was merely an example of this classical deference to the political branches in matters of foreign policy." *Id.*; *see* Mem. 43.

Since 1978, five U.S. Presidents have annually determined that it is in the national interest to continue the exercise of national emergency powers with respect to Cuba under TWEA and the "grandfather clause" upheld in *Regan*. *See* Mem. 3-4; Determination No. 2006–23, 71 Fed. Reg. 54399 (Sept. 13, 2006) (most recent renewal of the President's TWEA authority to continue economic sanctions against Cuba); *see also* Szubin Dec. ¶¶ 8, 14 (describing President's judgment that the exercise of TWEA authorities with respect to Cuba is in the national interest of the United States, as well as some of the embargo's major purposes). The "national security" standard described by Plaintiffs is illusory and contradicts the Supreme Court's repeated holdings with respect to the deference owed to "[m]atters relating 'to the conduct of foreign relations.'" *Regan*, 468 U.S. at 242 (quoting *Harisiades*, 342 U.S. at 589); *Freedom to Travel Campaign*, 82 F.3d at 1439 ("[Plaintiffs], however, would have us evaluate the foreign policy underlying the embargo . . . . This is an invitation we must decline.").

Plaintiffs lean heavily upon two cases involving international travel, *Kent v. Dulles*, 357 U.S. 116 (1958), and *Aptheker v. Sec'y of State*, 378 U.S. 500 (1964), for propositions such as the supposed "connection between international travel and the First Amendment" and that "the right to travel is protected under the Fifth Amendment as a liberty interest that an individual cannot be deprived of without due process of law." Opp. 41-44. However, Plaintiffs neglect to mention that later Supreme Court opinions – including both *Zemel* and *Regan* – expressly qualified *Kent* and *Aptheker*. *Regan*, 468 U.S. at 240-41; *Zemel*, 381 U.S. at 15-17. In particular, *Zemel* and *Regan*

23

emphasized how *Kent* and *Aptheker* involved selective enforcement of travel restrictions on "the basis of political belief or affiliation." *Regan*, 468 U.S. at 242; *see Zemel*, 381 U.S. at 13 ("It must be remembered . . . that the issue involved in *Kent* was whether a citizen could be denied a passport because of his political beliefs or associations."); *Aptheker*, 378 U.S. at 520 (holding statute forbidding issuance of a passport to member of the Communist Party violated Fifth Amendment); *Kent*, 357 U.S. at 125 (holding Secretary of State's inquiry of passport applicants as to affiliation with the Communist Party violated due process).  As discussed, Plaintiffs have not shown how 31 C.F.R. § 515.565 is anything other than content and viewpoint neutral.  They have not – and cannot – show that the regulation's application depends upon OFAC's inquiry into their political beliefs, requires Plaintiffs to forfeit political views, inhibits the content of Plaintiffs' speech, or punishes Plaintiffs for hearing any particular content or viewpoint.  Both *Kent* and *Aptheker* are inapplicable.

Plaintiffs oddly assert that "the Supreme Court has repeatedly recognized that the right to travel is protected under the Fifth Amendment as a liberty interest that an individual cannot be deprived of without due process of law," Opp. 42, where the Court has expressly rejected that proposition with respect to *international* travel.  *Compare Regan*, 468 U.S. at 241, n.25 (noting that the constitutional right to travel within the United States and the right to travel abroad were treated indiscriminately at the time *Kent* was decided, but "[t]hat position has been rejected in subsequent cases"); *Haig v. Agee*, 453 U.S. 280, 306 (1981) ("[T]he *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States." (emphases in original)); Mem. 44.  Their claims remain meritless and cannot survive a motion to dismiss.

## V.    This Action is Ready for Resolution Because No Material Facts Are In Dispute

While prefacing their response with general objections, Plaintiffs have not specifically

disputed any of the facts set forth in Defendants' Statement of Undisputed Material Facts. Paragraphs 1-2, 8-13 of Plaintiffs' Response, for example, do not reflect factual disputes, but set forth irrelevant (and frequently incorrect) legal arguments.  Similarly, paragraphs 15-17 do not dispute the stated fact that the CAFC I report discussed short-term educational travel licenses, and that it made certain recommendations.  Instead, as discussed *supra*, Plaintiffs quarrel with the Report's content and recommendations. *See* Response ¶¶ 15-17.  While Plaintiffs may disagree with the Report's conclusions, they cannot dispute the fact of the Report's existence, the fact of the Report's analysis, the fact of the Report's recommendations, and the fact that the President directed OFAC to implement those recommendations.

## CONCLUSION

For the foregoing reasons, and for the reasons expressed in Defendants' memorandum, this Court should grant Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

By:    /s/ Hannah Y.S. Chanoine
SANDRA M. SCHRAIBMAN
Assistant Branch Director, Civil Division
HANNAH Y.S. CHANOINE
Trial Attorney, Civil Division
U.S. Department of Justice
P.O. Box 883, Washington, DC  20044
Telephone:  (202) 305-2318
Facsimile:  (202) 616-8202
E-mail: hannah.chanoine@usdoj.gov

Dated: May 10, 2007                              *Counsel for Defendants*

25