**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EMERGENCY COALITION TO DEFEND, EDUCATIONAL TRAVEL ("ECDET"); WAYNE S. SMITH; JOHN W. COTMAN; JESSICA KAMEN; ADNAN AHMAD,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF THE TREASURY; HENRY M. PAULSON, JR., Secretary of the United States Department of the Treasury; THE OFFICE OF FOREIGN ASSETS CONTROL; ADAM J. SZUBIN, Director of the Office of Foreign Assets Control,

Defendants.

Case No. 1:06-CV-01215
Judge Ellen S. Huvelle

**PLAINTIFFS' SURREPLY**

# TABLE OF CONTENTS

**PAGE**

I. Introduction……………………………………………………………………..1

II. Standing…………………………………………………………………...........2

(a) The Absence of College Plaintiffs………………………………………..2

(b) The Standing of Plaintiff Wayne Smith…………………………………….5

III. Congressional Preemption of Executive Branch Authority With Respect to Travel to Cuba and the Concomitant Inapplicability of *Chevron* Deference in this Case………………………………………………………….6

IV. OFAC's Action Was Not Content and Viewpoint Neutral…………………………...7

V. Plaintiffs' First and Fifth Amendment Claims……………………………………...9

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Aptheker v. Secretary of State*,
378 U.S. 500 (1964)……………………………………………………………….9

*Cernuda v. Heavey*,
720 F. Supp. 1544 (S.D. Fl. 1989)…………………………………………………...7

*Chevron U.S.A. Inc. v. NRDC*,
467 U.S. 837 (1984)……………………………………………………………6, 7

*Kent v. Dulles*,
357 U.S. 116 (1958)……………………………………………………………1, 9

*Keyishian v. Board of Regents*,
385 U.S. 589, 603 (1967)…………………………………………………….....9

*Natl. Wrestling Coaches Assoc. v. Dept. of Educ.*,
366 F.3d 930 (D.C. Cir. 2004)………………………………………………….....3

*Regan v. Wald*,
468 U.S. 222 (1984)…………………………………………………...………2, 9, 10

*United States v. Frade*,
709 F.2d 1387 (1983)……………………………………………………….......7

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579, 637 (1952)…………………………………………………………7

*Zemel v. Rusk*,
381 U.S. 1 (1965)………………………………………………………………1, 9

## STATUTES AND REGULATIONS

31 C.F.R. § 515.565……………………………………………………………………5

22 U.S.C. § 7209…………………………………………………………………..6, 7

50 U.S.C. App. § 5(b)(4) (1994)……………………………………………………..7

69 Fed. Reg. 33768-74 (June 16, 2004)……………………………………………...4

**U.S. CONSTITUTION**

First Amendment……………………………………………………………………*passim*

Fifth Amendment……………………………………………………………………*passim*

**LEGISLATIVE MATERIALS**

Administrative Procedure Act (APA), 5 U.S.C. § 702…………………………………5, 6

## I. INTRODUCTION

Defendants begin their Reply Memorandum with the comment that Plaintiffs' Opposition Memorandum is "an exercise in rhetoric not law." It is of course for the Court to judge the strength of Plaintiffs' legal arguments; but as for the charge of engaging in a rhetorical exercise, Plaintiffs are curious to know what Defendants are actually talking about. At a guess it is this – the earnest invocation by Plaintiffs of their academic freedom as professors and students of higher education is viewed as a politically motivated challenge to the Cuba policy of the Bush Administration.[1] Anyway, what do Defendants place in opposition to Plaintiffs "rhetoric"? Nothing more than a series of simultaneously florid and dusty platitudes, of which the president's purported "immense inherent authority in the realm of foreign affairs" is representative. Reply Mem. 13. The government's case is this: Because international travel is not accorded the same level of protection that is given travel among the states, it therefore receives no protection at all. Reply Mem. 24. This is a palpable misstatement of controlling law, as a quick glance at Defendants' oft-cited *Zemel v. Rusk*, 381 U.S. 1, 14 (1965) confirms, to-wit: "In *Kent v. Dulles* we [i.e. the Supreme Court] held that 'the right to travel [abroad] is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." The Supreme Court in *Zemel* went on to say, "…requirements of due process are a function not only of the extent of the governmental restriction imposed, but also of the extent of the necessity for the restriction." *Id*. In *Zemel* the necessity for the restriction on travel to Cuba was the "judgment of the State Department that a goal of the Castro regime is to export its Communist revolution to the

---

[1] *See* Reply Mem. 14, where Plaintiffs are said to "dwell extensively on their disagreement with U.S. foreign policy." They did not. They are however rightly indignant over being made the victims of the Administration's domestic reelection strategy.

rest of Latin America." The last time the Supreme Court addressed restrictions on international travel was *Regan v. Wald,* 468 U.S. 222, 240 (1984) where the Court said: "Respondents rely on a number of our prior decisions which recognized [a right to international travel guaranteed by the due process clause of the Fifth Amendment]." It also said that Cuba's activities in support of "armed violence and terrorism in the Western Hemisphere" and its troops deployed elsewhere in the world in support of "objectives inimical" to the U.S. provided "an adequate basis under the Due Process Clause of the Fifth Amendment to sustain [the travel restrictions]." *Id.* at 241. So, notwithstanding Defendants' rhetorical excesses there *is* a Fifth Amendment liberty interest in international travel. In this case that interest is combined with the First Amendment guarantee of academic freedom. Under controlling Supreme Court case law, to restrict that freedom the government bears the heavy burden of showing that it has an "adequate basis" in U.S. national security concerns to justify its restrictions. In this case it has not done so, nor can it. All that it can claim as its purpose in restricting U.S. academic travel to Cuba (based on the Administrative Record on file with Court) is to "hasten" a transition to democracy in Cuba. As Plaintiffs have said before, it is not enough. Opp. Mem. 44.

## II. STANDING

### (a) The Absence of College and University Plaintiffs

Defendants continue to clamor that U.S. colleges and universities are not parties to this action. Reply Mem. 11. Somehow the absence of such institutions is supposed to deprive professors and students of standing to challenge the government's deprivation of *their* individual rights. Plaintiffs cited several cases for the principle that standing is established where the action of a third party (e.g. a university canceling its courses in

Cuba) is fairly traceable to the challenged agency action (e.g. OFAC's rulemaking). Mem. in Opp. 26, 27. Defendants nevertheless claim that the D.C. Circuit, in *Natl. Wrestling Coaches Assoc. v. Dept. of Educ.*, 366 F.3d 930 (D.C. Cir. 2004), upheld the dismissal of the complaint in that case for lack of standing, "because no university that had altered its wrestling program was a party to the case." Reply Mem 8. What the court really said was, "The addition of unspecified educational institutions as members of [the Assoc.] does nothing to alter the [standing] analysis." *Id.* at 945. The Court's decision rested on the finding that the plaintiffs had offered "nothing but speculation to substantiate their assertion that a favorable judicial decision would result in schools altering their *independent* choices regarding the restoration or preservation of men's wrestling programs." *Id.* at 933 (emphasis added). The Court went on to hold, "The direct causes of appellants' asserted injuries – loss of collegiate-level wrestling opportunities for male student-athletes – are the independent decisions of educational institutions that choose to eliminate or reduce the size of men's wrestling teams." *Id.* at 935. There were, as the Court noted, many reasons for colleges and universities to discontinue a men's wrestling team, "… and nothing require[d] schools to eliminate or cap men's wrestling…."[2] *Id.* at 938. In *this* case OFAC's rule changes resulted in the immediate elimination by regulatory fiat of hundreds of U.S. academic programs in Cuba, on pain of criminal prosecution. Mem. in Opp. 5-6. There was simply no "independent choice" involved, so causality is indisputable. As for redressability, no matter what Plaintiffs submit in that regard, it will never be enough for Defendants. For example, they denigrate the filed Declarations of a Vice Provost and a Program

[2] For example one of the wrestling programs under discussion, that of Bucknell University, was eliminated twenty-two years *after* the law was adapted that appellants complained of, and as the bases for its action Bucknell cited "gender proportionality, absence of league sponsorship, budgetary concerns and the belief that it was the 'moral thing to do.'" *Natl. Wrestling Coaches Assoc.*, 366 F.3d at 939, 942.

Coordinator that state that their Cuban programs will be reinstituted if the challenged OFAC amendments are rescinded. Reply Mem. 9, 10. Those Declarations are sufficient. It is this simple, Plaintiffs have demonstrated that they were injured *as intended*, by the government and no one else on June 16, 2004. Defendants blame shifting is as discreditable as it is abjectly unconvincing. As for Defendants' claim that the fact that Johns Hopkins University is not a party to this case "suggests [its] views may differ from Plaintiffs" (Reply Mem. 11), they must know that the Provost of Johns Hopkins University submitted a letter to OFAC on July 14, 2004. (Exhibit 1). That letter said:

> "In this period of globalization, we at Johns Hopkins, like our colleagues at other colleges and universities, take very seriously the need to offer our students an international dimension to their education. So as not to deprive our students and scholars of an important academic opportunity, I respectfully request that your office reconsider its decision to impose on our Cuban exchanges time and enrollments conditions that will make it impossible for us to continue offering an educationally valuable and nationally important program." Letter of Steven Knapp, ¶ 4.

The letter was submitted in response to OFAC's notice in the Federal Register that provided a date for the receipt of "written comments" concerning its "interim final" rule.[3] Any comments received were to "be posted without change" on OFAC's website and were to be "considered in the development of final regulations." In the end, the interim final rule was unaltered by as much as a comma and the comments were never displayed on OFAC's website. However, we now learn that the comments were available "in the Treasury Department's Reading Room located at 1500 Pennsylvania Avenue N.W., Washington, D.C." (Szubin Decl. ¶ 20), to anyone who might wish to travel to Washington, DC to read them – assuming they had some way of knowing that they were there. (This aspect of the Administrative Record was of course not provided to the Court

[3] 69 Fed. Reg. 33768 (June 16, 2004).

in this litigation). Johns Hopkins was only one of an unknown number of United States academic institutions to submit comments to OFAC explaining the dire consequences of that agency's rule change to their educational programs in Cuba. Yet the government insinuates in its Reply that the nation's universities - particularly Johns Hopkins - may actually approve of OFAC's action! OFAC never met its duty under the APA to exercise independent judgment either as to the evidence in support of or the consequences of the draconian administrative action it took. Instead it did what the White House told it to do and for precisely the reason it was told to do it - on the basis of invented "abuses" of academic programs in Cuba. Szubin Decl. ¶ 16, 17.

**(b) The Standing of Plaintiff Wayne Smith**

Defendants assert that Plaintiff Wayne Smith could not teach a Johns Hopkins' program in Cuba even before the OFAC rulemaking challenged in this case, because a "professor who taught at a structured educational program was required to be a full-time permanent employee of the licensed U.S. educational institution." Reply Mem. 2. In support of their contention Plaintiffs cite the Declaration of OFAC Director Adam J. Szubin (¶ 19). The provision he refers to, subsection (a)(2)(vii), applied only to the "organization and preparation for [educational activities in Cuba]." The portion of the rule authorizing professors to teach in Cuba said nothing about "full-time or permanent" status. (See pre-2004 version of § 515.565(a)(2)). As a result, Plaintiff Wayne Smith and an unknown number of adjunct professors for years taught openly in Cuba up to the time of the OFAC rule change. (In Dr. Smith's case from 1997 to 2004). (Smith Decl. ¶ 7). It was at that point, (i.e. on June 14, 2004) that the rule was suddenly "clarified" to deny those professors their right to impart their expertise to U.S. students in Cuba. The caprice with which Defendants treat academic freedom could hardly be better

exemplified than by their claim to have "clarified" away the rights of this country's many distinguished adjunct professors. Plaintiff Smith has standing to pursue his APA and constitutional challenges.

**III. CONGRESSIONAL PREEMPTION OF EXECUTIVE BRANCH AUTHORITY REGARDING TO TRAVEL TO CUBA AND THE CONCOMITANT INAPPLICABILITY OF *CHEVRON* DEFERENCE IN THIS CASE**

Defendants, in providing their gloss on the purpose of the codification of OFAC's Cuba travel regulations at 22 U.S.C. § 7209[4], disparage the statement of one of the authors of that codification (former Congressman George Nethercutt (R-WA)) who explained that the purpose of the codification exercise was to "lock in the very limited categories of travel permitted at that point in time." Reply Mem. 17. Well, here is another statement – this time from the other author of that codification, Lincoln Diaz-Balart (R-FL). He said, while the measure was actually being debated on the floor of the House of Representatives: "With regard to the examples brought out about academics and others being able to travel, *that is under the current restrictions, under the current regulations permitted*. So what is not permitted under this legislation is an expansion of further travel …" (146 Cong. Rec. H9670, H9672 (Oct. 11, 2000)) (emphasis added).[5] Could Mr. Diaz-Balart have been clearer in assuring his fellow legislators that Mr. Nethercutt was correct in his contention that codification would "lock in" such rights as those of academic travel that were in effect on the date of that codification? In its Opposition Memorandum (at pages 40-41) Plaintiffs detailed Justice Jackson's description of a presidential act taken in contravention of the will of Congress as

[4] The Trade Sanctions and Export Enhancement Act, 2000.

[5] Mr. Diaz-Balart was responding to the concern expressed by Congressman Jim McGovern (D-MA) that, "Should this President or the next President want to extend travel licenses for universities to set up exchange programs from the current 2-year license to 3 years, he will have to ask Congress." *Id*.

reflecting a president's "power at its lowest ebb," and hence it was entitled to the least deference. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952). In the circumstance that exist in this case – i.e. the Free Trade in Ideas Act of 1994 and the codification of the Cuban travel regulations in the Trade Sanctions Reform and Export Enhancement Act, 2000[6] – it is ludicrous for Defendants to claim that *Chevron* standard deference is due their action in eliminating U.S. academic programs in Cuba. Incredibly, however, they persist in claiming that OFAC's action was taken pursuant to a "broad grant of Congressional authority" and was an exercise of the "President's immense inherent authority in the realm of foreign affairs" (Reply Mem. 13), notwithstanding the fact that Congress codified the Cuban travel regulations in 2000 to remove them from presidential authority *after* having stated its unequivocal sense six years before (in the body of the Trading with the Enemy Act itself) that travel for educational purposes was not to be restricted under the authority of that statute.[7] *Chevron* deference is inapplicable to this case.

**IV. OFAC'S ACTION WAS NOT CONTENT AND VIEWPOINT NEUTRAL**

Defendants contend that academic freedom cases such as "*Sweezy* and its progeny are inapplicable to content-neutral regulations" and further that Plaintiffs "have not shown how [the] regulation attempts to direct or control the content or viewpoint of their speech." Reply Mem. 6. Defendants also assert falsely that "Plaintiffs concede that [the challenged rule changes] are content and viewpoint neutral." Reply Mem. 21. They do no such thing. To state the obvious, a regulation that simultaneously denies a student access to the academic content and viewpoints of an adjunct professor's course (and/or

[6] 50 U.S.C. App. §5(b)(4) (1994) and 22 U.S.C. §7209, respectively.

[7] Defendants seem genuinely not to grasp that "the Executive Branch [i.e. OFAC] must exercise its power under TWEA in accordance with congressional intent." *Cernuda v. Heavey*, 720 F. Supp. 1544 (S.D. Fl. 1989) citing *United States v. Frade*, 709 F.2d 1387 (1983).

the courses of professors from universities other than those in which the student is enrolled in a degree program), is a regulation that controls both the content and viewpoint of the affected teacher and the students who are deprived of that content and viewpoint. Second, by promulgating a rule change that terminated U.S. academic programs in Cuba, the Defendants denied students at U.S. colleges and universities the indispensable "content" of direct experience of Cuban architecture, art, culture, religion, politics and society in courses devoted to those subjects. (Is it really arguable that the locale of a particular course is a significant portion of the content of that course?) Defendants also of course denied those students the viewpoints that would have arisen naturally from *in situ* instruction in Cuba. Finally, the government claims that "the Supreme Court has expressly refused to apply the so-called (sic) 'academic freedom' cases to content-neutral restrictions." Reply Mem. 20, citing *Univ. of Pa. v. EEOC*, 493 U.S. 182 (1990). This is nonsense. In that case the Supreme Court was addressing the narrow question of whether it should "recognize an expanded right of academic freedom to protect confidential peer review materials from disclosure [to the EEOC]." *Id.* at 197. The Court said: "Fortunately, we need not define the precise contours of any academic freedom right against governmental attempts to influence the content of academic speech though the selection of faculty *or by other means*." *Id*. (emphasis added). Would the government argue (as logical consistency would demand) that the forced closure of all universities and colleges in this country would not violate academic freedom because it would be content-neutral? Well, that is what happened in this case to U.S. colleges and universities' programs in Cuba. They were shut down by the government, and with that shut down their content ceased to exist.

## V. PLAINTIFFS' FIRST AND FIFTH AMENDMENT CLAIMS

This case is limited to the question of the constraints the government may place on the foreign travel of professors and students who wish to and indeed at times must go to Cuba to properly pursue academic objectives. There is neither a national security nor a public safety basis for the constraints at issue in this case.[8] Plaintiffs have found no case that addresses the amalgam of Fifth Amendment (substantive due process) and First Amendment (academic freedom) protections that are the subject of this litigation. (The absence of on-point cases suggests that until June, 2004 the government had enough respect for the independence of academia to refrain from brazenly interjecting itself into this important and historically protected zone of freedom). However, Supreme Court cases point the way to a decision by the Court that international travel is "an important aspect of the liberty" of U.S. citizens[9] that can be infringed only on a showing of evidence of "weighty" national security concerns[10] (such as evidence of "Cuban efforts to destabilize governments throughout the Western Hemisphere"[11]) that demonstrate "an adequate basis under the due process clause of the Fifth Amendment" to restrict such travel.[12] With respect to academic freedom, it is "a special concern of the First Amendment." *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967). Taken together, a special Fifth Amendment protection is accorded international travel when that travel is undertaken for purposes protected by the First Amendment.[13] Applying Supreme Court precedent to this case, a curtailment of international travel for academic purposes simply

[8] Again, the sole basis for the restrictions challenged in this case is to "hasten the day that Cuba will be a free country." Szubin Decl. ¶ 15.
[9] *Kent v. Dulles*, 357 U.S. 116, 127 (1958).
[10] *Zemel v. Rusk*, 381 U.S. 1, 16 (1965), *Regan v. Wald*, 468 U.S. 222 (1984)
[11] *Regan*, 468 U.S. at 243.
[12] *Id.*
[13] *See Kent v. Dulles*, *supra*, and *Aptheker v. Secretary of State*, 378 U.S. 500 (1964). In those cases the First Amendment rights at issue were freedom of speech and association. Here academic freedom protected by the First Amendment is at stake.

cannot be justified in order to "hasten the day that Cuba will be a free country." Szubin Decl. ¶ 15.

However, the government asks the Court to ignore the First Amendment aspect of this case - and with no evidence to support such a contention - asks that the Court to believe that denying hard currency to Cuba is an "important," "substantial" or "vital" purpose. Reply Mem. 20. They cite three cases - by the way, none of which truly presents a First Amendment dimension. (1) *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431 (9th Cir. 1996). This case is not binding and it is wrongly decided, in that the court ignored Supreme Court admonitions that a showing of "weighty concerns" of foreign policy that rest on national security considerations is required to justify restrictions on international travel. Mem. in Opp. 42. (2) *Regan v. Wald*, 468 U.S. 222 (1984). That case devolved on extensive evidence of the national security basis for restrictions on Cuba. *Id*. 241. There is none here. (3) *Walsh v. Brady*, 927 F.2d 1229 (D.C. Cir. 1991). In that case the plaintiff wished to travel to Cuba to review posters he intended to purchase for resale in the U.S. The D.C. Circuit pointed out that:

> "…merchants over the long history of trade have often arranged for imports without inspection of the wares at the site of productions [and] the ban is not absolute, as importers *may* travel to Cuba in search of posters if their travel expenses are paid by Cuban hosts or other non-U.S. persons. Such an advance is by no means improbable, as Cuban poster manufacturers will have a serious incentive to make the investment, especially in view of Walsh's legal inability to pay his own way."

So, the infringement on Mr. Walsh's First Amendment rights could fairly be described as incidental. Only Defendants would - and do - claim the same with respect to the OFAC action challenged in this case.

Dated: May 29, 2007

Respectfully submitted,

By: /s/ Robert L. Muse

ROBERT L. MUSE
(D.C. Bar No. 376369)
Muse & Associates
1320 19th St. NW, Suite M-2
Washington, DC 20036
Telephone: (202) 887-4990
Facsimile: (202) 861-6912
E-mail: MUSERL@YAHOO.COM

JOHN T. RIELY
(D.C. Bar No. 391840)
4405 East West Highway #603
Bethesda, Md. 20814
Telephone: (301) 656-3382
Facsimile: (301) 656-0729
E-mail: JTRIELY@MSN.COM
*Counsel for Plaintiffs*