IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EMERGENCY COALITION TO DEFEND, EDUCATIONAL TRAVEL ("ECDET"); WAYNE S. SMITH; JOHN W. COTMAN; JESSICA KAMEN; ADNAN AHMAD, | ) ) ) ) ) |
| Plaintiffs, | ) Case No. 1:06-CV-01215 ) Judge Ellen S. Huvelle |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF THE TREASURY; HENRY M. PAULSON, JR., Secretary of the United States Department of the Treasury; THE OFFICE OF FOREIGN ASSETS CONTROL; ADAM J. SZUBIN, Director of the Office of Foreign Assets Control, | ) ) ) ) ) ) ) |
| Defendants.[1] | ) ) |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' SURREPLY
IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Henry M. Paulson, Jr., in his official capacity as the Secretary of the United States Department of the Treasury, substitutes for John W. Snow, and Adam J. Szubin, in his official capacity as Director of the Office of Foreign Assets Control, substitutes for Barbara Hammerle.

**INTRODUCTION**

Plaintiffs' Surreply includes arguments and new factual matter that they should have – and could have – raised in their Opposition. Nevertheless, these belated efforts fail to refute Defendants' basic contentions: that Plaintiffs lack standing; that OFAC validly exercised the President's TWEA authority; that the challenged regulation survives First Amendment scrutiny; and that Supreme Court precedent forecloses their Fifth Amendment claims. Because Defendants' prior submissions suffice to respond to much of Plaintiffs' Surreply, this Response touches upon only a few additional points.

**I.     Plaintiffs' Surreply Fails to Refute Their Lack of Standing**

(1) <u>Absence of Injury-In-Fact</u>. Defendants showed that Plaintiffs lack standing to press their claims, because neither the individually named professors nor the students had alleged an "actual or imminent" "injury-in-fact," Mem. 19-22, Rep. 1-7. Defendants pointed out that even prior to the challenged rulemaking, part-time employees such as Plaintiff Smith were not actually entitled to teach courses in Cuba. Mem. 11; Rep. 1-2. As set forth in the Declaration of OFAC's director, both before and after the 2004 amendment of § 515.565, a professor who taught a structured educational program in Cuba was required to be a full-time permanent employee of the licensed U.S. educational institution. *See* Declaration of Adam J. Szubin, ¶¶ 14(f), 19 (explaining how rule's paragraph structuring obscured full-time employee requirement, and how 2004 amendment clarified requirement). Plaintiffs' Surreply complains that "the portion of the rule [prior to amendment] authorizing professors to teach in Cuba said nothing about 'full-time or permanent status.'" Sur. 5. This assertion is incorrect.

Absent authorization from OFAC, any person subject to United States jurisdiction who engages in any travel-related transactions involving Cuba violates the CACR. *See* 31 C.F.R. § 515.201(b)(1). Prior to the 2004 amendment, 31 C.F.R. § 515.565(a)(2) set forth the "Scope of

1

transactions authorized under U.S. academic institution's specific license." *See* 64 Fed. Reg. 25808, 25816 (May 13, 1999); 68 Fed. Reg 14141 (Mar. 24, 2003). Section (a)(2) provided that:

> Upon receipt of a specific license pursuant to paragraph (a)(1) of this section by the accredited U.S. academic institution, the institution and its students and employees are authorized to engage in the travel-related transactions set forth in §515.560(c) and such additional transactions as are directly incident to any of the categories of educational activities set forth in paragraphs (a)(2)(i) through (a)(2)(vii) of this section undertaken under the auspices of the specifically-licensed institution. **Activities covered by this authorization are limited to the following** [subsections (i)-(vii)].

31 C.F.R. § 515.565(a)(2) (2003) (emphasis added). While (a)(2)'s initial language referred to "students and employees," the selfsame paragraph expressly limited the "activities covered by this authorization" to the subsequent seven subsections. Only one of those subsections authorized travel-related transactions by the institution's employees in the relevant category of educational programs affected by the 2004 rulemaking, *i.e.* structured educational programs in Cuba as part of a course offered at an accredited U.S. college or university:

> (vii) The organization of and preparation for transactions and activities described in paragraphs (a)(2)(i) through (a)(2)(vi) of this section **by a full-time employee** of a U.S. academic institution. [...]

31 C.F.R. § 515.565(a)(2)(vii) (2003) (emphasis added); *see* Szubin Dec. ¶ 19. Teaching activities could only be authorized pursuant to (a)(2)(vii), because no other subsection authorized employees of the licensed institution to conduct travel related transactions with respect to structured courses in Cuba.[2]  Contrary to Plaintiffs' assertions, the regulation prior to amendment did not authorize part-

---

[2] Subsection (a)(2)(i) authorized "[p]articipation in a structured educational program by an undergraduate or graduate student or undergraduate or graduate student group as part of a course offered at an accredited U.S. college or university"; (a)(2)(ii) authorized "[n]oncommercial academic research in Cuba . . . (for example, research toward a graduate degree)"; (a)(2)(iii) and (a)(2)(iv) did not involve "structured educational program[s] . . . as part of a course offered at an accredited U.S. college or university," but rather activities relating to studying or teaching "at a Cuban academic institution"; (v) authorized sponsorship of Cuban

time employees such as Plaintiff Smith to teach in Cuba pursuant to an institutional license. Smith's allegation of injury, therefore, devolves to a claim that the 2004 rulemaking deprived him of the right to engage in activities that he was never authorized to do in the first place.

(ii) <u>Lack of Redressability</u>. Defendants also showed how even if, *arguendo*, Plaintiffs had adequately alleged an "actual or imminent" "injury-in-fact," any such injury was not redressable in light of the absence of academic institutions as parties to this case.[3] Mem. 22-24, Rep. 7-12. Because not a single academic institution is party to this case, Plaintiffs have "failed to demonstrate how a favorable judicial decision on the merits of their claims will redress this injury." *Nat'l Wrestling Coaches Assoc. v. Dep't of Educ.* 366 F.3d 930 (D.C. Cir. 2004). *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*, much more is needed" (emphasis in original)); *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (denying standing where question of whether injury would be redressed by favorable decision depended "on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict"); *see also Allen v. Wright*, 468 U.S. 737, 758 (1984); *Simon v. E.Ky, Welfare Rights Org.*, 426 U.S. 26, 41-46 (1976). Absent direct institutional participation in this case, Plaintiffs have not met their burden to allege all standing

---

scholars "to teach or engage in other scholarly activity at a college or university in the United States"; (a)(2)(vi) covered "educational exchanges sponsored by Cuban or U.S. <u>secondary schools</u>." Not one of these subsections can be read as authorizing teaching activities at "structured educational program[s] . . . as part of a course offered at an accredited U.S. college or university." Only (a)(2)(vii) – limited to full-time employees – encompasses that authority.

[3] Plaintiffs again conflate the independent criteria for Article III standing: causation and redressability. Opp. 25; Sur. 3. Defendants never disputed causation. *See* Mem. 22-24; Rep. 7.

criteria clearly.  *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665-666 (D.C. Cir. 1996).

Plaintiffs tried to fix their redressability problem by submitting various declarations. Defendants showed how these declarations did not repair Plaintiffs' standing, because (a) the declarants were not clearly authorized to make predictive statements on behalf of their respective academic institutions on this subject matter, (b) the declarations were irrelevant to the individual Plaintiffs' injuries, or (c) the declarants were similarly situated to the Plaintiffs.  Rep. 9-12.

Defendants further noted that the absence of direct redressability evidence is telling. Rep. 11-12.  Plaintiffs waited two years before challenging the 2004 rulemaking.  *Id.*  During those two years, Plaintiffs could have importuned officials at both Johns Hopkins and Howard for institutional participation in this action as parties.  *Id.*  Similarly, Plaintiffs could have renewed such a petition during the pendency of this motion.  The fact that neither Johns Hopkins nor Howard has elected to participate in this action – in any fashion – suggests that these institutions' views may differ from Plaintiffs.  *Id.*  Indeed, the redressability inquiry exists separate from the causation inquiry for just this sort of purpose: to identify potential fault lines between the interests of the third party actors and the interests of the parties before the court.  *See Nat'l Wrestling Coaches*, 366 F.3d at 943-44.

With their Surreply, Plaintiffs submit a letter that could have easily been submitted with their Opposition: a 2004 letter from Johns Hopkins University to OFAC, asking OFAC to reconsider the rulemaking.  Letter of Steven Knapp, July 14, 2004 (Dkt. #19).  Nevertheless, this letter does not change the redressability analysis.  From a standing perspective, Johns Hopkins' interests may be quite different from the individual interests of Plaintiffs Smith, Kamen and Ahmad.  For example, even if Johns Hopkins wanted to reinstate its Cuba Exchange program, the current institutional leadership may lack interest in rehiring Smith for the teaching job.  Thus, a favorable judicial

decision might not redress Smith's alleged injury. Similarly, even if the program were reinstated, Johns Hopkins could refuse Kamen and Ahmad admission into the program. *See* Reply 4-5 (analyzing student assertions of standing in light of competitive admissions process).[4] These examples illustrate the potential friction between the Plaintiffs' interests and the absent institutions' interests – and how redress of the individually alleged injuries depends entirely "on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562.

Furthermore, as Defendants noted, even if Johns Hopkins views are identical to Plaintiffs,' this Court should be concerned that Johns Hopkins itself has neither brought this suit, nor elected to participate in a suit that they were doubtless urged to join. Mem. 22-24; Rep. 11. The current leadership of Johns Hopkins has not submitted to the authority of this Court, and has not provided sworn testimony as to their intentions. Accordingly, this Court cannot simply assume, based on a

---

[4] The student Plaintiffs' claims may now be moot. "Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 70 (1983) (citing *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974)); *see* U.S. Const. Art. III, § 2, cl. 1; *Evangelical Lutheran Church v. INS*, 288 F. Supp. 2d 32, 50 (D.D.C. 2003) (Federal courts lack "power to decide questions that cannot affect the rights of litigants in the case before them"); *Miller v. Roche*, No. 03-1742, Slip. Op. at *2-3, 2006 WL 326006 (D.D.C. Feb. 10, 2006). It is undisputed that Plaintiffs Kamen and Ahmad were scheduled to graduate in 2007, *see* Pl.s' LCvR 7(h) stmt at ¶¶ 6-7 (Dkt. #15 ). Johns Hopkins commencement occurred on May 17, 2007, a week after Defendants filed their Reply. *See* http://www.jhu.edu/commencement/, *last visited* June 10, 2007. If Kamen and Ahmad graduated on that date, they are no longer enrolled undergraduate students enrolled. They would be ineligible to participate in undergraduate exchange programs – be it to Cuba or Zaire or Lebanon – and thus this Court would lack jurisdiction over their alleged injuries. *See DeFunis*, 416 U.S. at 318-20 (holding case challenging admissions process moot as student would not face again  admissions process and would graduate soon).

three year old letter,[5] that a favorable decision will redress Plaintiffs' injuries. *See Lujan*, 504 U.S. at 562; *Nat'l Wrestling Coaches,* 366 F.3d at 943-44.

**II.     Plaintiffs' Surreply Does Not Show that Congress Preempted TWEA**

Defendants explained that a particularly deferential standard of review applies to OFAC's action under the APA. Mem. 26-28; Rep. 13-19. First, OFAC's reasonable interpretation of TWEA (and the TSRA) merits deference under the familiar *Chevron* analysis. *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984); *Consarc Corp. v. U.S. Treasury Dept., Office of Foreign Assets Control*, 71 F.3d 909, 914 (D.C. Cir. 1995). Second, the challenged action relates to the President's twin exercise, through the Secretary of the Treasury and, in turn, through OFAC, of (1) a broad grant of Congressional authority, and (2) the President's immense inherent authority in the realm of foreign affairs. *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981) ("When the President acts pursuant to an express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress. In such a case the executive action would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." (quotation marks, citation omitted)).

Plaintiffs' Surreply revisits the TSRA to assert that *Chevron* deference to OFAC's action is inapplicable and OFAC's interpretation of TSRA is improper. Sur. 6-7. Based on a legislator's isolated statement during a debate on TSRA, Plaintiffs assert that "codification would 'lock in' such

---

[5] Plaintiffs complain that this letter and other comments submitted to OFAC *after* the rulemaking were not submitted as part of the Administrative Record (AR). Sur. 4-5; *see* Mem. 11 n.13. This concern reflects a fundamental misunderstanding of record review under the APA. The agency action Plaintiffs challenge in this action is the 2004 rulemaking. The AR for the Court's review consists of "the materials that were before the agency at the time its decision was made." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997) (emphasis added). Comments received after the challenged agency action, therefore, are not part of the AR.

6

rights as those of academic travel that were in effect on the date of that codification." Sur. 6. Regardless of what legislators said before TSRA's enactment, as the agency charged with implementing TSRA, OFAC's reasonable interpretation of TSRA fully merits *Chevron* deference. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 125 S. Ct. 2688, 2699 (2005) ("[i]f the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory construction."); *see* Rep. 17-19. Plaintiffs invoke Mr. Lincoln Diaz-Balart's assertion that the TSRA prevents "an expansion of further travel." Sur. 6 (emphasis added). Even if that were true, the challenged rule involves a contraction of travel categories, not an expansion. As Defendants explained, TSRA does not require OFAC to authorize any travel at all. Rep. 17-19.[6]

### III. The Content and Viewpoint Neutrality of the Rulemaking

Defendants argued that the challenged regulation is content and viewpoint neutral, Mem. 39-40, an issue which Plaintiffs utterly failed to address in their Opposition, Rep. 21. Plaintiffs now belatedly contend, without citation, that "a regulation that simultaneously denies a student access to the academic content and viewpoints of an adjunct professor's course . . . is a regulation that controls

---

[6] Mr. Diaz-Balart's statement also suggests that OFAC would retain the flexibility to alter travel regulations within the relevant codified categories. Plaintiffs acknowledge that Mr. Diaz-Balart was responding to the concern expressed by Mr. Jim McGovern that: "Should this President or the next President want to extend travel licenses for universities to set up exchange programs from the current 2-year license to 3 years, he will have to ask Congress." 146 Cong. Rec. H9670, H9672 (Oct. 11, 2000). In effect, Mr. McGovern was worried that the TSRA would have the meaning urged by Plaintiffs, namely, that within the codified categories, the President would be deprived of flexibility. Mr. Diaz-Balart, however, responded to Mr. McGovern with reassurance: "with regard to the examples brought out about academics and others being able to travel, that is under the current restrictions, under the current regulations permitted. So what is not permitted under the legislation is an expansion of further travel and initiative with the purpose of the most immediate, what would constitute the most immediate generator of hard currency for the regime." *Id.* Plaintiffs cannot rely upon Mr. Diaz-Balart's statements to suggest that OFAC has unreasonably interpreted TSRA.

7

the content and viewpoint of the affected teacher and students who are deprived of that content and viewpoint. Sur. 7-8. This is not a correct statement of the law. "The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys .... Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. CCNV*, 468 U.S. 288, 294 (1984)). "'As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based.'" *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001) (quoting *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642-643 (1994)); *see also Blount v. SEC*, 61 F.3d 938, 942 (D.C. Cir. 1995) (noting that a rule's use of subject-based categories does not automatically establish it as content-based). Similarly, "[t]he essence of viewpoint-based discrimination is the state's decision to pick and choose among similarly situated speakers in order to advance or suppress a particular ideology or outlook." *Berner v. Delahanty*, 129 F.3d 20, 28 (1st Cir. 1997).

Here, the regulation limiting an institution's educational activities in Cuba to full-semester programs taught by full-time employees to students actually enrolled at the licensed institution is content and viewpoint neutral. The regulation "does not distinguish based on the content" of the courses taught, "nor is it justified by reference to the content" of those courses. *Vopper*, 532 U.S. at 526. Rather, the amended regulation eliminating short-term academic programs is justified by reference to the central goals of the Cuban embargo: to deprive the Castro dictatorship of hard currency. Szubin Dec. ¶¶ 14-19. Plaintiffs have not shown that the short-term academic programs constituted a form of disfavored speech, or that OFAC's rulemaking permits selection of certain

8

viewpoints above others. It is a geographical restriction, not a content or viewpoint restriction. *See* Mem. 39-40; Rep. 32. Thus, intermediate scrutiny applies, Mem. 40-43; Rep. 21-22, and the "so-called academic freedom cases" are inapplicable. *Univ. of Pa. v EEOC*, 493 U.S. 182, 197 (1990).

## IV.     Plaintiffs Posit a "National Security" Standard Rejected by the Supreme Court

Plaintiffs have challenged a regulation implementing the Cuban embargo. Their suit, therefore, centers upon the President's conduct of foreign relations. As the Supreme Court has warned in the context of adjudicating another challenge to the Cuban embargo, "[m]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Regan v. Wald*, 468 U.S. 222, 243-44 (1984) (quoting *Harrisiades v. Shaughnessy*, 342 U.S. 580 (1952)). Both Plaintiffs' Opposition and Surreply blatantly urge this Court to ignore "this classical deference," *id.,* and to substitute its judgment on foreign policy for that of the political branches. *E.g.*, Sur. 9-10.[7] This Court should firmly decline the invitation to evaluate the foreign policy determinations underpinning the rulemaking. *See Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1439 (9th Cir. 1996).

## V.     No Unique 5th Amendment Protection For "1st Amendment International Travel"

Plaintiffs assert that "a special Fifth Amendment protection" is "accorded international travel when that travel is undertaken for purposes protected by the First Amendment." Sur. 9. Defendants have shown how the cases Plaintiffs rely upon contradict this conclusion. Mem. 34-36, 43-44; Rep. 23-24; *e.g. Regan*, 468 U.S. at 241-42 (distinguishing *Kent v. Dulles*, 357 U.S. 116 (1958) and

---

[7] Plaintiffs claim "a national security nor a public safety basis" is absent; that academic travel limitations "cannot be justified in order to 'hasten the day that Cuba will be a free country'"; that *Regan* "devolved [*sic*] on extensive evidence of the national security restrictions on Cuba" but "[t]here is none here"; and that "with no evidence" Defendants "ask[] the Court to believe that denying hard currency is an 'important,' 'substantial,' or 'vital' purpose." Sur. 9-10.

9

*Aptheker v. Sec'y of State*, 378 U.S. 500 (1964) as selective enforcement of travel restrictions on "the basis of political belief or affiliation"). Defendants also showed that courts have repeatedly rejected the idea that the First Amendment exempts groups from sanctions limitations upon international travel. Mem. 42-43. *E.g. Walsh v. Brady*, 927 F.2d 1229, 1234-35 (D.C. Cir. 1991) (First Amendment "newsgathering" claim); *Farrakhan v. Reagan*, 669 F. Supp 506, 510-12 (D.D.C. 1987) ("An accommodation toward all religious groups exempting them from the limitations of economic sanctions would intolerably limit the President's power to deal with international emergencies")), *aff'd*, (table) 851 F.2d 1500 (D.C. Cir. 1988); *Clancy v. OFAC*, No. Case 05-C-580, Slip. Op., 2007 WL 1051767, **11-16 (E.D.Wis. Mar. 31, 2007) (First, Fifth Amendment claims regarding international travel alleged to be symbolic speech). Plaintiffs' arguments are no different from those the Supreme Court rejected in *Zemel v. Rusk* more than forty years ago. 381 U.S. 1, 16-17 (1965).[8]

**CONCLUSION**

For the foregoing reasons, and for the reasons expressed in Defendants' Memorandum and Reply, this Court should grant Defendants' Motion.

Dated: June 12, 2007

Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General
JEFFREY A. TAYLOR
United States Attorney
By:    /s/ Hannah Y.S. Chanoine
SANDRA M. SCHRAIBMAN
HANNAH Y.S. CHANOINE
*Counsel for Defendants*

---

[8] "[We] cannot accept the contention of appellant that it is a First Amendment Right that is involved. For to the extent that the Secretary's refusal to validate passports for Cuba acts as an inhibition . . . it is an inhibition of action. There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. . . . The right to speak and publish does not carry with it the unrestrained right to gather information." 381 U.S. at 16-17.