## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
                                             )
**EMERGENCY COALITION TO DEFEND**            )
**EDUCATIONAL TRAVEL,** *et al.*,            )
                                             )
            **Plaintiffs,**                  )
                                             )
            **v.**                           )    **Civil Action No. 06-1215 (ESH)**
                                             )
**UNITED STATES DEPARTMENT OF**              )
**THE TREASURY,** *et al.*,                  )
                                             )
            **Defendants.**                  )
———————————————————— )

## MEMORANDUM OPINION

This suit challenges a 2004 regulation promulgated by the Office of Foreign Assets Control ("OFAC") of the United States Department of Treasury, which tightened restrictions on educational programs offered in Cuba by U.S. academic institutions. (1st Am. Compl. ¶ 19.) Plaintiffs, who include college students, professors, and an organization of "higher education professionals" interested in teaching and attending courses conducted by U.S. universities in Cuba, have challenged the regulation under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, and the First and Fifth Amendments of the Constitution. Defendants OFAC, the Department of the Treasury, and the Director of OFAC and Secretary of the Treasury, who have been sued in their official capacities, have moved to dismiss the complaint, or in the alternative, for summary judgment, on the grounds that plaintiffs lack standing; the regulation has a rational basis and must be upheld under *Chevron*'s deferential standard; and the regulation does not violate plaintiffs' constitutional rights. As explained herein, the Court denies defendants' jurisdictional challenge, but grants the motion on the merits.

# BACKGROUND

Beginning in 1963, and continuing to the present day, the United States government has restricted travel to Cuba by persons subject to U.S. jurisdiction as part of a broad trade embargo against Cuba under the Trading with the Enemy Act ("TWEA"), 50 U.S.C. App. § 5(b), and the Cuban Assets Control Regulations ("CACR"), 31 C.F.R. Part 515, which ban nearly all economic transactions with Cuban nationals. The stated purpose of the CACR is to "isolate the Cuban government economically and deprive it of U.S. dollars." OFFICE OF FOREIGN ASSETS CONTROL, U.S. DEP'T OF TREASURY, WHAT YOU NEED TO KNOW ABOUT THE U.S. EMBARGO: AN OVERVIEW OF THE CUBAN ASSETS CONTROL REGULATIONS 1 (2004), http://www.treas.gov/offices/enforcement/ofac/programs/cuba/cuba.pdf. OFAC is the office within Treasury responsible for implementing the CACR. (*See* 1st Am. Compl. ¶ 11.) The exact contours of the travel restrictions have changed over time, but in their current form the CACR permit limited categories of people -- including certain types of journalists and academic researchers -- to travel to Cuba under general licenses without obtaining prior approval from OFAC. *See* 31 C.F.R. §§ 515.560(a), 515.563(a), 515.564(a). All others seeking to travel to Cuba must first obtain a specific license from OFAC. *Id.* § 515.60(a). Specific licenses are available on a case-by-case basis for purposes such as family visits, humanitarian projects, and religious and educational activities. *Id.* Since 1999, accredited U.S. academic institutions have been able to obtain specific licenses under § 515.565 of the CACR to permit their students and employees to participate in specified educational activities in Cuba, including "structured educational program[s]" offered by U.S. colleges and universities in Cuba. *Id.* § 515.565.

At issue in this case are several 2004 amendments to § 515.565 that further restricted the

availability of specific licenses for the structured educational programs that U.S. academic

institutions may offer in Cuba.  (*Id.* ¶ 19.)  Prior to 2004 there was no durational requirement for

educational travel to Cuba, but under § 515.565 as amended, educational programs conducted by

U.S. schools in Cuba must last at least ten weeks.  31 C.F.R. § 515.565(a)(1).  The 2004

amendments also require that any student using an institution's license for educational travel to

Cuba be enrolled in an undergraduate or graduate degree program at that institution.  *Id.*

§ 515.565(a).  In addition, plaintiffs claim that the 2004 amendment added a requirement that the

teachers of U.S. institutions' structured programs in Cuba must be full-time, permanent faculty

who are regularly employed in a teaching capacity at that licensed institution.  (1st Am. Compl.

¶25(iii).)  *See* 31 C.F.R. § 515.565(a)(4).  However, defendants argue that this requirement

existed in § 515.565 prior to the 2004 amendments, and that the language of the 2004

amendments only served to "further clarif[y]" this preexisting requirement.  (Defs.' Mem. at 11.)

*See* 69 Fed. Reg. 33770 (noting that the regulation was "amended to clarify that employees who

travel under an institution's license must be full-time permanent employees of the licensed

institution").

The new rules implemented recommendations contained in a report by the Commission

for Assistance to a Free Cuba, an interagency commission formed by President Bush in 2003 and

tasked with exploring how the United States could best "[b]ring about a peaceful, near-term end"

to the Castro dictatorship.  *See* U.S. Dep't of State, Mission and Members of Commission for

Assistance to a Free Cuba,  http://www.state.gov/p/wha/rt/cuba/c12238.htm (last visited July 26,

2007).  (1st Am. Compl. ¶¶ 21-25.)  The Commission concluded that the educational travel

provisions of the CACR were being abused by some travelers and educational institutions as

"disguised tourism."  (A.R. at 63 [COMMISSION FOR ASSISTANCE TO A FREE CUBA, REPORT TO

THE PRESIDENT (2004)].)  In particular, the report cited short-term "study-tour programs" offered

by U.S. institutions, open to students not enrolled at the institution, which often included

"lengthy unscheduled time periods to permit largely tourist activities to be accomplished."  (*Id.*)

Emphasizing the importance of depriving the Castro regime of U.S. revenues from tourism, the

Commission recommended the new educational travel restrictions as a means of "foster[ing]

genuine academic study in Cuba" and curtailing the abuses of study-tour programs.  (*Id.* at 61-

63, 65.)

Plaintiff Emergency Coalition to Defend Educational Travel ("ECDET") is an

organization of higher education professionals affiliated with U.S. colleges and universities.  (1st

Am. Compl. ¶ 4.)  It was formed in response to the 2004 CACR amendments, and its stated

purpose is to "defend the freedom of U.S. professors and students to design, teach, and attend

courses in Cuba free of U.S. goverment *diktat*."  (Pls.' Opp'n at 3.)  Plaintiff Wayne Smith is the

Chairman of ECDET and an adjunct professor of Latin American Studies at Johns Hopkins

University.  (1st Am. Compl. ¶ 5.)  He serves as the Director of Johns Hopkins' Cuban Exchange

Program, and in every year from 1997 to 2004, he taught inter-session courses in Cuba of two- to

three-weeks duration.  (*Id.*; Smith Decl. ¶¶ 1, 7.)  Smith claims that as a result of the 2004

amendments, Johns Hopkins was forced to cancel all of its Cuban Exchange programs, and he is

therefore no longer able to teach in Cuba.  (Smith Decl. ¶¶ 8, 9.)  Plaintiff John Cotman is an

associate professor of Political Science at Howard University.  His academic specialties are

comparative politics and international relations of the Caribbean, and he has conducted extensive

research on Cuba's foreign relations.  (1st Am. Compl. ¶ 6.)

Plaintiffs Jessica Kamen and Adnan Ahmad were, at least at the time this lawsuit was filed, undergraduate students at Johns Hopkins.  (*Id.* ¶¶ 7, 8.)   They both expected to graduate in 2007.[1]  (*Id.*)  Plaintiff Abby Wakefield is currently a sophomore at Johns Hopkins.[2]  (*Id.* ¶ 9.)  These three students claim that they have an interest in participating in the two-week inter-sessional courses in Cuba of the sort that Johns Hopkins offered prior to the 2004 amendments.  (*Id.* ¶¶ 7-9; Ahmad Decl. ¶¶ 1, 3; Kamen Decl. ¶¶ 1, 3.)  Ahmad, who has already participated in one Johns Hopkins inter-session program in Cuba, and Kamen both state that were it not for the 2004 amendments and the cancellation of all of Johns Hopkins' Cuba programs, they "certainly" would have studied in Cuba in the future.  (Ahmad Decl. ¶¶ 1-3; Kamen Decl. ¶¶ 2, 3.)  Wakefield states that she was informed by Plaintiff Smith, in his capacity as the Director of Johns Hopkins' Cuban Exchange Program, that "Johns Hopkins' inter-sessional courses will resume immediately upon the rescission of the OFAC rulemaking challenged in this case," and that "she has been accepted for enrollment in the first such resumed course."  (1st Am. Compl. ¶ 9.)

According to plaintiffs, the 2004 amendments to the CACR have led to the "almost unanimous decision of U.S. colleges and universities to end their academic programs in Cuba." (Pls.' Opp'n at 25.)  Prior to 2004, college students could attend educational programs in Cuba conducted by other universities and receive course credit at their own institutions towards their

---

[1]Plaintiffs have failed to provide any information regarding whether plaintiffs Ahmad and Kamen actually graduated in 2007, as was expected.  If they did, they would no longer be enrolled as undergraduate students at Johns Hopkins.

[2]Abby Wakefield was added as a plaintiff in an Amended Complaint filed on July 10, 2007.  Defendants subsequently filed a second Motion to Dismiss [Dkt. #22] addressing Wakefield's claims.

degrees.  (*See id.* at 4-5.)  This permitted a school to be able to finance a Cuba program by

servicing interested students from other schools, even if there was not enough interest among its

own undergraduate students to support such programs.  Plaintiffs argue that the new requirement

that only students of the school that runs the program may attend makes offering study abroad

programs in Cuba economically infeasible for almost every school.  (*Id.* at 5.)  Plaintiffs also

argue that most American college students are not able to attend ten-week programs in Cuba if

they hope to graduate "on time."  (*Id.* at 5; Smith Decl. ¶ 8.)

Plaintiffs claim that the 2004 amendments to the CACR educational travel provisions

unconstitutionally violate their First Amendment right of "academic freedom" and their Fifth

Amendment right to travel internationally.  (1st Am. Compl. ¶¶ 34, 36; Pls.' Opp'n at 41-42.)

They also argue that the amendments violate the APA because they are "in direct contravention

of the intention of Congress;" are arbitrary and capricious; and are not rationally related to the

purpose of the TWEA.  (1st Am. Compl. ¶¶ 31, 32.)  Defendants argue that each of these

plaintiffs lacks standing to challenge the amendments; that the amendments are a reasonable

interpretation of TWEA under the APA and well within the Executive's inherent authority in the

realm of foreign affairs; and that plaintiffs have not been deprived of their First or Fifth

Amendment rights.

## ANALYSIS

## I.    Standing

To meet the requirements for Article III standing, a plaintiff bears the burden of showing

that:  (1) he or she has suffered an injury-in-fact which is (i) concrete and particularized, and (ii)

actual or imminent, not conjectural or hypothetical; (2) there is a causal connection between the

alleged injury and conduct that is fairly traceable to the defendant, and not the result of the independent action of some third party not before the court; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "These requirements together constitute the 'irreducible constitutional minimum' of standing, which is an 'essential and unchanging part' of Article III's case-or-controversy requirement." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (quoting *Lujan*, 504 U.S. at 560). If "plaintiff[s'] standing does not adequately appear from all materials of record, the complaint must be dismissed." *Warth v. Seldin*, 422 U.S. 490, 502 (1975).

Where the plaintiff is an association seeking to sue on behalf of its members, "that plaintiff must demonstrate that (1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937 (D.C. Cir. 2004) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Plaintiff Smith is a member of ECDET, and the parties agree that the question of ECDET's standing may be resolved based on whether Smith has standing to bring this action as an individual. (Pls.' Opp'n at 18; Defs.' Mem. at 18.)

Defendants advance two main arguments in support of their claim that plaintiffs lack standing under Article III: (1) none of the plaintiffs has established an injury-in-fact that is actual or imminent, and (2) even assuming an injury, because the decision to conduct academic programs in Cuba rests with the academic institutions, as opposed to the professors or students,

plaintiffs have failed to demonstrate how a favorable judicial decision on the merits of their claims would redress their injuries. (Defs.' Mem. at 19, 22.) Defendants do not contest that plaintiffs can meet the causation prong of the standing inquiry. (Defs.' Reply at 7.)

**A.     Injury-in-Fact**

Injury-in-fact is the "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks, citations, and footnote omitted). The Supreme Court has "emphasized repeatedly" that the alleged injury "must be concrete in both a qualitative and temporal sense. The complainant must allege an injury to himself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, No. 05-1188, 2007 WL 1713334, at * 10 (D.C. Cir. June 15, 2007) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (internal quotation marks, citations and alteration omitted)). "'[S]ome day' intentions -- without any description of concrete plans, or . . . even any specification of *when* the some day will be -- do not support a finding of the 'actual or imminent' injury that [the Supreme Court] cases require." *Lujan*, 504 U.S. at 564 (emphasis in original).

Under *Lujan*, it is clear that plaintiffs Cotman, Ahmad, and Kamen have not established an injury-in-fact that would support Article III standing. Professor Cotman states that Howard University, where he is employed, currently has no full-semester courses in Cuba "because of insufficient resources," and even if Howard had a full-semester Cuba course, he would not be able to teach there because "professional and domestic duties would not allow [him] to spend a minimum period of ten weeks in Cuba." (Cotman Decl. ¶ 13.) According to Cotman, Howard

offered several courses in Cuba during spring break in 2001, 2002, and 2003 taught by other professors, but plans to repeat those programs were cancelled because of the CACR amendments.  (*Id.* ¶¶ 10, 11.)  He further states that he "normally" teaches five-week undergraduate courses during the summer for Howard and for Cape Cod Community College, but he fails to state that he regularly teaches any courses in Cuba; on the contrary, he admits that "parental responsibilities have limited [his] fieldwork in Cuba since 1995." (*Id.* ¶¶ 8, 13.)  He concludes that the OFAC rule changes "have made it impossible" for him to teach Howard students or students from other academic institutions in Cuba in his area of expertise.  (*Id.* ¶ 14.)  But significantly, Cotman does not allege or describe any specific plans or concrete opportunities he had to teach in Cuba that were foreclosed by the 2004 CACR amendments.

Nor do plaintiffs Kamen and Ahmad allege any specific plans or concrete opportunities to attend an academic program in Cuba.  Ahmad avers that he once previously participated in a two-week winter-session program in Cuba offered by Johns Hopkins, and that "[a]s a result of the OFAC rulemaking challenged in this action" and the cancellation of Johns Hopkins' Cuba programs, "[he] cannot develop further [his] academic interests in Cuba through further study there." (Ahmad Decl. ¶¶ 1, 2.)  He states that "[i]f OFAC had not effectively abolished Johns Hopkins' courses in Cuba [he] certainly would have studied there again" (*id.* ¶ 3), but he fails to explain how he could have done so given the fact that he appears to have graduated from Johns Hopkins this past spring.[3]  Kamen declares that "[i]n the spring of 2006 [she] inquired as to what courses in Cuba are offered by Johns Hopkins," and was "told that the University cancelled all of

---

[3]If Kamen and Ahmad indeed graduated on schedule this past spring and are no longer undergraduate students at Johns Hopkins, their claims would be moot.  However, because the Court finds that they do not have standing to bring these claims, it need not address this issue.

its programs in Cuba as a result of the OFAC rulemaking . . . ." (Kamen Decl. ¶ 2.) Like Ahmad, she states in conclusory fashion that "[i]f not for the OFAC rule changes that terminated Johns Hopkins' courses in Cuba, [she] certainly would have studied there." (*Id.* ¶ 2.) These (presumably former) students do not allege that they planned to enroll in any particular course in Cuba at any particular time, and plaintiffs present no evidence to indicate that these students would have even been granted admission into any course in Cuba offered by Johns Hopkins.[4] Without any further allegations or descriptions of these students' actual concrete plans to travel to Cuba, their declarations can only be interpreted as nothing more than optimistic statements of general desires and intentions for the future.

Cotman, Ahmad and Kamen's general desires and uncertain future plans to participate in academic programs in Cuba, without more, are precisely the type of 'some day' intentions that the *Lujan* Court held did not support a finding of a concrete and particularized and actual or imminent injury. Therefore, these three plaintiffs have failed to establish Article III standing.

Plaintiffs Smith and Wakefield, however, have arguably alleged sufficient facts to meet their burden under *Lujan*. In his declaration, Professor Smith states that from 1997 until they "were prevented from doing so by OFAC's 2004 amendments to 31 C.F.R. § 515.565," he and another professor took fifteen to twenty students per year to Cuba on three-week inter-session programs in January. (Smith Decl. ¶ 7.) They also often took a smaller group of students to

---

[4]The Court also notes that the CACR regulations do not foreclose all opportunities for U.S. students to study in Cuba, even if their college or university no longer offers courses there. Students are permitted to participate "in a formal course of study at a Cuban academic institution, provided the formal course of study in Cuba will be accepted for credit toward the student's undergraduate degree . . . and provided the course of study is no shorter than 10 weeks in duration." 31 C.F.R. § 515.565(a)(3). Plaintiffs argue, however, that this option is "unrealistic" for most students. (Pls.' Opp'n at 24.)

Cuba for a three-week course in June. (*Id.*) He states that they "would have continued those short programs, indeed, were already discussing the different possible focuses of the program for January 2005 at the time of the OFAC rule change," but that they "were directly prevented from doing so by the 2004 amendment . . . ." (*Id.* ¶ 9.) As for Wakefield, plaintiffs' first amended complaint avers that "[t]o deepen and refine her understanding of [U.S.-Cuba relations] she wishes to take an inter-sessional Johns Hopkins' course of two weeks duration in Cuba," and that she "has been informed by Professor Smith, in his capacity as Director of Johns Hopkins' Cuban Exchange Program, that Johns Hopkins' inter-sessional courses will resume immediately upon the rescission of the OFAC rulemaking challenged in this case." (1st Am. Compl. ¶ 9.) The complaint also states that Wakefield has "been informed by plaintiff Smith that she has been accepted for enrollment in the first such resumed course." (*Id.*) While their claims present a close case as to standing, on balance the Court concludes that plaintiffs have the better argument that their concrete and definite statements of future plans elevate their claims beyond the realm of hypothetical intentions and suffice to support a finding of injury-in-fact.[5]

---

[5]Defendants argue that Smith is unable to demonstrate the requisite injury-in-fact since he is not a full-time permanent professor at Johns Hopkins, and thus he was not permitted to teach in Cuba prior to the 2004 amendments and would not be permitted to teach there even if the 2004 amendments were repealed. (Defs.' Reply at 1-2.) The parties dispute whether teachers of Cuba programs had to be full-time employees prior to the 2004 amendments. Defendants explain that the pre-2004 regulations clearly required teachers of programs in Cuba to be full-time employees, but that requirement "had been somewhat obscured by the paragraph structuring in the previous version of the regulation" (Defs.' Reply at 2 n.2), and the 2004 amendments merely sought to "clarify" that preexisting requirement. (Defs.' Mem. at 11.) However, on the facts before the Court, it is clear that Johns Hopkins had a license to conduct short-term programs, and that Smith *was* regularly teaching courses in Cuba. It is therefore arguably a fair inference that if the regulations were returned to the *status quo ante*, he would be able to do so again. The Court therefore need not decide this nebulous question of whether part-time professors were permitted to teach in Cuba under the pre-2004 CACR.

**B.    Redressability**

The entities that are directly regulated by the 2004 amendments -- U.S. academic institutions that have conducted educational programs in Cuba -- are not parties to this action. When a plaintiff is not the object of government action, but his asserted injury arises from the government's regulation of a third party, "it becomes 'substantially more difficult' to establish standing." *Nat'l Wrestling Coaches*, 366 F.3d at 938 (quoting *Lujan*, 504 U.S. at 562).  Because the elements of causation and redressability in such a case "hinge on the independent choices of the regulated third party," it is the "burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* (quoting *Lujan*, 504 U.S. at 562).  However, "mere indirectness of causation is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice" to establish standing. *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 47 (D.C. Cir. 1994) (quoting *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C. Cir. 1988)).  Defendants essentially argue that success on the merits of this case would not necessarily redress the injury suffered by Smith and Wakefield because Johns Hopkins, which is not a party to this action, could independently choose to forgo a Cuba program even if the 2004 amendments were repealed.  (*See* Defs.' Mem. at 23.)

Several recent opinions of the D.C. Circuit have examined the redressability requirement. For instance, in *National Wrestling Coaches*, organizations representing men's college wrestling coaches, athletes, and alumni challenged a regulation interpreting Title IX issued by the Department of Education.  The regulation required universities to provide intercollegiate athletic opportunities to male and female students in numbers proportionate to their respective

enrollments. 366 F.3d at 935. As a result, many colleges and universities, which were not parties to the suit, chose to eliminate their men's wrestling teams to comply with the regulation. *Id.* Plaintiffs did not suggest that any particular school would forgo the elimination of its wrestling team in the absence of the litigation, but argued that if the regulation were repealed, they would have "better odds" of reinstating the wrestling programs. *Id.* at 939. The D.C. Circuit held that the plaintiffs could not establish redressability because they offered "nothing but speculation" that the "requested change in government policy [would] alter the behavior of regulated third parties that [were] the direct cause of the plaintiff's injuries." *Id.* at 938, 940.

Similarly, in *Renal Physicians Ass'n v. Department of Health & Human Services*, No. 06-5133, 2007 WL 1671676, at *2-*3 (D.C. Cir. June 12, 2007), an association representing medical directors of outpatient dialysis facilities challenged a Centers for Medicare and Medicaid Services regulation that identified two "safe harbor" methods by which healthcare facilities could establish that physician compensation was at or below fair market value, as required by a provision of the Social Security Act relating to certain physician referrals. The plaintiff organization argued that its members were injured because dialysis providers were likely to limit compensation for physicians services to the amount allowed under the safe harbor, resulting in a substantial reduction in their compensation. *Id.* at *3. As in *National Wrestling Coaches*, the alleged impact of the regulation on the plaintiff's members was indirect and resulted from the independent actions of third parties. *Id.* at *5. In support of standing, the plaintiff submitted an affidavit of one of its members, a nephrologist, who stated that the facility where he performed medical services reduced his wages as a result of the new regulation. *Id.* at *9. Noting that the affidavit addressed causation but not redressability, the Circuit rejected

-13-

plaintiff's standing under *National Wrestling Coaches* because it had "not alleged any facts

showing that an order invalidating the safe harbor [would] likely cause dialysis facilities to

increase the wages of [plaintiff's] members," and because it was "'speculative,' rather than

'likely,' that invalidating the safe harbor [would] somehow cause the[] facilities to pay more."

*Id.* at *9-*10.  The Court thus reaffirmed the holding in *National Wrestling Coaches* that "a bald

allegation of standing is not enough to survive even a motion to dismiss where neither the factual

allegations nor their logic establish redressability."  *Id.* (citing *Nat'l Wrestling Coaches*, 366

F.3d at 938, 941-43.)

        The crucial inquiry in both of these cases was whether plaintiffs' evidence was too

speculative.  In contrast, plaintiffs here have submitted several declarations that directly address

the issue of redressability:  Gilbert Merkx, the Development Director for International Studies at

Duke University, declares that Duke cancelled its academic programs in Cuba as a result of

"OFAC's actions," and if those actions were overturned, Duke would reinstate its programs in

Cuba.  (Merkx Decl. ¶ 3.)  This same claim is made by Helen Stellmaker, the Coordinator of

Program Advising and Student Activities in the International and Off-Campus Studies Office at

St. Olaf Collage, and by Nancy Zingale, a Political Science Professor at the University of St.

Thomas.  (Stellmaker Decl. ¶ 3; Zingale Decl. ¶ 4.)  Plaintiffs also have submitted a letter from

Steven Knapp, Provost and Senior Vice President for Academic Affairs at Johns Hopkins, to the

Director of OFAC, which notes that the 2004 OFAC regulations "effectively terminate" Johns

Hopkins short-term academic programs in Cuba, and asks the agency to reconsider the

regulations so that Johns Hopkins may "continue offering [the] educationally valuable and

nationally important program."  (Ex. 1 to Pls.' Surreply [Knapp letter]; *see also* Gonzales Decl.

-14-

¶ 6 (stating that "the restrictions implemented by the Bush administration forced the cancellation of [Johns Hopkins' Cuban] academic exchange activities," and "[a]s a result, . . . the doors of access [to] . . . programs in Cuba have remained shut").)  These  factual statements and "their logic," which fairly support an inference that Johns Hopkins and other universities would reinstate their Cuban academic programs were the Court to repeal the 2004 amendments, allow plaintiffs to avoid the mere "unadorned speculation" that the D.C. Circuit found to be fatal in *National Wrestling Coaches* and *Renal Physicians Ass'n*.  *Nat'l Wrestling Coaches*, 366 F.3d at 943 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976)).

Furthermore, in both *National Wrestling Coaches* and *Renal Physicians Ass'n* there was evidence that the harm plaintiffs complained of would not necessarily be abated in the absence of the challenged regulations.  In *Renal Physicians Ass'n*, even if the safe harbor provisions were invalidated, the facilities would still need to ensure that they paid no more than fair market value for physician referrals, and the safe harbor provision had already identified a simple method of doing so that was acceptable to the regulating agency.  *Renal Physicians Ass'n*, 2007 WL 1671676, at *10.  In other words, "the word [was] already out," and the Court found it likely that facilities would continue to rely on the calculations provided for in the safe harbor provision, as they enjoyed implicit agency approval.  *Id.*  Similarly, in *National Wrestling Coaches*, even without the challenged regulation, universities would still be obligated to comply with Title IX, and "the independent desire of colleges to balance their athletic programs worked to hold in place changes that might have been influenced at the outset by the Department of Education's policies."  *Id.* (citing *Nat'l Wrestling Coaches*, 366 F.3d at 939-40).  In this case, there is no reason to even suppose that Johns Hopkins or other universities would not reinstate their

-15-

academic programs in Cuba should the 2004 amendments be repealed.

In sum, the Court finds that plaintiffs have alleged "facts from which it reasonably could be inferred that, absent the [challenged policy], there is a substantial probability that . . . if the court affords the relief requested, the asserted [injury] will be removed." *Warth*, 422 U.S. at 504. Accordingly, plaintiffs Wakefield and Smith,[6] and therefore plaintiff ECDET as well, have met their burden at this stage of the litigation of establishing Article III standing. The Court will therefore turn to the merits of plaintiffs' claims.

## II.    First Amendment

Plaintiffs argue that the "amendments to 31 C.F.R. § 515.565 violate plaintiffs' rights of academic freedom and association as guaranteed by the First Amendment because they dictate, directly and indirectly, to the faculties[] and students of United States colleges and universities who may teach, who may attend, what may be taught and how it should be taught." (1st Am. Compl. ¶ 34.) Plaintiffs further argue that the "First Amendment right to academic freedom simply cannot be curtailed for so-called foreign policy considerations, at least not without . . . a demonstration . . . that such curtailment was 'supported by the weightiest considerations of national security.'" (Pls.' Opp'n at 44 (quoting *Zemel v. Rusk*, 381 U.S. 1, 16 (1965)).) The parties needlessly debate the question of whether there is a First Amendment right to academic

---

[6]Defendants also argue that plaintiffs seek to assert the rights of the universities, rather than their own rights, and that their claims must therefore be dismissed under the prudential limitations to third-party standing. However, plaintiffs Smith and Wakefield have each alleged a sufficient injury-in-fact, and the Court is satisfied that these plaintiffs are asserting injuries to their own rights and not "rest[ing] [their] claim[s] to relief on the legal rights or interests of third parties." *See Warth*, 422 U.S. at 499. Plaintiffs' complaints therefore fall within "the zone of interests to be protected . . . by the . . . constitutional guarantee[s] in question." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 475 (1982).

freedom, and if so, whether that right that inheres in the individual, as opposed to the institution. (*See* Defs.' Mem. at 36-39; Pls.' Opp'n at 27-29.)  For even assuming that plaintiffs possess a First Amendment right to academic freedom, the law is clear that it is not unconstitutionally infringed by the regulations at issue here, as the 2004 CARC restrictions are content neutral and supported by an "important" and "substantial" governmental interest.  *Walsh v. Brady*, 927 F.2d 1229, 1235 (D.C. Cir. 1991).

"The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. . . . Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. CCNV*, 468 U.S. 288, 293 (1984)).  OFAC's regulations are justified by the goal of "deny[ing] the Castro government hard currency which could be used for purposes inimical to the interests of the United States" (*see* Szubin Decl. ¶¶ 14, 16) and "hasten[ing] Cuba's transition to a free and open society," 69 Fed. Reg. 33768, not by reference to what or how professors teaching short-term academic programs for U.S. institutions in Cuba may teach their students.  Indeed, the regulations place no restrictions on what universities and their professors may teach their students about Cuba -- they merely restrict them in limited circumstances from teaching students in Cuba.  Thus, there can be no question that the 2004 CARC amendments are content neutral, and only incidentally, if at all, burden plaintiffs' First Amendment rights.  *See Capital Cities/ABC v. Brady*, 740 F. Supp. 1007, 1013-14 (S.D.N.Y. 1990) (holding that the CACR restrictions are not "content-based discriminatory restrictions").

The Supreme Court has made it clear that when it has spoken "of 'academic freedom'

and the right to determine on 'academic grounds who may teach,' the Court was speaking in reaction to content-based regulation," *Univ. of Pa. v. EEOC*, 493 U.S. 182, 197 (1990), and the "so-called" academic freedom doctrine applies only to government efforts "to control or direct the *content* of the speech engaged in by the university or those affiliated with it." *Id.* (emphasis in original). For this reason, the cases relied on by plaintiffs -- *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), and *Keyishian v. Board of Regents*, 385 U.S. 589 (1967) -- are inapposite, for they were explicitly distinguished by the Supreme Court in *University of Pennsylvania v. EEOC* as dealing with content-based regulations.[7]

Moreover, plaintiffs' argument that any infringement on their First Amendment right to academic freedom must be "supported by the weightiest considerations of national security" is simply incorrect. (Pls.' Opp'n at 44.) The proper standard under which to evaluate content-neutral restrictions that incidentally burden speech is the intermediate scrutiny test announced in *United States v. O'Brien*, 391 U.S. 367, 377 (1968). Under *O'Brien*, "content-neutral regulations that have an incidental effect on First Amendment rights will be upheld if they further 'an important or substantial governmental interest.'" *Walsh*, 927 F.2d at 1235 (quoting *O'Brien*, 391 U.S. at 377) (rejecting a plaintiff's First Amendment "newsgathering" challenge to travel restrictions to Cuba). And the D.C. Circuit has previously held that "the interest in denying hard currency to embargoed countries such as Cuba is 'important' and 'substantial.'" *Id.*

_____

[7]The other cases relied on by plaintiffs to support their academic freedom claims are also distinguishable because the challenged government actions at issue were not content and/or viewpoint neutral. *See Wieman v. Updegraff*, 344 U.S. 183 (1952) (invalidating a statute that required state employees, including teachers, to take a loyalty oath forswearing communism); *Fowler v. Bd. of Educ.*, 819 F.2d 657 (6th Cir. 1987) (suit challenging a teacher's discharge for allegedly unbecoming conduct in showing film containing violence and nudity to her high school class).

Indeed, similar content-neutral restrictions on travel to Cuba and other countries have consistently been upheld in the face of First Amendment challenges. *See, e.g.*, *Zemel*, 381 U.S. at 16-17 (rejecting appellant's argument that there is a First Amendment right involved in the Secretary of State's refusal to validate passports for Cuba, while recognizing that the ban "render[ed] less than wholly free the flow of information" about Cuba); *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1441 (9th Cir. 1996) (rejecting First Amendment claim that the CACR restrictions on educational travel infringed plaintiff's "right to gather firsthand information about Cuba"); *Clancy v. OFAC*, No. 05-C-580, 2007 WL 1051767, at *16 (E.D. Wis. 2007) (rejecting a First Amendment challenge to restrictions on travel to Iraq because "the challenged infringement of First Amendment freedoms [was] permissible as incidental to the proper, important, and substantial general purpose of the regulations"). Accordingly, plaintiffs' First Amendment claims fail as a matter of law.

## III.    Fifth Amendment

Plaintiffs also assert that the "amendments to 31 C.F.R. § 515.565 restrict and burden plaintiffs' Fifth Amendment liberty interest in organizing, teaching and participating in educational programs conducted abroad by United States institutions of higher learning." (1st Am. Compl. ¶ 36.) The Fifth Amendment, they argue, guarantees a right to international travel which cannot be infringed absent justification by a "convincing[] . . . national security threat." (Pls.' Opp'n at 43; Pls.' Surreply at 9.) This argument is simply wrong.

The Supreme Court has indeed recognized a right to travel protected by the Constitution, *see, e.g.*, *Saenz v. Roe*, 526 U.S. 489, 501-03, (1999), but it has expressly distinguished between domestic and international travel, according less importance to the latter. *See Haig v. Agee*, 453

U.S. 280, 306 (1981) ("The Court has made it plain that the *freedom* to travel outside the United

States must be distinguished from the *right* to travel within the United States." (emphasis in

original); *Regan v. Wald*, 468 U.S. 222, 241 n.25 (1984) ("In *Kent*, the constitutional right to

travel within the United States and the right to travel abroad were treated indiscriminately.  That

position has been rejected in subsequent cases." (citation omitted)).  Accordingly, courts have

held that "[g]iven the lesser importance of th[e] freedom to travel abroad, the Government need

only advance a rational, or at most an important, reason" for restricting such travel.  *Freedom to

Travel Campaign*, 82 F.3d at 1439.

        Just as in the First Amendment context, restrictions on travel to Cuba and other countries

have repeatedly been upheld in the face of Fifth Amendment challenges.  In *Regan v. Wald*, 468

U.S. 222 (1984), plaintiffs challenged the CACR's restrictions on travel to Cuba, arguing "their

enforcement violate[d] [their] right to travel guaranteed by the Due Process Clause of the Fifth

Amendment."  *Id.* at 240.  Relying on *Zemel*, 381 U.S. at 13, where the Court sustained against a

Fifth Amendment attack "a refusal by the Secretary of State to validate the passports of United

States citizens for travel to Cuba," *Regan*, 468 U.S. at 241, the *Regan* Court held that "there

[wa]s an adequate basis under the Due Process Clause of the Fifth Amendment to sustain the

President's decision to curtail the flow of hard currency to Cuba . . . by restricting travel."[8]  *Id.* at

---

        [8]Plaintiffs rely exclusively on two cases to support their Fifth Amendment claims, *Kent v.
Dulles*, 357 U.S. 116 (1958) and *Aptheker v. Sec. of State*, 378 U.S. 500 (1964), both of which
were qualified by the Supreme Court in *Zemel*, 381 U.S. at 17, and *Regan*, 468 U.S. at 240-41.
Both *Kent* and *Aptheker* involved government efforts to "selectively" restrict travel "on the basis
of political belief or affiliation."  *Regan*, 468 U.S. at 241.  Therefore, they are inapplicable to
cases such as this one, where the challenged regulation imposes travel restrictions of general
applicability based on "foreign policy considerations affecting all citizens."  *Id.* (quoting *Zemel*,
381 U.S. at 13).

243; *see also Freedom to Travel Campaign*, 82 F.3d at 1439 (upholding CACR restrictions on educational travel to Cuba against a Fifth Amendment challenge based on the "important, substantial, and even vital" goal of restricting the flow of hard currency into Cuba (internal quotation marks omitted)); *Clancy*, 2007 WL 1051767, at * 12 (relying on *Zemel* and *Regan* to reject a Fifth Amendment challenge to restrictions on travel to Iraq, and noting that "[t]he foreign policy implications of [the restrictions] and the presumptive constitutionality of travel restrictions outweigh any countervailing interest of [the plaintiff] in international travel").

Plaintiffs incorrectly argue that the Supreme Court's decisions upholding travel restrictions in both *Zemel* and *Regan* were premised on the demonstration of "'weighty concerns' of foreign policy that rest on national security considerations." (Pls.' Surreply at 10.) The *Regan* Court, however, explicitly rejected the notion that "only a Cuban missile crisis in the offing w[ould] make area restrictions on international travel constitutional" and confirmed that the holding in *Zemel* "was not tied to the Court's independent foreign policy analysis." *Regan*, 468 U.S. at 242. There is therefore no basis for plaintiffs' invocation of a "national security" standard as a prerequisite to restrictions on international travel. To the contrary, *Regan* recognized that the courts owe a substantial measure of "deference to the political branches in matters of foreign policy." *Regan*, 468 U.S. at 242 ("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952))).

Because the government has advanced an "important" and "substantial" reason for the CARC educational travel restrictions (*i.e.*, the denial of U.S. currency to the Castro government),

*Walsh*, 927 F.2d at 1235, and because of the "classical deference" owed to the political branches

of government in the realm of foreign affairs, *Regan*, 468 U.S. at 242, plaintiffs' Fifth

Amendment challenge to the 2004 CACR amendments must be rejected.

## IV.    Administrative Procedures Act

Lastly, plaintiffs challenge the 2004 amendments to § 515.565 under the APA.  Because

OFAC is the agency charged with administering the CACR under TWEA, *see* 31 C.F.R. §

515.802, "a challenge to its interpretation must either demonstrate that the statute clearly forbids

the agency's interpretation or that the interpretation is unreasonable."  *Consarc Corp. v. U.S.*

*Treasury Dep't*, 71 F.3d 909, 914 (D.C. Cir. 1995) (citing *Chevron U.S.A. Inc. v. NRDC*, 467

U.S. 837, 843-44 (1984)).  Plaintiffs make both arguments:  that the restrictions on educational

travel "are not rationally related to the purpose of [TWEA] and are arbitrary, capricious and

otherwise not in accordance with law" (1st Am. Compl. ¶ 31), and that the amendments were

undertaken "in contravention of the will of Congress" because OFAC's authority to restrict

educational travel to Cuba was curtailed or "preempted" by the Free Trade in Ideas Act of 1994

("FTIA"), Pub. L. No. 103-236 § 525 (codified at 50 U.S.C. App. § 5(b)(4)), and the Trade

Sanctions Reform and Export Enhancement Act of 2000 ("TSRA"), 22 U.S.C. § 7209.  (1st Am.

Compl. ¶ 32; Pls.' Opp'n at 40; Pls.' Surreply at 6.)  Both arguments are lacking in merit.

First, it is clear that the regulations at issue are not foreclosed by the FTIA or the TSRA.

The TSRA prohibits the Secretary of the Treasury from authorizing "travel-related transactions"

with Cuba "for tourist activities." 22 U.S.C. § 7209(b)(1).  The regulations interpreting the

statute exclude "[e]ducational activities" from the definition of "tourist activities" under the

TSRA, *see* 31 C.F.R. § 515.560, but that exclusion does *not* lead to the conclusion that OFAC

may never restrict education-related travel to Cuba.  As for the FTIA, which amended TWEA to

restrict the President's authority to regulate the import and export of certain informational

materials such as films and photographs, *see* 50 U.S.C. App. § 5(b)(4), plaintiffs point to

Congress's prefatory language, which stated that: "It is the sense of the Congress that the

President should not restrict travel or exchanges for informational, educational, religious,

cultural, or humanitarian purposes or for public performances or exhibitions, between the United

States and any other country."  Pub. L. No. 103-236 § 525(a).  (*See* Pls.' Opp'n at 15, 41.)

Courts have repeatedly held that such "sense of Congress" language is merely precatory and

non-binding.  *See, e.g.*, *Yang v. Cal. Dep't of Soc. Servs.*, 183 F.3d 953, 958 (9th Cir. 1999);

*Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 994-95 (1st Cir. 1992); *Trojan*

*Tech., Inc. v. Commonwealth of Pa.*, 916 F.2d 903, 909 (3rd Cir. 1990).  And nothing in the

mandatory provisions of the statute itself prohibits OFAC from regulating travel to Cuba under

TWEA.[9]  *See* 50 U.S.C. App. § 5(b)(4); *cf. Murphy v. I.R.S.*, No. 05-5139, 2007 WL 1892238, at

*9 (D.C. Cir. July 3, 2007) ("[A]mendments by implication, like repeals by implication, are

disfavored." (citing *United States v. Welden*, 377 U.S. 95, 103 n. 12 (1964); *Cheney R.R. Co. v.*

*R.R. Ret. Bd.*, 50 F.3d 1071, 1078 (D.C. Cir. 1995))).  Plaintiffs' argument regarding these two

statutes, therefore, fails to demonstrate that OFAC was acting "in contravention of the will of

---

[9]If Congress had wished to repeal the Executive's authority to restrict travel under TWEA, it could have done so explicitly.  The FTIA amended not only TWEA, but also simultaneously amended the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1702(b).  With respect to IEEPA, Congress *did* explicitly restrict the President's authority to regulate transactions "ordinarily incident to travel."  Pub. L. No. 103-236 § 525(c)(1).  The corresponding House of Representatives Conference Report confirmed that "[b]ecause the embargoes on Cuba and North Korea are imposed not under IEEPA but under TWEA, this change would . . . not apply to either of those embargoes."  H.R. Conf. Rep. 103-482, at 240, *reprinted in* 1994 U.S.C.C.A.N. 398, 483.

Congress" when it promulgated the 2004 CACR amendments.

Because Congress "has [not] directly spoken to the precise question at issue," OFAC's regulation is entitled to the full measure of deference set forth in *Chevron*.  467 U.S. at 842; *see also Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("If the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory construction.").  OFAC based the 2004 amendments on the extensive findings and recommendations of an interagency commission.  *See* 69 Fed. Reg. 33768.  Given the conclusions of the Commission that the educational travel provisions of the CACR were being abused by some travelers and educational institutions as "disguised tourism," thereby contributing to a flow of U.S. tourism dollars to Cuba (A.R. at 61-63), OFAC's restrictions on the duration of U.S. academic programs in Cuba and who may participate in them are rationally related to TWEA's grant of authority to the Executive to "investigate, regulate, . . . prevent or prohibit, any . . . use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or . . . transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. App. § 5(b)(1)(B).

Plaintiffs lament that the conclusions reached by the Commission were "conclusory" and influenced by "electoral concerns."  (Pls.' Opp'n at 9-12; 15.)  However, plaintiffs' disagreement with the Commission's findings and recommendations does not cause OFAC's reliance on them to be arbitrary and capricious.  Plaintiffs also argue that the CACR's restrictions on academic travel are "non-economic" in nature, and therefore that they are not rationally related to TWEA,

which "has a purely economic purpose." (1st Am. Compl. ¶ 31.)  It is clear, however, that such

restrictions on travel are unquestionably economic regulations.  *See Walsh*, 927 F.2d at 1235

(upholding the CACR's restrictions on travel to Cuba because of its "important" and

"substantial" goal of "denying hard currency to embargoed countries such as Cuba"); *Freedom*

*to Travel Campaign*, 82 F.3d at 1439 (noting that "[t]he purpose of the [Cuban] travel ban is the

same now as it has been since the ban was imposed almost 35 years ago -- to restrict the flow of

hard currency into Cuba").  And to the extent that plaintiffs base their APA challenge on the

assertion that the 2004 amendments "den[ied] U.S. professors and students their constitutional

rights to teach and study in Cuba" (Pls.' Opp'n at 34-35), such claims cannot stand, for as the

Court has already determined, no constitutional rights have been unlawfully infringed in this

case.

        In short, OFAC's interpretation of TWEA set forth in the 2004 amendments to the CACR

is not arbitrary or capricious and must be upheld under *Chevron* as a reasonable interpretation of

the statute.[10]  Accordingly, plaintiffs' APA challenge cannot survive.

---

        [10]Though the application of *Chevron* deference alone is sufficient to uphold the
regulations, it should also be noted that the regulations at issue here are entitled to an even
greater measure of deference because they relate to the exercise of the Executive's authority in
the realm of foreign affairs.  *See, e.g.*, *Jama v. Immigration & Customs Enforcement*, 543 U.S.
335, 348 (2005) (noting a "customary policy of deference to the President in matters of foreign
affairs"); *Regan*, 468 U.S. at 242 ("Matters relating 'to the conduct of foreign relations . . . are so
exclusively entrusted to the political branches of government as to be largely immune from
judicial inquiry or interference.'" (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589
(1952))); *cf. Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981) ("[B]oth the legislative history
and cases interpreting the TWEA fully sustain the broad authority of the Executive when acting
under this congressional grant of power.").

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is granted, and plaintiffs' claims are dismissed with prejudice.  A corresponding Order accompanies this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge


Date: July 30, 2007